**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

JANE DOE 1; JOHN DOE 1; JOHN MINOR
DOE 1, by and through his next friend, Jane
Doe 1; JOHN DOE 2; JOHN MINOR DOE 2, by
and through his next friend, John Doe 2; JANE
DOE 3; JOHN DOE 3; JANE MINOR DOE 3,
by and through her next friend, Jane Doe 3;
JANE DOE 4; JOHN DOE 4; JANE MINOR
DOE 4, by and through her next friend, Jane Doe
4; JANE DOE 5; JOHN DOE 5; JOHN MINOR
DOE 5, by and through his next friend, Jane Doe
5; JANE DOE 6; JOHN DOE 6; JANE MINOR
DOE 6, by and through her next friend, Jane Doe
6; JANE DOE 7; JOHN DOE 7; and JANE
MINOR DOE 7, by and through her next friend,
Jane Doe 7,

> *Plaintiffs*,

> v.

WILLIAM C. THORNBURY, JR., MD, in his
official capacity as the President of the Kentucky
Board of Medical Licensure; AUDRIA
DENKER, RN, in her official capacity as the
President of the Kentucky Board of Nursing; and
ERIC FRIEDLANDER, in his official capacity as
the Secretary of the Cabinet for Health and Family
Services,

> *Defendants*.

**COMPLAINT**

Civil No. ___3:23CV-230-RGJ

Plaintiffs,[1] by and through their attorneys, bring this Complaint against the above-named

Defendants, and state the following in support thereof:

---

[1]    Plaintiffs have filed a separate motion to proceed using these pseudonyms, rather than their legal names, in order to protect their privacy regarding the minor plaintiffs' transgender status and their medical condition and treatment.

1

## PRELIMINARY STATEMENT

1.       On March 29, 2023, the Kentucky legislature voted to override Governor Andy Beshear's veto and enacted Senate Bill 150, which bans medical care for transgender minors (the "Health Care Ban" or "Ban").[2]  Absent intervention by this Court, the Ban will go into effect on June 29, 2023, disrupting and/or preventing medical care for the minor Plaintiffs and other adolescents across Kentucky.  The Ban violates the constitutional rights of Kentucky adolescents and their parents, and—if it goes into effect—will cause severe and irreparable harm.

2.       Gender dysphoria is a serious medical condition characterized by clinically significant distress caused by incongruence between a person's gender identity and the sex they were designated at birth.  Every major medical association in the United States recognizes that adolescents with gender dysphoria may require medical interventions to treat severe distress.  Specifically, for some transgender adolescents, puberty-delaying treatment and, for older adolescents, hormone therapy, are medically indicated to alleviate severe distress associated with gender dysphoria.  In providing this medically necessary healthcare, medical providers are guided by widely accepted protocols for assessing and treating transgender adolescents.

3.       The Ban interferes with parents' ability to obtain this established treatment for their transgender adolescent children by prohibiting health care providers, including doctors, nurse practitioners, nurses, and physician assistants, among others, from prescribing or administering medications "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's

---

[2]       While S.B. 150 also governs bathroom policies and sexual education in schools, Plaintiffs' claims here relate solely to Section 4(2)(a) and (b) of S.B. 150, which bans the prescription and/or administration of puberty blockers and hormone therapy for transgender adolescents.

sex" at birth—that is, when used to provide transition-related care to a transgender adolescent. S.B. 150 § 4.

4.      If the Ban goes into effect, it will have devastating consequences for the transgender Plaintiffs, their families, and other transgender adolescents and their families in Kentucky.  The Ban will deprive the transgender Plaintiffs and other transgender adolescents of medical care that their doctors and parents agree is medically necessary.  Untreated gender dysphoria is associated with severe psychological and emotional harm including anxiety, depression, and suicidality. Disrupting or denying medically needed care will inevitably cause Plaintiffs and other vulnerable adolescents significant, irreparable harm.

5.      Plaintiffs seek relief from this Court.

**A.      Transgender Plaintiffs and Their Parent Plaintiffs**

**i.      The Doe 1 Family**

6.      Plaintiffs Jane Doe 1 and John Doe 1 reside in Jefferson County, Kentucky.  They are the parents of Plaintiff John Minor ("JM") Doe 1, their twelve-year-old son.  JM Doe 1 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 1 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through his mother, Jane Doe 1. Plaintiffs JM Doe 1, Jane Doe 1, and John Doe 1 seek to proceed in this case under pseudonyms to protect JM Doe 1's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 1]'s transgender status and [his] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. 2019).[3]

---

[3] For each Plaintiff, *see also* Plaintiffs' forthcoming Motion to Proceed Pseudonymously.

### ii.      The Doe 2 Family

7.      Plaintiff John Doe 2 resides in the Eastern District of Kentucky.  John Doe 2 is the father of Plaintiff JM Doe 2, a fifteen-year-old boy.  JM Doe 2 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 2 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through his father, John Doe 2.  Plaintiffs JM Doe 2 and John Doe 2 seek to proceed in this case under pseudonyms to protect JM Doe 2's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 2]'s transgender status and [his] diagnosed medical condition—gender dysphoria."  *Foster*, 2019 WL 329548, at *2.

### iii.      The Doe 3 Family

8.      Plaintiffs Jane Doe 3 and John Doe 3 reside in Jefferson County, Kentucky.  They are the parents of Plaintiff Jane Minor (also "JM") Doe 3, their ten-year-old daughter.  JM Doe 3 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 3 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through her mother, Jane Doe 3.  Plaintiffs JM Doe 3, Jane Doe 3, and John Doe 3 seek to proceed in this case under pseudonyms to protect JM Doe 3's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 3]'s transgender status and [her] diagnosed medical condition—gender dysphoria."  *Foster*, 2019 WL 329548, at *2.

### iv.      The Doe 4 Family

9.      Plaintiffs Jane Doe 4 and John Doe 4 reside in the Eastern District of Kentucky.  They are the parents of Plaintiff JM Doe 4, their fourteen-year-old daughter.  JM Doe 4 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 4 sues pursuant to Federal Rule of Civil Procedure 17(c), by and

through her mother, Jane Doe 4.  Plaintiffs JM Doe 4, Jane Doe 4, and John Doe 4 seek to proceed in this case under pseudonyms to protect JM Doe 4's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 4]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster*, 2019 WL 329548, at *2.

### v.      The Doe 5 Family

10.     Plaintiffs Jane Doe 5 and John Doe 5 reside in the Eastern District of Kentucky. They are the parents of Plaintiff JM Doe 5, their sixteen-year-old son.  JM Doe 5 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 5 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through his mother, Jane Doe 5.  Plaintiffs JM Doe 5, Jane Doe 5, and John Doe 5 seek to proceed in this case under pseudonyms to protect JM Doe 5's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 5]'s transgender status and [his] diagnosed medical condition—gender dysphoria." *Foster*, 2019 WL 329548, at *2.

### vi.      The Doe 6 Family

11.     Plaintiffs Jane Doe 6 and John Doe 6 reside in Jefferson County, Kentucky.  They are the parents of Plaintiff JM Doe 6, their thirteen-year-old daughter.  JM Doe 6 is transgender and is currently receiving medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 6 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through her mother, Jane Doe 6.  Plaintiffs JM Doe 6, Jane Doe 6, and John Doe 6 seek to proceed in this case under pseudonyms to protect JM Doe 6's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature,

specifically [JM Doe 6]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster*, 2019 WL 329548, at *2.

> ### vii.        The Doe 7 Family

12.     Plaintiffs Jane Doe 7 and John Doe 7 reside in the Western District of Kentucky. They are the parents of Plaintiff JM Doe 7, their nine-year-old daughter.  JM Doe 7 is transgender and anticipates needing to receive medically necessary care that will be prohibited by the Ban when it goes into effect.  JM Doe 7 sues pursuant to Federal Rule of Civil Procedure 17(c), by and through her mother, Jane Doe 7.  Plaintiffs JM Doe 7, Jane Doe 7, and John Doe 7 seek to proceed in this case under pseudonyms to protect JM Doe 7's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [JM Doe 7]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster*, 2019 WL 329548, at *2.

## B.    Defendants

13.     Defendant William C. Thornbury, Jr., MD, is the President of the Kentucky Board of Medical Licensure ("KBML").  The KBML is responsible for "all medical and osteopathic licensure functions" in the State.  Ky. Rev. Stat. Ann. § 311.530(1).  In his official capacity, Defendant Thornbury, along with other members of the KBML, has the power to license, regulate, and discipline health care providers within the State of Kentucky.  Ky. Rev. Stat. Ann. § 311.565. The KBML is headquartered at 310 Whittington Parkway, Suite 1B, Louisville, KY 40222.  The Ban provides that "a licensing or certifying agency for health care provider . . . shall revoke . . . the licensure or certification" of a health care provider who provides care the Ban prohibits.  S.B. 150 § 4(4).  Defendant Thornbury is sued in his official capacity.

14.     Defendant Audria Denker, RN, is the President of the Kentucky Board of Nursing ("KBN").  The KBN is responsible for all nursing licensure functions in the State.  Ky. Rev. Stat.

Ann. § 314.131(2). In her official capacity, Defendant Denker, along with other members of the KBN, has the power to license, regulate, and discipline nurses within the State of Kentucky. *Id.* The KBN is headquartered at 312 Whittington Parkway, Suite 300, Louisville, KY 40222. The Ban provides that "a licensing or certifying agency for health care provider . . . shall revoke . . . the licensure or certification" of a health care provider who provides care the Ban prohibits. S.B. 150 § 4(4). Defendant Denker is sued in her official capacity.

15.     Defendant Eric Friedlander is the Secretary for the Cabinet of Health and Family Services ("Cabinet"). In his capacity as secretary of the Cabinet, Defendant Friedlander is charged with overseeing the licensure of health care facilities in the State. Ky. Rev. Stat. Ann. § 216B.042; *see also* Ky. Rev. Stat. Ann. §216B.105. The Cabinet is headquartered at 275 E. Main St., Frankfort, KY 40621. The Ban provides that "a licensing or certifying agency for health care provider . . . shall revoke . . . the licensure or certification" of a health care provider who provides care the Ban prohibits. S.B. 150 § 4(4). Defendant Friedlander is sued in his official capacity.

## JURISDICTION AND VENUE

16.     Plaintiffs assert claims under 42 U.S.C. § 1983 for the deprivation of their constitutional rights and for violations of Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. This Court has subject -matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17.     This Court has personal jurisdiction over Defendants because Defendants are domiciled in Kentucky and the denial of Plaintiffs' rights guaranteed by federal law occurred within Kentucky.

18.     All Defendants reside in Kentucky, and, upon information and belief, Defendant Thornbury and Denker reside in this judicial district. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1). If enforced, the Ban will violate the federal statutory and

constitutional rights of Plaintiffs in this judicial district.  Therefore, venue is also proper in this district pursuant to 28 U.S.C § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.     Gender Identify and Gender Dysphoria**

19.      Gender identity is an essential element of human identity and a well-established concept in medicine. Everyone has a gender identity.  Most people's gender identity is consistent with their birth sex.  Transgender people, however, have a gender identity that differs from their birth sex.  Being made to live in conflict with a person's gender identity causes discomfort and distress which can interfere with a person's ability to function in a productive and healthy way.

20.     Gender dysphoria is the clinical diagnosis for the distress that arises when a transgender person cannot live consistent with their gender identity.  To be eligible for a diagnosis of gender dysphoria, a young person must meet the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (DSM-5-TR) (DSM-5 released in 2013 and DSM-5-TR released in 2022) (the "DSM-5").[4]  If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

21.     Fifty-six percent of transgender youth have reported a previous suicide attempt and 86 percent have reported suicidality.  *See* Austin, Ashley, et al. "Suicidality among Transgender

---

[4]      Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 notes that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*." DSM-5.  Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Diverse Individuals* (2012), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

Youth: Elucidating the Role of Interpersonal Risk Factors." *Journal of Interpersonal Violence*, vol. 37, no. 5-6, 2020, https://doi.org/10.1177/0886260520915554.

22.     In the past, mental health professionals have attempted to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms.  Today, the medical profession recognizes that such efforts put transgender adolescents at risk of profound harm, including dramatically increased rates of suicidality.

23.     Gender dysphoria is highly treatable.  Health care providers who specialize in the treatment of gender dysphoria follow well-established standards of care and clinical practice guidelines that have been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

24.     The standards of care for treatment of transgender people, including transgender adolescents, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of its standards of care for the treatment of gender dysphoria in minors and adults in 2022, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("SOC 8").  Coleman, E., et al. "Standards of Care for the

Health of Transgender and Gender Diverse People, Version 8." *International Journal of Transgender Health*, vol. 23, no. 1, 2022, https://doi.org/10.1080/26895269.2022.2100644.

25.     The SOC 8 is based upon a rigorous and methodological evidence-based approach. Its recommendations are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus.  The SOC 8 incorporates recommendations on clinical practice guideline development from the National Academies of Medicine and the World Health Organization.

26.     The SOC 8's recommendations were graded using a modified GRADE (Grading of Recommendations, Assessment, Development, and Evaluations) methodology considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

27.     The Endocrine Society has also promulgated a similar standard of care and clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Hembree, Wylie C, et al. "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline." *The Journal of Clinical Endocrinology & Metabolism*, vol. 102, no. 11, 2017, pp. 3869–3903., https://doi.org/10.1210/jc.2017-01658.

28.     The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care and clinical practice guidelines, which are comparable to guidelines that those professional medical organizations use to treat other conditions.

29.     The treatment of gender dysphoria is designed to reduce a transgender person's clinically significant distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as "transition" or "gender transition."  There are several components to the gender transition process.

30.     The precise treatment of gender dysphoria depends on an individualized assessment of a patient's needs.

31.     Social transition involves a transgender person taking measures to live in accordance with their gender identity in all aspects of life.  For transgender boys, it means living fully as a boy; for transgender girls, it means living fully as a girl.  Social transition can include adopting a name, pronouns, hairstyle, and clothing consistent with the person's gender identity. The steps a transgender person takes as part of their social transition help align their gender identity with all aspects of everyday life.

32.     Gender transition may also involve taking prescribed medications, puberty blockers, and hormones, to bring a person's body into alignment with their gender identity.

33.     Before beginning puberty, transgender children are not prescribed medications for the purpose of treating their gender dysphoria.

34.     For a transgender adolescent who has begun puberty, puberty blocking medication prevents the patient from going through the physical developments associated with puberty that exacerbate the distress experienced by the incongruence between the patient's gender identity and body.  As such, under the WPATH Standards of Care and clinical practice guidelines, puberty blocking medication may become medically necessary and appropriate after a transgender adolescent reaches puberty to minimize or prevent the exacerbation of gender dysphoria and the permanent physical changes that puberty would cause.  In providing medical treatments to

adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in the diagnosis and treatment of gender dysphoria. The effects of puberty delaying treatment are reversible once the treatment is discontinued.

35.     For older transgender adolescents, hormone therapy may also be medically necessary to bring their body into alignment with their gender identity and further treat the gender dysphoria they may experience without treatment.

36.     The treatment for gender dysphoria is effective. Longitudinal studies have shown that transgender adolescents with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender adolescents. Durwood, Lily et al. "Mental Health and Self-Worth in Socially Transitioned Transgender Youth." *Journal of the American Academy of Child and Adolescent Psychiatry*, vol. 56, no. 2 (2017): 116-123.e2. doi:10.1016/j.jaac.2016.10.016; Olson, Kristina R et al. "Mental Health of Transgender Children Who Are Supported in Their Identities." *Pediatrics*, vol. 137, no. 3 (2016): e20153223. doi:10.1542/peds.2015-3223. Access to puberty blocking medications during adolescence is associated with lower rates of suicide in transgender individuals. Turban, Jack L., et al. "Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation." *Pediatrics*, vol. 145, no. 2 (2020): https://doi.org/10.1542/peds.2019-1725. In contrast, transgender adolescents with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression. *Id.*

**B.     S.B. 150 And The Ban**

37.     On March 29, 2023, the Kentucky legislature voted to override Governor Andy Beshear's veto and enact Senate Bill 150. Absent intervention by this Court, the Ban will go into effect on June 29, 2023.

38.     The Ban prevents healthcare professionals from providing well-established medically necessary care.

39.     Specifically, in relevant part, Section 4, Subsection 2 of the Ban provides that:

> Except as provided in subsection (3) of this section, a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:
>
> > (a) Prescribe or administer any drug to delay or stop normal puberty;
> >
> > (b) Prescribe or administer testosterone, estrogen, or progesterone, in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex;[5]

40.     The Ban states that healthcare professionals who violate Section 4, Subsection 2 will have their licenses revoked by the appropriate regulatory agency.  S.B. 150 § 4.  It also allows private parties to initiate a "civil action to recover damages for injury suffered as a result of a violation."  *Id.* § 5.

41.     As a result of the Ban, health care providers, including doctors, nurse practitioners, nurses, and physician assistants, will be precluded from providing—and transgender adolescents in Kentucky, with the consent of their parents, will be prevented from accessing—medically necessary treatment.

42.     The Ban thus prohibits well-established treatments for gender dysphoria in transgender adolescents, including puberty delaying treatment and hormone therapy (testosterone for transgender boys, and estrogen and testosterone suppressants for transgender girls), because these medications are provided for the purpose of "validat[ing] a minor's" gender identity.  S.B.

---

[5]     Plaintiffs' challenge here relates solely to sections 4(2)(a) and (b) of the Ban, which if permitted to go into effect will restrict the Transgender Plaintiffs' access to puberty blockers and hormone therapy.  Plaintiffs' challenge here does not relate to sections 4(2)(c), (d), or (e) of legislation, which regulate surgical procedures.

150 § 4.  The Ban however would permit medical providers to prescribe and administer the same medications for any other purpose to non-transgender patients.  *Id.*

43.     These medications are proven safe and effective and are commonly used to treat adolescents not only for gender dysphoria, but for a variety of other conditions.  For instance, puberty delaying medication is commonly used to treat central precocious puberty.  Central precocious puberty is the premature initiation of puberty by the central nervous system—before 8 years of age in people designated female at birth and before 9 years of age in people designated male.  When untreated, central precocious puberty can lead to the impairment of final adult height as well as antisocial behavior and lower academic achievement. The Ban permits puberty delaying treatment for central precocious puberty because it is not provided for purposes of "validat[ing] a minor's" gender identity.  S.B. 150 § 4.

44.     Likewise, the Ban prohibits hormone therapy when the treatment is used to treat transgender adolescents with gender dysphoria but allows the same hormone therapy when prescribed to non-transgender patients.

45.     For example, boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age.  Without testosterone, for most of these patients, puberty would eventually initiate naturally.  However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers.

46.     Likewise, girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen.  Moreover, girls with polycystic ovarian

syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.

47.     In each of these circumstances, as well as when prescribing these medications to treat gender dysphoria, doctors advise patients and their parents about the risks and benefits of treatment and tailor recommendations to the individual patient's needs.  For adolescents, parents must consent to treatment and the minor patient must give their assent.

## C.     The Ban Will Irreparably Harm the Plaintiffs

### i.     The Doe 1 Family

48.     JM Doe 1 is a twelve-year-old transgender boy who resides in Kentucky with his mom, Jane Doe 1, dad, John Doe 1, and siblings.

49.     When JM Doe 1 began puberty and started menstruating, he grew depressed and suicidal because of the mismatch between his body and his sense of himself as a boy.  In August 2022, JM Doe 1's parents took him to medical professionals who diagnosed him with gender dysphoria.  With Jane's and John's consent, JM Doe 1 began treatment for gender dysphoria, including menstrual suppression medication.  JoM Doe 1's treatment has considerably alleviated his depression.

50.     If the Ban goes into effect, JM Doe 1 will be unable to continue receiving medically necessary care as treatment for his gender dysphoria in Kentucky.

51.     JM Doe 1, Jane Doe 1, and John Doe 1 fear that JM Doe 1 will be irreparably harmed by not being able to continue receiving the medical care he needs because of the Ban, which will cause his severe gender dysphoria and related symptoms of depression and suicidality to return.

### ii.  The Doe 2 Family

52.     JM Doe 2 is a fourteen-year-old transgender boy who resides in Kentucky with his dad, John Doe 2.

53.     JM Doe 2 knew he was a boy from an early age.  Since at least the first grade, JM Doe 2 has preferred more masculine clothing and has wanted to be called by a masculine name. JM Doe 2's dad took him to medical professionals who diagnosed JM Doe 2 with gender dysphoria.

54.     JM Doe 2's feelings of dysphoria increased when he began puberty and started menstruating.  With John Doe 2's consent, JM Doe 2 was prescribed and began using medication to suppress menstruation and, later, testosterone patches.  These treatments improved JM Doe 2's overall wellbeing, significantly reducing his gender dysphoria and suicidality.

55.     If the Ban goes into effect, JM Doe 2 will be unable to continue receiving medically necessary care as treatment for his gender dysphoria in Kentucky.

56.     JM Doe 2 and John Doe 2 fear that the Ban will cause JM Doe 2 irreparable harm by preventing him from continuing to receive the care he needs to treat his gender dysphoria, which will cause his gender dysphoria and related symptoms of distress, depression, anxiety, and suicidality to return.

### iii.  The Doe 3 Family

57.     JM Doe 3 is a ten-year-old transgender girl who resides in Kentucky with her mom, Jane Doe 3, and dad, John Doe 3.

58.     JM Doe 3 has been consistent in her gender identity since a young age.  She started asking for "girl's" clothes when she was six; she grew out her hair and stopped using her birth name when she was eight.

59.     For most of her youth, JM Doe 3 also has struggled with symptoms of anxiety, which is commonly associated with gender dysphoria.  She first received counseling for anxiety when she was five.

60.     JM Doe 3 told her parents that she is a girl in March 2022.  With her parents' consent, JM Doe 3 was prescribed and began taking puberty blockers in January 2023.  In making this important medical decision, JM Doe 3's parents were and remain comforted by the knowledge that JM Doe 3's treatment is reversible.  These treatments have been essential to JM Doe 3's health, by making JM Doe 3's gender dysphoria and anxiety symptoms more manageable.

61.      If the Ban goes into effect, JM Doe 3 will be unable to continue receiving medically necessary care as treatment for her gender dysphoria in Kentucky.

62.     JM Doe 3, Jane Doe 3, and John Doe 3 fear that the Ban will cause JM Doe 3 irreparable harm by preventing her from continuing to receive the care she needs, which will cause her severe gender dysphoria and anxiety to return.

#### iv.     The Doe 4 Family

63.     Plaintiff JM Doe 4 is a fourteen-year-old transgender girl who resides in Kentucky. She splits her time between her mom, Jane Doe 4, and her dad, John Doe 4, who share custody of her.

64.     JM Doe 4 has always known she is a girl.  Her parents took her to medical professionals who diagnosed her with gender dysphoria.  With her parents' consent, she was prescribed and now takes estrogen.  This treatment has significantly reduced JM Doe 4's gender dysphoria and helped her feel more comfortable in her body.  Taking estrogen has provided JM Doe 4 with a comfort and joy that her parents had never seen in her before.

65.     If the Ban goes into effect, JM Doe 4 will be unable to continue receiving medically necessary care as treatment for her gender dysphoria in Kentucky.

66.     JM Doe 4, Jane Doe 4, and John Doe 4 fear that the Ban will cause JM Doe 4 irreparable harm by preventing her from continuing to receive the care she needs, which will cause her severe gender dysphoria to return.

### v.      The Doe 5 Family

67.     Plaintiff JM Doe 5 is a sixteen-year-old transgender boy who resides in Kentucky with his mom, Jane Doe 5, dad, John Doe 5, and a sibling.

68.     When JM Doe 5 was fourteen, he told his parents that he is a boy.  JM Doe 5's parents took him to healthcare professionals who diagnosed JM Doe 5 with gender dysphoria. After careful discussion with JM Doe 5 and his doctors, Jane Doe 5 and John Doe 5 allowed JM Doe 5 to begin taking medication to suppress menstruation and testosterone.  This treatment has improved JM Doe 5's symptoms of depression and anxiety.

69.     If the Ban goes into effect, JM Doe 5 will be unable to continue receiving medically necessary care as treatment for his gender dysphoria in Kentucky.

70.     JM Doe 5, Jane Doe 5, and John Minor Doe 5 fear that the Ban will cause JM Doe 5 irreparable harm by preventing him from continuing to receive the care he needs, which will cause his severe gender dysphoria, depression, and anxiety to return.

### vi.      The Doe 6 Family

71.     Plaintiff JM Doe 6 is a thirteen-year-old transgender girl who resides in Kentucky with her mom, Jane Doe 6, dad, John Doe 6, and a sibling.

72.     JM Doe 6 told her parents she is a girl when she was eleven.  Jane Doe 6 and John Doe 6 took JM Doe 6 to medical professionals who diagnosed her with gender dysphoria.  With the consent of her parents, JM Doe 6 was prescribed and takes puberty blockers.  This treatment has improved JM Doe 6's symptoms of gender dysphoria.

73.     If the Ban goes into effect, JM Doe 6 will be unable to continue receiving medically necessary care as treatment for her gender dysphoria in Kentucky.

74.     JM Doe 6, Jane Doe 6, and John Doe 6 fear the Ban will cause JM Doe 6's irreparable harm by preventing her from continuing to receive the care she needs, which will cause her gender dysphoria to return.

### vii.     The Doe 7 Family

75.     Plaintiff JM Doe 7 is a nine-year-old transgender girl who resides in Kentucky with her siblings and her mom, Jane Doe 7, and dad, John Doe 7.

76.     JM Doe 7 was diagnosed with gender dysphoria when she was seven.  Since being diagnosed, JM Doe 7's parents take her to an endocrinologist, a social worker, and other health care professionals who provide guidance on JM Doe 7's medical care.  With her parents' consent and the guidance of these health care professionals, JM Doe 7 has socially transitioned and uses a female name, pronouns, and expression both inside and outside the home.  Once JM Doe 7 begins puberty, which could be at any time, JM Doe 7's parents and doctors may determine that she requires medical care that the Ban will prohibit.

77.     JM Doe 7, Jane Doe 7, and John Doe 7 worry that the Ban will cause JM Doe 7 irreparable harm by preventing her doctors from providing the medical care she may need when she begins puberty.

### CLAIMS FOR RELIEF

### COUNT ONE

### 42 U.S.C. § 1983 – Deprivation of the Right to Parental Autonomy Guaranteed by the Due Process Clause of the Fourteenth Amendment
### (Parent Plaintiffs Against all Defendants)

78.     Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

79.     The Parent Plaintiffs bring this Count against all Defendants.

80.     The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  That fundamental right includes the liberty to make medical decisions for their minor children, including the right to obtain established medical treatments to protect their children's health and well-being.

81.     The Ban violates this fundamental right by preventing the Parent Plaintiffs from obtaining established, medically necessary care for their minor children.

82.     By intruding upon parents' fundamental right to direct the upbringing of their children, the Ban is subject to strict scrutiny.

83.     Defendants have no compelling justification for preventing parents from ensuring their children can receive established medical care that is necessary to treat a recognized medical condition.  The Ban does not advance any legitimate interest, much less a compelling one.  Nor is the ban narrowly tailored to further a compelling governmental interest.

## COUNT TWO

### 42 U.S.C. § 1983 – Deprivation of Rights Guaranteed By
### The Equal Protection Clause of the Fourteenth Amendment

### (All Plaintiffs Against all Defendants)

84.     Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

85.     All Plaintiffs bring this Count against Defendants Thornbury, Denker, and Friedlander.

86.     The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

87.     On its face, the Ban singles out transgender minors and prohibits them from obtaining medically necessary treatment based on their sex and transgender status.

88.     In addition to this facially discriminatory classification, the Ban treats transgender minors differently and less favorably than non-transgender minors by allowing minors who are not transgender to obtain the same medications that are prohibited when medically necessary for transgender minors.

89.     Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

90.     Transgender-based government classifications are subject, at a minimum, to heightened scrutiny because they are also sex-based classifications.

91.     Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different than their birth sex, they comprise a discrete group.  This defining characteristic bears no relation to a transgender person's ability to contribute to society.  Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.  As such, transgender-based classifications meet the criteria for strict scrutiny.

92.     The Ban does nothing to protect the health or well-being of minors and lacks any constitutionally sufficient justification.  To the contrary, the Ban undermines the health and well-being of transgender minors by denying them essential medical care.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(1) issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the Ban is unconstitutional under the Fourteenth Amendment;

(2) temporarily, preliminarily, and permanently enjoin Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the Ban;

(3) award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(4) grant such other relief as the Court finds just and proper.

Dated: May 3, 2023                       Respectfully Submitted,

                                         */s/ Heather Gatnarek*
                                         Corey Shapiro
                                         Heather Gatnarek
                                         Crystal Fryman
                                         Kevin Muench
                                         ACLU OF KENTUCKY FOUNDATION
                                         325 W. Main St. Suite 2210
                                         Louisville, KY 40202
                                         (502) 581-9746
                                         corey@aclu-ky.org
                                         heather@aclu-ky.org
                                         crystal@aclu-ky.org
                                         kevin@aclu-ky.org

                                         Christopher F. Stoll*
                                         Kelly Jo Popkin*
                                         NATIONAL CENTER FOR LESBIAN RIGHTS
                                         870 Market Street, Suite 370
                                         San Janecisco, CA 94102
                                         (415) 365-1320
                                         cstoll@nclrights.org
                                         kpopkin@nclrights.org

                                         Stephanie Schuster*
                                         Randall M. Levine*
                                         MORGAN, LEWIS & BOCKIUS LLP
                                         111 Pennsylvania Ave., NW
                                         Washington, DC 20004-2541

(202) 739-3000
stephanie.schuster@morganlewis.com
randall.levine@morganlewis.com

Amanda J. Ford*
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
(617) 431-7700
amanda.ford@morganlewis.com

*pro hac vice application forthcoming*

*Counsel for Plaintiffs*