## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

JANE DOE 1, *et al.*,

        *Plaintiffs*,

    v.

WILLIAM C. THORNBURY, JR., MD, in his official capacity as the President of the Kentucky Board of Medical Licensure, *et al.*,

        *Defendants*.

No. 3:23-cv-00230-DJH

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 4

I.   MEDICAL TREATMENT FOR ADOLESCENTS WITH GENDER
     DYSPHORIA IS BACKED BY RESEARCH AND CONSISTENT WITH
     ESTABLISHED STANDARDS OF CARE. ................................................. 4

II.  KENTUCKY LAWMAKERS IGNORED RESEARCH AND
     ESTABLISHED STANDARDS OF CARE WHEN THEY VOTED FOR
     THE TREATMENT BAN. ............................................................................. 7

III. THE TREATMENT BAN SINGLES OUT TRANSGENDER
     ADOLESCENTS. ........................................................................................... 8

IV.  THE TREATMENT BAN WILL INFLICT SEVERE AND IRREPARABLE
     HARM UPON PLAINTIFFS. ....................................................................... 9

ARGUMENT ...................................................................................................... 13

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT
     THE TREATMENT BAN VIOLATES THE EQUAL PROTECTION
     CLAUSE. ..................................................................................................... 14

     A.   The Treatment Ban Is Subject To Heightened Constitutional
          Scrutiny. ............................................................................................ 14

     B.   The Treatment Ban Cannot Withstand Heightened Scrutiny. ....... 18

     C.   The Treatment Ban Fails Even Rational Basis Review. ................. 21

II.  PLAINTIFFS' CLAIM THAT THE TREATMENT BAN VIOLATES THE
     DUE PROCESS CLAUSE IS LIKELY TO SUCCEED. ............................ 22

III. THE BALANCE OF EQUITIES FAVORS PRESERVING THE STATUS
     QUO AND PREVENTING THE TREATMENT BAND FROM TAKING
     EFFECT. ...................................................................................................... 23

     A.   Plaintiffs Will Suffer Immediate And Irreparable Harm If The
          Treatment Ban Takes Effect. ........................................................... 23

     B.   An Injunction Will Not Harm Defendants And Is In The Public
          Interest. ............................................................................................. 24

CONCLUSION ................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*ACLU Fund of Mich. v. Livingston Cnty.*,
   796 F.3d 636 (6th Cir. 2015) ................................................................25

*Adkins v. City of New York.*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015)..............................................16, 17

*Bd. of Educ. v. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ..........................................17, 23

*Bernal v. Fainter*,
   467 U.S. 216 (1984)............................................................................22

*Board of Trustees of University of Alabama v. Garrett*,
   531 U.S. 356 (2001) (Kennedy, J., concurring).................................21

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020)..................................................................2, 15

*Brandt v. Rutledge*,
   551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd sub nom.*, 47 F.4th 661 (8th Cir.
   2022) ............................................................................................. *passim*

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)............................................................................25

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) ............................................................14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993).............................................................................19

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)........................................................................2, 21

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
   751 F.3d 427 (6th Cir. 2014) (en banc) ............................................13

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972).............................................................................20

*Eknes-Tucker v. Marshall*,
   603 F. Supp. 3d 1131 (M.D. Ala. May 13, 2022), *appeal docketed*,

No. 22-11707 (11th Cir. 2022) ...................................................................... *passim*

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F. Supp. 3d 267 (W.D. Pa. 2017) ....................................................16

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018) ..................................................16

*Flack v. Wis. Dep't of Health Servs.*,
  328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................16

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) .............................................................16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) .....................................................15, 16, 17

*Heller v. Doe*,
  509 U.S. 312 (1993)...............................................................................20

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*,
  927 F.3d 396 (6th Cir. 2019) .................................................................22

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ...............................................................16

*Love v. Beshear*,
  989 F. Supp. 2d 536 (W.D. Ky. 2014).............................................14, 15

*M.A.B. v. Bd. of Educ.*,
  286 F. Supp. 3d 704 (D. Md. 2018).......................................................16

*Martin- Marietta Corp. v. Bendix Corp.*,
  690 F.2d 558 (6th Cir. 1982) .................................................................24

*Middleton v. City of Flint*,
  92 F.3d 396 (6th Cir. 1996) ...................................................................22

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982)...............................................................................18

*Norsworthy v. Beard*,
  87 F. Supp. 3d (N.D. Cal. 2015) ...........................................................16

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .....................................................3, 14, 23

*Parham v. J.R.*,
  442 U.S. 584 (1979)................................................................................2

*Planned Parenthood Inc. v. Cameron*,
  2022 WL 3973263 (W.D. Ky. 2022), *appeal docketed*,
  No. 22-5832 (6th Circuit 2023) .........................................................25

*Ray v. McCloud*,
  507 F. Supp. 3d 925 (S.D. Ohio 2020) ...........................................16, 21

*Romer v. Evans*,
  517 U.S. 620 (1996)....................................................................21, 22

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017).............................................................................18

*Shelby Cnty. Deputy Sheriffs' Ass'n v. Gilless*,
  67 F. App'x 860 (6th Cir. 2003)...........................................................14

*Smith v. City of Salem, Ohio*,
  378 F.3d 566 (6th Cir. 2004) ...............................................................15

*United States v. Virginia*,
  518 U.S. 515 (1996)................................................................2, 15, 18, 20

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)...........................................................................22

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) .........................................................15, 17

**Other Authorities**

Am. Med. Ass'n, Press Release, *AMA to states: Stop interfering in health care of
  transgender children* (Apr. 26, 2021) ...............................................19

Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,
  Fifth Edition, Text Revision (2022) ....................................................4

Governor Andy Beshear, *Veto Message from the Governor of the Commonwealth
  of Kentucky Regarding Senate Bill 150 of the 2023 Regular Session* (Mar. 24,
  2023) ...............................................................................................7

Maggie Astor, *G.O.P. State Lawmakers Push a Growing Wave of Anti-
  Transgender Bills*, N.Y. Times (Jan. 25, 2023)....................................18

Bruce Schreiner, *GOP lawmakers override Ky. Governor's veto of transgender
  bill*, PBS News Hour (Mar. 29, 2023)

PBS Video of Kentucky Senate Debate & Vote to Override Veto of SB 150,
  https://ket.org/legislature/archives/2023/regular/senate-chambers-199498.

Senate Bill 150 ..................................................................................................... *passim*

U.S. CONST. AMEND. XIV ...................................................................................... *passim*

*WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (2022) .................................................. 5

## **INTRODUCTION**

Section 4 of Kentucky's recently enacted Senate Bill 150 ("SB 150") will go into effect on June 29, 2023.  Section 4(2)(a) and (b) will forbid healthcare providers from providing adolescent transgender patients medically necessary treatments for gender dysphoria, including hormone therapy and puberty blockers (the "Treatment Ban").  This will cause irreparable physical and mental harm to Plaintiffs—transgender minors ("Minor Plaintiffs") and their parents ("Parent Plaintiffs)—and transgender youth across Kentucky.  The Treatment Ban not only is cruel; it violates the fundamental due process rights of parents to obtain established medical care for their children and denies transgender minors equal protection of the laws.

Several federal courts have enjoined substantively similar bans for precisely these reasons.  "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022), *appeal filed*, No. 22-11707 (11th Cir.); *accord Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022).  The Treatment Ban will force Minor Plaintiffs "to live with physical characteristics that do not conform to their gender identity, putting them at high risk of gender dysphoria and lifelong physical and emotional pain."  *Brandt*, 551 F. Supp. 3d at 892; *see also Eknes-Tucker*, 603 F. Supp. 3d at 1150 ("[W]ithout transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality.").

This Court should follow the growing weight of authority and enter a preliminary injunction against enforcement of the Treatment Ban.[1]  As set forth below, all the requirements for a preliminary injunction are satisfied here.

*First*, Plaintiffs are likely to succeed on the merits of their claims that the Treatment Ban violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. The Equal Protection Clause requires heightened scrutiny of laws like the Treatment Ban that expressly discriminate on the basis of sex, and it prohibits such discrimination absent an "exceedingly persuasive" justification.  *United States v. Virginia*, 518 U.S. 515, 531 (1996). Because the government cannot discriminate against an individual for being transgender "without discriminating against that individual based on sex," *Bostock v. Clayton Cnty*., 140 S. Ct. 1731, 1741 (2020), laws that discriminate against transgender people must be "substantially related to a sufficiently important governmental interest," *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 441 (1985).  Here, the Treatment Ban targets transgender adolescents, denying them medically necessary care because of their gender nonconformity, and no important state interest supports the Treatment Ban.

In addition, the Due Process Clause protects parents' rights "to seek and follow medical advice" to safeguard their children's health.  *Parham v. J.R*., 442 U.S. 584, 602 (1979); *see Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021) ("Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary.").

---

[1]     The parties have separately tendered a proposed agreed order to expedite the briefing schedule pursuant to Local Rule 7.1.  However, if the Court is unable to rule on Plaintiffs' motion for preliminary injunction before June 29, 2023, when the Treatment Ban is scheduled to go into effect, Plaintiffs request a temporary restraining order to preserve the status quo pending entry of a preliminary injunction.

Kentucky's interference with that right is subject to—and fails—strict scrutiny.  Far from narrowly tailored to serve a compelling government interest, the Treatment Ban is sweeping and categorical, prohibiting any use of transitioning medications to treat gender dysphoria in transgender adolescents regardless of individual circumstance or medical need, and notwithstanding their demonstrated safety and efficacy.  The Treatment Ban contradicts scientific evidence and established medical standards and undermines, rather than advances, any interest in protecting transgender youth by denying them care that is appropriate and necessary for their physical and mental health.  *See, e.g.*, *Brandt*, 551 F. Supp. 3d at 891, 893 (holding Arkansas's ban of established medical treatments for transgender youth failed even rational basis review, much less the strict scrutiny).

*Second*, because the Treatment Ban violates Plaintiffs' constitutional rights, they will suffer irreparable harm as a matter of law without a preliminary injunction.  *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).  Moreover, Minor Plaintiffs currently receive this medically necessary treatment, and their health and wellbeing will be irreparably damaged if the Commonwealth forces their treatment to stop.  Further, Parent Plaintiffs, who already carefully determined that this care is necessary for their children, will be forced to watch their children suffer from an entirely preventable denial of care.

*Finally*, the balance of the equities decisively favors a preliminary injunction.  Minor Plaintiffs and other transgender adolescents in Kentucky have been receiving the medical treatments prohibited by the Treatment Ban for months or even years without ill effect to themselves or anyone else, and an injunction to preserve the status quo during this litigation will not harm the Commonwealth.  On the other hand, Plaintiffs will be denied necessary medical care

in violation of their constitutional rights in the absence of an injunction. For these reasons and the reasons below, the Court should issue a preliminary injunction.

## BACKGROUND

I.  **MEDICAL TREATMENT FOR ADOLESCENTS WITH GENDER DYSPHORIA IS BACKED BY RESEARCH AND CONSISTENT WITH ESTABLISHED STANDARDS OF CARE.**

"Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex. Declaration of Dr. Daniel Shumer ("Shumer Decl.") ¶ 25; Declaration of Dr. Aron Janssen ("Janssen Decl.") ¶ 17. The medical term "transgender" refers to individuals whose gender identity does not align with their sex assigned at birth. Shumer Decl. ¶ 25. A transgender boy is a youth whose assigned sex at birth was female but whose gender identity is male; a transgender girl is a youth whose assigned sex at birth was male but whose gender identity is female. Scientific research and medical literature across disciplines demonstrate that gender identity has a strong biological foundation, with some studies showing that gender identity has a genetic component. *Id.* ¶¶ 28–32.

"Gender dysphoria" is a widely recognized, serious medical condition occurring when a person's gender identity and assigned sex are incongruous. Declaration of Dr. Suzanne Kingery ("Kingery Decl.") ¶ 23. The condition causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* Living in a manner consistent with one's gender identity is critical to *every person's* health and wellbeing, including transgender people. Shumer Decl. ¶ 26; Janssen Decl. ¶ 18. Efforts to "cure" transgender individuals by forcing their gender identity into alignment with their assigned sex are "harmful and ineffective" and are considered unethical by all major associations of medical and mental health professionals. Shumer Decl. ¶ 27; Janssen Decl. ¶ 20.

To be diagnosed with gender dysphoria, a minor patient generally must satisfy criteria set forth in AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FIFTH EDITION, TEXT REVISION (2022), known as the "DSM-5-TR."  Specifically, the patient's incongruence between assigned sex and gender identity must persist for at least six months and manifest as two or more of the following: a marked incongruence between one's experienced/expressed gender and assigned sex; a strong desire to be rid of one's natal sex characteristics because of the marked incongruence; a strong desire for the sex characteristics of the other gender; a strong desire to be of the other gender; a strong desire to be treated as the other gender; and a strong conviction that one has the typical feelings and reactions of the other gender. Shumer Decl. ¶ 35.

The major medical associations in the United States, including the American Academy of Pediatrics ("AAP"), the Endocrine Society, the American Medical Association ("AMA"), the American Psychological Association, the American Psychiatric Association, and the American Academy of Family Physicians, among others, all recognize that adolescents with gender dysphoria may require medical intervention to treat the severe distress the condition causes.  *Id.* ¶¶ 50–53; Kingery Decl. ¶ 25.  Denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety and depression, eating disorders, substance abuse, self-harm, and suicidality.  Shumer Decl. ¶ 39.  Gender dysphoria is highly treatable.  *Id.*  When they have access to appropriate medical care, along with parental and societal support, transgender minors are more likely to "thrive and grow into healthy adults."  *Id.* ¶ 40; *see also* Kingery Decl. ¶¶ 67, 73.

Standards of care for treating transgender minors diagnosed with gender dysphoria initially were developed by the World Professional Association for Transgender Health ("WPATH"), an

international, multidisciplinary professional association with a mission to promote evidence--based care and research for transgender health, including the treatment of gender dysphoria.  Shumer Decl. ¶ 37; Kingery Decl. ¶ 25; *see also WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (2022) ("WPATH SOC 8").  The Endocrine Society has promulgated a similar standard of care and clinical practice guidelines for the provision of puberty blockers and hormone therapy as a treatment for gender dysphoria in minors and adults.  Shumer Decl. ¶ 50.

The AMA, the AAP, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations follow the WPATH and Endocrine Society standards of care and clinical practice guidelines, which are comparable to guidelines that those professional medical organizations use to treat other conditions.  *Id.* ¶ 53.

Treatment of gender dysphoria reduces a transgender person's clinically significant distress by permitting them to live in alignment with their gender identity.  Kingery Decl. ¶ 27.  Undergoing treatment for gender dysphoria is commonly referred to as "transition" or "gender transition."  *Id.*; Shumer Decl. ¶ 56.  The precise treatment of gender dysphoria depends on a comprehensive biopsychosocial assessment of each patient's needs by a mental health professional and involves both social and medical components.  Shumer Decl. ¶ 41; Kingery Decl. ¶ 33.

"There are no medications considered for transition until after the onset of puberty."  Shumer Decl. ¶ 57; *accord* Kingery Decl. ¶ 28.  For adolescents who have begun puberty, transition may involve taking prescribed medications—puberty blockers and, for older adolescents, hormone therapy—to bring the patient's body into alignment with their gender identity.  Shumer Decl. ¶¶ 44, 61.  For a transgender adolescent who has begun puberty, puberty

blocking medication prevents the patient from going through the physical developments associated with puberty that exacerbate the distress experienced by the incongruence between the patient's gender identity and body.  *Id.* ¶ 61.  The effects of puberty delaying treatment are reversible once the treatment is discontinued.  *Id.* ¶ 64; Kingery Decl. ¶ 30.  For older transgender adolescents, hormone therapy may also be medically necessary to bring their body into alignment with their gender identity and further treat the gender dysphoria they may experience without treatment. Kingery Decl. ¶ 32; Shumer Decl. ¶¶ 68–69.

Longitudinal studies have shown that transgender adolescents with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender adolescents.  Shumer Decl. ¶ 40; *see* Kingery Decl. ¶¶ 67, 73.  Access to puberty blocking medications during adolescence is associated with lower rates of suicide in transgender individuals.  Shumer Decl. ¶ 27.  In contrast, transgender adolescents who do not receive appropriate medical care for gender dysphoria are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.  *Id.*

## II.   KENTUCKY LAWMAKERS IGNORED RESEARCH AND ESTABLISHED STANDARDS OF CARE WHEN THEY VOTED FOR THE TREATMENT BAN.

On March 16, 2023, Kentucky lawmakers passed SB 150, which includes the Treatment Ban.  Governor Beshear vetoed SB 150 on March 24, 2023.  The Governor explained that SB 150: (a) "will endanger the children of Kentucky" by ignoring evidence that "receipt of care dramatically reduces the rates of suicide attempts, decreases feelings of depression and anxiety, and reduces substance abuse"; (b) "will cause an increase in suicide among Kentucky's youth"; and, (c) "allows too much government interference in personal healthcare issues and rips away the freedom of parents to make medical decisions for their children."  Governor Andy Beshear, *Veto*

*Message from the Governor of the Commonwealth of Kentucky Regarding Senate Bill 150 of the 2023 Regular Session*, Mar. 24, 2023, https://apps.legislature.ky.gov/record/23rs/sb150/veto.pdf.

On March 29, 2023, the Kentucky legislature overrode the Governor's veto.  Several legislators expressed disbelief in the established science related to gender identity and the treatment of gender dysphoria.  One lawmaker referred to transgender identity as "fantasy," insisting that transgender persons will "find themselves miserable from decisions that they made when they were young."  Bruce Schreiner, *GOP lawmakers override Ky. Governor's veto of transgender bill*, PBS News Hour (Mar. 29, 2023), https://www.pbs.org/newshour/politics/gop-lawmakers-override-kentucky-governors-veto-of-transgender-bill.  Others asserted that hormone treatments for gender dysphoria are "experiments" that cause "irreversible damage."  PBS Video of Kentucky Senate Debate & Vote to Override Veto of SB 150 (Part 1) at 1:41:12–1:41:20 (Sen. Mills); *id.* at 2:00:28–2:00:30 (Sen. Williams); *id.* at 1:49:25–1:19:30 (Sen. Tichenor), https://ket.org/legislature/archives/2023/regular/senate-chambers-199498.   None of these statements is supported by research.

## III.    THE TREATMENT BAN SINGLES OUT TRANSGENDER ADOLESCENTS.

Absent a preliminary injunction, the following Treatment Ban will go into effect on June 29, 2023:

> Except as provided in subsection (3) of this section, a health care provider shall not, for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's sex, knowingly:
>
> > (a) Prescribe or administer any drug to delay or stop normal puberty; [or]
> >
> > (b) Prescribe or administer testosterone, estrogen, or progesterone, in the amounts greater than would normally be produced endogenously in a healthy person of the same age and sex.

SB 150 § 4(2)(a)–(b).[2]

Under Section 4(6), health care providers may "systematically reduce[]" over time, rather than "immediately terminat[e]," administration of these drugs to transgender youth who are already receiving them when the law takes effect.

The law permits healthcare providers to prescribe the same medications to non-transgender minors for conditions other than gender dysphoria.  *See id.* § 4(2)–(3).  Specifically, the same medications can be prescribed or administered to treat a "[a] minor born with a medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous" or a "minor diagnosed with a disorder of sexual development."  *Id.* § 4(3).

SB 150 charges the agencies that license and certify healthcare providers in the Commonwealth with enforcing the Treatment Ban.  These agencies "shall revoke [a] health care provider's licensure or certification," if, after completion of the agency's disciplinary and hearing process, they find the provider violated the Treatment Ban.  *Id.* § 5.

In sum, the Treatment Ban will forbid healthcare providers—including doctors, nurse practitioners, nurses, and physician assistants—from providing medically necessary treatments to transgender adolescents like Minor Plaintiffs, while allowing them to provide the same treatments to non-transgender adolescents.

## IV.    THE TREATMENT BAN WILL INFLICT SEVERE AND IRREPARABLE HARM UPON PLAINTIFFS.

The Treatment Ban will cause irreparable physical and psychological harm to transgender adolescents diagnosed with gender dysphoria in Kentucky, including Minor Plaintiffs.  The Ban

---

[2]    SB 150 also includes a ban on surgeries for transgender minors, which Plaintiffs do not challenge.  Compl. ¶ 39, n. 5, ECF. No. 2.

will terminate their access to necessary medical treatment and impose additional harms on their parents and medical providers.  Janssen Decl. ¶ 49.

Just as the harm caused by a prohibition on diabetes treatment would not be mitigated by tapering a diabetic child off insulin, this irreparable harm is not mitigated simply because SB 150 allows some transgender adolescents to be tapered off their medicines.  To the contrary, a transgender minor who has been receiving and benefitting from these medications and who is then required to stop taking them (either immediately or over time) "will suffer and their mental health will deteriorate." Kingery Decl. ¶¶ 53, 68.  There are no medical standards of care for terminating or "tapering off" transitioning medications in transgender adolescents who require them.

**The Doe 1 Family.**  John Minor Doe 1 ("JM1") is a twelve-year-old transgender boy who lives with his family in Jefferson County, Kentucky.  Declaration of Jane Doe 1 ("JD1 Decl.") ¶ 4. JM1 told his family he was transgender when he was eleven years old, which at the time did not surprise his mother.  *Id.* ¶ 5.  When JM1 was a little boy, he asked his mother questions like: "Mom, did you always know you were a girl?"  *Id.*  When JM1 began puberty and started menstruating in December 2021, his mental health declined dramatically.  He became suicidal during and around his menstrual cycle.  In spring 2022, after his second menstrual period, JM1's parents hospitalized him because he told a classmate he wanted to die.  *Id.* ¶ 6.

In fall 2022, JM1 was diagnosed with gender dysphoria, following hours of interviews with therapists, psychiatrists, a pediatric nurse practitioner, and an endocrinologist.  *Id.* ¶ 7.  JM1's parents continue to work closely with his doctors in Kentucky to manage his depression and suicidality, and in November 2022, he began taking puberty blockers to stop his menstrual periods. *Id.* ¶ 8.  JM1's parents saw an immediate improvement in his emotional and mental health, and they attribute a dramatic reduction in his suicidality to this medication.  *Id.*  JM1's parents fear that

if the Treatment Ban goes into effect, their son will be deprived of a "lifesaving and life changing" treatment, and they don't know if their family will be able to obtain treatment for him outside of Kentucky. *Id.* ¶ 9.

**The Doe 2 Family.** John Minor Doe 2 ("JM2") is a fifteen-year-old transgender boy who resides with his family in the Eastern District of Kentucky. Declaration of John Doe 2 ("JD2 Decl.") ¶ 4. JM2 was identified as female at birth, but as early as the first grade would ask to be called by a male name and male pronouns; he has always preferred "boy's" clothes; and, from a young age, he periodically questioned whether something was "wrong" with him. JM2 "came out" as a boy at home and at school in about the seventh or eighth grade, at which point he began to socially transition. *Id.* ¶ 6.

When JM2 began puberty and started menstruating, he felt depressed and distressed by the mismatch between his body and gender identity. *Id.* After many evaluations and careful discussions with doctors in Kentucky regarding the risks and benefits of treatment, JM2 began receiving medications to treat his gender dysphoria, including birth control pills to stop his periods and testosterone treatment. He continues to receive this treatment in Kentucky, and he also sees a therapist. *Id.* ¶ 7. Hormone therapy has significantly improved JM2's mood and sense of self. JM2 feels tremendous pride when he sees his body changing to match his male identity. *Id.* ¶ 8. JM2 has not experienced any negative impacts from hormone therapy. *Id.*

JM2's father believes that if the Treatment Ban goes into effect and prevents JM2 from continuing his treatment with birth control and testosterone, he will revert to his previous distressed mental state. *Id.* ¶ 9. JM2's father does not know whether he will be able to obtain the required treatments for his son outside of Kentucky.

**The Doe 3 Family.** Jane Minor Doe 3 ("JM3") is an eleven-year-old transgender girl who lives with her family in Jefferson County, Kentucky. Declaration of Jane Doe 3 ("JD3 Decl.") ¶¶ 3–4. Though she was identified as male at birth, JM3 has known since a very young age that she is a girl. She started asking for "girl's" clothes when she was six; she grew out her hair and stopped using her birth name when she was nine. *Id.* ¶ 5. She "came out" to her parents as a girl in March 2022. Because of the stigma associated with being transgender, her parents have feared for her safety. At the start of fifth grade, JM3 began to socially transition. Although she faces some bullying at school and has been rejected by some family members, she has mostly been accepted by her peers and family. *Id.* ¶ 7.

JM3 has been under the care of a psychologist in Kentucky and receives treatment for gender dysphoria and generalized anxiety disorder. *Id.* ¶ 8. JM3's psychologist diagnosed her with gender dysphoria in spring 2022 and referred her to a pediatric endocrinologist. *Id.* ¶ 9. The endocrinologist in Kentucky prescribed JM3 puberty blockers after explaining the risks associated with the treatment and evaluating her motivations and comprehension of the procedure. *Id.* ¶ 11. JM3 continues to receive treatment from an endocrinologist in Kentucky, and her next appointment will be in June 2023. *Id.* ¶ 12. JM3's endocrinologist has informed her and her family that she will not be able to continue to treat JM3 if the Treatment Ban goes into effect on June 29, 2023, and her parents do not know if they will be able to obtain care for her outside of Kentucky. *Id.* ¶ 13. Puberty blockers have made JM3's gender dysphoria and anxiety symptoms more manageable, and her parents fear the physical, emotional, and psychological consequences of

discontinuing them. *Id.* ¶ 14. JM3's parents worry that her symptoms of distress will return without continued treatment if the Treatment Ban goes into effect. *Id.*

**The Doe 5 Family.** John Minor Doe 5 ("JM5") is a sixteen-year-old transgender boy who lives with his family in Kentucky. Declaration of Jane Doe 5 ("JD5 Decl.") ¶ 4. JM5 was identified as female at birth, but has known since a young age that he is a boy. *Id.* ¶ 5. At age eleven, he started to wear his hair short and dress more androgynously. *Id.* ¶ 6. JM5 began using a male name and male pronouns while he was in the seventh grade, and "came out" as transgender while in the eighth grade. Because of the stigma associated with transgender identity, JM5's parents have feared for his safety. *Id.* When JM5 began puberty and started menstruating, he experienced extreme distress. *Id.* ¶ 7. His parents took him to a gynecologist to discuss possible treatment options, who prescribed medication to stop JM5's periods. *Id.* After providing detailed information regarding treatment options and associated risks, a physician recommended that JM5 be prescribed testosterone. *Id.* ¶¶ 7–8. He continues to receive this care within the Commonwealth, in addition to seeing a therapist. *Id.* ¶ 9.

JM5's parents almost immediately noticed a positive change in his mental health after he started testosterone treatment—he is happier, more confident, and more outgoing. *Id.* ¶ 10. JM5's parents are very concerned for his welfare if the Treatment Ban prevents him from continuing his testosterone treatment in Kentucky. *Id.* They do not know whether they will be able to obtain care for him outside of Kentucky if the Treatment Ban goes into effect and prohibits his treatments, and they worry his symptoms of distress will return. *Id.*

## ARGUMENT

A preliminary injunction is warranted where the movant is likely to succeed on the merits and the balance of equities favor preserving the status quo while the litigation proceeds. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). The

equitable factors the Court balances are irreparable harm to the movant without an injunction, any substantial harm an injunction would cause a non-movant, and the public interest.  *Id.*  "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."  *Obama for Am.*, 697 F.3d at 436 (cleaned up).  Under this settled standard, a preliminary injunction barring the Treatment Ban from going into effect on June 29, 2023, is warranted.

However, if the Court is unable to resolve this preliminary injunction motion before June 29, 2023, the Court should enter a temporary restraining order against the Treatment Ban to preserve the status quo, prevent irreparable harm to Plaintiffs, and protect the Court's subject matter jurisdiction while it considers whether a preliminary injunction should issue.  *See Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006) ("TROs are of a short duration and usually terminate with a ruling on a preliminary injunction.").  The same factors guide courts' decisions to issue temporary restraining orders as preliminary injunctions.  *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp*., 511 F.3d 535, 542 (6th Cir. 2007).

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT THE TREATMENT BAN VIOLATES THE EQUAL PROTECTION CLAUSE.

### A.  The Treatment Ban Is Subject To Heightened Constitutional Scrutiny.

The Equal Protection Clause forbids the States from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  State laws that single out particular groups for less favorable treatment implicate this constitutional right.  More rigorous constitutional scrutiny is given to laws that single out suspect or quasi-suspect classes of persons. *See, e.g.*, *Shelby Cnty. Deputy Sheriffs' Ass'n v. Gilless*, 67 F. App'x 860, 863 (6th Cir. 2003); *Love v. Beshear*, 989 F. Supp. 2d 536, 547 (W.D. Ky. 2014).

14

The Treatment Ban targets an identifiable group—*transgender* minors—for less favorable treatment.  Although the Treatment Ban does not use the term "transgender," it bans the listed medications only when used to "alter the appearance of, or to validate a minor's perception of, the minor's sex, if that appearance or perception is inconsistent with the minor's [birth] sex."  SB 150 § 4(2).  Having an "appearance or perception" of one's sex that is "inconsistent with [one's birth] sex" is precisely what defines a person as transgender, and the prohibited medications are precisely what allow a transgender person to be transgender—that is, to live consistent with their gender identity rather than be forced to live in their birth sex.  By singling out treatments that target the defining feature of what it means to be transgender—that is, living consistent with a person's gender identity rather than their birth sex—the Treatment Ban singles out transgender adolescents, depriving them of essential medical care because of their gender nonconformity, while permitting the same medications to be prescribed or administered for any other reason.  *Id.*  For two independently sufficient reasons, heightened constitutional scrutiny—rather than mere "rational basis" review—applies.

*First*, "all gender-based classifications" are subject to heightened scrutiny.  *United States v. Virginia*, 518 U.S. 515, 555 (1996).  Discrimination against transgender persons is a form of gender-based discrimination.  "It is *impossible* to discriminate against a person for being … transgender without discriminating against that individual based on sex."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) (emphasis added).  Classifications on the basis of transgender status "cannot be stated without referencing sex."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020).  As the Sixth Circuit held nearly twenty years ago, discrimination against a person who "fails to act and/or identify with his or her gender … is no different" than other forms of gender discrimination, *Smith v. City of Salem, Ohio,* 378 F.3d 566, 575 (6th Cir. 2004), and

"easily constitute[s] a claim of sex discrimination grounded in the Equal Protection Clause," *id.* at 577; *accord Brandt,* 47 F.4th at 670; *Grimm,* 378 F.3d at 608–09; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017);[3] *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011).

Indeed, the Treatment Ban is such a gender-based classification.  It prohibits medications prescribed or administered "for the purpose of attempting to alter the appearance of, or to validate a minor's perception of, the minor's *sex*, if that appearance or perception is inconsistent with the minor's *sex*" assigned at birth.  SB 150 § 4(1)(a)–(b) (emphases added).  A law that "prohibits transgender minors—and only transgender minors—from taking transitioning medications due to their gender nonconformity … constitutes a sex-based classification for purposes of the Fourteenth Amendment." *Eknes-Tucker,* 603 F. Supp. 3d at 1147; *accord Brandt*, 47 F.4th at 670.  Heightened scrutiny applies for this reason alone.

*Second*, as numerous courts have recognized, transgender persons are at least a quasi--suspect class in their own right, which independently triggers heightened scrutiny.  *E.g.*, *Grimm*, 972 F.3d at 611–13; *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York.,* 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *M.A.B. v. Bd. of Educ.*, 286 F. Supp. 3d 704, 718–22 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d, 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron,* 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951–53 (W.D. Wis. 2018); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020). As these courts found, transgender people exhibit the characteristics of a quasi-suspect class: (1)

---

[3]     *Abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020)

they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to a person's ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power.  In particular:

(1) "[T]here is not much doubt that transgender people have historically been subject to discrimination including in education, employment, housing, and access to healthcare." *Bd. of Educ. v. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).  They have and continue to "face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051.  "Transgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience physical assault in places such as schools (35%) and places of public accommodation (8%)," and they "are more likely to be the victim of violent crimes" than people who are not transgender.  *Grimm*, 972 F.3d at 612.

(2) "[T]here is obviously no relationship between transgender status and the ability to contribute to society." *Dep't of Educ.*, 208 F. Supp. 3d at 874.  "Seventeen of our foremost medical, mental health, and public health organizations agree that being transgender implies no impairment on judgment, stability, reliability, or general social or vocational abilities." *Grimm,* 972 F.3d at 612.

(3) The "characteristic of the class" of transgender persons "calls down discrimination when it is manifest." *Dep't of Educ.*, 208 F. Supp. 3d at 874 (cleaned up); *see Adkins*, 143 F. Supp. 3d at 139–40 (noting "transgender people often face backlash in everyday life when their status is discovered").

(4) There is ample evidence that transgender people, who represent "a tiny minority of the population," are politically powerless. *Dep't of Educ.*, 208 F. Supp. 3d at 874. In very recent memory, transgender soldiers were prohibited from serving in the military. Today, many states, including Kentucky, have enacted laws to deprive transgender adolescents of medically necessary healthcare, as well as laws banning transgender youth from school sports, restrooms, classroom discussions, and from changing their name or gender markers on government identity documents. *See* Maggie Astor, *G.O.P. State Lawmakers Push a Growing Wave of Anti-Transgender Bills*, N.Y. TIMES, Jan. 25, 2023, https://www.nytimes.com/2023/01/25/us/politics/transgender-laws-republicans.html. In 2023 alone, state legislatures proposed more than 150 bills targeting transgender people for negative treatment. *Id.*

**B.      The Treatment Ban Cannot Withstand Heightened Scrutiny.**

To survive heightened scrutiny, discriminatory classifications must substantially relate to an important governmental interest. *Virginia*, 518 U.S. at 524. This standard demands an "exceedingly persuasive justification" for discrimination. *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). A justification based on overbroad generalizations is not sufficient, *Virginia*, 518 U.S. at 533, and any asserted justification must reflect the law's "actual purpose" when enacted, not a hypothetical rationale or one "invented *post hoc* in response to litigation," *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982).

The Treatment Ban cannot withstand this test. *First*, denying transgender adolescents medically necessary treatments does not serve any important governmental objective. By prohibiting providers from prescribing or administering puberty delaying medications or hormone treatments to transgender adolescents, the Kentucky Legislature *overrode* generally accepted medical protocols for treatment of gender dysphoria. Based on medical research and clinical

18

experience, groups such as the AMA, the AAP, the Endocrine Society, and the American Academy of Child and Adolescent Psychiatry all have determined that these medications are safe, effective, and necessary treatments for adolescents with gender dysphoria.  Shumer Decl. ¶ 53; Janssen Decl. ¶ 8; *see, e.g.*, WPATH SOC 8.

The medical research supporting the use of puberty blockers and hormone therapy for transgender adolescents is substantial.  Medical treatment for patients diagnosed with gender dysphoria has long been recognized as standard care by major medical associations.  The AMA recognizes that "standards of care and accepted medically necessary services that affirm gender or treat gender dysphoria may include mental health counseling, non-medical social transition, [and] gender-affirming hormone therapy" and that "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people."  Press Release – American Medical Association, *AMA to states: Stop interfering in health care of transgender children* (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children. These standards of care are peer-reviewed and based on the best available science and clinical experience.  Shumer Decl. ¶¶ 45–53.

In addition to lacking any basis in medical science, any purported claim that the Treatment Ban was enacted to protect health or safety is belied by the law's express allowance of the same medications when prescribed or administered to non-transgender minors for any purpose *other* than treating gender dysphoria.  That strongly suggests that the Kentucky Legislature was not genuinely motivated by any concern over whether these medications are safe for use by minors, but rather by disapproval of their use for transgender minors.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("A law cannot be regarded as protecting

an interest . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.")
(cleaned up).

Nor is a generic concern about the risks associated with these medications sufficient to withstand heightened scrutiny. The risks associated with the prohibited medications are rare for transgender and non-transgender patients alike. Shumer Decl. ¶¶ 75–76, 82, 85. Thus, while the State may attempt to "superficial[ly]" defend the Treatment Ban "as a health measure," protecting health cannot "reasonably be regarded as its purpose." *Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972); *see id.* at 453 (striking down contraception ban for single people where stated health-related rationales applied equally to married people).

Of course, every medical intervention carries risks and potential benefits. Shumer Decl. ¶ 79. Weighing the risks and potential benefits of treatment for gender dysphoria is a medical judgment similar to other judgments made by healthcare providers, adolescent patients, and their parents. *Id.* There is nothing unique about the risks associated with puberty-delaying treatment or hormone therapy that justifies the wholesale prohibition of such treatments. *Id.* ¶ 82.

 *Second*, the Treatment Ban undermines the Commonwealth's interest in safeguarding the health and safety of minors. At a bare minimum, heightened scrutiny requires that a law *advance* an important governmental interest, not impede it. *See, e.g.*, *Virginia*, 518 U.S. at 523. Denying transgender adolescents medically necessary care is harmful, not helpful. If allowed to take effect, the Treatment Ban will actively cause harm to minors, like the Minor Plaintiffs, who will be denied medically necessary care they urgently need. Without treatment to affirm their gender identity, many adolescents with gender dysphoria suffer extreme distress and elevated rates of anxiety, depression, and suicidality. Shumer Decl. ¶¶ 87–88; Janssen Decl. ¶ 48.

### C.    The Treatment Ban Fails Even Rational Basis Review.

Plaintiffs have a strong likelihood of success on the merits even if the Treatment Ban were evaluated under the deferential "rational basis" test.  That test requires a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  This relationship must not be "so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446; *see, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 939 (S.D. Ohio 2020) (rejecting Ohio's justifications for disallowing transgender people to change sex marker on birth certificate under rational basis review "because there is no logical connection between the Policy and proffered justifications").

Here, for the reasons stated above, there is no logical or rational connection between the Treatment Ban and any justifications that may be proffered by Defendants.  Rather than protecting transgender minors from harm, the Treatment Ban deprives them of the only safe and effective treatments for their gender dysphoria, leaving them with *no* treatment for a serious medical condition that, when left untreated, predictably causes serious and irreparable harms.  The Treatment Ban permits the same medications to be prescribed and administered to other minors, thereby belying any claim that the medications themselves are unsafe.  And it imposes a sweeping and categorical ban, completely barring these treatments regardless of a minor's individual medical circumstances or needs, and regardless of the severe and even life-threatening harm that may be caused for youth who have been benefitting from these medications and now must terminate them.

In such a case, where a law imposes "a broad and undifferentiated disability on a single named group" and inflicts "immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it," there is an "inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996).  Such prejudice need not reflect "malice" or a conscious intent to

21

harm, but "may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). Here, because the Treatment Ban singles out transgender minors in such a stark way, barring the only established treatments for their medical care, and because it will cause them to suffer such serious harms, it cannot survive any level of review. "It is not within our constitutional transition to enact laws of this sort." *Romer*, 517 U.S. at 633.

## II. PLAINTIFFS' CLAIM THAT THE TREATMENT BAN VIOLATES THE DUE PROCESS CLAUSE IS LIKELY TO SUCCEED.

The Due Process Clause protects "against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Where a fundamental right is at issue, strict scrutiny applies. Under strict scrutiny, a law will fail unless it is "narrowly tailored to further" a "compelling state interest." *Middleton v. City of Flint*, 92 F.3d 396, 404 (6th Cir. 1996). It is settled in this circuit that parents have a fundamental right "to direct their children's medical care," and that laws that invade that right are subject to strict scrutiny. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). Here, the Treatment Ban interferes with this right by barring Parent Plaintiffs from obtaining the only medically accepted, safe, and effective treatment for their transgender children.

As discussed, the Treatment Ban cannot survive heightened scrutiny or even rational basis review, so it necessarily fails the more demanding strict scrutiny. The law's categorical prohibition of medically necessary care for transgender adolescents is not narrowly tailored because it is not, by any means, the "least restrictive" way of achieving any legitimate, much less compelling, objective. *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984). Moreover, any assertion that the law is intended to protect children "is pretextual because [it] allows the same treatments for non-

transgender minors that are banned for transgender minors as long as the desired results conform with the stereotype of the minor's biological sex." *Brandt*, 551 F. Supp. 3d at 893.

In sum, the Treatment Ban deprives Parent Plaintiffs of their fundamental right to obtain medical treatment for their children that their children's doctors have recommended, that has improved their children's health and wellbeing, and that every major medical association has recognized as safe, effective, and necessary. *See Brandt*, 551 F. Supp. 3d at 892 ("Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."). "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker*, 603 F. Supp. 3d at 1146.

## III. THE BALANCE OF EQUITIES FAVORS PRESERVING THE STATUS QUO AND PREVENTING THE TREATMENT BAND FROM TAKING EFFECT.

### A. Plaintiffs Will Suffer Immediate And Irreparable Harm If The Treatment Ban Takes Effect.

Harm "is irreparable if it is not fully compensable by monetary damages." *Obama for Am.*, 697 F.3d at 436 (cleaned up). When constitutional rights or civil rights are threatened or impaired, as they are here, irreparable injury is presumed. *Id.*; *Dep't of Educ.*, 208 F. Supp. 3d at 878. The irreparable harm here, however, is far more than the deprivation of the Plaintiffs' constitutional rights. By enforcing the Treatment Ban, Defendants will immediately deny patients life-saving medical care by either forcing them to discontinue treatment or preventing them from initiating treatment. This will force families, like Parent Plaintiffs, to either watch their children suffer or to incur the significant expense of regular travel or relocation to access care.

As one district court has held, the following irreparable harms flow inevitably from enforcement of the Treatment Ban: (1) transgender youths face "high risk of gender dysphoria and

lifelong physical and emotional pain," and (2) parents must choose between watching their children suffer or uprooting their family to move to another state. *Brandt*, 551 F. Supp. 3d at 892; *see also Eknes-Tucker*, 603 F. Supp. 3d at 1150 (finding that transgender plaintiffs and their parents were likely to be irreparably harmed by a similar Alabama law).

Here, as a result of the Treatment Ban, JM1, JM2, JM3, and JM5 will lose access to the medical treatment that has allowed them to thrive. They and their parents are already experiencing severe anxiety and distress at the prospect of either losing care in the coming months or being forced to move. *See* JD1 Decl. ¶ 9; JD2 Decl. ¶ 9; JD3 Decl. ¶ 13; JD5 Decl. ¶ 11. The Treatment Ban will force Minor Plaintiffs to proceed through endogenous puberty despite having already made careful determinations with their doctors and parents that doing so would severely harm their mental and physical health. *See* JD1 Decl. ¶ 9; JD2 Decl. ¶ 9; JD3 Decl. ¶ 13; JD5 Decl. ¶ 11. Parent Plaintiffs can avoid this harm to their minor children only by disrupting their lives and families to travel or move elsewhere for treatment. *See* JD1 Decl. ¶ 9; JD2 Decl. ¶ 9; JD3 Decl. ¶ 13; JD5 Decl. ¶ 11. These severe harms cannot be remedied by damages: they will be irreparable.

**B.     An Injunction Will Not Harm Defendants And Is In The Public Interest.**

The balance of equities weighs heavily in favor of Plaintiffs, who will suffer significant, irreparable harm without an injunction, whereas Defendants will not suffer any, much less a substantial, harm if an injunction issues. At most, Defendants stand to temporarily lose the ability to disrupt the status quo with a new law that does not advance any legitimate state interest and is likely to be held unconstitutional. That doesn't compare to the very real harm Plaintiffs are about to suffer. *See, e.g.*, *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

Granting an injunction will undoubtedly serve the public interest. As the Sixth Circuit has made clear: "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's

constitutional rights." *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (cleaned up).  If this Court does not grant preliminary relief, the lives of many transgender youth and their families will be upended while the Court continues to evaluate the lawfulness of the Treatment Ban during the pendency of the litigation.  *See, e.g., Planned Parenthood Inc. v. Cameron*, 2022 WL 3973263, at *9 (W.D. Ky. 2022) ("[C]ourts in the Sixth Circuit have held that public policy supports an injunction when there would be a disruption to medical services."), *appeal docketed*, (6th Circuit 2023).  In contrast, because the Treatment Ban harms rather than protects transgender youth, the State will suffer no harm if the preliminary injunction is granted. *See Eknes-Tucker*, 603 F. Supp. 3d at 1151 (finding severe harm from denying access to care outweighs State's harms).

Finally, the preliminary injunction must apply statewide because the Treatment Ban prohibits necessary care for all transgender adolescents throughout the Commonwealth.  *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established").  As other courts considering similar bans have done, this Court should preliminarily enjoin Defendants from enforcing the Treatment Ban.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary injunction preventing enforcement of the Treatment Ban, SB 150 § 4(2)(a)–(b).

Dated: May 22, 2023                Respectfully Submitted,

/s/ Heather Gatnarek
Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
ACLU OF KENTUCKY FOUNDATION
325 W. Main St. Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org
crystal@aclu-ky.org
kevin@aclu-ky.org

Christopher F. Stoll*
Kelly Jo Popkin*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

Stephanie Schuster*
Randall M. Levine*
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
(202) 739-3000
stephanie.schuster@morganlewis.com
randall.levine@morganlewis.com

Amanda J. Ford*
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
(617) 431-7700
amanda.ford@morganlewis.com

*po hac vice application forthcoming

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing was filed with the Court using the CM/ ECF system on May 22, 2023, which will generate an electronic notice of filing to all counsel registered with that service.

_/s/ Heather Gatnarek_
Heather Gatnarek
