**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| JANE DOE 1; JOHN DOE 1; JOHN MINOR DOE 1, by and through his next friend, Jane Doe 1; JOHN DOE 2; JOHN MINOR DOE 2, by and through his next friend, John Doe 2; JANE DOE 3; JOHN DOE 3; JANE MINOR DOE 3, by and through her next friend, Jane Doe 3; JANE DOE 4; JOHN DOE 4; JANE MINOR DOE 4, by and through her next friend, Jane Doe 4; JANE DOE 5; JOHN DOE 5; JOHN MINOR DOE 5, by and through his next friend, Jane Doe 5; JANE DOE 6; JOHN DOE 6; JANE MINOR DOE 6, by and through her next friend, Jane Doe 6; JANE DOE 7; JOHN DOE 7; and JANE MINOR DOE 7, by and through her next friend, Jane Doe 7, | Civil Action No. 3:23-cv-00230-DJH |

Plaintiffs,

v.

WILLIAM C. THORNBURY, JR., MD, in his official capacity as the President of the Kentucky Board of Medical Licensure; AUDRIA DENKER, RN, in her official capacity as the President of the Kentucky Board of Nursing; and ERIC FRIEDLANDER, in his official capacity as the Secretary of the Cabinet for Health and Family Services,

Defendants.

F I L E D
JAMES J. VILT, JR. - CLERK

MAY 3 1 2023

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

**STATEMENT OF INTEREST OF THE UNITED STATES**

The Commonwealth of Kentucky recently enacted a statute that denies an entire category of medically necessary care to young people because of their sex and because they are transgender. Section 4 of Kentucky Senate Bill 150, 2023 Ky. Acts Ch. 132 (2023) ("SB 150"), prohibits health care providers in Kentucky from administering medically necessary care for

1

transgender minors diagnosed with gender dysphoria, while leaving non-transgender minors free to receive the same procedures and treatments. The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to advise the Court that, by denying transgender minors—and *only* transgender minors—access to medically necessary and appropriate care, SB 150 violates the Equal Protection Clause of the Fourteenth Amendment.[2]

## INTEREST OF THE UNITED STATES

The United States has a strong interest in protecting individual and civil rights, including the rights of transgender persons. Executive Order 13,988 recognizes the right of all people to be "treated with respect and dignity," "to access healthcare . . . without being subjected to sex discrimination," and to "receive equal treatment under the law, no matter their gender identity or sexual orientation." 86 Fed. Reg. 7,023 (Jan. 25, 2021).

The United States has, for example, intervened in litigation challenging an Alabama law imposing a felony ban on the provision of gender-affirming care to minors and obtained a preliminary injunction to halt enforcement of the law. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1151 (M.D. Ala. 2022) (enjoining enforcement); U.S. Am. Compl. in Intervention, ECF No. 92, *Eknes-Tucker v. Marshall*, 2:22-cv-184-LCB-SRW (M.D. Ala. May 4, 2022). The United States also has intervened in litigation challenging a Tennessee law that bans the provision of gender-affirming medical care to transgender minors. *L.W. v. Skrmetti*, 3:23-cv-00376, 2023 WL 3513302 (M.D. Tenn. May 16, 2023) (granting intervention); U.S. Compl. in

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[2] The United States expresses no view on any issues in this case other than those set forth in this brief.

2

Intervention, ECF No. 38-1, *L.W. v. Skrmetti*, 3:23-cv-00376 (M.D. Tenn. Apr. 26, 2023); *see also* U.S. Statement of Interest, ECF No. 19, *Brandt v. Rutledge*, 4:21-cv-00450 (E.D. Ark. June 17, 2021); Br. for the U.S. as Amicus Curiae in Supp. Pls.-Appellees, *Brandt by & through Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022).

## BACKGROUND

### A.     Transgender Youth and Their Need for Medically Necessary and Appropriate Gender-Affirming Care

Transgender people are individuals whose gender identity does not conform with the sex they were assigned at birth. A transgender boy is a child or youth who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a child or youth who was assigned a male sex at birth but whose gender identity is female. By contrast, a non-transgender, or cisgender, child has a gender identity that corresponds with the sex the child was assigned at birth. A person's gender identity is innate.[3]

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[4] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.[5] To be diagnosed with gender dysphoria, the incongruence between sex assigned at birth and gender identity must

---

[3] Declaration of Aron Janssen, M.D. ¶¶ 17, 20, ECF No. 17-2 [hereinafter Janssen Decl.]; Declaration of Daniel Shumer, M.D. ¶¶ 25–26, ECF No. 17-1 [hereinafter Shumer Decl.]; *see also* Brief of *Amici Curiae* American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations in Support of Plaintiffs' Motion for Preliminary Injunction at 5–6, ECF No. 19-2 [hereinafter Br. Amici].

[4] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022), https://perma.cc/FM78-QMZ2.

[5] Janssen Decl. ¶ 7; Shumer Decl. ¶ 35; Expert Declaration of Suzanne Kingery, M.D. ¶ 23, ECF No. 17-3 [hereinafter Kingery Decl.].

3

persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.[6] The inability of transgender youth to live consistent with their gender identity due to the irreversible physical changes that accompany puberty can have significant negative impacts on their overall health and wellbeing.[7] Thus, the delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality.[8]

Standards of care for treating transgender youth diagnosed with gender dysphoria have been published by several well-established medical organizations, including the World Professional Association for Transgender Health ("WPATH"), the Endocrine Society, and the American Academy of Pediatrics ("AAP").[9] The standards of care published by these organizations provide a framework that is based on the best available science and clinical experience, and are widely accepted and endorsed for the treatment of gender dysphoria in

---

[6] Shumer Decl. ¶ 35.

[7] Kingery Decl. ¶ 29.

[8] *Id.*; *see* Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGTBQI+ Youth*, SAMHSA Publication No. PEP22-03-12-001 (2023), at 14, https://perma.cc/2SJU-8K66 [hereinafter *SAMHSA Report*] ("Withholding timely gender-affirming medical care when indicated . . . can be harmful because these actions may exacerbate and prolong gender dysphoria.") (footnotes omitted).

[9] Shumer Decl. ¶¶ 45–53; Kingery Decl. ¶ 25; *see also* Br. Amici at 9; E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022), https://perma.cc/V639-K6FQ [hereinafter *WPATH Standards*]; Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) Pediatrics 1 (2018), https://perma.cc/D4R6-GP6C [hereinafter *AAP Statement*]; Wylie Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017), https://perma.cc/8R3P-6NQY [hereinafter *ES Standards*].

4

children and adolescents.[10] Generally, these organizations recommend that pre-pubertal children with gender dysphoria receive treatments that may include supportive therapy, encouraging support from loved ones, and assisting the young person through elements of a social transition.[11] What social transition means for an individual may evolve over time and can include a name change, pronoun change, bathroom and locker use, personal expression, and communication of affirmed gender to others.[12]

Medical organizations such as WPATH, the Endocrine Society, and AAP recommend that additional treatments involving medications may be appropriate for some adolescents.[13] After the onset of puberty, treatment options may include the use of gonadotropin-releasing hormone agonists to prevent progression of pubertal development (also called "puberty blockers") and hormonal interventions such as testosterone and estrogen administration using a gradually increasing dosage schedule.[14] The guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria should only be recommended when certain criteria are met.[15] These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when gender dysphoria worsens with the onset of puberty; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the

---

[10] Shumer Decl. ¶ 53; Br. Amici at 9.

[11] *See WPATH Standards* at S75–76; *AAP Statement* at 4–6; *see also* Shumer Decl. ¶¶ 42–43; Kingery Decl. ¶ 28; Br. Amici at 11.

[12] *See WPATH Standards* at S76; *AAP Statement* at 6; *see also* Shumer Decl. ¶ 43.

[13] Kingery Decl. ¶ 32; Br. Amici at 11.

[14] *WPATH Standards* at S116; Br. Amici at 11–14.

[15] *See WPATH Standards* at S59–S66; *ES Standards* at 3878; *AAP Statement* at 4–5; Br. Amici at 11–14.

5

adolescent's other mental health concerns (if any) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and when the adolescent has been informed of any risks.[16] All of the guidelines emphasize that family support is an essential component of gender-affirming care.[17] WPATH's guidelines also emphasize that an individualized approach to clinical care for transgender adolescents is both ethical and necessary and recommends a multidisciplinary approach.[18] The guidelines state that the available data reveal that pubertal suppression for transgender youth generally leads to improved psychological functioning in adolescence and young adulthood.[19]

### B. Section 4 of SB 150

The Kentucky legislature overrode Governor Andy Beshear's veto and enacted SB 150 on March 29, 2023. Section 4(2)(a) and (b) of SB 150 bans the prescription and administration of certain gender-affirming medical care to transgender youth suffering from gender dysphoria.

The challenged provisions of the law,[20] set to go into effect on June 29, 2023, are as follows:

---

[16] *See id.*

[17] *See WPATH Standards* at S75–76; *ES Standards* at 3885; *AAP Statement* at 5.

[18] *See WPATH Standards* at S45 and S56.

[19] *See WPATH Standards* at S47; *ES Standards* at 3882; *AAP Statement* at 5. *See also SAMHSA Report* at 37 ("Access to gender affirmation can reduce gender dysphoria and improve mental and physical health outcomes among transgender and gender-diverse people . . . .").

[20] As the Complaint in this matter challenges only Section 4(2)(a) and (b) of SB 150, this Statement of Interest addresses only those provisions of the statute. *See* Compl. ¶¶ 1, n.2; 39, n.5, ECF No. 2.

> (2) Except as provided in subsection (3) of this section, a health care provider
> shall not, for the purpose of attempting to alter the appearance of, or to
> validate a minor's perception of, the minor's sex, if that appearance or
> perception is inconsistent with the minor's sex, knowingly:
>
> > (a) Prescribe or administer any drug to delay or stop normal puberty; [or]
> >
> > (b) Prescribe or administer testosterone, estrogen, or progesterone, in
> > amounts greater than would normally be produced endogenously in a
> > healthy person of the same age and sex . . . .

SB 150 §§ 4(2)(a)–(b). Section 4(1) of SB 150 defines "minor" as a person under age eighteen,

and "sex" as "the biological indication of male and female as evidenced by sex chromosomes,

naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia

*present at birth.*" *Id.* § 4(1) (emphasis added). Thus, the statute prohibits healthcare providers

from providing certain healthcare to minors if that care alters the appearance of their sex to be

inconsistent with their sex assigned at birth, or if it "validate(s) a minor's perception of their sex,

if that perception is inconsistent with" their sex assigned at birth. In other words, SB 150

prohibits puberty blockers and hormone treatments *only* when offered as gender-affirming care

for transgender youth.[21]

But nothing in SB 150 prevents health care providers from administering these same

medical treatments to non-transgender youth for other purposes. For example, a non-transgender

minor who was assigned male at birth may receive testosterone as a treatment for hypogonadism

or delayed puberty to allow the minor to progress through male puberty[22] because the treatment

is consistent with the sex the minor was assigned at birth. And subsection (3) of the statute

---

[21] *See* Shumer Decl. ¶ 35; Kingery Decl. ¶ 23. The statute permits health care providers to taper
their minor patients off of gender-affirming medical care if they certify in the medical record that
immediately terminating care would be harmful to the minor. *See* SB 150 § 4(6). But depriving
minors of needed care, even over time, will still cause them serious harm. *See* Kingery Decl. ¶¶
53, 68.

[22] *See* Shumer Decl. ¶ 82.

7

expressly states that these prohibitions do not apply to the treatment of minors born with certain conditions—namely, a "medically verifiable disorder of sex development, including external biological sex characteristics that are irresolvably ambiguous"—or who are later diagnosed with such a condition, "if a health care provider has determined, through genetic or biochemical testing, that the minor does not have a sex chromosome structure, sex steroid hormone production, or sex steroid hormone action, that is normal for a biological male or biological female." *Id.* § 4(3)(a)–(b). Such "disorders of sex development" are also known as "DSD" or intersex conditions,[23] and health care providers prescribing or administering the prohibited medical treatments to intersex individuals are specifically exempted from liability under the statute. *Id.* § 4(3).

The penalties for a violation of SB 150 are severe. The statute directs licensing and certifying agencies to revoke a health care provider's licensure or certification if the agency finds that the provider has violated § 4(2). *Id.* § 4(4). It also creates a private right of action "to recover damages for injury suffered as a result of" the prohibited medical treatments, and extends the statute of limitations beyond that normally allowed for tort actions. *Id.* § 4(5).

On March 24, 2023, after the legislature passed SB 150, Governor Beshear vetoed the bill. The Governor's veto message stated that SB 150 would "endanger the children of Kentucky," and pointed out that gender-affirming medical care "dramatically reduces the rates of suicide attempts, decreases feelings of depression and anxiety, and reduces substance abuse." Governor Andy Beshear, *Veto Message from the Governor of the Commonwealth of Kentucky Regarding Senate Bill 150 of the 2023 Regular Session*, Mar. 24, 2023,

---

[23] *See* Shumer Decl. ¶ 6; Kingery Decl. ¶ 62. Notably, the statute's narrow definition of "sex" excludes intersex conditions causing ambiguous genitalia at birth, as it references only "nonambiguous internal and external genitalia present at birth." *Id.* § 4(1)(b).

8

https://apps.legislature.ky.gov/record/23rs/sb150/veto.pdf. "Improving access to gender-affirming care," the Governor's veto message continued, "is an important means of improving health outcomes for the transgender population." *Id.*

On March 29, 2023, the legislature overrode the Governor's veto. In doing so, several legislators asserted that gender-affirming care is "dangerous" or "experimental" and that SB 150 is necessary to "protect[]" youth from purported serious risks of gender-affirming care. Kentucky Senate Debate & Vote to Override Veto of SB 150 (Part 1), 1:40:40–1:41:20 (statement by Sen. Mills that gender-affirming puberty blockers and hormone treatments are "dangerous for the health of th[e] child" and describing gender-affirming care as "an experiment"); 1:49:00–1:49:30 (statement by Sen. Tichenor that gender-affirming treatments are "experimental procedures" causing "irreversible damage"); 2:00:00–2:00:30 (statement by Sen. Williams that gender-affirming care "sign[s] [children] up for a lifetime of drug use" and that these "drugs" "cause suicide rates to increase"); 2:01:15–2:02:06 (statement by Sen. Wheeler that transgender youth "need to be protected," suggesting that hormone treatments "can have dangerous consequences," and questioning whether "the feelings that these [transgender] people are having are real"), https://ket.org/legislature/archives/2023/regular/senate-chambers-199498. The legislators provided no medical or scientific support for any of these statements.

## DISCUSSION

SB 150 violates the Equal Protection Clause because it discriminates against transgender minors on the basis of their sex and their membership in a quasi-suspect class. Accordingly, the statute is subject to heightened scrutiny, which it fails because it is not substantially related to an important government interest. The statute is therefore unconstitutional, and Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 17) should be granted.

A.   **SB 150's Ban on Gender-Affirming Medical Care Warrants Heightened Scrutiny Under the Equal Protection Clause.**

SB 150 is subject to heightened scrutiny because it prohibits only transgender youth from obtaining medically necessary gender-affirming care, but leaves other minors eligible for such care. In so doing, the statute discriminates on the basis of both sex and transgender status.

1.   **SB 150's Ban on Gender-Affirming Medical Care Discriminates on the Basis of Sex.**

When evaluating whether a law violates the Equal Protection Clause by discriminating on the basis of sex, courts apply "heightened" or "intermediate" scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988).

SB 150 discriminates on the basis of sex because the medical treatments available to a minor under SB 150 depend on the sex the minor was assigned at birth. Other courts have recently reached the same conclusion in similar contexts. *See Eknes-Tucker*, 603 F. Supp. 3d at 1147 (Alabama's felony gender-affirming care ban "constitutes a sex-based classification for purposes of the Fourteenth Amendment"); *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021) ("[H]eightened scrutiny applies to Plaintiff's Equal Protection claims because [a law banning gender-affirming care for minors] rests on sex-based classifications . . . ."), *aff'd sub nom. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022).

Under SB 150, the medical treatments available to a minor expressly depend on "the biological indication of male and female as evidenced by sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth"—*i.e.*, sex. SB 150 § 4(1)(b). For example, under SB 150, a minor assigned female at birth cannot receive testosterone to treat gender dysphoria, but a non-transgender minor who was assigned male at birth can receive testosterone to treat low hormone production because the treatment is

10

consistent with the sex the minor was assigned at birth. *See id.* § 4(3)(b). As the U.S. Supreme

Court held in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1746 (2020), sex discrimination

"unavoidably" occurs when an individual is treated differently based on transgender status,

because the individual had "one sex identified at birth" but identifies with a different sex

"today."

SB 150's carveout for intersex minors, Section 4(3)(a)–(b), reinforces the conclusion that

SB 150 discriminates on the basis of sex. These provisions exempt minors from SB 150's

prohibitions if they are born with or later diagnosed with "disorders of sex development," or

intersex conditions. *Id.* Consequently, under SB 150, it is legal for a medical provider to offer the

same medical care to an intersex minor that would be unlawful when offered to affirm a

transgender minor's gender identity. SB 150 permits this care for intersex minors because it is

intended to conform their appearance to expectations associated with the sex they were assigned

at birth, rather than a sex different from that assigned at birth, as in the case of transgender

minors. *See id.* This is discrimination based on sex.

SB 150 also discriminates on the basis of sex because it conditions the availability of

particular medical procedures on a sex stereotype: that an individual's gender identity should

match their sex assigned at birth. The Sixth Circuit has repeatedly recognized that discrimination

against transgender individuals based on their gender nonconformity is sex discrimination. *See*

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 220–22 (6th Cir. 2016) (relying on "settled law in

this Circuit" to state that transgender discrimination is sex discrimination); *Barnes v. City of*

*Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (citing Sixth Circuit precedent analyzing sex

stereotypes to support the conclusion that a transgender officer had standing to bring a sex-

discrimination claim under the Equal Protection Clause); *Smith v. City of Salem*, 378 F.3d 566,

11

572, 577 (6th Cir. 2004) (holding that an employee whose employment the City sought to terminate because of their transgender status stated a sex discrimination claim under Title VII and Equal Protection Clause); *see also Avery v. Nelson*, No. 1:23-cv-160, 2023 WL 2399830, at *3–4 (W.D. Mich. Mar. 8, 2023) (citing *Smith* and *Bostock* in holding that plaintiff set forth plausible equal protection claims against employers for discriminating against plaintiff and terminating plaintiff's employment because of plaintiff's gender dysphoria and related gender non-conforming behavior and appearance).

Indeed, in a case later consolidated with *Bostock* before the Supreme Court, the Sixth Circuit relied on *Smith v. City of Salem*, among other precedents, to find that "[d]iscrimination on the basis of transgender and transitioning status is necessarily discrimination on the basis of sex." *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) (holding that terminating a transgender employee because she informed her employer that she would begin transitioning at work is sex discrimination).[24] Other circuits have held the same.[25]

## 2. SB 150's Ban on Gender-Affirming Medical Care Discriminates Against Transgender Individuals, a Quasi-Suspect Class.

SB 150 also warrants heightened scrutiny because it discriminates on the basis of

---

[24] In *R.G. & G.R. Harris Funeral Homes, Inc.*, the Sixth Circuit also relied on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), where a plurality of the Supreme Court held that discrimination because of a failure to conform with gender stereotypes is sex discrimination. 884 F.3d at 571–74.

[25] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611–13 (4th Cir. 2020) (concluding that school board's policy prohibiting transgender students from using restrooms that match their gender identity constitutes sex-based discrimination and transgender persons constitute a quasi-suspect class); *Whitaker*, 858 F.3d at 1051 (finding school policy requiring students to use bathroom in accordance with sex on student's birth certificate is "inherently based upon a sex-classification"); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender.").

12

transgender status, a quasi-suspect classification. *See Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986) (noting that "heightened scrutiny" applies to constitutional claims of discrimination based on membership in a "quasi-suspect" class). To determine whether a group constitutes a quasi-suspect class, the Supreme Court has analyzed whether the group: (1) has historically been subjected to discrimination, *see Lyng*, 477 U.S. at 638; (2) has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41(1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).

While no court within the Sixth Circuit has decided the issue, both the Fourth and Ninth Circuits have recognized transgender people as a quasi-suspect class under the Equal Protection Clause. *See Grimm*, 972 F.3d at 611, 613 (concluding that transgender persons constitute a quasi-suspect class after finding "[e]ach factor is readily satisfied"); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (upholding the district court's application of strict scrutiny after applying factors to determine transgender people are, at least, a quasi-suspect class). Many district courts have held the same.[26]

The Court should reach the same conclusion here because each of the factors enumerated above supports a finding that transgender persons are a quasi-suspect class. First, transgender individuals, as a class, have historically been subject to discrimination and continue to "face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051 (recognizing transgender people as a quasi-suspect class); *accord Grimm*, 972 F.3d at 611–

---

[26] *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951–53 (W.D. Wisc. 2018); *Highland*, 208 F. Supp. 3d at 873–74.

13

612; *Ray*, 507 F. Supp. 3d at 937.

Second, no "data or argument suggest[s] that a transgender person, simply by virtue of

transgender status, is any less productive than any other member of society." *Adkins v. N.Y.C.*,

143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *accord Grimm*, 972 F.3d at 611–12; *Ray*, 507 F.

Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874. The American Psychiatric Association has

stated that "[b]eing transgender or gender diverse implies no impairment in judgment, stability,

reliability, or general social or vocational capabilities."[27]

Third, transgender individuals share "obvious, immutable, or distinguishing

characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477

U.S. at 638). Specifically, transgender individuals' "gender identity does not align with the

gender they were assigned at birth." *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704,

721 (D. Md. 2018). As many courts have recognized, "being transgender is not a choice. Rather,

it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612–13; *see also Ray*,

507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874 (quoting *Lyng*, 477 U.S. at 638).

Fourth, people who are transgender lack political power. *See Grimm*, 972 F.3d at 613

("Even considering the low percentage of the population that is transgender, transgender persons

are underrepresented in every branch of government."). While the number of openly transgender

elected officials is growing, they still represent a small fraction of office-holders. *Id.* The

proliferation of enacted legislation aimed at restricting the rights of transgender individuals,

particularly transgender minors, is further evidence of the limited political power of the

---

[27] APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2018), https://perma.cc/4LZB-BVMK.

transgender community. *See M.A.B.*, 286 F. Supp. 3d at 721 (noting that courts have had to block numerous laws because they violated rights of transgender individuals).

Because SB 150 discriminates against transgender persons and they constitute a quasi-suspect class, the statute is subject to intermediate scrutiny.

## B. SB 150's Ban on Gender-Affirming Care Cannot Survive Heightened Scrutiny Because it is not Substantially Related to Achieving Kentucky's Important Governmental Interests.

To withstand heightened scrutiny, a defendant must show that the challenged action "serves important governmental objectives" and that the "discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia* (*VMI*), 518 U.S. 515, 524 (1996) (requiring an "exceedingly persuasive justification" for a sex-based classification) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. The heightened scrutiny inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that a legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, where intermediate scrutiny applies, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation," and it "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533.[28] A classification does not withstand heightened scrutiny

---

[28] *See also Glenn*, 663 F.3d at 1321; *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014) ("[The court] must examine [the law's] actual purposes and carefully

when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women,* 458 U.S. at 730.

SB 150's asserted purpose, protecting youth from physical and emotional harm, cannot withstand heightened scrutiny because a ban on transgender youth receiving certain forms of medically necessary gender-affirming care is not "substantially related" to achieving that objective. *See VMI*, 518 U.S. at 533. Rather, it is a pretextual justification lacking accurate scientific or medical basis that ultimately harms—not helps—the minors it purports to protect. Indeed, banning these forms of gender-affirming care will have devastating effects on many transgender youths while providing no countervailing benefit to them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979) (courts must "weigh[] the state interest sought to be furthered against the character of the discrimination caused by the statutory classification"). Furthermore, the legislation's text and history belie the purported purpose of protecting youth, strongly suggesting that Kentucky's asserted interest is pretextual.

First, it is well-established that the provision of gender-affirming care to treat gender dysphoria is helpful, not harmful, to transgender youth. Contrary to Kentucky legislators' assertions that gender-affirming care for transgender youth is "dangerous" or "experimental," every major medical association, including the American Psychiatric Association, WPATH, the Endocrine Society, and AAP, has recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some youth diagnosed with gender dysphoria.[29] In fact, the medical evidence shows that trying to "cure" a person with a diagnosis of gender dysphoria by forcing them to live in alignment with their sex assigned at birth is

---

consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.").

[29] Br. Amici at 8–9; Janssen Decl. ¶ 8.

severely harmful and ineffective.[30] Transgender minors who do not receive gender-affirming

care face increased rates of victimization, substance abuse, depression, anxiety, and suicidality.[31]

The medical community overwhelmingly agrees that gender-affirming care is medically

necessary for some transgender youth.[32]

Second, the medical research supporting the safety and efficacy of the forms of gender-

affirming care banned by SB 150 is substantial. Contrary to the assertions in the statute, gender-

affirming medical treatment for patients diagnosed with gender dysphoria is far from

"experimental" in nature, and, instead, has long been recognized as part of the standards of care

by major medical associations.[33] The American Medical Association recognizes that "standards

of care and accepted medically necessary services that affirm gender or treat gender dysphoria

may include mental health counseling, non-medical social transition, gender-affirming hormone

therapy, and/or gender-affirming surgeries," and that "[e]very major medical association in the

United States recognizes the medical necessity of transition-related care for improving the

physical and mental health of transgender people."[34] Clinicians have used these standards of

---

[30] Janssen Decl. ¶ 20.

[31] *See* Jack L. Turban, et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17(1) PLoS ONE 1, 1–15 (2022); Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics 1, 1–8 (2020); Nat'l Academies Scis., Eng'g, and Med., *Understanding the Well-Being of LGBTQI+ Populations* 363–64 (2020); *AAP Statement*; *see also* Janssen Decl. ¶ 43–48; Br. Amici at 18–21.

[32] *See, e.g.*, Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5(2) Pediatrics 1 (2022); Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7(3) Clinical Practice in Pediatric Psychology 302 (2019); *see also* Br. Amici at 8.

[33] Shumer Decl. ¶¶ 23, 86; Br. Amici at 8, 15–16.

[34] James L. Madara, *AMA to States: Stop Interfering in Health Care of Transgender Children,* AMA (April 26, 2021), https://perma.cc/7JYQ-FW2P (letter from CEO); *see also* American Academy of Family Physicians et al., *Frontline Physicians Call on Politicians to End Political Interference in the Delivery of Evidence Based Medicine* (May 15, 2019), www.aafp.org/news/media-center/more-statements/physicians-call-on-politicians-to-end-

care, which are peer-reviewed and based on reviews of scientific literature, for decades.[35]
Hormone treatment for gender dysphoria began soon after estrogen and testosterone became
commercially available in the 1930s, and doctors have long used hormone therapies for patients
whose natural hormone levels are below normal range.[36] Puberty blockers have been prescribed
to treat gender dysphoria for over 20 years, and for several decades to treat medical conditions
such as precocious puberty, a condition in which a child enters puberty at a young age.[37]

Notably, SB 150 implicitly acknowledges the longstanding safety of these treatments, as
it allows health care providers to prescribe and administer them for purposes other than gender
dysphoria. SB 150's carveout for intersex minors further attenuates any connection between the
law and Kentucky's purported concern about the health risks to youth. *See* SB 150 § 4(3)(a)–(b).
This underscores the mismatch between the "alleged objective" and "actual purpose" of SB 150.
*See Miss. Univ. for Women*, 458 U.S. at 730.

"[I]f the constitutional conception of 'equal protection of the laws' means anything, it
must at the very least mean" that the desire to express moral disapproval of "a politically
unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v.*

---

political-interference-in-the-delivery-of-evidence-based-medicine.html (statement issued on
behalf of American Academy of Family Physicians, American Academy of Pediatrics, American
College of Obstetricians and Gynecologists, American College of Physicians, American
Osteopathic Association, and American Psychiatric Association).
[35] *See* Meredith McNamara, M.D., M.S., et al., "A Critical Review of the June 2022 Florida
Medicaid Report on the Medical Treatment of Gender Dysphoria," at 5 (July 8, 2022),
https://medicine.yale.edu/lgbtqi/research/gender-affirming-
care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.p
df; *see also* Br. Amici at 15–16.
[36] Brandy Schillace, *The World's First Trans Clinic*, Scientific American, Aug. 1, 2021, at 74;
Kingery Decl. ¶ 62.
[37] Kingery Decl. ¶ 55; Schumer Decl. ¶ 63.

*Moreno*, 413 U.S. 528, 534 (1973).[38] But that is exactly what Kentucky has done here, attempting to conceal its moral disapproval in the guise of "protecting" youth. In reality, though, SB 150 prevents transgender minors diagnosed with gender dysphoria from receiving care that their physicians and parents agree is appropriate and medically necessary. Therefore, it does not substantially achieve the legislature's asserted interest in protecting youth. SB 150 fails heightened scrutiny.[39]

## CONCLUSION

SB 150 bans certain forms of medically necessary care for transgender minors, while leaving non-transgender minors free to receive the same procedures and treatments. The law fails heightened scrutiny because its asserted purpose—protecting minors from "experimental" care— is pretextual, and because banning medically necessary care to treat gender dysphoria is not substantially related to serving an important government objective. To the contrary, the law harms the health of transgender youth, blocks parents from making individual determinations regarding the appropriate care of their transgender children, and threatens health care providers with penalties simply for treating minor transgender patients consistent with broadly accepted

---

[38] *See also Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (admonishing that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").
[39] Heightened scrutiny applies in this case under clearly established Supreme Court and Sixth Circuit law. But SB 150's ban on gender-affirming medical care would not survive even rational basis review because, for the reasons stated above, there is not even a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). By restricting medically necessary health care only to transgender minors but allowing for the same care to be provided to non-transgender minors, Kentucky shows its hand: the purpose of SB 150 is not to "protect" youth, but rather to deprive transgender minors of medically necessary care. A law motivated by prejudice towards a particular group and bearing no rational relationship to the law's stated purpose cannot survive even the lowest level of review. *See Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534 ("[A] bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

standards of medical care. SB 150 violates the Equal Protection Clause of the Fourteenth

Amendment and the Court should grant Plaintiffs' Motion for Preliminary Injunctive Relief.

Dated: May 31, 2023

MICHAEL A. BENNETT
United States Attorney
Western District of Kentucky

JESSICA R. C. MALLOY
Assistant United States Attorney
717 West Broadway
Louisville, KY 40202
Tel.: (502) 779-2765
Jessica.Malloy@usdoj.gov

CARLTON S. SHIER, IV
United States Attorney
Eastern District of Kentucky

CARRIE B. POND
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, KY 40507
Tel.: (859) 233-2661
Carrie.Pond@usdoj.gov

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief, Federal Coordination and
Compliance Section

COTY MONTAG
Deputy Chief, Federal Coordination and
Compliance Section

JENNA GRAMBORT
Trial Attorney
Federal Coordination and Compliance
Section
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW – 4CON
Washington, DC 20530
Tel.: (202) 598-5032
Jenna.Grambort@usdoj.gov

*Attorneys for the United States of America*

CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, the foregoing Statement of Interest was filed in

person with the Clerk of the Court, and counsel of record were served by mail.

Respectfully submitted,

Jessica R. C. Malloy
Assistant United States Attorney