UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISIVLLE DIVISION

*Electronically filed*

| | |
|---|---|
| DOE 1, *et al.*<br>        Plaintiffs | |
| v. | Civil Action No. 3:23-CV-00230-DJH |
| THORNBURY, *et al.*<br>        Defendants | |
| and | |
| COMMONWEALTH OF KENTUCKY,<br>ex rel. ATTORNEY GENERAL DANIEL<br>CAMERON<br>        Intervening Defendant | |

---

## THE COMMONWEALTH OF KENTUCKY'S RESPONSE IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On September 21, 2022, the Associated Press reported about videos that had surfaced of a doctor and staffer at Vanderbilt University Medical Center "touting that gender-affirming procedures are 'huge money makers' for hospitals." Kimberlee Kruesi, *Social media posts spark calls to investigate Tenn.'s VUMC*, Associated Press (Sept. 21, 2022), https://perma.cc/KV5A-MLL9. After investigation, Tennessee prohibited that use of these "huge money makers" on children. Tenn. Code Ann. § 68-33-103.

During the 2023 legislative session, Kentucky took note and conducted its own investigation into these practices. By overwhelming margins, the General Assembly overrode the Governor's veto and enacted Senate Bill ("SB") 150. Sections 4(2)(a) and (b) of SB 150 prohibit the use of two specific "huge money makers"—puberty blockers and cross-sex hormones—to attempt to alter the appearance of a child's sex. As Representative Jennifer Decker noted during committee hearings about SB 150, "there is no quality long-term study to establish that there is [a] long-term benefit to gender-transition services, and more importantly, there is long-term evidence that these services result in permanent, lifelong harm to children." Rep. Decker Testimony, House Judiciary Committee, 44:40–45:00 (Mar. 2, 2023), https://ket.org/legislature/archives/2023/regular/house-judiciary-committee-198318.

Representative Decker is right. Because "the evidence is lacking," the international medical consensus is burgeoning in opposition to the notion that these huge money-makers "are beneficial and should be more accessible." *What America has got wrong about gender medicine*, The Economist (Apr. 5, 2023) [Ex. 1]. As just one example, less than three months ago, Sweden's health authority conducted one of the few systematic reviews of this issue, concluding that injecting puberty blockers "in children with gender dysphoria should be

considered experimental treatment of individual cases rather than standard procedure." Ludvigsson, et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, Acta Paediatrica, 2 (Apr. 17, 2023) [Ex. 2]. Why? Because the evidence "is insufficient" to back claims that injecting cross-sex hormones "in children with gender dysphoria" is beneficial. *Id.* Following such "concerns about the rapid widespread adoption of interventions and call[s] for rigorous scientific review . . . across the ideological spectrum," "several European countries have issued guidance to limit medical intervention in minors, prioritizing psychological care." Jennifer Block, *Gender Dysphoria in Young People is Rising—and so is Professional Disagreement*, The British Medical Journal, 1 (Feb. 23, 2023) [Ex. 3].

Some within the United States are acting. Nineteen other States have prohibited some form of this experimentation.[1] A federal agency recently concluded that "[t]here is a lack of current evidence-based guidance for care of children and adolescents who identify as transgender regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation." *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*, AHRQ, Nom. No. 0928, 2 (Jan. 8, 2021) [Ex. 4]. More action from the federal government is needed, however, after two such children tragically committed suicide while taking those drugs as part of a study. Press Release, U.S. Senate Committee on Health, Education, Labor, & Pensions (June 6, 2013), https://perma.cc/LR2Q-K5C2.

---

[1] Ariz. Senate Bill 1138 (2022); Ark. Code Ann. ¶ 29-9-1502; Ala. Code ¶ 26-26-4; Fla. Admin. Code R. 64B8-9.019; Ga. Senate Bill 140 (2023); Idaho House Bill 71 (2023); Ind. Senate Bill 480 (2023); Iowa Senate File 538 (2023); Miss. House Bill 1125 (2023); Mo. Senate Bill 49 (2023); Mont. Senate Bill 99 (2023); Neb. Legislative Bill 574 (2023); N.D. House Bill 1254 (2023); Okla. Senate Bill 613 (2023); S.D. House Bill 1080 (2023); Tenn. Code Ann. § 68-33-103; Tex. Senate Bill 14 (2023); Utah Senate Bill 16 (2023); W.V. House Bill 2007 (2023).

Make no mistake, Kentucky's children will be irreversibly damaged if this Court issues a categorical state-wide injunction blocking enforcement of Sections 4(2)(a) and (b) of SB 150. The list of the "numerous harms . . . either known, or reasonably anticipated by respected health authorities" resulting from children of one sex taking puberty blockers and cross-sex hormones to attempt to alter their appearance is long: (1) sterilization without proven fertility preservation options; (2) permanent loss of capacity for breast-feeding in adulthood; (3) lifetime lack of orgasm and sexual function; (4) neurodevelopment and cognitive development deficiencies; (5) elevations in metabolic and cardiovascular disease; (6) height loss; (7) decreased bone mineral density; (8) elevated risk of Parkinsonism in adult females; (9) sterile abscesses; (10) leg pain; (11) headaches; (12) mood swings; (13) weight gain; (14) testosterone and anabolic steroid addiction; (15) generalized paresthesia; (16) venous thromboembolic events; (17) adverse drugs reactions, especially effects on the cardiovascular system; (18) severe hyperandrogenism; (19) myocardial infarction; (20) polycystic ovaries, clitoromegaly, and atrophy of the lining of the uterus and vagina; (21) vocal-cord damage; (22) hirsutism or male pattern balding; (23) cancer; (24) severe erythrocytosis; (25) hyperestrogenemia; and (26) changes in fat deposition and muscle development. Cantor Decl., ¶¶ 201–25; Laidlaw Decl., ¶¶ 75–152, 264–65; Levine Decl., ¶¶ 169–98. Many of these ailments are not reversible. Cantor Decl., ¶¶ 225–37; Laidlaw Decl., ¶¶ 38, 78, 88, 90, 95, 106–08, 111, 120, 134, 152, 214, 230, 264–65; Levine Decl. ¶¶ 14(h) & (l), 29, 119–21, 126, 128, 138, 169–98.

Those are just some of the physical harms that proponents of using puberty blockers and cross-sex hormones claim are outweighed by the supposed mental health benefits of using such drugs on a gender-dysphoric child. But not only does mental health not improve with

their use, it can get worse, leading to an *elevated* rate of suicide, suicidality, anxiety, depression, and regret. Levine Decl., ¶¶ 14(j)–(l), 46–82, 138–85, 221–22; Laidlaw Decl. ¶¶ 119, 137, 202–07; Cantor Decl., ¶¶ 26, 139–61, 176–99, 220, 225–237. So the very drugs that are touted by some as life-saving are more likely to lead to lives ending. The reason is simple—no matter what permanent or invasive interventions the medical community may be willing to experiment with, a person's biological sex is immutable. Laidlaw Decl., ¶¶ 14–42, 263; Levine Decl., ¶¶ 14(a), 15–23; Cantor Decl., ¶¶ 104–06. Puberty blockers and cross-sex hormones, when used in the manner prohibited by SB 150, often affirm nothing but continued mental suffering, and augment it with new, iatrogenic physical suffering.

Believing that SB 150 is bad public policy despite all the objective medical evidence supporting it is one thing. Claiming a constitutional right that prohibits enforcement of SB 150 is another. The Plaintiffs are not entitled to their sought relief.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted). To do so, a plaintiff "must establish" four things: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 535–36 (citation omitted). The Plaintiffs have not made this showing.

I.      **The Plaintiffs stand no chance at success on the merits.**

"Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). That is the case here. There is no fundamental right of a parent to obtain for a child whatever drugs the parent—much less, the child—desires, no matter what. And a law that classifies according to age and the non-FDA approved use of puberty blockers and cross-sex hormones for a particular purpose does not trigger heightened scrutiny. Instead, "health and welfare laws[ are] entitled to a 'strong presumption of validity' [and] must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted). Sections 4(2)(a) and (b) of SB 150 are constitutional.

A.  **There is no limitless right of a parent to obtain drugs for a child.**

The Plaintiffs boldly assert a fundamental right to obtain whatever drugs they want for their children, without restriction. Their cursory argument is make-work. Sure, "parents' substantive due process right 'to make decisions concerning the care, custody, and control' of their children includes the right to direct their children's medical care." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (citation omitted). But this general right to make the ultimate decision from a list of available medical treatments does not translate into some sort of affirmative, limitless right to obtain whatever drugs the parent wants for his or her child, carte blanche. "[T]o recognize the right Plaintiffs assert would be to compel the [Kentucky] legislature, in shaping its regulation of [the medical profession], to accept Plaintiffs' personal views of what therapy is safe and effective for minors." *Pickup v.*

*Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

To start, even the general parental right to make medical decisions for a child from a list of legally-permissible treatments "does not mean that parents' control over their children is without limit." *Kanuszewski*, 927 F.3d at 419. "[L]imitations on parents' control over their children are particularly salient in the context of medical treatment." *Id.*; *see also id.* at 419 n.12; *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006) (Parental rights are "limited by an equally compelling governmental interest in the protection of children. . . . '[A]lthough parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor[s].'" (citation omitted)).

This right is circumscribed even more when the parent, rather than simply choosing between several available options, is trying to affirmatively obtain for his or her child drugs that are banned when used for a particular purpose. Such a right of a *child herself* is non-existent: "[M]ost federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment . . . if the government has reasonably prohibited that type of treatment." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 599 (6th Cir. 2013) (citation omitted); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710–11 & n.18 (D.C. Cir. 2007) (rejecting the existence of a constitutional right to "potentially life-saving" medical treatment and noting that "[n]o circuit court has acceded to an affirmative access claim"); *cf. Washington v. Glucksberg*, 521 U.S. 702, 725–26 (1997) (noting that "the right to refuse unwanted medical treatment c[annot] be some-how transmuted into a right to" get specific treatment, such as assisted suicide).

6

Without a direct, unlimited fundamental right *of the child* to demand particular treatment, the Plaintiffs conjure an indirect fundamental right of a parent to obtain those same drugs for the same child. But in this context, the parent's asserted right is "derivative from, and therefore no stronger than," the child's own right to obtain drugs or the parent's own right to obtain drugs for himself or herself. *Whalen v. Roe*, 429 U.S. 589, 604 (1977). "[T]t would be odd if parents had a substantive due process right to choose specific treatments for their children— treatments that reasonably have been deemed harmful by the state—but not for themselves." *Pickup*, 740 F.3d at 1236; *Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983) ("[A parent]'s rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself.").

Even more problematic, when they describe the right as one of simply directing a child's medical care, the Plaintiffs frame their asserted right at too "high [of a] level of generality." *Dobbs*, 142 S. Ct. at 2258. "To validly assert a substantive due process claim, a petitioner must provide a 'careful description' of the claimed liberty interest." *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *5 (6th Cir. Apr. 5, 2023). "Because 'guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended,' courts should be 'reluctant' to expand the rights recognized as fundamental." *Id.* (citation omitted). Parents may have a general right to make, from a list of legally-available options, a particular healthcare choice. But there is no fundamental right to obtain for their children particular drugs for a particular prohibited use. *See Dobbs*, 142 S. Ct. at 2242 (holding that for an asserted right to be fundamental, it "must be 'deeply rooted in this Nation's history and tradition' and implicit in the concept of ordered liberty'" (citation omitted)).

Instead, as long as Kentucky's decision to prohibit the use of puberty blockers and cross-sex hormones due to the potential to inflict irreversible harm on a child is "reasonabl[e]," it is constitutional. *Pickup*, 740 F.3d at 1236. As explained below, it is both.

**B.  Rational basis review applies to the Plaintiffs' equal protection claim.**

"The underlying principle of the Equal Protection Clause is that 'all persons similarly situated should be treated alike.'" *Clark*, 2023 WL 2787325, at *8 (citation omitted). But "[l]aws that do not involve suspect classifications and do not implicate fundamental rights or liberty interests, in contrast, will be upheld if they are 'rationally related to a legitimate state interest.'" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002) (citation omitted). The Plaintiffs argue that Sections 4(2)(a) and (b) of SB 150 create either sex or transgender-based classifications that trigger intermediate scrutiny. Pls.' Mot. Prel. Inj. 14–18, DN 17. That argument breezes by many assumptions that do not hold water. Rational basis review applies.

**1.  SB 150 does not create sex-based classifications.**

Writing exactly half a century ago, the Supreme Court observed that our nation "had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). Almost 30 years ago, Justice Ginsburg made clear that courts would no longer allow women to be denied "full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities" "simply because they are women." *United States v. Virginia*, 518 U.S. 515, 532 (1996).

8

This recognition, however, "does not [automatically] make sex a proscribed classification." *Id.* at 533. That is because "'[i]nherent differences' between men and women, we have come to appreciate, remain cause for celebration." *Id.* This includes "[p]hysical differences between men and women [that] are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" *Id.* (citation omitted). It is only when "classifications [are] used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women" that heightened scrutiny applies. *Id.* at 534. More succinctly, only if a classification "closes a door or denies opportunity to" one of the sexes does intermediate scrutiny apply. *Id.* at 532–33.

But nothing about the challenged provisions "closes a door or denies opportunity" to just one of the sexes or "create[s] or perpetuate[s] . . . the inferiority" of one of the sexes. The provisions apply equally to *both* sexes. Children of both sexes are prohibited from doing the same thing—taking off-label drugs to attempt to alter biological appearance inherent in sex. Since the challenged provisions apply to both sexes equally, it is impossible to conclude that they prefer one sex over the other, the necessary basis of a sex-based equal protection claim.

Because sex is binary, Cantor Decl., ¶¶ 104–06; Laidlaw Decl., ¶¶ 14–42, 263; Levine Decl., ¶¶ 14(a), 15–23, of course the effect of the law is to prohibit only boys from doing certain things that girls are allowed to do, and vice versa. But this is irrelevant because "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (citation omitted). That is because the type of "[d]iscriminatory purpose" triggering heightened scrutiny

9

"implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993) (citation and quotation marks omitted); *see also id.* at 269 ("'Women seeking abortion' is not a qualifying class."); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause . . . commands . . . that all persons *similarly situated* should be treated alike." (emphasis added)). The Plaintiffs have not attempted to assert any invidious discrimination, so they have not shown that the challenged provisions should be subject to heightened scrutiny.

The Plaintiffs point to decisions that gloss over critical aspects of our equal protection jurisprudence. They first cite decisions like *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020), for the assertion that "[i]t is *impossible* to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." But the Sixth Circuit has found that "*Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). That's because imputing *Bostock*'s "but-for cause" test to the equal-protection context would be incongruent with Justice Ginsburg's recognition that the "'[i]nherent differences' between men and women . . . remain cause for celebration." *Virginia*, 518 U.S. at 533. Applying a "but-for cause" test in the equal-protection context would "fail to acknowledge even our most basic biological differences," which "risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001) ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that

10

are real.”); *cf. Bostock*, 140 S. Ct. at 1832–33 (Kavanaugh, J., dissenting) (explaining that the Supreme Court has never characterized sexual-orientation discrimination as sex-based discrimination “because everyone . . . has long understood that sexual orientation discrimination is distinct from, and not a form of, sex discrimination”).

The Plaintiffs also point to sex-stereotype decisions like *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004), for the assertion that “discrimination against a plaintiff who is a transsexual . . . is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*, who, in sex-stereotypical terms, did not act like a woman.” But Sections 4(2)(a) and (b) of SB 150 have nothing to do with sex “stereotype[s], defined as a frame of mind resulting from irrational or uncritical analysis.” *Nguyen*, 533 U.S. at 68. Rather, they have to do with “inherent . . . [p]hysical differences between men and women [that] are enduring.” *Virginia*, 518 U.S. at 533 (citation and quotation marks omitted). The Plaintiffs are turning equal protection analysis on its head by arguing that sex stereotypes should receive constitutional protection. It is the Plaintiffs who believe that when a child behaves in a sex-stereotypical way, that child should be given physically and mentally life-changing drugs to attempt to alter the appearance of the child’s sex to better align with the admittedly stereotypical behavior. Under the challenged provisions however, children are free to transcend whatever stereotypes they believe exist. It is biology—inherent physical differences that no amount of medicine can change, Laidlaw Decl., ¶¶ 14–42, 263; Levine Decl., ¶¶ 14(a), 15–23; Cantor Decl., ¶¶ 104–06—that children cannot transcend.

The challenged provisions also do nothing to “single[] out transgender adolescents.” Pls.’ Mot. Prel. Inj. 15, DN 17. Not all transgender adolescents wish to be prescribed puberty

blockers or cross-sex hormones to attempt to transform their sex. Levine Decl., ¶ 53. And no adolescent, not just transgender adolescents, can be prescribed those drugs for the purpose of attempting to alter his or her appearance inherent in biological sex.[2] There is therefore a "lack of identity" between "transgender" status and the prohibited use of drugs, precluding application of heightened scrutiny. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

Instead, the challenged provisions create age- and medical-procedure-for-a-specific-purpose-based classifications, neither of which is subject to heightened scrutiny. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) (age); *Vacco v. Quill*, 521 U.S. 793, 800–01 (1997) (applying rational basis review to uphold a ban on physician-assisted suicide). Only minors, not adults, are prohibited from being prescribed drugs and only for the purpose of attempting to alter the minor's sex-inherent appearance. Moreover, the Plaintiffs admit that puberty blockers and cross-sex hormones can be used for reasons other than attempting to alter a minor's sex-inherent appearance. Pls.' Mot. Prel. Inj. 15, DN 17. That is a classification based

---

[2] For example, individuals with autogynephilia might not fall within the Plaintiffs' definition of being "transgender," as they don't necessarily identify as the opposite sex and only wish to be of the opposite sex for sexual arousal. Anne A. Lawrence, *Autogynephilia: an underappreciated paraphilia*, National Institutes of Health, https://perma.cc/S9B6-MMM5. Nor would eunuchs, who still identify as men but simply "wish to eliminate masculine physical features, masculine genitals, or genital functioning." E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People Version 8*, International Journal of Transgender Health, Vol. 23, No. S1, S88 (2022) [Ex. 6]. As minors, they are also covered by the law.

on the use of the drug, not based on who is using it. And it is an important distinction because puberty blockers and cross-sex hormones have far different applications and results depending on what they are used for and the duration of use. Laidlaw Decl. ¶¶ 64–152.

Some courts, using surface-level examination, have erroneously found laws that prohibit the use of drugs on minors to attempt to alter their biologically-inherent appearances to be sex-based discrimination. This Court should not follow suit.

### 2. Gender-dysphoric individuals are not a protected class.

The Plaintiffs' second attempt at obtaining heightened review of Sections 4(2)(a) and (b) of SB 150 is to characterize those provisions as creating a classification based on gender dysphoria, allegedly a protected class. As already explained, however, the challenged provisions do not discriminate based on a diagnosis of gender dysphoria.

But even if they did, gender-dysphoric individuals are not a protected class entitled to heightened scrutiny. In *Ondo v. City of Cleveland*, the Sixth Circuit held that it has "always applied rational-basis review to state actions involving sexual orientation," since the Supreme Court "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender." 795 F.3d 597, 609 (6th Cir. 2015). The Plaintiffs do not assert that gender dysphoria is ascertainable at the moment of birth, nor have they advanced any credible argument that gender dysphoric individuals are entitled to protected-class status when sexual orientation is not.

Instead, the Plaintiffs simply assert, that four factors support characterizing gender dysphoria as a protected class. In doing so, the Plaintiffs proffer no reason to believe that any discrimination faced by gender-dysphoric individuals is different from or more pervasive than

discrimination based on sexual orientation, to which rational basis review applies. *Id.* Or that of mental disability, which the Supreme Court did not recognize as a suspect class, despite "a history of unfair and grotesque mistreatment" including compulsory sterilization in at least 32 states. *Cleburne Living Ctr., Inc. v. City of Cleburne, Tex.*, 726 F.2d 191, 197 (5th Cir. 1984), *aff'd in part and vacated in part*, 473 U.S. 432 (1985). The Plaintiffs also cannot credibly claim, on one hand, that gender dysphoria leads to debilitating anxiety, depression, and suicidality, and at the same time claim that gender dysphoria does not affect "the ability to contribute to society." Pls.' Mot. Prel. Inj. 17, DN 17; Med. Assocs. Amicus Br. 4. The Plaintiffs make no attempt to claim that gender dysphoria is an "obvious, immutable, or distinguishing characteristic," and instead claim only that once gender dysphoria becomes evident, discrimination follows. *Id.* Finally, it is particularly difficult for any objective observer to conclude that political powerlessness follows gender dysphoria when dozens of legal activist groups and all manner of associations from the medical profession, not to mention the federal and various state governments, are expending great resources in lawsuits advocating on their behalf. *See generally, e.g.*, *Doe v. Thornberry*, 3:23-cv-230 (W.D. Ky.) (docket listing all parties, counsel, and amici); *Eknes-Tucker v. Alabama*, No. 22-11707 (11th Cir.) (same), No. 2:22-cv-184 (M.D. Ala.) (same); *Brandt v. Rutledge*, No. 21-2875 (8th Cir.) (same), 4:21-cv-450 (E.D. Ark.) (same); *L.W. v. Skrmetti*, 3:23-cv-376 (M.D. Tenn.) (same); *Doe v. Ladapo*, 4:23-cv-114 (M.D. Fla.); *K.C. v. Med. Licensing Bd. of Ind.*, 1:23-cv-595 (S.D. Ind.).

Until the Sixth Circuit reverses course, it is not for this Court to recognize gender-dysphoric individuals as a protected class to which intermediate scrutiny applies.

### C.  Regardless of the level of scrutiny applied, Senate Bill 150 is constitutional.

Rational basis review applies to the Plaintiffs' claims. "[G]overnmental action subject to . . . the rational basis test must be sustained if *any* conceivable basis rationally supports it." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005). If the Court thinks intermediate scrutiny applies here, as long as the law serves "important governmental objectives" and is "substantially related to the achievement of those objectives," it is constitutional. *Virginia*, 518 U.S. at 533 (citation omitted). Even under the strictest scrutiny, the challenged provisions need not be "perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015).

Whatever level of scrutiny is applied, the result remains the same—Sections 4(2)(a) and (b) of SB 150 are constitutional. No one can dispute that Kentucky has a "compelling governmental interest in the protection of children," *Kottmyer*, 436 F.3d at 690; *Reno v. ACLU*, 521 U.S. 844, 869 (1997), "in protecting vulnerable groups . . . from abuse, neglect, and mistakes," *Washington*, 521 U.S. at 731, and "in protecting the integrity and ethics of the medical profession," *id.*; *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). So the only question is whether the challenged provisions sufficiently serve those interests. They do.

Children are in the midst of a mental health crisis. Nangia Decl., ¶¶ 34–35; Cantor Decl., ¶¶ 139–45; Jean Twenge, *Teens have less face time with their friends – and are lonelier than ever*, The Conversation (Mar. 20, 2019), https://perma.cc/5NAM-MQUF. At the same time, more and more children are identifying themselves as transgender. Nangia Decl., ¶¶ 16–20; Laidlaw Decl., ¶¶ 208–11; Levine Decl., ¶¶ 24–36. This is apparently because some in the medical community—those who have seemingly made careers out of creating lifelong patients—

believe that girls who, for example, for six months wear Jordans instead of flats, play princes using swords with boys instead of princesses at a tea party with girls, and show an understandable dislike of their menstrual cycle, should somehow try to become boys instead of simply being encouraged to continue to transcend ridiculous sex stereotypes while being confident about who they are in their own skin. Nangia Decl., ¶ 15 (outlining the current diagnostic criteria for gender dysphoria); *see also id.* ¶¶ 20–36 (outlining other reasons for the increase in rates of gender dysphoria); Levine Decl., ¶¶ 24–36. Such encouragement, though, would mean those who reap the financial benefits of prescribing puberty blockers and cross-sex hormones—"huge money makers"—would have to stop injecting them in children with gender dysphoria. Cantor Decl., ¶ 11. And that would mean no more lifelong patients who must continuously take these profitable drugs. Laidlaw Decl., ¶ 55; Levine Decl., ¶ 119.

And stop they should. Most children with gender dysphoria will desist. Cantor Decl., ¶¶ 113–18, 125–34; Levine Decl., ¶¶ 14(f), 103–18, 219–24; Laidlaw Decl., ¶¶ 212–15. But desisting is bad for business, so some medical professionals will first recommend socially treating the children as of the opposite sex. Levine Decl., ¶¶ 46–50; Laidlaw Decl., ¶¶ 55–63. This dramatically flips the expected outcome of desisting—once social transition occurs, the medical professional has now almost guaranteed that the child will persist. Cantor Decl., ¶¶ 119–21; Levine Decl., ¶¶ 14(g), 96, 109, 119–29, 138; Laidlaw Decl., ¶¶ 55, 212–16, 264.

*That's* conversion therapy. And it is not without its consequences. As discussed (at 3–4), injecting puberty blockers and cross-sex hormones in kids with gender dysphoria causes irreversible harm to their physical and mental health. *See also* Ex. 7 (sample consent forms conceding high risk of harm). Easing a child's anxiety, depression, and suicidality is the

16

proffered justification for injecting those drugs into kids with gender dysphoria. But, as also already explained (at 3–4), doing that makes those mental ailments even worse.

Indeed, international consensus is building that there is no reliable evidence to support any of the claims that injecting puberty blockers and cross-sex hormones into children with gender dysphoria is beneficial. Cantor Decl., ¶¶ 16–36, 74–86, 163–75; Laidlaw Decl., ¶¶ 225–33. The Royal Australian & New Zealand College of Psychiatrists, *Recognising and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria/Gender Incongruence*, Position Statement 103 (Aug. 2021), https://perma.cc/LR94-73ZU. Consider what some European countries, where medical interventions for minors with gender dysphoria began, Cantor Decl., ¶ 16; Levine Decl., ¶ 74, have concluded:

- *Sweden.* After a review in 2022 concluded that "the risk of puberty suppressing treatment . . . and gender-affirming hormonal treatment currently outweigh the possible benefits," Sweden restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases." Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3. This was confirmed by Sweden's most recent systematic review. Ex. 2.

- *Norway.* A 2023 Norway review concluded that its national guidelines for treating gender dysphoria were inadequate because there is "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people." Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/J6Q5-EJ3D. Now, "such treatments" are to be considered as experimental "treatments under trial." *Id.* (quotation marks omitted).

- *France.* A 2022 French review concluded that regarding puberty blockers and cross-sex hormones, "the greatest reserve is required in their use, given the side effects." *Medicine and Gender Transidentity in Children and Adolescents*, French National Academy of Medicine, https://perma.cc/CD5V-MEBR. The review stressed "psychological support" and instructed that "great medical caution must be taken in children and adolescents, given . . . the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Id.*

17

- *United Kingdom.* A 2020 UK systematic review of the use of puberty blockers and cross-sex hormones in gender-dysphoric children revealed that they are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers]," *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria,* Nat'l Inst. for Health & Care Excellence, 12, 40 (Mar. 11, 2021), https://perma.cc/93NB-BGAN, the safety of cross-sex hormones is similarly unknown, *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria,* Nat'l Inst. for Health & Care Excellence, 14 (Mar. 11, 2021), https://perma.cc/M8J5-MXVG, and "the available evidence was not strong enough to form the basis of a policy position," Hilary Cass, *The Cass Review: Interim Report,* 35 (Feb. 2022), https://perma.cc/RJU2-VLHT. Because of the "uncertainties surrounding the use of hormone treatments," the UK "will only commission [puberty blockers] in the context of a formal research protocol," NHS England, *Interim Service Specification,* 16 (Oct. 20, 2022), https://perma.cc/N3CY-JYNY, and "[t]he primary intervention for children and young people [will be] psychosocial and psychological support and intervention." NHS England, *Interim Service Specification,* 2 (June 9, 2023) https://perma.cc/V2DF-N93T.

- *Finland.* Finland's review concluded that "[a]s far as minors are concerned, . . . there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based." Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland,* 6(14) (2020), https://perma.cc/VN38-67WT. So "no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." *Id.* at 7(14) In sum, "[i]n light of available evidence, gender reassignment of minors is an experimental practice. . . . Information about the potential harms of hormone therapies is accumulating slowly and is not systematically reported." *Id.* at 8(14).

Because of revelations like these, children subjected to the use of these drugs are fighting back.[3] Consider the stories of just a few of the many brave detransitioners who are coming forward to prevent what happened to them from happening to any other child. Becker Decl.; Hein Decl.; Jane Decl.; Kershner Decl.[4] In 2020, a British citizen brought suit against a

---

[3] Parents are fighting back, too. Sheinfeld Decl.; K.W. Decl.; Miller Decl.; Spielbauer Decl.; E.G. Decl.; E.T. Decl.; Jeannette Cooper Testimony, Senate Families & Children Committee, 51:57–58:44 (Mar. 14, 2023) https://ket.org/legislature/archives/2023/regular/ senate-families-and-children-committee-198727.

[4] Luka Hein Testimony, House Judiciary Committee, 59:22–1:03:14 (Mar. 2, 2023) https://ket.org/legislature/archives/2023/regular/house-judiciary-committee-198318, Senate Families & Children Committee, 1:07:38–10:15 (Mar. 14, 2023), https://ket.org/legislature/archives/2023/regular/senate-families-and-children-committee-

UK gender clinic, which led to a UK court finding "that puberty blockers might have 'potentially irreversible' and 'life-changing' effects on a young person . . . , that there was 'very limited evidence as to its efficacy' . . . such that 'it is right to call the treatment experimental' . . . , and that use of puberty blockers almost always [leads] to use of cross-sex hormones that 'may well lead to a loss of fertility.'" Cantor Decl., ¶ 18; Laidlaw Decl., ¶¶ 209, 226; Levine Decl., ¶ 77; Ex. 8, ¶¶ 134, 148–49 (*Bell v. Tavistock* decision). Even the appellate court reviewing the court's findings acknowledged that "[m]edical opinion is far from unanimous about the wisdom of embarking on treatment before adulthood." Cantor Decl., ¶ 18. And just this year, a detransitioner sued the individuals and entities who subjected her to these drugs. Compl., *Brockman v. Kaiser Found. Hosps., Inc.*, STK-CV-UMM-2023-0001612 (Cal. Super. Ct.) [Ex. 5].

These lawsuits stand a good chance of succeeding, considering there is no agreed upon standard of care for treating children with gender dysphoria. Levine Decl., ¶¶ 14(b)–(c), 51–83. Of course there cannot be when "only three systematic, comprehensive research reviews . . . have been conducted concerning the safety and efficacy of puberty blockers and cross-sex hormones as treatments for gender dysphoria in children" that "unanimously concluded the evidence on medicalized transition in minors to be of poor quality." Cantor Decl., ¶¶ 11–12, 39, 42–43, 52, 63–65, 69–103, 163–99, 258–312; Levine Decl., ¶¶ 130–68; 217–35; Laidlaw Decl., ¶¶ 58, 117; Nangia Decl., ¶¶ 45, 133; *see also* Cantor Decl. ¶¶ 37–68 (outlining the hierarchy of evidence and general principles by which scientific assertions are

---

198727; Prisha Mosley Testimony, Senate Families & Children Committee, 1:03:53–07:44 (Mar. 14, 2023) https://ket.org/legislature/archives/2023/regular/senate-families-and-children-committee-198727); *see also* Kelly Wagner Testimony, Senate Families & Children Committee, 58:45–1:03:52 (Mar. 14, 2023) https://ket.org/legislature/archives/2023/regular/senate-families-and-children-committee-198727.

evaluated). Numerous unbiased and objective sources confirm the lack of evidence supporting the Plaintiffs' assertions about the use of puberty blockers and cross-sex hormones on children with gender dysphoria, so such "treatment" can only be considered experimental. Cantor Decl., ¶¶ 11–12, 16–36, 74, 77–86, 153–97, 238–46, 258–312; Levine Decl., ¶¶ 14(i)–(l), 46–83, 130–68, 217–35; Laidlaw Decl., ¶¶ 169–207, 263; Nangia Decl., ¶¶ 45, 133.

Even the organizations pushing for the use of these drugs in children with gender dysphoria acknowledge this. Cantor Decl., ¶¶ 87–103, 148, 171–75, 237–56; Levine Decl., ¶¶ 60–83; Ex. 6 at S33 (WPATH "recognize[s] evidence is limited."). Reviews of those organizations' standards do, too. A well-known review of WPATH's standards of care concluded that "transition-related clinical practice guidelines tended to lack methodological rigour and rely on patchier, lower-quality primary research" and gave the standards "unanimous ratings of 'Do not recommend.'" Cantor Decl., ¶¶ 71, 87, 92–102; 247–48 (cleaned up); *see also* Levine Decl., ¶¶ 46–83, 199–200, 219–24; Laidlaw Decl., ¶¶ 171–90, 266. The same is true of the Endocrine Society's standards. Cantor Decl., ¶¶ 71, 87–91; 249–54; Levine Decl., ¶¶ 80–81, 199–200, 219–24; Laidlaw Decl., ¶¶ 171–90, 266; Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, J. Clinical Endocrinology & Metabolism, 3871–72 (Nov. 2017), https://perma.cc/L4T8-UVWC. And it is true of the AAP's "Policy Statement." Cantor Decl., ¶¶ 103, 255–56; Levine Decl., ¶ 79. One would expect similar conclusions about the positions of all the medical associations that endorse these standards, if these organizations did anything more than rubber stamp them.

This is all unsurprising, given the ideological takeover of these associations, their practice of systematically silencing any dissension, and their self-interest in promoting these

practices (especially in ensuring insurance coverage). Levine Decl., ¶¶ 60–83, 210–16; Cantor Decl., ¶¶ 171–75; Laidlaw Decl., ¶¶ 171–201; *see generally Josephson v. Bendapudi*, 3:19-cv-230 (W.D. Ky.) (employment action brought by Kentucky doctor Allen Josephson, M.D., against the University of Louisville for retaliating against him for dissenting on this issue).[5] These factors also explain why WPATH, the Endocrine Society, and the AAP have never conducted the requisite systematic reviews to support the assertion that the use of puberty blockers and cross-sex hormones on children with gender dysphoria is "safe." Cantor Decl., ¶¶ 69–73, 87–103. How could it be? There is no reliable evidence to prove that gender dysphoria is biologically based, Cantor Decl., ¶¶ 108, 122–24, 162; Levine Decl., ¶¶ 14(d)–(e), 24–36, 84–102, 210–16; Laidlaw Decl., ¶¶ 14–42, 52–54, 263, yet some medical professionals believe that this mental-health issue should be "treated" by meddling with biology. Biology is immutable, gender dysphoria is not. Yet it would appear that "[g]ender dysphoria is the only diagnosis . . . for which an alteration of bodily integrity is being clinically advised for the purpose of affirming identity." Nangia Decl., ¶ 133; Levine Decl., ¶ 32.

There are other, better ways of treating gender dysphoria, like psychotherapy, that do not involve irreversible damage and that can identify other mental health issues that may be the true catalyst for gender dysphoria. Levine Decl., ¶¶ 37–50, 65, 69–72, 210–16, 221–22, 226; Nangia Decl., ¶¶ 5, 37–60, 144–47, 163–76; Cantor Decl., ¶¶ 16, 51, 61, 117, 153–61,

---

[5] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022), https://perma.cc/9S26-SNJ8 (examining the ideological corruption of the AAP); Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://perma.cc/L29R-AVYJ (same); *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014) (same for WPATH); *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (same); Laidlaw Decl., ¶ 187 (explaining that only one of the nine listed authors of the Endocrine Society's standards has not served as a leader in WPATH or an author of its standards of care).

176–99; Laidlaw Decl., ¶ 228; NHS England, *Interim Service Specification*, 2, https://perma.cc/V2DF-N93T. WPATH itself has "highly recommended" psychotherapy. WPATH, *Standard of Care 7*, at 8, 23–25, 28 (2012), https://perma.cc/N3XE-RYDW.

Such treatment is also preferable to the insertion of puberty blockers and cross-sex hormones because a child cannot provide informed consent to such procedures. Levine Decl., ¶¶ 201–09; Nangia Decl., ¶¶ 61–162; Laidlaw Decl., ¶ 264.[6] Even if informed consent were possible, we have no idea exactly what clinics are telling children, and their parents, about these procedures. Levine Decl., ¶¶ 73–83; Becker Decl.; Hein Decl.; Jane Decl.; Kershner Decl.; Reed Decl.; Sheinfeld Decl.; K.W. Decl.; Miller Decl.; Spielbauer Decl.; E.G. Decl.; E.T. Decl.; Ex. 7 (sample consent forms). And we have no reason to believe the process is uniform. Since there is no reliable method for predicting which children will desist versus persist, Cantor Decl., ¶¶ 109–37, 162; Levine Decl., ¶¶ 84–129; Laidlaw Decl., ¶¶ 13–42, 213, professionals do not know if they just created a lifelong patient or a detransitioner.

In the end, while "the position of the American Medical Association" and other medical interest groups may be relevant to a "legislative committee," it does not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The Kentucky General Assembly has more than enough bases to justify Sections 4(2)(a) and (b) of SB 150.[7] Laidlaw Decl., ¶ 267; Nangia Decl., ¶¶ 171–76.

---

[6] Many medical associations, including the American Medical Association, have filed amicus briefs in the U.S. Supreme Court consistent with this position. Am. Med. Ass'n., et al., Br., *Roper v. Simmons*, 543 U.S. 551 (2005), (No. 03-633), 2004 WL 1633549 (explaining the immaturity of adolescents' brains); Am. Psych. Ass'n, et al., Br., *Miller v. Alabama*, 567 U.S. 460 (2012) (Nos. 10-9649, 10-9647), 2012 WL 174239 (same).

[7] *See also* House Judiciary Committee Testimony, 45:10–59:21 (Mar. 2, 2023) (testimony of Dr. Roger Hyatt Jr., Dr. Andre Vanmol, and Kentucky board-certified Dr. William Ashburn)

**II.      The Plaintiffs will be irreparably harmed without Senate Bill 150.**

The Plaintiffs claim that they will be irreparably harmed without a preliminary injunction. In fact, they will be irreparably harmed if Sections 4(2)(a) and (b) of SB 150 are not enforced. So it is impossible for the Plaintiffs to claim irreparable harm. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) ("[E]ven the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." (citation and quotation marks omitted)).

The Plaintiffs' claim of irreparable harm for a violation of their constitutional rights assumes the success of their merits arguments. But even if the Plaintiffs could show a violation of their constitutional rights, this does not automatically result in irreparable harm. *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) ("[A] denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation."); *Siegel v. LePore*, 234 F.3d 1163, 1177–78 (11th Cir. 2000) (same).

There is no reason to believe that Kentucky medical professionals cannot manage the Plaintiffs' health through existing or innovative psychotherapy. Levine Decl., ¶¶ 37–50, 65, 69–72, 210–16, 221–22, 226; Nangia Decl., ¶¶ 5, 37–60, 144–47, 163–76; Cantor Decl., ¶¶ 16, 51, 61, 117, 153–61, 176–99; Laidlaw Decl., ¶ 228; WPATH, *Standard of Care 7*, at 8, 23–25, 28, https://perma.cc/N3XE-RYDW; NHS England, *Interim Service Specification*, 2, https://perma.cc/V2DF-N93T; *see also* SB 150 Section 4(6) (allowing a "health care provider

---

https://ket.org/legislature/archives/2023/regular/house-judiciary-committee-198318; Senate Families & Children Committee, 45:54–51:54 (Mar. 14, 2023) (testimony of Dr. Andre Vanmol) https://ket.org/legislature/archives/2023/regular/senate-families-and-children-committee-198727.

[to] institute a period during which the minor's use of the [drugs] is systematically reduced"). There is nothing physically wrong with the Plaintiffs. And not only have the Plaintiffs failed to provide enough information for a true mental health assessment to be conducted, the information they have provided does not support their claims. Laidlaw Decl., ¶¶ 235–62. In fact, based on the available information, it appears the Plaintiffs' physical and mental health is getting worse but will improve once the experimentation on them ends. *Id.*

Because the Plaintiffs will suffer irreparable harm if they obtain the relief they seek, it is impossible for them to satisfy the requisite irreparable harm requirement.

## III.   The balance of equities and public interest heavily favor enforcement of SB 150.

When, as here, the defendant is the government, the balance-of-equities and public-interest factors "merge." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). And notably, "[i]t's in the public interest that we give effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (citation omitted). "[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). More importantly, for all the reasons stated above, *all* Kentucky children who are subjected to the acts prohibited by Sections 4(2)(a) and (b) of SB 150 will become irreversibly damaged if the preliminary injunction the Plaintiffs seek is granted.

## IV.   The Plaintiffs are not entitled to the scope of the injunction they seek.

"A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). A preliminary injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Commonwealth v.*

*Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). In fact, a district court "abuse[s] its discretion" if it "extend[s] the preliminary injunction's protection to non-part[ies]" when "an injunction limited to the parties" would do. *Id.*

Six of the seven Plaintiffs are children currently taking puberty blockers or cross-sex hormones. Yet the Plaintiffs wish to obtain a preliminary injunction that allows all Kentucky children, even those who have not started those drugs, to be exposed to them. But the only Plaintiff who has not yet started those drugs, a Plaintiff that did not file a declaration, has not even tried to make the requisite showing that an injunction extending to that Plaintiff or those like that Plaintiff is warranted. *See Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) ("Nor . . . was it appropriate … to grant a preliminary injunction in favor of persons other than [the plaintiff]. . . . [The plaintiff] did not seek class-action relief, and he has made no showing . . . why the injunction needed to run in favor of other individuals in order to protect him." (citation omitted)); *Mitchell v. City of Cincinnati*, No. 21-4061, 2022 WL 4546852, at *3–4 (6th Cir. Sept. 29, 2022) (requiring a show of "imminence" to obtain a preliminary injunction).

One final point. The Plaintiffs are not challenging Sections 4(2)(c)–(e) of SB 150. Why not? Chopping off the healthy body parts of children is just as much a part of WPATH's standards of care as the insertion of puberty blockers and cross-sex hormones. Ex. 6 at S128–36. The Commonwealth submits that no challenge has been made here because, like the rest of the relied-upon "standards of care," they are insufficiently backed by evidence and cause far more irreversible harm than any alleged benefit.

## CONCLUSION

The Court should deny the Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

/s/ Alexander Y. Magera
Victor Maddox (KBA No. 43095)
Heather L. Becker (KBA No. 94360)
Jeremy J. Sylvester (KBA No. 92771)
Alexander Y. Magera (KBA No. 97708)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Heather.Becker@ky.gov
Jeremy.Sylvester@ky.gov
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*
*ex rel. Attorney General Daniel Cameron*

# CERTIFICATE OF SERVICE

I certify that on June 9, 2023, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

/s/ Alexander Y. Magera
*Counsel for the Commonwealth of Kentucky*
*ex rel. Attorney General Daniel Cameron*

26