1  Charles S. LiMandri, SBN 110841
   cslimandri@limandri.com
2  Paul M. Jonna, SBN 265389
   pjonna@limandri.com
3  Robert E. Weisenburger SBN 305682
   rweisenburger@limandri.com
4  LiMANDRI & JONNA LLP
   P.O. Box 9120
5  Rancho Santa Fe, California, 92067
   Telephone:  (858) 759-9930
6  Facsimile:   (858) 759-9938

7  Mark E. Trammell*
   mtrammell@libertycenter.org
8  CENTER FOR AMERICAN LIBERTY
   1311 S. Main Street, Suite 207
9  Mount Airy, MD 21771
   Telephone: (703) 687-6212
10 Facsimile: (517) 465-9683

11

12 *Pro Hac Vice motion forthcoming

13 Attorneys for Plaintiff
   CHLOE E. BROCKMAN

Harmeet K. Dhillon (SBN: 207873)
Harmeet@dhillonlaw.com
John-Paul S. Deol (SBN: 284893)
JPDeol@dhillonlaw.com
Jesse D. Franklin-Murdock (SBN: 339034)
JFranklin-Murdock@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Electronically Filed
Superior Court of California
County of San Joaquin
2023-02-22 15:08:10
Clerk: Kacey Sutton

Case Management Conference
2023-08-21 8:30AM in 11B

STK-CV-UMM-2023-0001612

14

15            SUPERIOR COURT OF THE STATE OF CALIFORNIA

16      IN AND FOR THE COUNTY OF SAN JOAQUIN – STOCKTON BRANCH

17 CHLOE E. BROCKMAN a/k/a CHLOE
   COLE, an individual
18
19             Plaintiff,
20 v.
21 KAISER FOUNDATION HOSPITALS,
   INC., a California Corporation, THE
22 PERMANENTE MEDICAL GROUP, INC.,
   a California Corporation, LISA KRISTINE
23 TAYLOR, M.D., an individual, HOP
   NGUYEN LE, M.D., an individual,
24 SUSANNE E. WATSON, PHD., an
   individual, and DOES 1 through 50,
25 inclusive,
26
             Defendants.
27

Case No.:

**COMPLAINT FOR:**

1. **MEDICAL NEGLIGENCE**
2. **MEDICAL NEGLIGENCE –**
   **HOSPITAL/MEDICAL GROUP**

**JURY TRIAL DEMANDED**

28

1
COMPLAINT

Plaintiff CHLOE E. BROCKMAN aka CHLOE COLE, an individual ("Plaintiff" or "Chloe"), brings this Complaint against Defendants LISA KRISTINE TAYLOR, M.D., an individual, HOP NGUYEN LE, M.D., an individual, SUSANNE E. WATSON, PHD., an individual ("collectively, the "Defendant Providers"), THE PERMANENTE MEDICAL GROUP, INC., a California Corporation, KAISER FOUNDATION HOSPITALS, INC., a California Corporation (collectively, the "Institutional Defendants") (the Defendant Providers and the Institutional Defendants are collectively referred to as the "Defendants"), and DOES 1 through 50, alleging as follows:

## INTRODUCTION

1.      This case is about a team of doctors (i.e., the Defendants) who decided to perform a mutilating, mimicry sex change experiment on Chloe, then a thirteen-year-old vulnerable girl struggling with complex mental health co-morbidities, who needed love, care, attention, and regular weekly psychotherapy, not cross-sex hormones and mutilating surgery.

2.      Chloe is a biological female who suffered from a complex, multi-faceted array of mental health symptoms as a child and adolescent.  Her presentation of symptoms and concerns included, among other things, the following: social anxiety; general anxiety; speech difficulties; depression; pubertal struggles associated with significantly increased negative emotions; body dysmorphia and serious self-image concerns; disruptive behavior; learning disabilities; autism spectrum symptoms; symptoms of an eating disorder; concerns about being sexually abused or raped, that eventually materialized into a sexual assault; exposure to only negative aspects about being female, without any discussion of the positive aspects of being female; and ongoing confusion regarding her gender.  She needed regular weekly psychotherapy for an extended period of time to evaluate, assess, and treat her complex co-morbid mental health symptoms.

3.      After being exposed for hours at a time to online transgender influencers, Chloe developed the erroneous idea that she was a boy.  When Chloe informed her parents that she thought she was a boy, her parents didn't know what to do and promptly sought guidance from the Defendants. Defendants immediately affirmed Chloe in her self-diagnosed gender dysphoria.  They did not question, elicit, or attempt to understand the psychological events that led her to this belief, nor did they seek to evaluate or appreciate her multi-faceted presentation of co-morbid symptoms.

Defendants should have performed an extended period of assessment and treatment comprising at least twelve weekly, one-hour sessions that should have included numerous informed consent discussions about the potential harms and hoped-for benefits. Instead, Defendants assumed that Chloe, a thirteen-year-old emotionally troubled girl, knew best what she needed to improve her mental health and handed her the prescription pad. They quickly put her on the puberty blockers and hormones "conveyer belt" of mimicry sex change. There is no other area of medicine where doctors will surgically remove a perfectly healthy body part and intentionally induce a diseased state of pituitary gland function based simply on the patient's wishes. Thus, they abetted her erroneous notion that she could change her sex.

4. Under Defendants' "care," between ages 13–17 years, Chloe underwent harmful transgender transition, specifically, off-label puberty blockers and cross-sex hormone "treatment," and a radical double mastectomy of her healthy breasts. There is at least one high quality, large scale, 30-year, population-based study that demonstrated that transgender individuals who chemically/surgically "transition" have poor mental health outcomes. This includes increased psychological morbidity, increased suicidal ideation and attempt, and a *19-fold increased rate of suicide as compared with the general population.* The studies that purportedly support positive outcomes for this "gender affirmation" treatment are "low to very low-quality studies", meaning they present a significant risk of containing erroneous conclusions and present a significant risk that patients will not attain the purported desired outcomes of treatment. In contrast, multiple reliable studies consistently indicate that *between 80% and 90% of minors that present with gender dysphoria accept their biological sex by late adolescence.* These risks all materialized in Chloe's case. She did not experience any long-term relief from her gender dysphoria treatment. Rather, her mental health condition declined as she proceeded through this treatment, and she eventually developed suicidal ideation after her radical double mastectomy, which symptoms she never experienced prior to this so-called "gender affirmation treatment."

5. Defendants blindly ramrodded Chloe through this transition "treatment," ignoring her extensive co-morbidities, her declining mental health condition, and the failure of her social and academic functionality to improve after each predetermined sequence of social, hormonal and

surgical "gender affirmation treatment." Put another way, Chloe was not responding to treatment and Defendants ignored this fact.

6.      Defendants also failed to provide Chloe and her parents with proper informed consent. Informed consent is a process that takes time for this type of "treatment". It requires regular therapy sessions over an extended period of time and assessment of the complete mental health condition of the patient. Defendants did provide regular in-depth therapy, which entirely prevented the possibility of informed consent in Chloe's case. They provided crisis-oriented psychotherapy, typically lasting 30 minutes or less, which was widely spaced until the next request from the parents. There were no in-depth meetings with the parents to discuss the short and long-term harms and hoped-for benefits well before the next medical or surgical step was undertaken. Defendants obscured and concealed important information such as the following:  the conflicting studies in this area; the high quality evidence demonstrating poor mental health outcomes; the existence of only low to very low-quality studies purportedly supporting this treatment; the significant likelihood that desired outcomes would not be attained; the significant possibility of desistence, detransition and regret; and the lack of accurate models for predicting desistence and detransition. They also did not disclose the significant health risks associated with a biological female taking high doses of harmful male hormone drugs and off-label puberty blockers. They did not discuss with Chloe or her parents the worrisome patterns that adult transgendered persons have demonstrated. Furthermore, Defendants falsely represented certain opposite facts, including that Chloe's dysphoria would never resolve unless she chemically/surgically transitioned, and that she represented a high-risk of suicide unless she transitioned. These were materially false representations. Chloe's parents were also asked: "would you rather have a dead daughter, or a live son?" This unethical form of coercion reflects a lack of understanding of suicide risk, or a deliberate decision to misrepresent suicide risk. Defendants' coercion, concealment, misrepresentations, and manipulation are appalling and represent an egregious breach of the standard of care. This misconduct also constitutes fraud, malice, and oppression.

7.      As occurs in most gender dysphoria cases, Chloe's dysphoria was not persistent and resolved when she was close to reaching adulthood. Consequently, she detransitioned and no longer

identifies as a male.  Unfortunately, as a result of the so-called transgender "treatment" that Defendants performed on Chloe, she now has deep physical and emotional wounds, severe regrets, and distrust of the medical system.  Chloe has suffered physically, socially, neurologically, and psychologically.  Among other harms, she has suffered mutilation to her body and lost social and physical development along with her peers, and at key developmental milestones that can never be regained.

8.      Chloe was the victim of Defendants who did not have any interest in taking the time necessary to sit with her and perform the regular, weekly psychotherapy that Chloe needed. Defendants grossly breached the standard of care by pushing Chloe into this harmful experimental treatment regimen without a proper period of psychological evaluation, without evaluating and treating her serious co-morbidities, without providing informed consent, and while actively utilizing emotionally super-charged and false information to derail the rational decision-making process of Chloe and her parents.   Defendants were not "caring" for Chloe, they were experimenting on her, and doing so all to their own great financial benefit.

## PARTIES

9.      At all times relevant herein, Plaintiff Chloe E. Brockman, an individual, was a resident of the County of San Joaquin, State of California.

10.     Plaintiff is informed and believes and thereon alleges that at all relevant times alleged herein, Defendant Lisa Kristine Taylor, M.D. ("Dr. Taylor"), is a physician duly licensed by the State of California to practice medicine in California.  On information and belief, Dr. Taylor practices medicine primarily in Oakland, California, but accepted the Plaintiff as a patient and assisted with providing a course of experimental transgender medical treatment on Plaintiff that occurred at least in part in Manteca, California, and caused substantial injury to Plaintiff in Manteca, California.

11.     Plaintiff is informed and believes and thereon alleges that at all relevant times alleged herein, Defendant Hop Nguyen Le, M.D. ("Dr. Le"), is a physician duly licensed by the State of California to practice medicine in California.  On information and belief, Dr. Le practices primarily in San Rafael, California, but accepted the Plaintiff as a patient and assisted with providing a course of experimental transgender medical "treatment" to Plaintiff that occurred at least in part in Manteca,

1   California and caused substantial injury to Plaintiff in Manteca, California.

2        12.    Plaintiff is informed and believes and thereon alleges that at all relevant times alleged

3   herein, Defendant Susanne E. Watson, PhD ("Dr. Watson"), is a psychologist duly licensed by the

4   State of California to practice medicine in California.  On information and belief, Dr. Watson

5   practices primarily in Oakland, California, but accepted the Plaintiff as a patient and assisted with

6   providing a course of experimental transgender medical "treatment" to Plaintiff that occurred at least

7   in part in Manteca, California and caused substantial injury to Plaintiff in Manteca, California.

8        13.    Collectively, Doctors Taylor, Le, and Watson are referred to as the "Defendant

9   Providers."

10       14.    Plaintiff is informed and believes and thereon alleges that at all relevant times alleged

11  herein, Defendant The Permanente Medical Group, Inc. ("Medical Group"), is, and at all times

12  mentioned in this complaint was, a California professional medical corporation with its executive

13  offices located in Oakland, California.  On information and belief, The Permanente Medical Group,

14  Inc., is the medical group through which Drs. Watson, Taylor, and Le collaborated to provide a course

15  of experimental transgender medical "treatment" to Plaintiff that occurred and caused substantial

16  injury to Plaintiff at least in substantial part in Manteca, California.

17       15.    Plaintiff is informed and believes and thereon alleges that at all relevant times alleged

18  herein, Defendant Kaiser Foundation Hospitals ("Kaiser Hospitals") is, and at all times mentioned in

19  this complaint was, a California corporation operating in Northern California, with executive offices

20  located in Oakland, California.  On information and belief, Kaiser Hospitals is the hospital network

21  through which experimental transgender medical treatment was provided by Drs. Watson, Taylor,

22  and Le to Plaintiff, causing substantial injury to Plaintiff in Manteca, California.

23       16.    The Medical Group and Kaiser Hospitals are collectively referred to as the

24  Institutional Defendants.

25       17.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as

26  DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff

27  will amend her Complaint to allege their true names and capacities and causes of action against said

28  fictitiously named defendants when the same have been ascertained.  Plaintiff is informed and

believes and thereon alleges that each of the defendants designated herein as a "DOE" is responsible in some manner and liable herein to Plaintiff for her injuries.

18.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned all of the DOES were the agents, servants and employees of their co-defendants and in doing the things hereinafter alleged were acting within the course and scope of their authority as such agents, servants and employees with the authorization, permission and consent of their co-defendants, except where stated otherwise below.  Each of these acts and failures to act is alleged against each Defendant whether acting individually, jointly, or severally.  Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act and fully ratified those acts.

19.     At all times mentioned herein, each Defendant was the agent and employee of each and all of the other defendants and, in performing the acts herein alleged, was acting within the course and scope of such agency and employment.  Plaintiffs are informed and believe that all of the wrongful acts alleged herein were authorized and/or ratified by officers, directors or other managerial agents of Defendants.

20.     On November 9, 2022, Chloe sent a notice of intent to sue letter to the Defendant. The statutorily prescribed 90-day hold period for litigation has expired.[1]

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter, and venue is proper, because a substantial portion of the injury and experimental medical treatment upon which this action is based occurred in San Joaquin County, State of California, in the city of Manteca.

22.     The amount in controversy exceeds the jurisdictional minimum of this Court.

## GENERAL ALLEGATIONS

23.     Chloe is a biological female who suffered from social anxiety, generalized anxiety, depression, disruptive behavior disorder, social troubles, body dysmorphia, autism spectrum symptoms, a cleft palate for which surgery had been performed, a likely eating disorder, learning

---

[1] https://libertycenter.org/wp-content/uploads/2022/11/Notice-of-Intent-to-Sue-Ltr-11-09-22-Redacted.pdf

disabilities, and gender confusion.  She had suffered from various of these issues for multiple years.

Chloe began to go through puberty earlier than most of her peers and experienced bullying and teasing

by her pears as result.  She also had difficulty at school and trouble with social interaction and

learning.  On September 12, 2012, at eight years old, she was diagnosed with Disruptive Behavior

Disorder.  On November 26, 2013, at nine years old, she had a diagnosis indicating an "encounter for

school problem."  On October 9, 2015, she had a diagnosis of ADHD.  She received no mental health

counseling related to her social and behavioral problems at school and was never diagnosed or treated

for autism spectrum disorder, though she had multiple indications of being on the autism spectrum.

24.     When Chloe was a child, as young as age six, she liked to wear boy clothes, but on the

other hand, she also liked to play with dolls.  When she was nine years old, she began struggling more

with her female identity.  Chloe had an idea in her mind that to be an ideal, attractive female she

needed to have voluptuous bodily attributes.  But Chloe did not perceive her own appearance as being

voluptuous.  She was critical of her broad shoulders and thinner, more muscular body.  Therefore,

she naively thought she was not and could not ever be an attractive female.  This was a serious, albeit

common, struggle for Chloe and many young girls while entering adolescence.

25.     During this time, Chloe was also exposed to many negative ideas both online and in

her social sphere about being female.  This included negative discussions of menstrual cycles,

pregnancy, childbirth, male domination, and similar distorting ideas.  She also was exposed to

concerns over sexual abuse and rape.  In her social sphere, she had heard about women being sexually

assaulted and raped.  Chloe had a constant underlying fear of the possibility of sexual abuse.

26.     In Chloe's social sphere, there was never any discussion of the positive experiences

of being female, such as the joy and intimacy that can be shared with a loving, caring spouse, and the

joy and intimacy that can be shared between a mother and child.

27.     In sum, Chloe erroneously thought that becoming a woman was undesirable and

thought that she could not be the type of woman that she naively perceived as ideal.  She also

continued to struggle socially with having friends.  She especially struggled with having female

friends as she often felt more comfortable around less judgmental boys.  But, as she and her peers

began to develop, the divide between her and her male friends grew as well.  Her female physical

1    features developed more, but not as much as she had hoped.  Her male friends' physical abilities

2    surpassed her own.  She experienced bullying and teasing in this regard.  These changes were all

3    discouraging to her.

4         28.    Defendants never meaningfully discussed nor attempted to treat with psychotherapy

5    Chloe's struggles and these underlying conflicts.  They never told Chloe that puberty changes are a

6    struggle for most people, particularly females, and that negative emotions tend to increase during

7    puberty, and further that it takes time to settle into these changes to one's evolving body.  These are

8    very basic components of psychotherapy for young adolescent girls that should have been evaluated

9    and discussed with Chloe but were not discussed.

10        29.    Chloe also began researching her feelings online, sometimes for hours at a time in a

11   single day.  During this process, she was exposed to various LGBT activist groups and transgender

12   influencers that praised and promoted individuals who identified as transgender.  These groups also

13   praised and promoted individuals who underwent the process of transitioning to appear like the

14   opposite biological sex.  Chloe craved the social approval that these individuals received and that she

15   was not otherwise receiving from her peers.

16        30.    Although Chloe was still attracted to males and had no significant interest in romantic

17   relationships with a female, these transgender influencers first put the false idea into Chloe's head

18   that perhaps she was actually a boy.  Chloe began to abandon her ideal of being a voluptuous female.

19   She perceived that she could never meet this voluptuous female standard, and she was strongly

20   influenced by all the imagined negative connotations of being female.  Consequently, this idea that

21   she was a boy became very attractive to her.

22        31.    Eventually she "came out" to some of her peers that she was a boy and engaged with

23   these various online activist LGBT groups, receiving the support and praise for her decision that she

24   craved.  By May 2017, when Chloe was twelve years old, she wrote a letter to her parents telling

25   them that she wanted to be referred to as "Ky" or "Chi," and that she wanted to be treated as a boy.

26   Chloe's parents were hesitant and concerned that this was not the best thing for Chloe, but they were

27   unsure how to respond and sought the guidance of medical professionals. They contacted Chloe's

28   pediatric care provider on June 2, 2017, expressing an interest in counseling for Chloe.

32.     About two weeks later, on June 13, 2017, Chloe and her parents had a preliminary consultation with a psychologist who immediately affirmed Chloe in her misguided beliefs without evaluating or attempting to understand the motivation for Chloe's self-proclaimed diagnosis that she was a "boy."  After this occurred, Chloe had various visits with mental health providers, wherein she reported at various times anxiety, depression, social anxiety, shyness, limited friends, and feeling disgusted with her hips, chest, and thin arms.  She also later expressed a desire to bind her breasts that were growing larger.  Chloe's providers opined that binding could be helpful but failed to disclose its health risks.  Therefore, Chloe began socially transitioning, i.e., presenting as a male in social settings. Her serious co-morbid symptoms were not discussed or addressed, if they were even perceived.  Her symptoms persisted and intensified.  It was as though her providers believed that once the criteria for gender dysphoria were met, there was nothing to do but put her on the chemical/surgical path.  Thus, they failed to afford her the opportunity that any other child with psychiatric symptoms would be given: thorough evaluation, appreciation of her developmental history, and an opportunity to treat the symptoms through understanding within a trusted extensive relationship with one qualified psychotherapist.

33.     At age thirteen, on November 30, 2017, Chloe had her first consultation with an endocrinologist, who advised against beginning hormone therapy due to Chloe's young age.  Chloe was disappointed, so she and her parents sought a second opinion from Defendant Taylor. Remarkably, Dr. Taylor was willing to begin puberty blockers and testosterone treatment immediately, and with no proper evaluation or treatment of Choe's constellation of other symptoms.

34.     Dr. Taylor prescribed Lupron Depot, a puberty blocker, and testosterone to Chloe. These chemicals stopped Chloe's natural progression of puberty, and medically induced various endocrine disorders, including among others, hypogonadotropic hypogonadism.[2]  This condition is a pituitary gland dysfunction, wherein the female ovaries or male testes produce little or no sex hormones.  This dysfunction requires chemical treatment to correct and can be otherwise caused by

---

[2] https://www.pennmedicine.org/for-patients-and-visitors/patient-information/conditions-treated-a-to-z/hypogonadotropichypogonadism#:~:text=Definition,the%20pituitary%20gland%20or%20hypothalamus.

damage to the pituitary gland from surgery, injury, tumor, radiation, genetic defects, heroin use, abuse of opiate medicines, iron overload, and other causes. Chloe's pituitary gland was not malfunctioning. To the contrary, it was functioning normally and was producing proper hormones to further her normal biological development. Dr. Taylor introduced these chemical interventions to disrupt the proper functioning of Chloe's pituitary gland, intentionally inducing various endocrine disorders in the process. In prescribing testosterone, Dr. Taylor also caused Chloe to develop more masculine characteristics, to suffer severe atrophy and damage to her reproductive organs, and other harms discussed in more detail below.

35.     The use of Lupron Depot and testosterone to treat "gender dysphoria" is not approved by the FDA and is an off-label use. Additionally, this "treatment" had been previously and repeatedly tried without success both in the U.S. and in other countries.[3]  Among others, the negative results caused the U.S. transgender clinic at Johns Hopkins Hospital to shut down decades ago, and also caused the Tavistock Transgender Clinic in England to shut down recently.[4]  Finland, Sweden, England, France, Belgium, and more recently Florida's Boards of Medicine, have all conducted systematic reviews of the relevant literature and concluded that the risks far outweigh any supposed benefits.[5]  Among others, one key study in this area is a high quality, 30-year, large scale, population-based study, out of Sweden.[6]  This prior study found increased psychiatric morbidity, increased suicidality, and a 19-fold increased rate of completed suicide as compared with the general population for transgender individuals "treated" with transition chemicals and surgery. When this data set was

---

[3] *Independent Review of Gender Identity Service for Children and Young People: Interim Report,* THE CASS REVIEW (February 2022) (https://cass.independent-review.uk/publications/interim-report/ (accessed Feb. 10, 2023); Chapman, M., *Johns Hopkins Psychiatrist: Transgender is 'mental disorder;' Sex Change 'biologically impossible'*, CNSNEWS.COM (June 21, 2015) https://www.cnsnews.com/article/national/michael-w-chapman/johns-hopkins-psychiatrist-transgender-mental-disorder-sex (last accessed February 7, 2023).

[4] Ibid.

[5] Buttons, C., *Finland's Leading Gender Dysphoria Expert Says 4 Out Of 5 Children Grow Out Of Gender Confusion*, THE DAILY WIRE (Feb. 2023).

[6] Dhejne, C., et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, PLOS ONE (Feb. 2011) (https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0016885)

analyzed by biological sex, the suicide rate for females who were presenting themselves as men was 40-fold higher than controls. These data have been available since 2011. Thus, strong evidence had established that transition treatment does not improve long-term mental health for transgender individuals and, therefore, is never clinically indicated for naïve, confused, and vulnerable minors like Chloe.

36.     Meanwhile, many U.S.-based medical groups like the Institutional Defendants are ignoring the strong evidence against the use of chemical and surgical transition and are instead relying upon low to very-low quality studies to support their "guidelines" for gender affirming care and transition.[7]  This low quality means the studies present a high possibility of containing erroneous conclusions regarding efficacy for "treatment" and present a significant risk that patients undergoing

---

[7] See e.g., Hembree, W., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline*, THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM (Sept. 2017); (The endocrine society guidelines in "Section 2.0 Treatment of Adolescents" recommend the use of puberty blockers and cross-sex hormones for adolescents who meet the diagnostic criteria for gender incongruence.  Each of the recommendations is designated with the symbols "$\oplus\oplus\circ\circ$" or "$\oplus\circ\circ\circ$."  The section titled "Method of Development of Evidence-Based Clinical Practice Guidelines" explains that the recommendations/suggestions designated by the symbol "$\oplus\oplus\circ\circ$" means that the recommendation is based on **low quality evidence** and the recommendations designated with the symbol ""$\oplus\circ\circ\circ$" are based on **very low-quality evidence**.  So, the endocrine society acknowledges that the supporting studies for these guidelines are low to very low quality studies).See also Buttons, C., *Finland's Leading Gender Dysphoria Expert Says 4 Out Of 5 Children Grow Out Of Gender Confusion*, THE DAILY WIRE (Feb 2023); Abbruzzese, E., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies—and research that has followed* JOURNAL OF SEX & MARITAL THERAPY (2022) (https://doi.org/10.1080/0092623X.2022.2150346).

It is worth noting that the 2009 version of the endocrine society guidelines did not recommend treatment with cross-sex hormones until at least the age of 16 and did not recommend a breast mastectomy until at least age 18.  See e.g. Hembree, W., *Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline*, THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM (Sept. 2009).  This change in the clinical guidelines did not reflect a change in scientific knowledge, but instead reflected a downgrade in the quality of the supporting evidence.  The 2009 guidelines are identified as being based on low to moderate quality evidence, whereas the 2017 guidelines are identified as being based on low to very low-quality evidence.  In order to suggest this "treatment" for lower age groups, the endocrine society shifted away from higher quality evidence relying instead on lower quality evidence.

In Chloe's case, had she not undergone any of this "treatment" until she was 16-18, the serious and permanent harm that she suffered would never have occurred.  Chloe's case is a prime example demonstrating the higher quality of the prior clinical guidelines.

---

12

COMPLAINT

1  this treatment will not experience the purported/intended effects.[8]   Defendants advised transition

2  allegedly relying upon risky low-quality studies, while ignoring high-quality evidence

3  contraindicating this "treatment."   This advice was reckless, willful, malicious, oppressive, and

4  fraudulent, and intended to benefit Defendants financially.

5       37.     Furthermore, eleven studies of childhood gender dysphoria have been conducted,

6  including three large-scale follow-up studies and eight smaller studies.[9]   Collectively, these studies

7  establish a desistence rate somewhere between 62% to 97.5% of cases averaging to around an 80-

8  90% desistence rate.[10]   The largest study found a desistence rate of approximately 92%.   In sum, a

9  well-established body of research demonstrates that gender dysphoria in children will desist by

10  adulthood in approximately 62%-97.5% of cases, with the person's mental state shifting to align with

11  the person's biological sex.[11]   The American Psychiatric Association DSM-5 identifies these same

12  desistence rates.[12]   Cases of gender dysphoria that first present in later adolescence are not well

13  studied.   Nevertheless, medically significant desistence/detransition rates have been identified, and

14  in recent years, the rate of desistence/detransition for later adolescent onset gender dysphoria is

15  accelerating.[13]   Furthermore, and of great importance, there are no diagnostic criteria and no models

16  

---

17  [8] Levine, S., et al., *Reconsidering informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, JOURNAL OF SEX & MARITAL THERAPY (March 2022) (DOI:
18  10.1080/0092623X.2022.2046221).

19  [9] Buttons, C., *Finland's Leading Gender Dysphoria Expert Says 4 Out Of 5 Children Grow Out Of Gender Confusion*, THE DAILY WIRE (Feb 2023); Korte, A., et al., *Gender Identity Disorders in
20  Childhood and Adolescence*, DTSCH ARZTEBL INT. (Nov. 2008) (DOI: 10.3238/arztebl.2008.0834); Cantor, J., *Do Trans-Kids Stay Trans- When They Grow Up?* SEXOLOGY TODAY
21  (http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html
22  (accessed Feb. 7, 2023)) (summarizing the eleven studies of desistence including three large scale follow-up studies and eight smaller scall studies).

23  [10] *Ibid*.

24  [11] *Ibid*.

25  [12] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition Text Revision DSM-5-TR™*, AMERICAN PSYCHIATRIC ASSOCIATOIN PUBLISHING,
26  page 517 (https://ebooks.appi.org/epubreader/diagnostic-statistical-manual-mental-disorders-fifth-edition-text-revision-dsm5tr).

27  [13] Levine, S., et al., Reconsidering informed Consent for Trans-Identified Children, Adolescents, and Young Adults, JOURNAL OF SEX & MARITAL THERAPY (March 2022) (DOI:
28  10.1080/0092623X.2022.2046221).

1   for predicting which cases of gender dysphoria will desist and which cases will persist.[14]  Indeed, one

2   parent of a transgender patient of Dr. Watson asked Dr. Watson how she determines who will benefit

3   from hormone treatment.  In response, Defendant Watson laughed and replied, ***"there's no criteria,***

4   ***but you kind of get a sense of it."***  Thus, Defendant Watson is not practicing evidence-based

5   medicine; she is experimenting on children and following fashion-based medicine.

6           38.    In addition to the high desistence rates, lack of predictive models for desistence, and

7   lack of mental health improvement, there are many other known and significant risks of administering

8   puberty blockers and cross-sex hormones.  These include, among others: sterility, painful intercourse,

9   impairment of orgasm, reduced bone development and inability to obtain peak or maximum bone

10  density, stopped or stunted growth of the pelvic bones for reproductive purposes, increased risk of

11  osteoporosis and debilitating spine and hip fractures as an adult, increased morbidity and death in

12  older age due to increased risk of hip fracture, negative and unknown effects on brain development,

13  emotional lability such as crying, irritability, impatience, anger, aggression, and reports of suicidal

14  ideation and attempt.  A recent study by Chen et al (2023) affirmed the previous indicators of a

15  significant increase in mortality among trans adults.

16          39.    Additional risks associated with testosterone include, among others: serious

17  cardiovascular and psychiatric adverse reactions, significant weight gain, increased or decreased

18  libido, headache, anxiety, depression, and generalized paresthesia, premature closure of boney

19  epiphyses with termination of growth causing inability to reach full height for adolescents, and

20  pulmonary embolism (i.e., blood clots in the lungs). There is a study of transgender men in which all

21  of the individuals who reported adverse drug reactions suffered cardiovascular events, and of those

22  reports, 50% of cases involved pulmonary embolism.  The labeling also notes risk of liver disfunction,

23  stating that prolonged use of high doses of androgens has been associated with development of

24  hepatic adenomas (benign tumors), hepatocellular carcinoma (cancer), and peliosis hepatis

25

26

27  [14] Korte, A., et al., *Gender Identity Disorders in Childhood and Adolescence*, DTSCH ARZTEBL INT. (Nov. 2008) (DOI: 10.3238/arztebl.2008.0834); Levine, S., et al., Reconsidering informed

28  Consent for Trans-Identified Children, Adolescents, and Young Adults, JOURNAL OF SEX & MARITAL THERAPY (March 2022) (DOI: 10.1080/0092623X.2022.2046221).

(generation of blood-filled cavities in the liver that may rupture)—all potentially life-threatening complications.

40.     Specifically for females, studies of transitioned females (i.e., transgender males) taking testosterone have shown a nearly 5-fold increased risk of myocardial infarction.  Females can also develop unhealthy, high levels of red blood cells which create an increased risk for cardiovascular disease, coronary heart disease, and death due to both.  Other affects include irreversible changes to the vocal cords and Adam's apple, deepening of the voice, abnormal hair growth, and male pattern balding of the scalp.  Additional risks include polycystic ovaries, atrophy of the lining of the uterus, and increased risks of ovarian and breast cancer.

41.     Chloe was rushed into this experimental transition treatment after only a few months of self-diagnosed gender dysphoria and without any adequate evaluation of her psychological history, her reasons for wanting to be a boy, and her numerous co-morbidities.  Defendants should have discussed Chloe's underlying feelings and thoughts leading up to her naive, self-proclaimed diagnosis.  Defendants should have performed psychotherapy to treat Chloe for her normal puberty struggles and for her body dysmorphia, social struggles, depression, anxiety, learning disabilities, autism symptoms, eating struggles, (continuing underweight status) and other related co-morbidities. The handful of erratic visits that she had with different mental health professionals lacked adequate follow-up evaluation and continuity of care and were woefully inadequate to properly evaluate and treat Chloe's varied mental health symptoms. Chloe's "gender dysphoria" symptoms were immediately and improperly treated as the top priority symptoms with no meaningful consideration or treatment of her other serious symptoms, which predated her gender dysphoria.

42.     Defendants fatally undermined the informed consent process by grossly overemphasizing Chloe's gender dysphoria symptoms and by failing to adequately evaluate and treat her co-morbidities.  Proper informed consent in Chloe's case could not occur without Defendants performing at least twelve, one-hour psychotherapy sessions, on a weekly basis.  These sessions should have fully explored and considered all of Chloe's co-morbidities and underlying psychological struggles.  All relevant diagnoses should have been considered.  All potential courses of treatment and the incumbent risks and benefits should have been evaluated and discussed at length with Chloe

and her parents.  Even without co-morbidities, the non-permanent, non-invasive option of longer-term psychotherapy, evaluation and treatment should have been discussed as a legitimate option, which it was not.  The failed evaluation and assessment resulted in grossly incomplete informed consent for Chloe and her parents.

43.     Regarding formalities, Dr. Taylor did not obtain any informed consent form for the puberty blockers, and the informed consent form for the testosterone treatment failed to identify any of the aforementioned risks.  The limited informed consent discussions that occurred fell grossly short of properly advising Chloe and her parents of the relevant serious risks and perceived benefits.  Indeed, Chloe has expressed that even if the long list of risks noted above had been discussed, it would have been absolutely impossible for her to understand what it would mean to go through menopause symptoms and have atrophy of her reproductive organs as a teenager.  She has also expressed that she did not understand, and there was no way she could possibly have understood, the impact of fertility and sexual function loss at age thirteen.  She had never had sex.  She did not even begin to imagine that she may want to have a romantic relationship with a man and have children until she was a junior in high school.  As a child herself, she had never thought about rearing children and/or whether she might want to breast feed them.  Defendants made no attempt to convey and impress upon Chloe the gravity of the life-long and devastating decision that she was making.  They falsely represented to Chloe that her symptoms would never resolve unless she transitioned and that she was at a high risk of suicide.  Chloe's parents were even given the ultimatum: "would you rather have a live son, or a dead daughter?"

44.     Therefore, at age thirteen, without proper informed consent and based on fraudulent misrepresentations, Chloe proceeded to receive puberty blocker injections and testosterone injections under Dr. Taylor's "care."  This experimental treatment began around January 10, 2018.

45.     After several months on cross-sex chemical treatment, Chloe's mental health declined, and she began to experience increasing anxiety, depression, and related issues.  She was also sexually assaulted by a boy at school who had frequently teased and harassed her.  He groped her breast in public before class.  This was an earth-shattering experience, wherein Chloe felt like she was the only person in the room and no one else seemed to care or notice.  She was concerned about reporting the

incident to school officials, fearing that the boy would be suspended for a couple days and then return to harass her more and perhaps do her worse harm.  It traumatized her to the core.  Her earlier childhood fears of sexual abuse were realized.  It took Chloe a couple of years to emotionally process, unpack, and come to grips with this assault.  At first, she didn't fully recognize the trauma.  She was already transitioning at this point.  So, she thought that she was already a "boy" and that she just needed to "man up."  But the truth is she was not a boy, and this was a deeply traumatic event that constituted a sexual assault.  This exacerbated her fears, and further propelled her into the belief that she did not want to be female and that she needed to get rid of her breasts to protect herself from further such abuse.

46.     She began binding her breasts daily at this point.  Daily binding and weekly testosterone injections caused her breasts to become deformed.  Chloe realized that her breasts were losing their form.  She felt that they were disgusting and that no one would ever be attracted to her as long as they remained on her body.  She resolved that she needed a double mastectomy at this point.

47.     Defendants never inquired or treated any of these important underlying psychological traumas, never elicited information related to the assault, and never elicited or evaluated Chloe's complex, conflicting, and confused feelings regarding her thinking that she would be safer being a boy.  Any competent provider should have easily discovered this information and recognized the need for an extended period of psychotherapy and further evaluation.  A competent provider would also have discovered this decline in her mental health condition and recognized it as a failure to respond to the "treatment."  Therefore, Defendants should have immediately stopped the treatment.  As it stands, Defendants proceeded with blinders on and let Chloe's complex case slip through the cracks without adequate monitoring and evaluation to the great detriment and suffering of Chloe, but to the financial benefit of Defendants.

48.     Due to the failure of proper care, Chloe expressed an interest to Dr. Taylor in continuing with transition and receiving a double mastectomy, naively thinking that it would solve all her problems.  Dr. Taylor did not evaluate this interest, did not ask about her underlying feelings, did not ask about or discover the assault that occurred, did not ask about or discover any of the underlying reasons why Chloe wanted to proceed with surgery, and instead blithely affirmed this

tragic decision.  Hence, Dr. Taylor simply provided Chloe with a referral for a plastic surgeon.

49.     Several months later, at age fourteen, Chloe consulted with Dr. Le regarding the double mastectomy, and he too merely affirmed her in this decision, also without evaluating whether this was the right decision for Chloe.  Dr. Le similarly failed to inquire about the assault and as to any of the psychological, emotional, and historical feelings as to why she wanted the surgery.  Dr. Le should have inquired and evaluated these issues before performing this radical, permanent, life-altering surgery.  Instead, he perfunctorily affirmed that a double mastectomy was an effective way to treat her gender dysphoria and proceeded with the consultation and with scheduling the surgery.

50.     It is important to note that the American Society of Plastic Surgeon's Policy Statement for aesthetic breast surgery in teenagers[15] states as follows:

> "Recommendations:     Adolescent candidates for (purely) aesthetic breast augmentation should be at least 18 years of age. Breast augmentation that is done for aesthetic reasons is best delayed until the patient has sufficient emotional and physical maturity to make an informed decision based on an understanding of the factors involved in this procedure. This includes being realistic about the surgery, expected outcome and possible additional surgeries. In considering emotional maturity for breast augmentation, the patients should request the procedure for themselves, not to satisfy another's perception of the patient. In addition, they should demonstrate sufficient emotional maturity to understand all aspects of this surgery. This would include having realistic expectations of the procedure itself, the outcome and the potential for future surgeries. Adolescent patients need to understand that, while implants can be surgically removed, the procedure may leave permanent changes on the body, including scarring and tissue changes."

Although Chloe was not seeking augmentation, the need for emotional and physical maturity to make a decision to totally remove one's breasts applies even more dramatically to Chloe's situation.

51.     Thereafter, Dr. Susanne E. Watson, Ph.D., performed a pre-operation psychological evaluation and recommended Chloe for the double mastectomy.  This evaluation was conducted in a single, two-hour visit.  There was no long-term, regular evaluation or assessment, and no follow-up evaluation of Chloe's psychological condition.  This perfunctory sign-off on Chloe's mental health condition is grossly deficient from a standard of care perspective.  There was no treatment of Chloe's

---

[15] American Society of Plastic Surgeons, *Policy Statement Breast Augmentation in Teenagers* (approved 2004, reaffirmed 2015) (https://www.plasticsurgery.org/documents/Health-Policy/Positions/policy-statement_breast-augmentation-in-teenagers.pdf).

underlying anxiety and depression that worsened several months after Chloe began the process of chemical transition.  Dr. Watson affirmed Chloe in this decision to transition and did not evaluate in any way whether Chloe was making the right decision.  Moreover, she failed to elicit the important information discussed above regarding Chloe's traumatic experiences, negative emotions, and related struggles.  Like Drs. Taylor and Le, Dr. Watson engaged in a very limited and perfunctory informed consent discussion that occurred in this single visit, as a part of the more general evaluation, and which glossed over the significant health and psychological risks of permanent breast removal surgery and continuing hormone treatment.  Dr. Watson's informed consent discussion was fatally flawed by the failure to evaluate properly the full scope of Chloe's psychological condition and underlying trauma, negative emotions, and mental suffering.  Dr. Watson neglected to discuss and evaluate her co-morbidities, related diagnoses, treatment options for these varying co-morbidities and for gender dysphoria itself, and entirely failed to present a truthful and complete risk/benefit analysis for Chloe and her parents.

52.     Additionally, Dr. Watson entirely failed to mention or discuss the following: (1) the existence of only low to very low quality studies of treating gender dysphoric children with transition chemicals and surgery; (2) the probability of desistence and the significant desistence rates for individuals diagnosed with gender dysphoria; (3) the significant probability that Chloe's dysphoria would resolve on its own without cross-sex hormones and surgery; (4) the significant probability that Chloe may later come to regret these decisions in the event that her gender dysphoria did not persist; (5) the significant possibility that treatment of this type would not attain the desired results of resolving her internal conflict; (6) the lack of accurate models for predicting which cases of gender dysphoria will desist and which will persist into adulthood; (7) the fact that transgender individuals who undergo transition hormones and surgery have a significantly increased suicide risk after transitioning, and (8) the fact that she previously had two significant surgical cleft palate repairs that may have influenced her sense of defectiveness as a girl.  Instead, Chloe and her parents were given the opposite information, including that Chloe's condition would never resolve on its own and that Chloe would likely commit suicide if she did not receive this treatment.  This was coercive and absolutely false based on Chloe's presentation of symptoms.  She had a complex and multi-faceted

presentation of mental health symptoms, but she was never evaluated to be at a significant risk of suicide.  Representing that Chloe's suicide risk would increase without transition was unwarranted, false, and manipulative.  Presented concurrently, this emotionally supercharged suicide threat and this false decision-making dichotomy backed Chloe and her parents into a corner.  They felt they had no option but to continue moving forward with transition and surgery.  Thus, Dr. Watson failed to provide important relevant information, obscured true information, provided false information, and manipulated Chloe and her parents into a false decision-making matrix of surgery or death.  This represents an egregious breach of the standard of care as well as fraud, malice, and oppression.

53.    Sophisticated, thoughtful experienced mental health professionals, particularly those with terminal degrees. are expected to understand that ambivalence is present in every major life decision, including elective body changes with hormones and mastectomy.  Throughout her years of care at Kaiser, the professionals who treated her demonstrated no understanding of this fact.

54.    In the months following Dr. Watson's evaluation, Chloe had increased mental health issues, including depression, anxiety, fears, and passive suicidal ideation.  Neither Dr. Watson nor Dr. Le conducted any further review of Chloe's mental health condition and did not discover these issues.  Therefore, they failed to assess and consider these negative mental health developments in evaluating and assessing whether Chloe should in fact proceed with permanent, irreversible, and mutilating surgery.  Chloe believed that these feelings would go away when she completed the surgery and continued with transition.  No one informed or advised her that a decline in her mental health condition is an indication that she was not responding to the experimental treatment and that resolving these underlying mental health concerns should occur before performing permanent and irreversible and mutilating surgery.  In this time frame, Chloe's mother had to request a "VOT [verification of treatment] for intermittent leave" from the pediatric care provider so that Chloe could be excused from school, as needed, because of Chloe's increased mental health issues.  Despite this worsening psychological condition, Defendants elected to press forward with permanent, irreversible, and disfiguring transition surgery.

55.    Chloe had a few more visits with Dr. Le, who obtained a so-called "informed consent" document that addressed normal risks of surgery that might apply to a breast cancer patient, but that

failed to address informed consent issues relating specifically to "gender dysphoria." Similar to Drs. Taylor and Watson, Dr. Le entirely failed to discuss the lack of adequate studies in this area and the fact that there were only low-quality studies of surgical breast removal as a means of treating gender dysphoria, especially in a minor. Dr. Le also entirely failed to mention the studies demonstrating high rates of desistence for children with gender dysphoria and the lack of accurate models for predicting desistence. He never cautioned Chloe or her parents of the significant probability that her dysphoria would resolve later in life without any surgical intervention and that Chloe may then regret undergoing this permanent, irreversible, and disfiguring surgery.

56.     Additionally, even as to the surgery itself, the informed consent discussions were woefully inadequate. Dr. Le never showed Chloe any pictures of poor results of the surgery and never showed her any pictures of what the surgery looks post-op prior to healing. Dr. Le only showed her pictures of "successful" results. A critical part of any informed consent discussion for an elective breast removal surgery includes showing unsuccessful results and showing pictures of the healing process. This discussion and presentation did not occur for Chloe. Complications of mastectomies for adolescent trans-identified patients are well known to plastic surgeons

57.     At age fifteen, on June 3, 2020, Dr. Le performed a radical double mastectomy, removing both of Chloe's healthy breasts.

58.     Chloe was initially satisfied, believing that she would now be able to socialize with the boys without a shirt, that she would no longer need to wear uncomfortable and cumbersome bindings, and that she would now be happy. But reality set in a few weeks later when she needed to have her stiches removed. The experience was strange and unsettling, both from a sensation perspective and a mental perspective. She was shocked and unprepared for how cut-up her chest looked after the surgery. Her grafts were black because they had been separated from the tissue and reattached and so the outside layer of tissue died. The sensation was very strange and uncomfortable. She had to look at herself daily and was appalled at how she looked. She felt like she had been turned into a monster. She was also led to believe that she would be fully healed within a few months and certainly within a year after surgery. However, she is now more than two years post-op and still has significant complications and problems from the surgery. These problems were never discussed or

1  disclosed as possible complications.

2       59.     Drs. Taylor, Watson, and Le affirmed Chloe in her desire to have her breasts removed

3  and never evaluated her internal reasoning for this surgery.   The Defendants in this case never

4  discovered, assessed, evaluated, or treated the sexual assault that she experienced.   They never

5  diagnosed or treated her for her body dysmorphia, the disgust that she had for her breasts, the feelings

6  that she would never be attractive with them on her body, and the other conflicted feelings about her

7  perceived inability to be an attractive woman.   They never evaluated or explored treatment options

8  for potential autism spectrum or for her social/behavioral troubles.   They never evaluated or treated

9  her apparent eating disorder.   They did not provide her with psychological support and treatment for

10  her learning disability and never evaluated the impact of that disability on her social life and her

11  personal confidence.

12       60.     After the surgery, Chloe's internal feelings of conflict with her gender returned more

13  vigorously than before.   Her mental health issues declined further.   Her depression and anxiety got

14  worse, and she developed suicidal ideation.   Her gender dysphoria did not resolve with this additional

15  stage of transition; instead, her mental state got worse.   She began to feel that it was all a huge mistake.

16  She also took a psychology class, wherein she learned about the Harlow monkey experiment and the

17  importance of a bond between a mother and a child.   This class made her think for the first time about

18  her natural desire to be a mother.   At the same time, this caused her serious distress because she

19  thought for the first time about caring for a child and about how she might want to breast feed that

20  child.   Consequently, she researched for the first time about the benefits of breast feeding a child.

21  She is heartbroken at the thought that she can never have the option to nourish and nurture a child

22  through breast feeding.   She is heart-broken that she can never experience the physical touch,

23  bonding, and intimacy that a mother and child can share through breastfeeding.   The cross-sex

24  chemicals she received also caused her severe distress as she suddenly realized the tragic impact of

25  her potential loss of fertility and a host of other related issues. She could not have possibly

26  comprehended these tragic consequences as a child, especially while taking such powerful drugs.

27       61.     Throughout and during her cross-sex hormone treatment, Chloe experienced a host of

28  other significant and severe physical and mental sufferings.   She experienced hot flashes,

accompanied by severe itching in random areas of her body, to the point that she could not wear sweaters or long pants during the colder seasons.  She would also hear loud cracks in her neck and back while breathing.  She has permanent changes to her bone structure, including wider shoulders, a stronger jaw, forehead, and nose; a larger ribcage; underdeveloped hips; an Adam's apple; and a masculine voice.  She suffered loss of sensation and severe atrophy of her reproductive organs.  She suffered frequent urinary tract infections, discomfort, and related issues.

62.     After Chloe stopped the hormones, she continued to have increased loss of sensation and increased dysfunction of her reproductive organs, masculine voice, weakening of her voice that now has a greater tendency to crack and lose power.  Chloe has continuing issues with more frequent UTI-like symptoms.  In the first few months after stopping hormones, she had clotting issues, incontinence issues, and digestive track issues.  She developed and continues to have joint pain in her knees and she continues to be prone to itching and rashes on her limbs, especially her legs.  Her joint paint continues to increase to her back area, and she has sporadic and unpredictable shooting pains across her back.

63.     Chloe has ongoing complications with her grafts for the mastectomy, which require regular care to address and that make showering and swimming problematic.  The damaged area of her skin on her right nipple graft has also spread off the graft and is moving downwards.  She has lost erogenous sensation in her chest area.  The nerves are not connected properly, and she will feel sensations in her arm pit instead of her chest.  She has lost social development with her peers including with regard to dating and romantic development.  She also is at a significant increased risk of having fertility problems.  She may be unable to have children, and if she is able to have children, she may be unable to deliver them naturally due to inadequate development of her pelvic bones.

64.     She has likely lost at least a couple of inches of her potential adult height.  She has increased facial and other body hair.  She is at higher risk of having bone density problems and is at an increased risk of bone fractures.  At an elderly age, bone fractures can cause serious injury and death.  She may have stunted neurological development and has concerns that she should have been treated for autism spectrum disorder.  She has now lost the ability to receive that treatment and related neurocognitive development that could have benefited her adult life.  She suffered from a sudden

massive increase in libido from taking testosterone, which was extremely difficult for her to navigate as a young female, and she suffered from and developed a pornography addiction.  Her dating pool was severely limited during this time.  Girls her age started to express an interest in her after transition, but Chloe was still only interested in men.  When Chloe stopped the hormones, she became intensely suicidal for the first time and prone to emotional outbursts.  She was severely depressed, and it was incredibly difficult for her to focus on anything including school.  As a result, she ended up failing out of high school her senior year and had to get a California High School Proficiency Exam Certificate.  She struggled with adjusting socially and presenting as a female again.  She missed out on important and irreplaceable female socialization due to ill-conceived social transitioning during critical years in her development.  After detransitioning, she was bullied because of her masculine physical features and voice.

65.    Chloe has suffered severe anxiety, depression, and suicidal ideation as a result of this so-called treatment.  She now has deep emotional wounds, severe regrets, and a deep distrust for the medical system.  She continues to struggle with depression.  It is very difficult for her to cope with the possibility of being unable to have biological children, and her inability to breastfeed them if she is able to have children.  She also struggles considerably with her body image, which she describes as having "taken a major hit from all of this."

66.    The full extent of Chloe's damages are being investigated and are not fully known at the time of filing this complaint.  The allegations herein are intended to be only a partial summary of the relevant facts and medical records, and Chloe's medical issues and damages resulting from the gross negligence, coercion, and fraud Defendants committed in this case.

67.    Defendants have also deliberately ignored and failed to meaningfully discuss with Chloe that sex-reassignment is not physically possible even with surgery.  There is no way to surgically replace functioning biological female organs with functioning biological male organs.  A trans-male (i.e., a woman who transitions to look more like a man) can never produce biological children with a female and vice versa.  At best, surgery and chemical treatment can modify a female body to mimic and appear more like a male body and vice versa.  Also, the female/male chromosome composition of XX/XY cannot be modified.  A female will have XX chromosomes even if she is

1   surgically and hormonally modified to appear more like a male.  But, as noted above, the potential

2   long-term outcomes of this mimicry are devastating for patients who undergo this treatment.

3   Defendants knew that this treatment was not a viable option and does not produce good mental health

4   outcomes, yet they sent Chloe down this terrible path of mutilation and regret without advising her

5   of any other options.  These acts and omissions represent a gross breach of the standard of care, and

6   support a finding of fraud, malice, and oppression.

7          68.    In addition, from a financial perspective, patients such as Chloe who "transition" to

8   appear more like the opposite sex represent a lucrative business opportunity for Defendants.  Chloe

9   underwent tens of thousands of dollars of so-called medical treatment, which inured to the benefit of

10  Defendants and to the harm of Chloe.  Had Chloe continued in her transition path, she would have

11  represented a monetary benefit to the Defendants of tens of thousands of additional dollars in terms

12  of follow-up lifelong treatment and in terms of further risky surgeries to construct fake genitalia.

13  Thus, Defendants have a high monetary incentive to send patients who appear to present with some

14  symptoms of gender dysphoria down the path to transition as soon as possible.  Patients like Chloe,

15  who would have naturally desisted from their gender dysphoria by adulthood, represent a significant

16  lost monetary potential if they are not medically treated when symptoms first present.  It is well

17  known that the vast majority of patients who start transition through puberty blockers go on to further

18  transition through life altering cross-sex hormones and surgery.

19         69.    It appears that the lucrative nature of transition treatment, rather than sound medical

20  evidence and Chloe's wellbeing, represented a substantial factor motivating Defendants' ill-formed

21  advice to start Chloe on the transition path.

22         70.    Additionally, it appears that surgical/hormone treatment represented an easier more

23  available treatment option to Defendants over regular interval psychotherapy. For over a decade,

24  since 2013, the California Department of Managed Healthcare has conducted an ongoing

25  investigation of Kaiser's inability to adequately staff mental health professionals, and this has been

26  reported in the news.[16]  The American Psychological Association has even sent a letter to the Kaiser

28  _____

[16] See Exhibits 1-6, 8-12.

Foundation Health discussing how Kaiser's lack of availability of follow-up mental health care falls below professional standards of care in this area.[17]   Remarkably, there have been multiple protests wherein thousands of mental health professionals affiliated with Kaiser went on strike at various times, including in Oakland, California.[18]   Also, hundreds of practitioners have left for private practice apparently due to Kaiser's unethical practice of intentionally understaffing the mental health division.[19]  Yet, Kaiser turned a record $8.1 billion profit in 2021 alone.[20]

71.     Chloe's case occurred during this time when Kaiser was inadequately staffed with mental health care providers.  It appears that this purposeful inadequate staffing, to make more profits, was a contributing factor to Defendants' inadequate mental health evaluation and psychotherapy treatment of Chloe.  It also appears that this inadequate staffing contributed to the apparent favoritism for easy chemical/surgical treatment, rather than the critically needed psychotherapy in Chloe's case.

72.     In addition to the foregoing, the Institutional Defendants are separately liable for allowing such radical, inadequately studied, off-label, and essentially experimental treatment to occur on minors, including Chloe, at their facilities.  They are also liable for failing to have adequate policies and procedures prohibiting and preventing the acts, omissions, failures of informed consent, fraudulent concealment, fraudulent misrepresentations, below the standard of care treatment, and other derelictions that occurred in Chloe's case and as described above.  Indeed, not only are the Institutional Defendants' policies and procedures inadequate to prevent such negligent and intentional malpractice, but they actively promote, encourage, and advertise on their website that their facilities and providers offer proper transgender treatment, including for minors.[21]   Thus, the Institutional Defendants are jointly and severally liable with the providers for the grossly negligent and fraudulent, malicious, and oppressive acts described in this complaint.  The Institutional Defendants are also

---

[17] See Exhibit 7

[18] See Exhibit 5,6, 10-12

[19] See Exhibit 10.

[20] Ibid.

[21] https://thrive.kaiserpermanente.org/care-near-you/northern-california/eastbay/departments/gender-affirming-care/pediatric-services-in-the-mst-department/ (accessed February 13, 2023).

separately and independently liable on the grounds described in this paragraph and the paragraphs above, pertaining to the failure to maintain an adequate staff of mental health care providers, all leading to inadequate patient care and follow-up, and the failure to maintain proper facilities, policies, and procedures.

## FIRST CAUSE OF ACTION

### MEDICAL NEGLIGENCE

### (By Plaintiff Against All Defendants)

73.     Plaintiff hereby incorporates each and every allegation previously set forth above as though fully set forth herein.

74.     During all relevant times, Plaintiff was a patient of Defendants who undertook to supervise, treat, and provide medical care and medical facilities to Plaintiff as described herein. Defendants collaborated to perform a course of experimental chemical and surgical mimicry change "treatment" on Plaintiff as described in detail above.  In summary, Defendants intentionally induced in Plaintiff an endocrine disorder through the administration of puberty blockers, placed Plaintiff on cross-sex testosterone hormones, and eventually collaborated to recommend and perform on Plaintiff a radical double mastectomy.

75.     By virtue of this doctor-patient relationship, Defendants owed Plaintiff a duty to exercise the level of skill, knowledge, and care in the evaluation, diagnosis, and treatment of Plaintiff that other reasonably careful providers in the same respective fields/specialties would use in similar circumstances.  Defendants breached the standard of care as described in more detail above by, among other things: (1) failing to properly evaluate, assess, diagnose, discover, and treat Plaintiff's medical and mental health conditions, including, but not limited to, Plaintiffs' medical and mental health co-morbidities and symptoms that presented prior to and concurrent with her gender dysphoria symptoms; (2) failing to recognize and provide or refer Chloe to a provider who could evaluate and treat her on a regular weekly basis over an extended period of time; (3) grossly overemphasizing Plaintiff's gender dysphoria symptoms to the point of excluding and ignoring her co-morbidities, related symptoms, and their relevant treatment options; (4) failing to provide Plaintiff with competent informed consent regarding the treatment options available and the relevant risks and benefits of

1    treatment; and (5) manipulating Plaintiff and her parents into a false decision making matrix by

2    deliberately obscuring relevant information, by presenting false and misleading information, and by

3    thwarting their rational decision making process through inserting an emotionally supercharged

4    ultimatum of a grossly exaggerated suicide risk when no such risk existed for Chloe.

5           76.    Regarding informed consent, among other things, Defendants obscured and did not

6    disclose the important potential results, risks of, and alternatives to this transition course of

7    "treatment," as discussed and elaborated in detail above.  In addition, Defendants intentionally

8    obscured and failed to disclose relevant information regarding the existence of only low-quality

9    studies purportedly supporting such treatment, and the existence of high-quality studies establishing

10   poor mental health outcomes for this treatment.  They also affirmatively misrepresented that

11   Plaintiff's symptoms would never resolve without this chemical/surgical transition, and failed to

12   disclose and discuss desistence rates.  Defendants also manipulated and derailed Plaintiff and her

13   parent's rational decision-making process, boxing them into a false decision-making matrix by

14   inserting an emotionally supercharged ultimatum of grossly exaggerated suicide risk when no such

15   risk existed for Chloe.  Defendants falsely represented that Chloe presented a high risk of suicide

16   unless she transitioned.  Chloe's parents were also coercively asked if they "would rather have a dead

17   daughter or a live son."  Defendants failed to adequately assess, evaluate, and diagnose Plaintiff's

18   widely varied presentation of symptoms and co-morbidities, which fatally undermined and obstructed

19   the possibility of Defendants providing Plaintiff with informed consent.  The process of assessing,

20   evaluating, diagnosing, and recommending treatment options, risks, and benefits, could not possibly

21   have met the standard of care in the limited therapy sessions that occurred in Plaintiffs case.  The

22   same provider should have met with Chloe for 1-hour sessions, weekly, for at least 12 weeks, in order

23   to meet the requisite standard of care.  Defendants did not discuss, evaluate, or inform Chloe as to

24   alternate treatment options, and the related risks and benefits.  Defendants failed to disclose to Chloe

25   that the decline in her mental health symptoms was an indicator that she was not responding to

26   "treatment" and that she should not continue with "treatment."  These, among other issues, represent

27   a gross breach of the standard of care and an egregious failure of informed consent.  A reasonable

28   person in Plaintiff's position would not have agreed to the transition treatment if properly and

adequately informed of the risks.  Plaintiff suffered harm and damage relating to numerous serious risks that should have been disclosed, discussed, and explained to Chloe and her parents but were not disclosed.

77.     As a direct and proximate cause of Defendants' breaches of the standard of care, Plaintiff sustained serious and permanent personal injuries, causing her general and special damages to be determined according to proof at trial.

78.     The acts and omissions described in this complaint also constituted fraud, oppression, and malice.  Defendants deliberately conveyed false information and obscured and concealed true information.  Defendants failed to inform Plaintiff about the issue of high likelihood of desistence and significant risk of regret.  Defendants failed to spend sufficient time with Plaintiff over an adequate period of time to evaluate her condition, and failed to inform her of her need for regular psychotherapy and the need for her to seek a therapist who could spend adequate time with her. Defendants did not tell Chloe about the increased risk of suicide for transgender individuals receiving chemical/surgical transition treatment.  Defendants did not tell her about the existence of high-quality evidence demonstrating poor mental health outcomes for this treatment and the existence of only low to very low-quality evidence purportedly supporting this treatment.  Defendants did not tell her about all of the extensive health risks.  Defendants experienced significant financial gain as their intended result.   The Institutional Defendants knowingly authorized and ratified this substandard and fraudulent treatment of Plaintiff for their own financial benefit and the detriment of Chloe.  These among other despicable acts and omissions support a finding of intentional fraud, malice, and oppression.

79.     The harm that Plaintiff experienced in this case as a result of being improperly treated with chemical/surgical interventions rather than psychotherapy for her varied presentation of co-morbid symptoms, would not have occurred unless the Defendants were negligent.  The fact that Plaintiff detransitioned after the so-called treatment establishes *res ipsa loquitor* that Plaintiff was not transgender and that Defendants were guilty of medical malpractice in their evaluation, assessment and treatment of Plaintiff.  Defendants' diagnoses, evaluation, and "treatment" of Chloe were *de facto* incorrect.  Proper evaluation, diagnosis, informed consent, and treatment of Plaintiff

that met the standard of care would never have started Plaintiff down this harmful path of physical transition that ultimately turned out to be a horrible experiment causing irreversible and serious injuries to Plaintiff.

80.     The harm occurred while Plaintiff was under the care and control of Defendants, and Plaintiff's own voluntary actions were not a cause contributing to the events that harmed Plaintiff. Plaintiff was a minor incapable of understanding and evaluating the decisions she was making, yet her providers treated her as if she could understand the implications of the decisions that she was making as described in greater detail above.

<u>**SECOND CAUSE OF ACTION**</u>

**MEDICAL NEGLIGENCE – HOSPITAL/MEDICAL GROUP**

**(By Plaintiff Against Kaiser Hospitals and Medical Group)**

81.     Plaintiff hereby incorporates each and every allegation previously set forth as though fully set forth herein.

82.     The Institutional Defendants were a medical provider for Plaintiff and had a duty of reasonable care to Plaintiff.  The Institutional Defendants had the obligation to select, maintain, and ensure the competence of the Defendant Providers.  The Institutional Defendants also had the obligation to provide procedures, policies, facilities, supplies, and qualified personnel reasonably necessary for the treatment of Chloe.  The Institutional Defendants breached these duties by failing to provide the requisite procedures, policies, facilities, supplies, and qualified personnel, and by failing to adequately select, maintain, and ensure the competence of the Defendant Providers.  Among other things, the Institutional Defendants allowed the Defendant Providers to treat Plaintiff with radical, inadequately studied, off-label, and essentially experimental transition "treatment."  The Institutional Defendants failed to have adequate policies and procedures in place to prevent the acts, omissions, failures of informed consent, fraudulent concealment, fraudulent misrepresentations, negligent treatment, and other breaches of the standard of care that occurred in regard to Plaintiff as described above.  Furthermore, the Institutional Defendants not only have inadequate policies and procedures to prevent such harmful treatment of patients like Chloe, but they actively promote, encourage, and advertise on their website that their facilities and providers offer proper transgender

treatment, including for minors.

83.     The Institutional Defendants also failed to employ adequate mental health professionals.  This inadequate staffing of mental health providers contributed to preventing Plaintiff from receiving regular psychotherapy evaluation, assessment, and treatment with the same provider, which was necessary in Plaintiff's case to meet the standard of care.

84.     Among other acts and omissions, these breaches of the standard of care caused Plaintiff to suffer personal injury and resulting special and general damages according to proof at trial.

85.     The acts and omissions described in this complaint also constituted fraud, oppression, and malice.  Defendants deliberately conveyed false information and obscured and concealed true information.  Defendants failed to inform Plaintiff about the issue of the high likelihood of desistence and the significant risk of regret.  Defendants failed to spend sufficient time with Plaintiff over an adequate period of time evaluating her condition and/or failed to inform her of her need for regular psychotherapy and the need for her to seek a therapist who could spend adequate time with her. Defendants did not tell her about the increased risk of suicide for transgender individuals receiving chemical/surgical transition treatment.  Defendants did not tell her about the existence of high-quality evidence demonstrating poor mental health outcomes for this treatment and the existence of only low to very low-quality evidence purportedly supporting this treatment.  Defendants did not tell her about all of the extensive health risks.  Defendants experienced significant financial gain as the intended result.   The Institutional Defendants knowingly authorized and ratified this substandard and fraudulent treatment of Plaintiff.  The Institutional Defendants knowingly failed to employ adequate mental health professionals to treat complex cases like Chloe.  These deficiencies, among other acts and omissions, support a finding of intentional fraud, malice, and oppression.

86.     The harm that Plaintiff experienced in this case as a result of being improperly treated with chemical/surgical interventions rather than psychotherapy for her varied presentation of co-morbid symptoms, would not have occurred unless the Defendants were negligent.  The fact that Plaintiff detransitioned after the so-called treatment establishes *res ipsa loquitor* that Plaintiff was not transgender and that Defendants were intentional or negligent in their evaluation, assessment and

treatment of Plaintiff.  Defendants' diagnoses, evaluation, and "treatment" of Chloe were *de facto* incorrect.  Proper evaluation, diagnosis, informed consent, and treatment of Plaintiff that met the standard of care would never have started Plaintiff down this harmful path of physical transition that ultimately turned out to be a horrible experiment causing irreversible and serious injuries to Plaintiff.

87.     The harm occurred while Plaintiff was under the care and control of Defendants, and Plaintiff's own voluntary actions were not a cause contributing to the events that harmed Plaintiff. Plaintiff was a minor incapable of understanding and evaluating the decisions she was making, yet her providers treated her as if she could understand the implications of the decisions that she was making as described in greater detail above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants according to law and according to proof, for the following:

1.   General damages, in an amount according to proof at the time of trial;

2.   Special damages for medical and related expenses, in an amount according to proof at the time of trial;

4.   Pain and suffering, past and future, and mental anguish, past and future;

5.   Pre-judgment interest on damages;

6.   Costs of suit;

7.   Such other and further relief as the court deems just and proper.

Respectfully Submitted,

LiMANDRI & JONNA, LLP

DHILLON LAW GROUP INC.

CENTER FOR AMERICAN LIBERTY

Dated: February 22, 2023          By: _____
                                      Charles S. LiMandri
                                      Paul M. Jonna
                                      Robert E. Weisenburger
                                      Harmeet K. Dhillon
                                      John-Paul S. Deol
                                      Jesse D, Franklin-Murdock

32
COMPLAINT

1    Mark E. Trammell*

2    Attorneys for Plaintiff
     Chloe E. Brockman

3    *Pro Hac Vice motion forthcoming

4    DHILLON LAW GROUP INC.

5

6

7                    **<u>DEMAND FOR JURY TRIAL</u>**

8    Plaintiff CHLOE E. BROCKMAN demands a trial by jury on all claims.

9

10   Respectfully Submitted,

11   LiMANDRI & JONNA, LLP

12   DHILLON LAW GROUP INC.

13   CENTER FOR AMERICAN LIBERTY

14
     Dated: February 22, 2023          By: _____
15                                          Charles S. LiMandri
                                            Paul M. Jonna
16                                          Robert E. Weisenburger
                                            Harmeet K. Dhillon
17                                          John-Paul S. Deol
                                            Jesse D, Franklin-Murdock
18                                          Mark E. Trammell*

19                                          Attorneys for Plaintiff
                                            Chloe E. Brockman
20
                                            *Pro Hac Vice motion forthcoming
21
                                            DHILLON LAW GROUP INC.
22

23

24

25

26

27

28

**EXHIBIT 1**

# CARE DELAYED, CARE DENIED:
## Kaiser Permanente's Failure to Provide
## Timely and Appropriate Mental Health Services



A report of the National Union of Healthcare Workers
www.NUHW.org

*November 2011*

# *Table of Contents*

Executive Summary                                    1

Introduction                                         5

Methodology                                          7

Findings                                             9

    I                            9

    II                           14

    III                          14

    IV                           16

    V                            18

Recommendations                                     21

Endnotes                                            23

Bibliography                                         25

Appendices

    A: Behavioral Health Survey                    27

    B: Quality Care Documentation Form              29

    C: Survey Results for Psychiatric Dept. Clinicians   30

    D: Survey Open-Ended Responses                  31

    E: Survey Results by Region                     33

CARE DELAYED, CARE DENIED

## Executive Summary

*With more than 6.6 million members, Kaiser Permanente is California's largest HMO and plays a massive role in the state's healthcare delivery system by operating more than 35 hospitals and several hundred clinics across the state. Less well known, however, is Kaiser's role in providing mental health services to Californians. Ranking perhaps second only to the State of California, Kaiser is one of the state's largest providers of mental health services. The Oakland-based company guarantees its members a full array of inpatient, outpatient and emergency mental health services provided by several thousand mental health professionals. Each year, thousands of Kaiser's members seek treatment for conditions ranging from autism, anxiety and bi-polar disorder to depression, schizophrenia and suicidal ideation.*

Despite Kaiser's pledge to provide comprehensive mental health services to its members, an in-depth analysis suggests that the HMO's mental health services are sorely understaffed and frequently fail to provide timely and appropriate care. Patients often experience lengthy delays in obtaining services, an overreliance on "group therapies," and frustrating obstacles that push many patients to forgo care or seek treatment elsewhere at their own cost.

Drawing on a survey of hundreds of Kaiser's mental health clinicians as well as documentation from regulatory agencies, court filings, patients and frontline caregivers, this study finds that Kaiser frequently fails to comply with California laws aimed at protecting patients' timely access to appropriate services.[1] Furthermore, it finds that Kaiser's failures are systematic and often purposeful. Indeed, the scope and specifics of these failures are sufficiently grave as to merit investigation by state and federal authorities as well as actions

> *"Treatment is "one size fits all" with overemphasis on medications, groups and educational classes in place of effective levels of scientifically-based, best practices care. [Patient] care treatment is too little in frequency, amount and/or duration…"*
>
> *-Kaiser Psychologist*

for recovery of funds by public and private payers, including individual Kaiser members. For example, despite receiving more than $10 billion annually from Medicare to provide a full range of services, including mental health care, Kaiser appears to be miscoding patient evaluation procedures, which may result in fraudulent claims to the Medicare program.

The study's key findings are the following:

- **Kaiser often violates California laws requiring HMOs to provide patients with "timely access" to appropriate mental health services.** Clinicians report that patients frequently endure waits of four weeks or longer for return appointments even though California law mandates a maximum wait time of 10 business days for both initial and return visits unless a licensed health professional has documented that a longer waiting time "will not have a detrimental impact on the health of the enrollee."[2] Furthermore, many clinicians report that patients' first appointments are often nothing more than group orientation sessions in which initial evaluations do not take place. When such evaluations finally do take place, clinicians report they are often

1

cursory and insufficient, but nonetheless are coded as if they were thorough and complete. In a survey of 305 Kaiser clinicians, nearly 90 percent of the respondents reported there is insufficient staffing at their clinic to provide patients with timely return visits. More than 75 percent reported that they are either frequently or very frequently "forced to schedule return visits further into the future than you believe is appropriate."

- **Kaiser reportedly falsifies patient scheduling records in an effort to avoid being cited by state regulators for lengthy appointment delays.** Clinicians report that Kaiser often uses "shadow" scheduling records, deliberately miscategorized appointments, and false appointment cancellations to avoid detection of delays that exceed California's "timely access" requirements.

- **Kaiser often funnels patients into group therapy even when individual therapy would be more effective.** Kaiser often pressures its clinicians to assign patients to group therapy even when clinicians conclude that individual therapy may be more beneficial. More than 50 percent of Kaiser clinicians report that patients are either frequently or very frequently "assigned to group therapy even though individual therapy may be more appropriate."

- **Kaiser reportedly performs initial patient evaluations and other mental health services that not only fall short of recommended clinical standards, but are coded incorrectly in possible violation of Kaiser's contracts with both private and governmental purchasers.** In San Diego, Kaiser has reportedly directed clinicians to spend only half as much time as the clinically recommended minimum for interviewing, assessing and diagnosing patients. This

reported "speed-up" of Kaiser's assessment procedures can have serious implications. For example, short-cut evaluations lasting only 20 to 30 minutes may result in the misdiagnosis of patients' conditions. Furthermore, Kaiser appears to be miscoding these procedures in a manner that may result in fraudulent claims to Medicare and other governmental and private purchasers. Interviews with clinicians indicate that Kaiser may be replicating this practice at many sites in California.

- **Kaiser's current mental health care deficiencies are part of an ongoing pattern of substandard care.** During recent years, government inspectors have cited Kaiser multiple times for failing to provide patients with timely access to mental health services. For example, in 2005 the California Department of Managed Health Care (DMHC) cited Kaiser for failing to provide its patients with timely access to mental health care. In 2010, Kaiser was fined $75,000 for unreasonably delaying a child's autism diagnosis for almost 11 months.

In short, Kaiser's systemic failures recall many of the well-documented abuses of HMOs from an earlier era – one that California believed its revised and expanded regulatory structure had long ago overcome. Kaiser is delivering this substandard care at the same time that the HMO is reporting record profits of $5.7 billion since 2009.[3]

The breadth and depth of Kaiser's failures call for state and federal authorities, as well as private payers, to act with deliberate speed to protect the interests of Kaiser enrollees and ensure they receive the mental health care to which they are entitled, and which they need.

As a first step, the California Department of Managed Health Care (DMHC), which regulates Kaiser's HMO plans, and the California

Department of Insurance (CDI), which regulates Kaiser's fee-for-service offerings, should initiate investigations to determine the full extent of Kaiser's regulatory violations and seek remedies as may be justified for Kaiser's violation of timely access standards, its failure to provide patients with clinically appropriate care, the insufficiency of its mental health provider network, and its non-compliance with mental health parity requirements, among other potential violations of state statutes and regulations.

As these investigations proceed, other public and private actions that merit consideration include:

- The State Attorney General initiating an investigation to determine whether any of Kaiser's failures to serve the mental health needs of its patients constitute "unfair business practices" under California Business and Professions Code §17200 or "false advertising" under §17500, and seeking appropriate remedies for any such violations. Additionally, state officials could initiate an investigation by the California Department of Justice's Medi-Cal Fraud Unit of Kaiser's potential false claims to Medi-Cal and Healthy Families and the potential breach of its specific contractual obligations or these programs' general conditions of participation.

- The Office of the Inspector General of the U.S. Department of Health and Human Services initiating an investigation of Kaiser's apparently false claims to the Medicare program for mental heath services provided under the Medicare Advantage program, and its possible violations of its specific contractual obligations or the programs' general conditions of participation.

- Other public and private payers who purchase health care coverage from Kaiser, most notably large public plans like the Federal Employee Health Benefits Program (FEHB) and the California Public Employees' Retirement System (CalPERS), pursuing audits of the treatment provided to plan members and seeking appropriate restitution for Kaiser's failures.

- The California Assembly's and Senate's Health Committees scheduling joint subject matter hearings to review the findings raised in this study and deliberate on what additional safeguards might help prevent the development of schemes to violate mental health patients' rights.

Finally, and most important, Kaiser should:

- Adopt the recommendations of its own mental health providers to increase staffing levels at mental health facilities, limit weekly initial intakes per clinician, and establish a binding system of dispute resolution for staffing problems that is managed by a neutral third party in order to ensure enough capacity to meet state requirements for timely access to appropriate care;

- Cease and desist from the inappropriate management of records, misuse of group therapy, and misrepresentation of orientation sessions and other triage mechanisms to evade its responsibilities to patients with mental health needs; and

- End the practice of 30-minute "intake" evaluations of mental health patients and ensure that patients receive appropriate assessments, properly documented, that conform to the clinical standards set forth by the American Psychological Association (APA) and the American Medical Association (AMA).

**EXHIBIT 2**



# DEPARTMENT OF Managed HealthCare

## OFFICE OF PLAN MONITORING
## DIVISION OF PLAN SURVEYS

**FINAL REPORT**

**ROUTINE SURVEY**

**OF**

**KAISER FOUNDATION HEALTH PLAN, INC.**

**BEHAVIORAL HEALTH SERVICES**

**DATE ISSUED TO PLAN:  MARCH 6, 2013**
**DATE ISSUED TO PUBLIC FILE:  MARCH 18, 2013**

**Final Report of a Routine Medical Survey**
**Kaiser Foundation Health Plan, Inc.**
**Behavioral Health Services**
**March 6, 2013**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY _____ 2

SURVEY OVERVIEW _____ 4

SECTION I:  DISCUSSION OF DEFICIENCIES AND CURRENT STATUS _____ 6

ACCESS AND AVAILABILTY OF SERVICES _____ 6
QUALITY MANAGEMENT/ ACCESS AND AVAILABILITY OF SERVICES _____ 14
HEALTH EDUCATION SERVICES:  MENTAL HEALTH PARITY _____ 19

SECTION II:  SURVEY CONCLUSION _____ 24

Kaiser Foundation Health Plan, Inc.
Final Report of the Routine Behavioral Health Survey
March 6, 2013

## EXECUTIVE SUMMARY

On January 6, 2012, the California Department of Managed Health Care (the "Department") notified Kaiser Foundation Health Plan, Inc. (the "Plan") that its Routine Medical Survey had commenced, and requested the Plan to submit information regarding its health care delivery system.

The survey team conducted the onsite portion of the survey from March 12, 2012, through March 15, 2012, and from March 19, 2012, through March 22, 2012. The Department completed its investigatory phase and closed the survey on July 25, 2012.

The Department assessed the following areas:

**Quality Management**
**Grievances and Appeals**
**Access and Availability of Services**
**Utilization Management**
**Continuity of Care**

The Department identified **four** deficiencies during the current Routine Medical Survey. The 2012 Survey Deficiencies table below notes the status of each deficiency.

### 2012 SURVEY DEFICIENCIES

| # | DEFICIENCY STATEMENT |
|---|---|
| | **ACCESS AND AVAILABILITY OF SERVICES** |
| 1 | **The Plan does not ensure that its quality assurance systems accurately track, measure, and monitor the accessibility and availability of contracted providers pursuant to the timely access standards.** (Rules 1300.67.2.2(c)(1) and (5); Rule 1300.67.2.2(d).) |
| 2 | **The Plan does not sufficiently monitor the capacity and availability of its provider network in order to ensure that enrollee appointments are offered within the regulatory timeframes.** (Rules 1300.67.2.2(c)(1) and (5); and Rule 1300.67.2.2(d).) |
| | **QUALITY MANAGEMENT/ ACCESS AND AVAILABILITY OF SERVICES** |
| 3 | **The Plan's Quality Assurance Program does not ensure that effective action is taken to improve care where deficiencies are identified in service elements, including accessibility, availability, and continuity of care.** (Rules 1300.70(a)(1) and (3); Rule 1300.70(b)(1)(D); Rule 1300.70(b)(2)(G)(3); and Rules 1300.67.2.2(c)(1) and (5); and Rule 1300.67.2.2(d)(3).) |

Kaiser Foundation Health Plan, Inc.
Final Report of the Routine Behavioral Health Survey
March 6, 2013

| | HEALTH EDUCATION SERVICES: MENTAL HEALTH PARITY |
|---|---|
| 4 | **The Plan does not provide accurate and understandable effective behavioral health education services, including information regarding the availability and optimal use of mental health care services provided by the Plan or health care organizations affiliated with the Plan.**<br><br>(Section 1374.72; Rule 1300.67(f)(8); and Rule 1300.80(b)(6)(B).) |

**EXHIBIT 3**



# DEPARTMENT OF Managed HealthCare

## OFFICE OF PLAN MONITORING
## DIVISION OF PLAN SURVEYS

# FOLLOW-UP REPORT

# ROUTINE SURVEY

# OF

# KAISER FOUNDATION HEALTH PLAN, INC.

# BEHAVIORAL HEALTH SERVICES

## DATE ISSUED TO PLAN:  FEBRUARY 13, 2015
## DATE ISSUED TO PUBLIC FILE:  FEBRUARY 24, 2015

**Routine Survey Follow-Up Report**
**Kaiser Foundation Health Plan, Inc.**
**Behavioral Health Services**
**February 13, 2015**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY _____ 2

SECTION I:  SUMMARY OF OUTSTANDING DEFICIENCIES FROM FINAL REPORT
            AND FOLLOW-UP SURVEY FINDINGS _____ 5

  ACCESS AND AVAILABILTY OF SERVICES _____ 5
  QUALITY MANAGEMENT/ACCESS AND AVAILABILITY OF SERVICES _____ 12
  HEALTH EDUCATION SERVICES: MENTAL HEALTH PARITY_____ 30

SECTION II:  ADDITIONAL INFORMATION RECEIVED DURING THE FOLLOW-UP
             SURVEY _____ 34

SECTION III:  SURVEY CONCLUSION_____ 35

Template Revision Date:  05/03/19

Kaiser Foundation Health Plan, Inc.
Behavioral Health Routine Survey Follow-Up Report
February 13, 2015

## EXECUTIVE SUMMARY

### Background

On March 6, 2013, the Department of Managed Health Care ("Department") issued its Final Report concerning the routine medical survey of behavioral health services for Kaiser Foundation Health Plan, Inc. ("Kaiser" or "Plan".) In the Final Report, the Department identified four uncorrected deficiencies related to the Plan's delivery of mental health services to its enrollees and informed the Plan that a Follow-Up Survey would commence within six months.

Because of the serious nature of the deficiencies identified in the Final Report, the Division of Plan Surveys prepared an immediate referral to the Department's Office of Enforcement. The Office of Enforcement investigated the matter further, and then the Department issued a Cease and Desist Order commanding the Plan to cease from engaging in the conduct identified in the violations, and filed an Accusation imposing an administrative penalty in the amount of four million dollars ($4,000,000.00). Although the Plan requested a hearing concerning the administrative penalty, the Plan decided to pay the penalty shortly after the hearing commenced.

The Follow-Up Survey, to determine whether the Plan had fully corrected the outstanding deficiencies, commenced in July 2013. The onsite portion of the survey was conducted during October 2013, March 2014, and April 2014. Throughout the remainder of 2013 and 2014, the Division of Plan Surveys continued work on the Follow-Up Survey and held several meetings with representatives from the Plan to gather additional information concerning corrective actions the Plan had taken to address the deficiencies identified in the Final Report.

### Summary of Deficiencies

The Department has determined that Deficiencies #1 and #2 have been corrected by the Plan. However, Deficiencies #3 and #4 have not been corrected.

In *Deficiency #1,* the Department found that the Plan failed to track and capture data necessary to determine whether mental health services are delivered within the timeframes specified in the Timely Access to Non-Emergency Health Care Services regulation, (Title 28, C.C.R., section 1300.67.2.2.). The Final Report identified four specific actions that prevented the Plan from capturing and tracking information needed to determine timely access compliance. In this Follow-Up Survey, the Department concludes that the Plan has taken steps to correct the problems identified in the Final Report.

However, during the Follow-Up Survey process, the Department identified an additional issue related to the Plan's tracking of timely access to services when enrollees receive services from externally-contracted providers. In late 2014, the Plan changed its processes so that it now tracks timely access for its largest and most frequently used external provider network in the Northern Region. The Department has informed the Plan that it needs to ensure that timely access is tracked for all externally-contracted providers to whom patients are referred for services. Additional review of the Plan's

Kaiser Foundation Health Plan, Inc.
Behavioral Health Routine Survey Follow-Up Report
February 13, 2015

| | FOLLOW-UP SURVEY STATUS OF OUTSTANDING DEFICIENCIES FROM FINAL REPORT ISSUED ON MARCH 6, 2013 | |
|---|---|---|
| **#** | **DEFICIENCY STATEMENT** | **FOLLOW-UP SURVEY STATUS** |
| | **ACCESS AND AVAILABILITY OF SERVICES** | |
| 1 | **The Plan does not ensure that its quality assurance systems accurately track, measure, and monitor the accessibility and availability of contracted providers pursuant to the timely access standards.** Rules 1300.67.2.2(c)(1) and (5); Rule 1300.67.2.2(d) | **Corrected** |
| 2 | **The Plan does not sufficiently monitor the capacity and availability of its provider network in order to ensure that enrollee appointments are offered within the regulatory timeframes.** Rules 1300.67.2.2(c)(1) and (5); and Rule 1300.67.2.2(d) | **Corrected** |
| | **QUALITY MANAGEMENT/ACCESS AND AVAILABILITY OF SERVICES** | |
| 3 | **The Plan's Quality Assurance Program does not ensure that effective action is taken to improve care where deficiencies are identified in service elements, including accessibility, availability, and continuity of care.** Rules 1300.70(a)(1) and (3); Rule 1300.70(b)(1)(D); Rule 1300.70(b)(2)(G)(3); and Rules 1300.67.2.2(c)(1) and (5); and Rule 1300.67.2.2(d)(3) | **Not Corrected** |
| | **HEALTH EDUCATION SERVICES:  MENTAL HEALTH PARITY** | |
| 4 | **The Plan does not provide accurate and understandable effective behavioral health education services, including information regarding the availability and optimal use of mental health care services provided by the Plan or health care organizations affiliated with the Plan.** Section 1374.72; Rule 1300.67(f)(8); and Rule 1300.80(b)(6)(B) | **Not Corrected** |

Kaiser Foundation Health Plan, Inc.
Behavioral Health Routine Survey Follow-Up Report
February 13, 2015

## SECTION III:  SURVEY CONCLUSION

Based on all of the information provided and reviewed in connection with the Routine and Follow-Up Survey, the Department concludes that Deficiency #3 and Deficiency #4 remain uncorrected. The available information suggests that, although the Plan has taken steps in good faith to try to correct issues related to timely access to behavioral health services, significant and serious concerns remain.

The volatility in the Plan's monthly timely access reports reveal that the measures taken by the Plan to date are inadequate to provide consistent timely access to behavioral health care services for its enrollees. While the Department understands the unique hurdles the Plan continues to face in recruiting adequate staff and in using externally-contracted providers, these challenges do not relieve the Plan of its statutory obligation to take effective action to correct access and availability problems. The Plan's actions to date have not been adequate to ensure that its enrollees *consistently* have ready access to all mandated behavioral health services consistent with good professional standards of practice and established timely access standards.

Additionally, the Plan must take additional steps to ensure its providers immediately cease disseminating inaccurate information to enrollees concerning behavioral health benefits and coverage. That misleading health education information is disseminated verbally, and in writing, to patients by providers is of great concern to the Department.

The ongoing issues of Plan non-compliance have been referred to the Department's Office of Enforcement for further investigation and possible disciplinary action, based on the Plan's failure to correct Deficiencies #3 and #4.

In the event the Plan wishes to append a brief statement to the Follow-Up Report as set forth in Section 1380(i)(3), please submit the response via the Department's Web portal, eFiling application. Click on the Department's Web Portal, **DMHC Web Portal**

Once logged in, follow the steps shown below to submit the Plan's response to the Follow-Up Report:
- Click the "eFiling" link.
- Click the "Online Forms" link
- Under Existing Online Forms, click the "Details" link for the **DPS Routine Survey Document Request** titled**, 2012 Routine Behavioral Health Survey - Document Request.**
- Submit the response to the Follow-Up Report via the "DMHC Communication" tab.

Plan Response to the Follow-Up Report

**EXHIBIT 4**



## OFFICE OF PLAN MONITORING
## DIVISION OF PLAN SURVEYS

## FINAL REPORT

## ROUTINE SURVEY

## OF

## KAISER FOUNDATION HEALTH PLAN, INC.

## A FULL SERVICE HEALTH PLAN

## DATE OF FINAL REPORT: JUNE 12, 2017

**Final Report of a Routine Survey
Kaiser Foundation Health Plan, Inc.
A Full Service Health Plan
June 12, 2017**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY _____ 2

SURVEY OVERVIEW _____ 4

SECTION I:  DISCUSSION OF DEFICIENCIES AND CURRENT STATUS _____ 6

QUALITY ASSURANCE (QA) Southern California – Behavioral Health_____ 6

QUALITY ASSURANCE (QA) /ACCESS AND AVAILABILITY OF SERVICES
Southern and Northern California – Behavioral Health_____ 9

GRIEVANCES AND APPEALS Southern and Northern California – Full Service and
Behavioral Health _____ 17

UTILIZATION MANAGEMENT Southern and Northern California – Full Service and
Behavioral Health _____ 23

SECTION II:  SURVEY CONCLUSION _____ 34

Kaiser Foundation Health Plan, Inc.
Final Report of the Routine Survey
June 12, 2017

## EXECUTIVE SUMMARY

On December 15, 2015, the California Department of Managed Health Care (Department) notified Kaiser Foundation Health Plan, Inc. (Kaiser Permanente or the Plan) that its Routine Survey had commenced and requested the Plan submit information regarding its health care delivery system for both full service and behavioral health services. The survey team conducted the Southern California onsite survey from May 16, 2016 through May 20, 2016 and on March 30, 2017. The Department conducted the Northern California onsite survey from June 20, 2016 through June 24, 2016.

While onsite the Department reviewed plan documents and files for both full service and behavioral health services. For the Full Service survey, the Department's review period for files was from March 1, 2014 through January 15, 2016. For the Behavioral Health survey, the Department's review period for files was from December 1, 2014 through January 1, 2015.

The Department assessed the following areas:

**Quality Assurance**
**Grievances and Appeals**
**Access and Availability of Services**
**Utilization Management**
**Continuity of Care**
**Access to Emergency Services and Payment**
**Prescription (RX) Drug Coverage**
**Language Assistance**

The Department identified **six** (**6**) deficiencies during the current Routine Survey. The 2016 Survey Deficiencies table below notes the status of each deficiency.

### 2016 SURVEY DEFICIENCIES TABLE

| # | DEFICIENCY STATEMENT | STATUS |
|---|---|---|
| | **QUALITY ASSURANCE (QA) Southern California – Behavioral Health** | |
| 1 | **The Plan does not consistently take effective action to improve care where deficiencies are identified, Plan follow-up where indicated, or monitor whether the provision and utilization of services meets professionally recognized standards of practice.** Section 1370; Rule 1300.70(a)(1); Rule 1300.70(a)(3). | **Not Corrected** |

Kaiser Foundation Health Plan, Inc.
Final Report of the Routine Survey
June 12, 2017

|  | **QUALITY ASSURANCE (QA)/ACCESS AND AVAILABILITY OF SERVICES Southern and Northern California – Behavioral Health** |  |
|---|---|---|
| 2 | **The Plan's Quality Assurance Program does not ensure that effective action is taken to improve care where deficiencies are identified in service elements, including accessibility, availability, and continuity of care.** Section 1370; Rules 1300.70(a)(1) and (3); Rule 1300.70(b)(1)(D); Rule 1300.70(b)(2)(G)(3); and Rules 1300.67.2.2(c)(1) and (5); and Rule 1300.67.2.2(d)(3). | **Not Corrected** |
|  | **GRIEVANCES AND APPEALS Southern and Northern California – Full Service and Behavioral Health** |  |
| 3 | **The Plan does not immediately notify enrollees filing expedited grievances of their right to notify the Department of their grievance.** Section 1368.01(b); Rule 1300.68.01(a). | **Not Corrected** |
| 4 | **For expedited grievance decisions to deny, delay, or modify health care service requests by providers based in whole or in part on medical necessity, the Plan does not consistently include in its written response a description of the criteria or guideline used by the Plan and the clinical reasons for the decision.** Section 1368(a)(5); Rule 1300.68(d)(4). | **Not Corrected** |
|  | **UTILIZATION MANAGEMENT Southern and Northern California – Full Service and Behavioral Health** |  |
| 5 | **The Plan does not consistently consider the "reasonable person" standard when evaluating the medical necessity of emergency services.** Section 1371.4(a)-(c); Rule 1300.67.2(c). | **Not Corrected** |
| 6 | **For decisions to deny emergency services based in whole or in part on medical necessity, the Plan does not consistently include in its written response a description of the criteria or guidelines used, and the clinical reasons for the decision.** Section 1367.01(h)(4). | **Not Corrected** |

Kaiser Foundation Health Plan, Inc.
Final Report of the Routine Survey
June 12, 2017

#3). The Plan submitted a corrective action plan in response to the Preliminary Report. The Department determined this deficiency was uncorrected at the time of the Final Report issued on March 18, 2013, and subsequently determined the deficiency remained uncorrected at the time of the Follow-Up Review conducted in the Fall of 2013 through Spring, 2014 as discussed in the Follow-Up Report issued to the Plan on February 13, 2015. As part of the Department's Follow-Up Review for deficiency #3, it reviewed the ability of enrollees to obtain follow-up appointments. The Department concluded enrollees faced barriers when obtaining appointments for behavioral health services including follow-up appointments. With respect to deficiency #3, the Department concluded in the Follow-Up Report that the Plan must implement a process for regularly tracking availability and timeliness of initial and follow-up appointments and take effective and timely action when problems are identified.

**Assessment:**

*1. The Plan does not take effective and timely action when problems are identified for initial behavioral health appointment availability.*

In order to address concerns regarding enrollee access to initial appointments raised in the 2012 Routine Survey, the Plan began tracking initial appointment access under an "Appointments within Standard" methodology. This measure reports, by Plan department and Plan medical center area, the percentage of initial appointments with wait times falling within the timeframe applicable to each appointment type set forth in Rule 1300.67.2.2(c)(5). The Plan set its threshold for corrective action for any medical center that falls below 80% of initial appointments occurring within the standards set forth in Rule 1300.67.2.2(c)(5). If a substantial drop occurs from one month to the next, the Plan takes action prior to any medical center falling below 80%.

Based on the data in Table 2 (below),[6] the Department determined that for the survey period, the Plan did not provide enrollees with timely access to initial appointments for behavioral health services or take effective action regarding these access problems when they were identified. While the Department acknowledges the Plan has significantly improved its compliance with regulatory timeframes,[7] Table 2 demonstrates that several medical centers (identified as A-E in Table 2) had rates for initial behavioral health appointments well below the Plan's internal 80% compliance standard for

---

[6] Table 2 represents data from a Plan document that tracks enrollee access to initial behavioral health appointments for physician and non-physician providers. The Department reviewed appointment information from four categories: 1) physician urgent 2) physician non-urgent 3) non-physician urgent 4) non-physician non-urgent. In addition, for those months where the table is blank, the Plan met its 80% threshold for access compliance.

[7] The Plan has enhanced its tracking reports to include the new measure on *Percentage Initiated to Seen*, regularly produces and disseminates these reports, improved the timeliness of its implementation of corrective actions, systematized the monitoring of corrective actions to ensure effectiveness, and implemented committee structures to conduct ongoing review of appointment availability. The Plan has also implemented a variety of corrective actions as it deems appropriate for various medical centers including hiring of additional staff, use of contracted providers, adding hours/appointments to individual therapists' schedules and temporarily sending staff from one Plan medical center to another to assist with resolving backlogs.

**EXHIBIT 5**







# Kaiser Permanente mental health clinicians strike for better patient care

December 14, 2018 | 9:44 AM CST  |  BY MARILYN BECHTEL





*Marilyn Bechtel/PW*

OAKLAND, Calif. – As dawn broke over Kaiser Permanente's flagship Oakland Medical Center on Dec. 11, pickets with bright signs saying, "Don't deny my patients mental health care" were already marching and chanting in front of the facility, drawing honks of solidarity from passing cars.

↑

The marchers were mental health clinicians, members of the National Union of Healthcare Workers (NUHW), protesting the long waits their patients must suffer between appointments, in sharp contrast to the prompt scheduling generally experienced by patients with physical illnesses.

Oakland's picketers were among some 4,000 psychologists, therapists, social workers, psychiatric nurses and addiction medicine specialists throughout California, striking the state's largest health care provider for five days, Dec. 10-14, and affecting over 100 Kaiser clinics and hospitals. Their demands included stepping up levels of mental health care staffing, as well as compensation matching that of other unionized Kaiser staff.

The NUHW workers have been without a contract since the end of September.

At noon, over 500 clinicians, union and community supporters – including members of the California Nurses Association and Stationary Engineers Local 39 who struck in sympathy with NUHW – joined in a spirited rally in front of the hospital.

Keynote speaker and leading mental health care advocate Patrick Kennedy told the strikers, "I don't know of another union in this country that represents and works on behalf of those with mental illness and addiction, as you do."

Calling mental illness "a public health epidemic," he told the strikers that while they are supporting their patients in seeking timely care, they are also raising an issue that's largely being ignored around the country, and that suffers from the shame and stigma which often affects patients seeking treatment.

Kennedy, a former U.S. Representative from Rhode Island, called equal treatment for those with mental illness a civil rights issue. H recalled his role while in Congress as a principal sponsor of the 2008 Mental Health Parity Act "that said the brain was part of the body – a radical notion." That legislation requires equal access to care and bans higher premiums and copays, and other forms of discrimination in care.

Sanmit Singh, a psychologist at Oakland's Child and Family Clinic, told the crowd: "I've been here for eight years, and I've always been booked out for four to six weeks." Mental health care shouldn't be a privilege, he said: "We have to compel Kaiser to do what's morally right and what they say they're supposed to do."



*Marilyn Bechtel/PW*

Jessica Dominguez, a licensed marriage and family therapist at Kaiser's Richmond facility, called attention to the disparities faced by Latinx patients, with services in Spanish even scarcer than those available in English.

California Nurses Association Co-President Zenia Cortez pointed to the "direct effect" the mental health staff shortage has for RNs and nurse practitioners "who see these same patients in Emergency Rooms, hospital units, and overwhelmingly through the call centers."

Oakland City Councilmember-elect Nikki Fortunato Bas told the crowd, "Oakland is a union town. We know Kaiser makes billions in net profits … It is time for Kaiser to step up and be a leader in the mental health sector."

NUHW says Kaiser has a history of forcing patients to endure long waits for therapy appointments. In 2013 California's Department of Managed Health Care fined the system $4 million for violating the state's Mental Health Parity Act, and after finding further violations in the following years, the agency required Kaiser to accept outside monitoring of its mental health services.

↑

The union points out that Kaiser has one fulltime clinician for every 3,000 patients – a ratio unchanged over the last three years.



*Marilyn Bechtel/PW*

In a conversation after the rally, licensed social worker and NUHW Executive Board member Clement Papazian said the problem of limited and poor access to care creates "all kinds of chaos" as patients' conditions deteriorate.

"What happens when people can't get in for their routine appointments on a regular, frequent basis is that they start to become more acute," he said. "We see them come into our crisis service, our Emergency Room, and they start to overwhelm the intensive outpatient services aimed at some of our sicker people."

Over time, Papazian said, the whole system starts to break down, with people failing to improve, or dropping out of care and therapists trying to see their patients with the time they have but lengthening the intervals further and further.

"Now let's magnify this over decades – and that is why people are out on the street in such numbers, because they are fed up with Kaiser's hollow promises."

Papazian said he hopes Kaiser's executives will start paying real attention to patients' stories. After years of struggle and after workers finally went to state authorities over the crisis, Kaiser said it wanted to work with the clinicians to make the giant health provider a service leade

"But," he said, "our general perception is that their rhetoric just doesn't match their actions. That's why the clinicians are out on the streets."

The day's action concluded with a town hall meeting featuring patients' family members, clinicians and area political leaders who discussed California legislation to assure care is equal for both mental and physical health. That story will follow.

TAGS:   health   strikes   workers

## CONTRIBUTOR



# Marilyn Bechtel

Marilyn Bechtel writes for *People's World* from the San Francisco Bay Area. She joined the PW staff in 1986 and currently participates as a volunteer. Marilyn Bechtel escribe para People's World desde el Área de la Bahía de San Francisco. Se unió al personal de PW en 1986 y actualmente participa como voluntaria.

## RELATED ARTICLES



↑

## EPA's proposed air pollution standards for soot could save thousands of...



## Yale graduate teachers and researchers vote to unionize



## Warning: U.S. capitalism is lethal (and bad for your health)

# Comments

↑

o comments

## 0 Comments

Sort by   Newest



Add a comment...

Facebook Comments plugin



MOST POPULAR TODAY



### Winds of the new Cold War are howling in the Arctic



### Free college was once the norm all over America



### Attempted assassination of Francia Márquez, Colombia's first Black vice president, foiled

↑



**Md. living wage law nations first**



**Before Venezuela: The long history of U.S. intervention in Latin America**

ABOUT PEOPLE'S WORLD  |  CONTACT  |  POLITICAL AFFAIRS ARCHIVE  |  MUNDO POPULAR ARCHIVE

DOWNLOAD PRINT EDITION

Copyright 2022. Some Rights Reserved.

SOME RIGHTS RESERVED

**EXHIBIT 6**

California Kaiser Mental Health Workers Launch Strike; Problems 'Keep Getting Worse' : NPR

Sorry, an error occurredPlease reload the page and try again.



DONATE

HEALTH CARE

# California Kaiser Mental Health Workers Launch Strike; Problems 'Keep Getting Worse'

December 16, 2019 · 6:12 PM ET



VANESSA ROMO

More than 4,000 Kaiser Permanente mental health professionals in California launched a five-day strike on Monday at Kaiser facilities across the state.

Psychologists, social workers, psychiatric nurses, addiction specialists and others represented by the National Union of Healthcare Workers say that Kaiser mental health clinics are severely understaffed, forcing some to work after hours to serve more patients. Meanwhile, they say, patients are forced to wait as long as two months for follow-up appointments because of inadequate staffing.

"We're striking because the problems that plague Kaiser's mental health system keep getting worse," said Kenneth Rogers, a Kaiser psychologist, in a statement.

"We don't have enough time to provide proper patient care which includes the preparation and follow up work that goes into every appointment. And patients are being forced to endure even longer wait times for appointments, while Kaiser sits on billions of dollars refusing to fix the problem," Rogers added.

Standing outside the San Leandro child outpatient clinic, clinical psychologist Michael Torres explained that he had joined the picket line to improve services for teenagers struggling with depression, anxiety or serious emotional trauma.

In an online video, Torres said, "I'm thinking of a teenager in my practice, who was tragically gang-raped. And that person had to wait three to five weeks in between sessions to see me for this trauma."

1/13/23, 1:06 PM                    California Kaiser Mental Health Workers Launch Strike; Problems 'Keep Getting Worse' : NPR

**Sponsor Message**





**National Union of Healthcare Workers**
@NUHW · **Follow**

Michael is a psychologist at @kpthrive. He spoke to us about  the trauma of his patients and how urgently Kaiser needs to up its game with mental health care.

*Watch on Twitter*

12:22 PM · Dec 16, 2019                                              ⓘ

♥ 15        💬 **Reply**        ↱ **Share this Tweet**

Read 1 reply

He said the long delays prolong symptoms and exacerbate a patient's condition. "There is no nationally recognized standard practice that suggests three to five weeks in between sessions is OK."

Kaiser released a statement critical of employees for walking off the job while reassuring patients that all hospitals and medical offices will remain open throughout the strike.

"We apologize for any inconvenience caused by this unnecessary strike. We believe that NUHW's repeated call for short strikes is disruptive to patient access, operational care and service and is frankly irresponsible," Arlene Peasnall, senior vice president and interim chief human resources officer wrote in an emailed statement.

Peasnall added that Kaiser has been working with an external, neutral mediator to reach a collective bargaining agreement with the health care workers' union. According to Peasnall, the mediator recently delivered a proposed compromise to both sides. While she said it was being seriously considered by Kaiser, "the union has rejected it and announced plans to strike instead of working through the mediated process."

Monday's start of the strike marks a little over a year since the last time Kaiser mental health employees took to the streets. That strike also lasted five days. Union officials say clinicians have been working without a contract for more than a year.

**Sponsor Message**

As member station KPBS reported, last year Kaiser officials said therapist staffing was up by 30% from 2015. "That's more than 500 new therapists in California — even though there's a national shortage," the company said.

Projections from the American Psychological Association show that the existing psychologist supply is insufficient to meet needs for mental health services in the United States. The organization estimates that there are about 98,000 licensed psychologists.

In 2015, Kaiser agreed to pay a $4 million fine levied by state regulators because of inadequate access to its mental health services, KPBS reported.

This year's strike was meant to begin in November, but it was postponed after the sudden death of Kaiser CEO Bernard Tyson.

health care workers strike    kaiser permanente    california    health care    mental health

# Sign Up For The Health Newsletter

Get the latest stories on the science of healthy living.

| What's your email? | SUBSCRIBE |
|---|---|

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

**EXHIBIT 7**

 



January 27, 2020

**VIA EMAIL**

Ms. Shelley Rouillard
Director, California Department of Managed Health Care
980 9th Street, Suite 500
Sacramento, CA  95814-2725

**Re:  Kaiser Access to Mental Health Care**

Dear Director Rouillard:

The American Psychological Association (APA), American Psychological Association Services, Inc. (APA Services), and the California Psychological Association (CPA)[1] would like to offer evidence and expertise in connection with very serious allegations from our members about extreme wait times for follow-up psychotherapy appointments for Kaiser Permanente of California (Kaiser) subscribers. Our concern is not only that Kaiser's practices violate California law, but also that Kaiser patients risk being harmed by Kaiser falling far below professional standards of care.

We ask you to consider these serious allegations and to take action to correct the disturbing deficiencies in care, which we have been unable to remedy through informal talks with Kaiser. We plan to participate in the January 31st meeting scheduled by the Department of Managed Health Care (DMHC) and hope to have additional opportunities to contribute to your consideration of this matter.

---

[1]  APA is the leading scientific and professional organization representing psychology in the United States, with more than 121,000 researchers, educators, clinicians, consultants and students as its members. APA Services is a legally separate companion organization to APA and supports advocacy and psychologists' economic and marketplace interests in ways that APA cannot. CPA is a 501(c)(6) non-profit professional association for licensed psychologists and others affiliated with the delivery of psychological services. CPA supports its members' professional interests, promotes and protects the science and practice of psychology, and advocates for the health and welfare of all Californians CPA represents the interests of approximately 17,000 psychologists licensed in California.

**Summary of Core Allegation**

In a letter to APA dated June 3, 2019 (attached) many members who work for Kaiser reported:

> Due to chronic understaffing at Kaiser's behavioral health services, our adult and child/adolescent patients—even those with complex and acute conditions such as Major Depressive Disorder-Chronic, Bipolar Disorder, Complex Post-Traumatic Stress Disorder, Eating Disorders—routinely wait 4-8 weeks between individual outpatient psychotherapy appointments with their non-physician licensed mental health clinician. At some Kaiser clinics, patients must wait as many as three to four months between appointments.

Our members believe that the company is so focused on meeting the specific time frames required under California law for *initial* appointments, e.g., 10 business days for non-urgent appointments with mental health care providers,[2] that it minimizes the importance of follow-up access.  The latter is subject to less specific and non-quantitative regulatory standards – i.e. access to follow-up care must be provided consistent with "professionally recognized standards of practice" and "good professional practice."[3]

Our members also claim that Kaiser manipulates records and data on initial and follow-up care so that the company appears more compliant with applicable laws and regulations than it actually is.  More disturbing are the allegations that the company intimidates or retaliates against psychologists who won't cooperate with its data manipulations, or who have raised follow-up access concerns internally and to outside entities like DMHC (including a psychologist who planned to be DMHC's witness in an administrative hearing against Kaiser).

Below is a brief overview of our relevant expertise that we would like to share with DMHC:

**A.  Clinical Expertise**:

<u>Follow-up Appointments:</u> APA is the leading national authority on psychological care.  In case DMHC would benefit from our input regarding "professionally recognized standards of practice" and "good professional practice" with respect to access to care, APA's position is that follow-up therapy appointments at 4-8 week or longer intervals, as alleged by our members, fall far below what is appropriate care for most patients.  Psychotherapy efficacy and comparative effectiveness studies are typically based on once a week therapy (see, e.g., APA's Clinical Practice Guidelines for the Treatment of Depression and for the Treatment of Posttraumatic Stress Disorder).[4]

---

[2] 28 CCR §1300.67.2.2(c)(5)(E)

[3] Health & Safety Code §1367(d); 28 CCR § 1300.70(b)(1)(A); 28 CCR §1300.67.2.2(c)(1)

[4] https://www.apa.org/depression-guideline/index,;  https://www.apa.org/ptsd-guideline/index

<u>Initial Assessments</u>:  While we have focused on our members' core allegation about access to follow-up care, we have also reviewed the National Union of Healthcare Workers' (NUHW) complaint to DMHC dated May 14, 2019 (attached) alleging that Kaiser "games" the requirement for initial assessments under 28 CCR §1300.67.2.2(c)(5)(E) by giving patients "short-cut" half-hour (or briefer) initial phone assessments.

Our position is that these short-cut assessments are inconsistent with professionally recognized standards of care for mental health evaluations.  In practice, assessment interviews are generally done in person, last a minimum of 45 to 60 minutes, cover a wide range of psychosocial and health issues, and determine an initial diagnosis and treatment plan. According to the Centers for Medicare and Medicaid Services, a psychiatric diagnostic evaluation (CPT codes 90791-90792) includes the following: a complete medical and psychiatric history; a mental status examination; establishment of an initial diagnosis; evaluation of the patient's capacity to respond to treatment; and an initial treatment plan.[5]  For a comprehensive guideline, please see the American Psychiatric Association Practice Guidelines for the Psychiatric Evaluation of Adults.[6] For a guideline on standards of care in the delivery of telepsychology services, please see the American Psychological Association Guidelines for the Practice of Telepsychology.[7]

**B.   Legal and Insurance Expertise:**

APA Services staff have been involved in access to psychological care issues for two decades. We have never seen such an egregious case of delayed access for follow-up appointments.

We also have years of experience evaluating disparities in access to care under mental health parity laws.  Kaiser's access to *medical* care seems to be very adequate, leaving the company with a dramatic disparity between good access to medical care and terrible access to mental health care.  We can't see any good reason for this disparity that would save the company from a parity law violation.  The only explanation that Kaiser offered us was to cite a State of California study indicating an 11% shortage of psychologists and other (non-psychiatrist) mental health providers, but the study actually referred to a projected shortage *a decade from now*.[8] We believe that Kaiser could hire more therapists readily if it admitted that this problem exists and chose to commit some of its ample resources to fixing it.[9]

---

[5] https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/31887_33/Outpatient_Psych_Fact_Sheet09.18.14.pdf
[6] https://psychiatryonline.org/doi/book/10.1176/appi.books.9780890426760
[7] https://www.apa.org/practice/guidelines/telepsychology
[8] https://futurehealthworkforce.org/wp-content/uploads/2019/03/MeetingDemandForHealthFinalReportCFHWC.pdf at 10
[9] See, e.g., https://californiahealthline.org/news/bruising-labor-battles-put-kaiser-permanentes-reputation-on-the-line/

**Conclusion**

Kaiser's lack of timely access to mental health care has been in the news lately, but APA Services has been investigating and evaluating our members' concerns, and consulting with CPA, for the past 6 months.  APA Services initially approached Kaiser with our core concerns about access to follow-up care in an effort to resolve the issue informally and collaboratively. The company's adamant denial that it has a follow-up access problem (combined with the data manipulation and intimidation/retaliation concerns) made an informal resolution unworkable; hence we are reaching out to you.

We would like to discuss these serious allegations with DMHC (and the monitor that DMHC has assigned to Kaiser's compliance if appropriate), to share more detailed information and expertise, and to urge DMHC to take action to resolve these problems and ensure appropriate access to mental health care for Kaiser patients.  We look forward to participating in the January 31st meeting and to further communication on this matter.

Thank you for your attention to our concerns.

Jared Skillings, Ph.D.
Chief of Professional Practice
American Psychological Association
American Psychological Association Services, Inc.

Alan Nessman
Senior Special Counsel
Legal and Regulatory Affairs/Practice Directorate
American Psychological Association
American Psychological Association Services, Inc.

**Jo Linder-Crow, PhD**
Chief Executive Officer l California Psychological Association

Director Rouillard
Page  5

**Attachments:**

June 3, 2019 letter from Kaiser psychologists to APA (psychologists' names removed)

May 14, 2019 letter from NUHW to DMHC

EXHIBIT 8



## OFFICE OF PLAN MONITORING
## DIVISION OF PLAN SURVEYS

## FINAL REPORT

## ROUTINE SURVEY

## OF

## KAISER FOUNDATION HEALTH PLAN, INC.

## DBA KAISER PERMANENTE

## A FULL SERVICE HEALTH PLAN

## FEBRUARY 11, 2021

**Routine Survey Final Report**
**Kaiser Foundation Health Plan, Inc.**
**DBA Kaiser Permanente**
**A Full Service Health Plan**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY _____ 2

SURVEY OVERVIEW _____ 6

SECTION I:  DISCUSSION OF DEFICIENCIES AND CURRENT STATUS _____ 9

   QUALITY ASSURANCE (Statewide) _____ 9
   GRIEVANCES AND APPEALS (Statewide) _____ 16
   UTILIZATION MANAGEMENT Statewide _____ 30
   PRESCRIPTION (RX) DRUG COVERAGE (Statewide)_____ 55

SECTION II:  SURVEY CONCLUSION _____ 57

Kaiser Foundation Health Plan, Inc.
Routine Survey Final Report
February 11, 2021

## EXECUTIVE SUMMARY

On November 16, 2018, the California Department of Managed Health Care (Department) notified Kaiser Foundation Health Plan, Inc. dba Kaiser Permanente (Plan) that it would conduct its scheduled Routine Survey pursuant to Health and Safety Code section 1380. The Department requested the Plan submit information regarding its health care delivery system in connection with the Routine Survey. The survey team conducted the onsite survey from April 15, 2019 through April 20, 2019 in the Northern California region, and May 6, 2019 through May 10, 2019 in the Southern California region.

The Department assessed the following areas:

**Quality Assurance**
**Grievances and Appeals**
**Access and Availability of Services**
**Utilization Management**
**Continuity of Care**
**Access to Emergency Services and Payment**
**Prescription (Rx) Drug Coverage**
**Language Assistance**

## BEHAVIORAL HEALTH STATUS SUMMARY

The Department identified deficiencies in the Plan's Behavioral Health Quality Assurance (QA) Program in both the 2012 and 2016 Routine Medical Surveys. On July 18, 2017, the Plan entered into a three year Settlement Agreement with the Department, which included corrective action plan deliverables. By entering into the Settlement Agreement, the Plan agreed to improve its Behavioral Health QA program and to ensure effective action was taken to improve care where deficiencies are identified, including in areas of accessibility, availability, and continuity of care. The Settlement Agreement required the Plan to engage the services of a consultant to assist and monitor the Plan's Behavioral Health QA program. The Plan and the consultant were required to work together in order to achieve the goals of the Settlement Agreement. The Plan and consultant were required to focus on six specific "Corrective Action Areas," which are described in the Settlement Agreement and summarized below:

- Improved documentation of the Plan's quality improvement efforts for access compliance;
- Improved transparency in behavioral health appointment access compliance measurement;
- Improved monitoring of member impact as a result of insufficient access and associated real time member remediation;
- Fully implemented systematic process to monitor follow-up appointment access and adherence to the enrollee's treatment plan;
- Improved internal corrective action plan development; and
- Improved integration of external provider access data and oversight.

Kaiser Foundation Health Plan, Inc.
Routine Survey Final Report
February 11, 2021

During the 2016 Routine Follow-Up Survey, the Department determined that the Plan had undertaken appropriate efforts under the terms of the Settlement Agreement to begin correcting these deficiencies. The Department noted these deficiencies as pended in the Follow-Up Survey Report, which was issued to the Plan on January 30, 2019. The Plan's corrective actions noted during the Follow-Up Survey included:

- Development of yearly work plans with the designated expert consultant for the first two years of the consultation period.
- Improved timely access compliance measurement mechanism that delineates when appointments that do not meet timely access standards result from member choice or lack of availability.
- Implementation of improved/revised internal corrective action plan process.
- Implementation of improved monitoring and remediation activities related to impact of when enrollees are not offered a timely appointment.
- Implementation of follow-up appointment monitoring process regarding adherence to an enrollee's treatment plan.
- Implementation of improved data monitoring of external (contracted) network access.
- Updated QA documents, policies and procedures.

For this 2019 Routine Survey, the Department reviewed the Plan's statewide behavioral health QA processes. Although the Department identified one QA deficiency in this 2019 Routine Survey, it is different from the behavioral health QA deficiencies noted in the 2016 Final and Follow-Up Survey Reports.

The Department's assessment included areas related to the Plan's Behavioral Health QA and its Access and Availability of Services for both Northern and Southern California. To assess Behavioral Health QA, the Department reviewed relevant Plan documents including behavioral health files involving potential quality issues (BH PQI files). Based on the BH PQI file review, the Department did not find a deficiency regarding the Plan's failure to follow-up on its corrective action plans (CAPs) intended to improve access to behavioral health appointments as noted in Deficiency #1 of the 2016 Routine Final Report.

To assess Access and Availability of Services, the Department reviewed the following documents:

- Plan policies and procedures related to Appointment Access and the Plan's Monitoring for Access and Availability of Appointments
- The Plan's Access Committee guidelines
- Internal monthly Plan tracking reports on the timeliness of initial appointments with physician and non-physician behavioral health providers for 2017-2018

Based on a review of the Plan's internal monthly initial appointments with physician and non-physician behavioral health providers tracking reports, the Department did not find a basis to cite the Plan for an access deficiency in the 2019 Routine Survey. In Deficiency #2 of the 2016 Routine Final Report, the Plan failed to provide enrollees with timely access to initial appointments for behavioral health services and failed to take

Kaiser Foundation Health Plan, Inc.
Routine Survey Final Report
February 11, 2021

effective action when access problems were identified. In the 2019 Routine Survey, the Department found while some rates for initial behavioral health appointments with non-physician providers fell below the Plan's internal compliance standard for multiple months, the Plan has a process for regularly tracking availability and timeliness of behavioral health initial appointments. In addition, when a particular facility fell below the Plan's threshold for two consecutive months, the Plan took effective and timely action, as described in the Plan's Quality Assurance Program.

Accordingly, in the 2019 Routine Survey, the Department determined the Plan has undertaken appropriate efforts to address Deficiencies #1 and #2 in the 2016 Routine Final and Follow-Up Survey Reports.

**2019 Routine Survey Deficiencies**

The Department identified **seven** deficiencies during the Routine Survey. The 2019 Survey Deficiencies Table below notes the status of each deficiency.

## 2019 SURVEY DEFICIENCIES TABLE

| # | DEFICIENCY STATEMENT | |
|---|---|---|
| | **QUALITY ASSURANCE (Statewide)** | |
| 1 | **The Plan fails to ensure that the quality of care provided is reviewed, problems are identified and effective action is taken to improve care where deficiencies are identified.**<br>Rule 1300.70(a)(1); Rule 1300.70(b)(1)(B). | **Not Corrected** |
| | **GRIEVANCES AND APPEALS (Statewide)** | |
| 2 | **The Plan's grievance system does not consistently monitor whether grievances are resolved in favor of the enrollee or the Plan.**<br>Section 1368(a)(1); Rule 1300.68(e)(1). | **Not Corrected** |
| 3 | **The Plan does not ensure all oral expressions of dissatisfaction are considered grievances, and therefore does not ensure adequate consideration of enrollee grievances and rectification when appropriate.**<br>Section 1368(a)(1); Rule 1300.68(a)(1). | **Not Corrected** |
| 4 | **For grievances involving delay, denial or modification of health care services, the Plan's response does not describe the criteria used and clinical reasons for the decision related to medical necessity.**<br>Section 1368(a)(5); Rule 1300.68(d)(4). | **Not Corrected** |

Kaiser Foundation Health Plan, Inc.
Routine Survey Final Report
February 11, 2021

| | UTILIZATION MANAGEMENT (Statewide) | |
|---|---|---|
| 5 | **The Plan does not systematically and routinely analyze utilization data to monitor potential over- and under-utilization of services. (Statewide)** Rule 1300.70(a)(3) and Rule 1300.70(c). | **Not Corrected** |
| 6 | **The Plan failed to demonstrate it complies with post-stabilization care requirements. (Northern California)** Sections 1262.8(f)(1), 1371.4(b), 1371.4 (d), 1371.4 (j)(1), 1371.4 (j)(3), 1371.4 (j)(2)(B), (C); 1386(b)(1); Rules 1300.71.4(a), (b)(1) – (3), (d). | **Not Corrected** |
| | PRESCRIPTION (RX) DRUG COVERAGE (Statewide) | |
| 7 | **The Plan does not update its formulary on a monthly basis.** Section 1367.205(a)(1) to (3). | **Not Corrected** |

EXHIBIT 9

 

SUBSCRIBER EDITION

News Sports Politics Opinion Obituaries • Personal Finance Food & Drink Bee Curious Equity Lab Homebuyers Guide

HEALTH & MEDICINE

# Kaiser behavioral health care on the hot seat after California complaints

BY CATHIE ANDERSON

UPDATED MAY 23, 2022 9:47 AM



Kaiser Permanente Behavioral health clinicians rallied on Dec. 19, 2019 at the California Capitol before taking to downtown Sacramento streets.

BY **ALYSSA HODENFIELD** ✉ | **CATHIE ANDERSON** ✉



Only have a minute? Listen instead
Powered by Trinity Audio

00:00                                                                    06:31

In an unexpected move, the California Department of Managed Health Care informed Kaiser Permanente that it will be examining whether the company is providing adequate mental health care services to its 9.4 million California members.

"This non-routine survey is based on complaints received from enrollees, providers, and other stakeholders concerning the plan's behavioral health operations," said Amanda Levy, the department's deputy director of health policy and stakeholder relations.

Levy said regulators would evaluate Kaiser's internal and external provider networks, timely access to care, processes for intake and follow-up appointments, appointment scheduling processes, levels of care and associated decision-making processes, medical record documentation and retention practices, and monitoring of urgent appointments.

**TOP VIDEOS**



Brittney Griner found guilty, sentenced to 9 years by Russian court

Leaders of Kaiser Permanente issued a statement through Steve Shivinsky, the director of national media relations. In part, he said: "We appreciate the DMHC's

clinically appropriate care to those who rely on us for their mental health services. We welcome the opportunity to review our performance and collaborate on new areas for improvement."

Kaiser's mental health clinicians, represented by the National Union of Healthcare Workers, have complained that their clients face weeks-long waits before they can get successive appointments and grueling schedules that leave clinicians little time to write notes or to connect patients to wraparound services.



"We have been pushing Kaiser Permanente to increase staffing and invest more in behavioral health care so that we can actually address the needs of our patients, but Kaiser keeps refusing," said psychologist Ken Rogers, a leader for the union in the Sacramento region. "Hopefully this investigation will finally force Kaiser to stop denying that it's failing its behavioral health patients and start working with us to improve its services."

In a news release issued Thursday, union leaders pointed to past fines and settlement agreements that the health care giant had signed with the Department of Managed Health Care, including one from 2013 when the company agreed to pay $4 million and to take corrective actions after the agency found it had failed to provide timely access to mental health care.

State records also show that regulators found issues with timely access to behavioral health services and availability of the care during a routine survey in 2016, but by 2019, Kaiser had instituted a corrective action plan that regulators said was working to alleviate the issues.

# Get unlimited digital access

Subscribe now for just $2 for 2 months.

CLAIM OFFER

focused on how the company handled consumer complaints and monitored whether they were effectively resolved.

Regulators were conducting a follow-up inspection to determine whether Kaiser had corrected these deficiencies when it announced the non-routine survey to determine whether the company complied with laws requiring timely access to behavioral health care.

## SHARP INCREASE IN KAISER COMPLAINTS

The California Department of Managed Health Care "help center received a 20% increase in behavioral health complaints for Kaiser in 2021 compared to 2020," wrote Rachel Arrezola, a spokesperson for the department, in response to a Bee inquiry. The department "is committed to ensuring enrollees have appropriate access to behavioral health care when they need it."



Kaiser's Shivinsky said: "We believe that a thoughtful, impartial review can help us and other health plans in California address challenges we are all facing. We know that we cannot solve the challenges of the national mental health crisis on our own and look forward to collaboration from across the mental health community."

Both the company and the union noted that California and the nation as a whole have seen a spike in demand for behavioral health services amid the COVID-19 epidemic.

The nonprofit Mental Health America estimated that more than 2.5 million youth in the U.S. have severe depression, and Black, indigenous and other youth of color are at the greatest risk.



In another key measure of mental health, the Centers for Disease Control and Prevention reported earlier this month that fatal overdoses have soared by 15% in 2021 with over 107,000 Americans dying. This follows upon a 30% increase in such deaths in 2020.

**NEW CALIFORNIA LAW REQUIRES TIMELY APPOINTMENTS**

Union officials said it's past time that Kaiser got its act together in managing behavioral health services. They warned state officials that the company was woefully unprepared to comply with a new state law that goes into effect July 1 requiring that health plans accommodate mental health therapy appointments within 10 business days unless the treating clinician determines that a longer wait would not be detrimental.

Already, union officials said, a 2020 survey of Kaiser clinicians found that, on a daily basis, 65% of respondents are scheduling their patients for return appointments further into the future than is clinically appropriate.

Shivinsky said Kaiser has been on a multiyear journey to improve the way mental health care is delivered, but like other providers, it has faced challenges amid a national shortage of clinicians in the field. The company has expanded its ability to provide virtual care to patients who want it; embedded mental health professionals in primary care clinics, pediatric settings, and emergency departments; and expanded collaborative care programs for patients who have anxiety and depression diagnoses.

"Despite all these efforts, we continue to face the same challenges others do," Shivinsky said. "We haven't solved the problems facing mental health care, and the pandemic has set us all back."

Arrezola said that consumers should file a grievance with their plan if they are not getting timely access to behavioral care. If they are not satisfied with their health plan's response or have been in their plan's grievance system for longer than 30 days for non-urgent issues, she said, they should contact the DMHC Help Center for assistance at (888) 466-2219 or www.HealthHelp.ca.gov.

This story was originally published May 21, 2022 5:25 AM.

**FOLLOW MORE OF OUR REPORTING ON HEALTH CARE WORKERS**

**EXHIBIT 10**

# Visalia **Times Delta**

CALIFORNIA

# Kaiser therapists flee California health giant as mental health patients languish

**Jack Ross and Kristy Hutchings** Capital & Main

Published 3:04 p.m. PT Aug. 1, 2022

When Susan Whitney was a therapist at Kaiser Permanente, her colleagues missed working in prison.

Whitney's co-workers first practiced mental health care in the region's penitentiaries before joining the state's largest health care provider. Working conditions for therapists at Kaiser were so deplorable, Whitney says, that her colleagues wanted to go back.

"They can provide better care," says Whitney, who retired from Kaiser in late 2021. "It's a better work environment."

Mental health practitioners at Kaiser are so overburdened with patients that waiting periods between appointments can be six weeks or more, according to therapists who spoke with Capital & Main. (Industry standards mean therapists outside Kaiser generally see patients on a weekly or bi-weekly basis, though cases vary.)

**Mental health crisis among youth:** California lawmakers target social media addiction

Now California's Department of Managed Health Care (DMHC) has launched a "non-routine survey" to determine whether Kaiser is offering adequate behavioral health care.

When asked about its access issues, Kaiser points to a nationwide shortage of mental health care practitioners.

"The need for mental health care in America has never been greater and at the same time harder to deliver," Kaiser representatives said in May. "Across the United States, mental health experts have reported the demand for mental health services has increased as much as 30% since the beginning of the pandemic."

Kaiser says it has prioritized filling hundreds of therapist vacancies in California.

"We recently launched a $500,000 recruiting initiative to source and hire clinicians to fill more than 1,000 open mental health clinician positions across Kaiser Permanente, more than 400 of which are in California," Yener Balan, Kaiser's vice president of behavioral health and specialty services, told Capital & Main in a March 29 statement.

"The challenge we face is that all mental health providers are drawing from the same, limited pool of talent."

**Read more:** California makes it easier for low-income residents to get and keep free health coverage

Kaiser, whose mental health care deficiencies have been well documented, turned an $8.1 billion profit in 2021, a company record. In 2021, the Fitch credit ratings agency rated Kaiser bonds AA- for the company's "track record of sound and consistent profitability."

Susan Whitney attributes Kaiser's staffing shortage to "a combination of greed and the lingering stigma over treating mental health the same as physical health."

"I cannot believe that they would treat physical health issues in the same way," she says.

## Caseloads reached into hundreds, some say

Emily Ryan, a licensed clinical social worker, began working at Kaiser in Sacramento in 2005. Her caseload at Kaiser was "horrendous," she says.

"I could believe that there is difficulty for them [hiring today], that there's a shortage of every kind of worker right now," she says. "In 2005 there was not. In 2008, when we had the economic crisis, there most certainly was not, and we were having the same exact problems."

Therapist Mickey Fitzpatrick, who worked in the Bay Area town of Pleasanton, says he had caseloads into the hundreds at Kaiser before he left for private practice. "If even a fraction of those new clients wanted to meet as frequently as is recommended, I didn't have the availability to see folks for multiple weeks to months at a time," he says.

In rural Kern County, Kaiser employs 35 mental health workers to serve approximately 100,000 Kaiser members, according to data from the National Union of Healthcare Workers. There is no cap on the number of cases therapists can take on, and they face a regular onslaught of new patients.

1/13/23, 2:50 PM
Kaiser therapists flee as mental health patients languish

"I have co-workers who've worked when they were very ill, but they felt like if they canceled one day, their patients would have to wait another six to eight weeks," says Whitney. "People are waking up in the middle of the night worrying about patients."

## Exodus to more lucrative private practice?

American health plans limit access to mental health care to keep expenses down, according to Richard G. Frank, a senior fellow at the Brookings Institution and director of the USC-Brookings Schaeffer Initiative for Health Policy. Other health care organizations have been accused of undermining their mental health care by not hiring enough therapists — or insufficiently reimbursing the ones they do have for counseling sessions — driving an exodus to more lucrative private practice.

This is by design, says Frank. Mental health patients are more expensive than physical health patients — not because the cost of care is higher, but because mental health patients tend to come with substantial physical health needs, too.

A 2020 study by the consulting company Milliman Inc. reviewed 21 million insurance holders and found that behavioral health patients cost plans 3.5 times more than patients without behavioral health needs.

**Experts:** The new 988 mental health hotline could make 'all the difference'

"Ever since mental health started being covered by insurance in the '60s and '70s, the incentives have been to avoid enrolling people with mental illness in your plan," says Frank.

Over time, parity laws mandating that health plans offer mental health care on par with their physical health care have grown increasingly strict. On Oct. 8, 2021, Gov. Gavin Newsom signed SB 221, which requires that follow-up appointments for mental health sessions be scheduled within 10 days of the previous session.

When asked about proceeding against Kaiser under the new law, the California Attorney General's Office declined to comment, citing "a potential or ongoing investigation."

Regulation and enforcement of health plans in California falls to the Department of Managed Health Care, which fined Kaiser $4 million in 2013 for overbooking its therapists.
Kaiser settled with the DMHC in 2017 following millions of dollars in fines and a litany of enforcement actions imposed against the company. The settlement established a six-point plan to address mental health access issues and forced Kaiser to hire a consultant to oversee the process.

Following the settlement, Kaiser established Connect 2 Care, a system of call centers, to shorten wait times for new mental health patients. Therapists interviewed by Capital & Main said Kaiser created its call centers merely to satisfy regulators, and Connect 2 Care has been criticized by the American Psychological Association.

In May 2022, the agency informed Kaiser of its investigation into the health care giant's mental health services.

**Read more:** Heat especially harms people with mental and behavioral health conditions, experts say

"We appreciate the DMHC's interest and accountability in understanding how we are working to deliver clinically appropriate care to those who rely on us for their mental health services," Kaiser wrote in a statement.

"Kaiser Permanente is meeting California's regulatory standard for initial appointments for mental health and wellness on average more than 90% of the time. We encourage therapists to document treatment recommendations, including both initial appointments and follow-up appointment frequency, and to escalate any challenges in scheduling to their manager, per the established process."

Kaiser's network of mental health practitioners may be even less robust than the numbers it touts. A 2021 lawsuit filed against Kaiser by the San Diego City Attorney's Office alleged that more than 30% of the therapists listed in Kaiser's directory were not actually available to patients: Some were listed with the wrong contact information, some had retired, some were not practicing within Kaiser's network, and some were not practicing altogether.

"Kaiser's grossly inaccurate provider directories harm their own customers' personal health, as well as their pocketbooks, while unlawfully and unfairly enabling the company to shed more costly enrollees to the detriment of its market competitors," the city of San Diego asserted in its lawsuit.

San Diego also filed lawsuits against two other major providers, Molina Healthcare of California and Health Net, for maintaining inaccurate directories of mental health care practitioners.

## Hundreds have left in recent years

Data from the National Union of Healthcare Workers, which represents Kaiser therapists, found practitioners have left Kaiser in steadily increasing numbers over the past three years:

Kaiser therapists flee as mental health patients languish

From June 2019 to November 2020, 469 practitioners left Kaiser, with annual turnover rates hovering around 8% per year in Northern California and 5% per year in Southern California. From December 2020 through May 2022, 850 practitioners left Kaiser, and the average annual turnover rate was more than 12% in Northern California and 10% in Southern California.

Kaiser mental health practitioners and experts told Capital & Main that working conditions are to blame for the exodus of therapists from the company. Ex-Kaiser therapist Mickey Fitzpatrick handily beats his old hourly rate, he says, which was $73.73 in April of 2021, after 10 years at the plan. In the Bay Area, therapists regularly charge $250 or more for 50 minute sessions.

"My graduates want to go to Kaiser for work, and they do," says Dr. Gilbert Newman, vice president for academic affairs at the Wright Institute, a private graduate school for psychology in California. "They often leave Kaiser because they don't like the work they do. They don't like being told you can't see people enough to help them."

Kaiser therapists can get in trouble with their managers when they recommend clients for regular follow-up appointments. In November of 2021, marriage and family therapist Tanya Veluz was summoned into a meeting with three of her superiors after she recommended patients for return sessions. The managers went through a list of those clients, questioning their need for care.

"They went through each case," Veluz recalls, "and for a couple where the distress was really high they said, 'Makes sense, we understand why you would want more support for this case.' Every other case they challenged my clinical decisions. 'Well … the questionnaire doesn't indicate the level of distress you're asking for.'"

The managers also questioned her estimates for the duration of her patients' treatment, Veluz says. Trauma patients, Veluz felt, would need sessions for two to six months.

According to Veluz, her manager told her it was impossible to know for how long a patient would need treatment. Veluz disagreed, citing her clinical experience as well as "plenty of research" supporting her diagnoses. She says one manager threatened her license.

When asked about the incident, Kaiser representatives did not directly comment. On July 19, the company said it is on a "multiyear journey to improve the way mental health care is delivered in America today" and has been expanding its virtual care and placing mental health professionals in medical settings. The company has "escalation procedures to support

our therapists if they are unable to schedule a needed follow up appointment" and a "dedicated phone line."

Ken Harlander, a licensed marriage and family therapist, practiced at Kaiser's Bakersfield clinic with Susan Whitney, and left for private practice last year. Harlander avoided delays between appointments at Kaiser by booking returning clients in spots reserved for new patients, which got him summoned to "the principal's office," he says.

"That was what happened if you tried to push back," he says. "When you would ask, 'Why are we selling a product we can't really provide?' you would get no answers."

Richard G. Frank agrees that post-pandemic demand bolsters Kaiser's shortage argument, but says insurance plans' refusal to compete with private practice is the real culprit behind practitioner shortages.

"I think there's a kernel of truth there, but I think it's exaggerated," he says. "What health plans typically claim is that they can't hire all the people they would like to hire at the current rate of pay. That's not the same thing as saying, 'Gee, there are none available.'"

But for Ken Harlander, it wasn't the pay that drove him to private practice — the company's excellent benefits made up for lower hourly wages. Harlander says he left because Kaiser overbooked him and prevented him from doing his job effectively.

"It's just been so good to not work there anymore," he says. "I actually practice good therapy."

Because of its benefits, Kaiser always has willing applicants, according to Harlander. "People would rather work at Kaiser than the county or Medi-Cal work," he says. "They could open slots and hire people away if they wanted to. They wouldn't even have to change their pay structure. If they said we're hiring five therapists, they'd get five candidates right now."

**Exhibit 11-A**

# 'It's atrocious': Parents and therapists lambast Kaiser's youth services



Ariana Bindman, SFGATE

Sept. 3, 2022 4:39 p.m.

○ ○ ○



Kaiser workers strike at the Oakland Medical Center to protest the HMO's "unethical" working conditions on Aug. 16, 2022.

Ariana Bindman

More than 2,000 mental health clinicians continued to strike at Kaiser Permanente hospitals across Northern California on Tuesday to protest the health care provider's "unethical" working conditions. On the front lines of the strike at the Oakland Medical Center, SFGATE spoke to several therapists and psychologists who are speaking out on the inhospitable working conditions that are allegedly harming both patients and practitioners.

**SFGATE**

✕

Alex Klein, a child psychologist who's worked at the Oakland Medical Center for the past seven years, said he is frustrated with Kaiser's current practices and the delays in care.

"If anything, it's been worsening since Kaiser has not been able to make suitable working conditions for clinicians," he said.

According to Klein, his colleagues are burnt out and leaving altogether. As staff dwindles, kids with "significant needs" who should be seen weekly sometimes wait two months or longer for appointments. By failing to support clinicians, he said that Kaiser is subsequently failing to support kids who are suicidal or dealing with conditions like PTSD, OCD, anxiety and depression.

SFGATE

In response to complaints from the picket line about the lack of staff, Kaiser said in a written statement that it has hired 200 new clinicians since January 2021 and has spent $500,000 to recruit more staff. Representatives also say that Kaiser will continue to prioritize urgent and emergency cases during the strike. "We are working hard to ensure that every patient who needs care this week receives it," they wrote in another statement.

"Despite all that we are doing, we, like others, are challenged to meet the demand and know more must be done," Deb Catsavas, senior vice president of human resources at Kaiser Permanente, said in the statement. "We are focused on continuing to find new ways to meet our members' and patients' mental health needs."

The National Union of Healthcare Workers — which represents the striking clinicians — said enough progress hasn't been made. The union said Kaiser rejected a proposal that would have helped increase staffing and decrease wait times for appointments. Despite Kaiser's statements that it is committed to "bargaining in good faith," therapists said that sometimes the HMO doesn't show up to their bargaining sessions at all.

Meanwhile, Klein said the pandemic is exacerbating the youth mental health crisis, which is the leading cause of disability and poor life outcomes, according to government data. The U.S. Centers for Disease Control and Prevention found that from 2009 to 2019, high school students reported experiencing increased feelings of sadness and hopelessness. The pandemic worsened the crisis. "We've seen a huge increase in anxiety, in depression, particularly with youth — children and teens," Klein continued.

✕



Jason Lechner, a marriage and family therapist, and Charles Aquilina, a psychologist who works in addiction medicine, both agreed that the pandemic increased the need for mental health services for both kids and adults.

"It made an already difficult problem worse because access to care, access to return appointments and follow-up care was really an issue even before so many people needed it," Lechner said. Aquilina said that physical isolation and excessive screen time is affecting youth in particular, and that substance abuse among teenagers is also on the rise.

Because of long wait times and staffing issues, some parents said they can no longer rely on Kaiser at all.

One mother, Marie, who requested to not use her full name, called the level of care her teenage son received at the Vallejo Kaiser during a mental health crisis "deplorable."

SFGATE

"Just to speak to the psychiatrist that was assigned to him took an act of God," she continue

Top Picks In Shopping

The best nonalcoholic beverages for Dry January

How to watch the Golden Globes live

The 15 best items in Disney's Valentine's Day collection

Even though multiple professionals told her that her son needed to see a mental health practitioner at least two or three times a week, Marie said that Kaiser offered to see him just once a month. She knew her son couldn't afford to wait that long and she put together a patchwork of services outside of Kaiser for him over the course of about six years.

"We spent nearly $500,000 out of pocket until he was 18 years old due to lack of response and quality mental health care from Kaiser," she wrote.

Over the phone, Marie told SFGATE that she took her son to see doctors at Stanford and UCLA, paying $2,400 for three sessions in Northern California and then $45,000 for a month-long evaluation at the University of Utah. Had her friend not given her a $200,000 personal loan, she said, she wouldn't have been able to save her child's life — but even that wasn't enough. Amid other financial troubles during the pandemic, she had to sell her own home.

SFGATE

"We have no retirement now," Marie said. "We spent what we had. But was it worth it? Of course. I always told my son I will do whatever it takes to see him through this."

Barbara McDonald, who spoke with SFGATE for a previous story, had a similar story. She spent $45,000 on services outside of Kaiser due to unpredictable cancellations and delays. "It feels completely negligent," McDonald said.

"They have got to throw away their handbook with how they operate for adolescent psychology," Marie said. "It's atrocious."



**Exhibit 11-B**

**Bloomberg Government**

# Kaiser to Boost California Therapist Numbers Under New Contract

By Tiffany Stecker / October 21, 2022 03:00AM ET / Bloomberg Law

Kaiser Permanente will be required to hire more mental health therapists and increase crisis services under a new four-year contract ratified by the therapists' union Thursday.

The agreement, which covers about 2,000 therapists for the nonprofit HMO in Northern California and the state's Central Valley, concludes the longest strike of mental health workers in history.

The standoff began in August with the therapists protesting Kaiser's inability to provide regular and timely behavioral health care to members, with some patients waiting months for follow-up treatment after an initial assessment.

"It took much longer than it should have to reach this agreement, but, in the end, we succeeded in securing important improvements in patient care that Kaiser negotiators told us across the bargaining table that they'd never agree to," Jennifer Browning, a licensed clinical social worker and member of the National Union of Healthcare Workers' bargaining committee, said in a statement.

The agreement is retroactive to September 2021, when the existing contract expired, and will end September 2025. It provides:

- Therapists with two additional hours per week to respond to patient emails and voice messages, contact social services agencies, and perform other duties;
- A 50-cent-per-hour raise for bilingual therapists, and;
- An increase in the duration of initial mental assessments for children, from 60 minutes to 90 minutes.

## Must Follow Committee

The agreement doesn't specify how many people Kaiser must hire in the coming years. But it holds management and labor responsible for adopting a plan to better treat specific diagnoses and requires Kaiser to implement the recommendations from those committees. Several of those panels have a mandate to increase staffing, union spokesman Matt Artz said.

California Therapists, Kaiser Agree to End Strike Over Staffing

That requirement could be Kaiser's best chance to offer better care, said Sarah Soroken, a triage and crisis therapist with the provider.

"They can't just take in the recommendations and not do anything with them," Soroken said in an interview.

A spokesman for Kaiser Permanente declined to comment at the time of publication.

The union began its California strike on Aug. 15 and accused Kaiser of violating a new state law (S.B. 221) to guarantee timely care for mental health patients. Kaiser members often wait months for follow-up appointments after an initial assessment, according to the HMO's own data.

Sen. Scott Wiener (D), the author of the timely care law, said that the settlement is a positive step to improve services.

"This resolution seems solid and creates a lot of leverage for the unions to make sure Kaiser is doing better," he said in an interview.

To contact the reporter on this story: Tiffany Stecker in Sacramento, Calif. at tstecker@bgov.com

**EXHIBIT 12**



**DIVE BRIEF**

# California probes Kaiser over enrollee access to mental health appointments

Published Aug. 29, 2022

By Susan Kelly
  Contributor

## Dive Brief:

- The California Department of Managed Health Care has launched a targeted enforcement investigation into whether Kaiser Permanente health plans are providing patients with timely access to appointments, as required by law, during a strike by mental health clinicians at the system's facilities, a DMHC spokeswoman confirmed in an email to Healthcare Dive on Sunday.

- The probe follows a complaint earlier this month by the National Union of Healthcare Workers to the DMHC that accused Kaiser Foundation Health Plan of illegally canceling behavioral health services for thousands of enrollees in Northern California in response to the impending strike by non-physician clinicians. The strike by DMHC-represented clinicians began on Aug. 15.

- Kaiser Permanente, in an emailed statement, told Healthcare Dive that it is using every resource available to ensure it meets members' mental health needs. "We welcome the opportunity to review the steps we have taken to prepare for and manage

through the union's efforts to disrupt mental health care," spokesman Marc Brown said.

## Dive Insight:

The more than 2,000 mental health therapists on strike will remain off the job until Kaiser increases staffing at its clinics and ends "dangerously long" wait times for therapy sessions, according to the NUHW. The union contends Kaiser is breaking California law and violating clinical standards by making patients wait months to start therapy and four to eight weeks between appointments.

California law requires health plans to arrange for care to be provided out of network if timely access to mental health services is unavailable from in-network providers.

DMHC spokeswoman Rachel Arrezola said the department notified Kaiser on Aug. 22 that it had opened an enforcement investigation. The DMHC will continue to monitor the plan closely during the strike to ensure it is in compliance with the law, she said.

"The DMHC is concerned about the potential for immediate harm to enrollees based on the very serious nature of allegations that the plan is not providing timely appointments to enrollees required by the law," Arrezola said.

Brown said 40% of Kaiser's clinicians are caring for members instead of striking, "with more returning each day." In addition, Kaiser Permanente psychiatrists, clinical managers and other licensed clinicians have stepped in to meet with people needing care. Kaiser is also working toward agreements with hundreds of community-based mental health providers to open their schedules

for at least two months to be able to treat more of Kaiser's patients, he said.

"We appreciate the DMHC's interest and accountability in understanding how we are working to deliver clinically appropriate mental health care during NUHW's unnecessary strike," Brown said.

Kaiser Permanente mental health clinicians in Hawaii were planning to begin a strike Monday, joining California therapists in calling for the system to address access-to-care issues.