UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically filed*

| | |
|---|---|
| DOE 1, *et al.*<br>    Plaintiffs<br><br>v.<br><br>THORNBURY, *et al.*<br>    Defendants<br><br>and<br><br>COMMONWEALTH OF KENTUCKY,<br>*ex rel.* ATTORNEY GENERAL DANIEL CAMERON<br>    Intervening Defendant | Civil Action No. 3:23-CV-00230-DJH |

### DECLARATION OF BRYNNE MILLER IN SUPPORT OF INTERVENOR DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Brynne Miller, declare as follows:

  1. I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently. I am submitting this Declaration in support of Intervenor Defendants' opposition to Plaintiffs' Motion for a Preliminary Injunction.

  2. My daughter, L., is now 19 years old. When L. was young, she and I had to flee from domestic violence and after that we both had to deal with a disrupted family in which the father was absent.

1

3. At age 13 L. became involved in a toxic manipulative relationship with an older boy. I ended the relationship when I found some troubling text messages between L. and the boy.

4. L. began experiencing gender confusion at age 13. She had a close friend who was identifying as a boy and L. began identifying as a boy. She went from being a confident happy girl comfortable in her body to a disheveled teen who wanted to hide her body with oversized sweatshirts.

5. L. and I met with L's pediatrician, and the doctor asked whether we were going to use he/him pronouns. I said "no we are going to stay in reality." The pediatrician scolded me. She said that L. was not wrong about identifying as a boy, that "these feelings don't just come out of nowhere."

6. The doctor met with L. alone. After that meeting, I entered the room and L. was hysterical and crying. The doctor whispered in L.'s ear and then demanded to know whether I knew that L. had called the suicide hotline.

7. With L. present, the doctor said, "if you do not get her the help she needs [*i.e.,* a gender therapist] and she kills herself you will feel awfully guilty." L. later told me that she felt badly for the doctor making me feel like I did not care for L.

8. I found this doctor's behavior questioning my concern for my child and undermining my parental authority in front of my child to be abhorrent and I did not take L. to see her again.

9. In the course of gathering information for an ADHD evaluation, I learned that L.'s school had been affirming L. as a boy with a male name without

notifying me. When I asked the guidance counselor about this, he said that they could not discuss children's identities with parents.

10. L. kept saying she wanted testosterone, that she wanted a male-looking body and to hear how her voice was going to sound. She believed her voice would sound great because a lot of "YouTube influencers" love how their voices sounded after they took testosterone.

11. Seven of L's friends at school had identified as trans and four were on testosterone. I did not want to restrict L. from seeing friends because I thought that would increase her resentment toward me. However, I told L. that she could not start taking testosterone. L. had a beautiful singing voice. I was constantly concerned that others might enable L. to surreptitiously obtain testosterone in a nearby large city.

12. Instead of testosterone or other medical interventions, I continued seeking effective mental health therapy for L. I was able to find her help that kept her whole and healthy into adulthood.

13. I also continued to remain grounded in biological reality by using her given name and female pronouns.

14. L. is now 19 years old, has graduated from high school, is taking college courses online. She no longer identifies as a transman and is no longer binding her breasts consistently. She knows she is a female even though she does not "feel" female.

15. She also discovered that her previous suicidal thoughts she thought were due to her being transgender were in fact likely symptoms of a recent diagnosis

of pre-menstrual dysphoric disorder, which greatly exaggerated her PMS symptoms and likely has been doing so for years. Administering appropriate female sex hormones have improved L.'s symptoms and diminished the suicidal thoughts.

16. Although legally she can obtain medical or surgical interventions for gender dysphoria, and it would be paid for in my state, L. has not pursued them and has not suffered the ill effects, including suicidal ideation, that the pediatrician and others had pressured me with. By contrast, L. has friends who are taking testosterone and they are not mentally healthy or well-adjusted.

17. I shudder to think what would have happened to L. mentally and physically if she had pursued these medical interventions to include the incorrect male sex hormone, testosterone.

18. The so-called "gender-affirming" medical interventions for children are dangerous and should be banned. In no other sphere do we encourage children to change their bodies or take dangerous off-label prescriptions because they are uncomfortable with their body.

19. Parents like me are being told these treatments are safe and well-studied, when they are not. They are given one-page marketing materials that gloss over the harms and do not even mention the risks and future impacts of the treatments, let alone the unknown risks and ramifications.

20. Even worse, parents are coerced into agreeing to treatments by threats that if they do not then their child will commit suicide, as happened with me. I have heard from many other parents that they are told "do you want a live son or a dead

daughter." Statements like these are not informed consent but coercive manipulation that undermines parents' rights to make decisions that are in the best interest of their children.

21.   Prohibitions on such treatments for minors put a stop to such bullying by the medical establishment and help preserve parental decision-making and family relationships from the trauma caused by coerced participation in these experiments.

22.   Laws such as Kentucky's SB 150 that do not allow these treatments to be given to minors should be supported for the sake of protecting children and parents.

23.   I urge the Court to uphold this critical child-protective law.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2023.

     /s/ *Brynne Miller*
     Brynne Miller