**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| JANE DOE 1, *et al.*, | |
| Plaintiffs, | |
| v. | |
| WILLIAM C. THORNBURY, JR., MD, in his official capacity as the President of the Kentucky Board of Medical Licensure, *et al.*, | No. 3:23-cv-00230 |
| Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

ARGUMENT .............................................................................................................. 1

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................... 1

      A.      Precedent Forecloses Cameron's Arguments Against Heightened Scrutiny. ........ 1

      B.      Cameron Cannot Avoid Strict Scrutiny On Plaintiffs' Due Process Claim........... 6

      C.      Cameron's Proffered Justifications Do Not Withstand Scrutiny. ......................... 8

            1.      Gender dysphoria is a recognized medical condition. ............................... 8

            2.      Adolescents with gender dysphoria overwhelmingly do not "desist." ........................................................................................................ 9

            3.      Treatments for gender dysphoria are safe and effective. .......................... 9

            4.      The international medical consensus supports the use of puberty blockers and hormone therapy for transgender adolescents. .................. 10

            5.      Anecdotes do not justify banning established medical care for a serious medical condition. ....................................................................... 10

            6.      Robust evidence shows the safety and efficacy of medical treatments for gender dysphoria in adolescents. ..................................... 11

            7.      WPATH and the Endocrine Society guidelines are based on evidence. ................................................................................................. 12

            8.      There is no evidence that psychotherapy alone is effective. .................... 13

             9.      Minors can provide informed assent to treatment. .................................. 13

II.     A PRELIMINARY INJUNCTION AGAINST ALL ENFORCEMENT OF THE TREATMENT BAN IS NECESSARY TO PROTECT PLAINTIFFS. ......................... 14

CONCLUSION........................................................................................................... 15

i

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ...................................................................................8

*Bassett v. Snyder*,
951 F. Supp. 2d 939 (E.D. Mich. 2013) .................................................................16

*Blakley v. Comm'r of Soc. Sec.*,
581 F.3d 399 (6th Cir. 2009) .................................................................................16

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) .................................................................................16

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020)........................................................................................3, 4

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) ........................................................................... *passim*

*Craig v. Boren*,
429 U.S. 190 (1976).................................................................................................6

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)..........................................................................................5, 6

*Doe v. Ladapo*,
2023 WL 3833848 (N.D. Fla. 2023) ............................................................... *passim*

*Edmo v. Idaho Dep't of Corr.*,
358 F. Supp. 3d 1103, *vacated in part on other grounds*, 935 F.3d 757 (9th
Cir. 2019) ..............................................................................................................14

*Eknes-Tucker v. Marshall*,
603 F. Supp. 3d 1131 (M.D. Ala. 2022) ........................................................ *passim*

*Geduldig v. Aiello*,
417 U.S. 484 (1974)...............................................................................................5, 6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ...................................................................................3

*K.C. v. Medical Licensing Bd.*,
No. 1:23-cv-00595, ECF No. 67, slip op. 32–33 (S.D. Ind. June 16, 2023) ..................1, 6, 10

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*,
927 F.3d 396 (6th Cir. 2019) ...................................................................................7

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) .................................................................5, 6

*Loving v. Virginia*,
    388 U.S. 1 (1967) ........................................................................................5

*Mulholland v. Marion Cnty. Elec. Bd.*,
    746 F.3d 811 (7th Cir. 2014) ....................................................................17

*Nguyen v. INS*,
    533 U.S. 53 (2001)......................................................................................2

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) ....................................................14

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)....................................................................................5

*Phillips v. Martin Marietta Corp.*,
    400 U.S. 542 (1971)....................................................................................5

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ...................................................................8

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925)....................................................................................8

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield*,
    2022 WL 17092846 (W.D. Wash. 2022) .................................................14

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020)....................................................................................9

*San Antonio Indep. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)........................................................................................8

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ..........................................................1, 2, 3, 4

*United States v. Virginia*,
    518 U.S. 515 (1996)....................................................................................2

*Vacco v. Quill*,
    521 U.S. 793 (1997)....................................................................................6

# **TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) ..................................................................................17

## INTRODUCTION

The Department of Justice (ECF No. 37) and more than twenty major medical organizations, including those with expertise in the treatment of gender dysphoria (ECF No. 19), agree that the Treatment Ban contradicts sound medical science and will cause Plaintiffs irreparable harm.  Every court to consider challenges to similar bans has agreed that a preliminary injunction is warranted.  *See Brandt v. Rutledge*, 47 F.4th 661, 667 (8th Cir. 2022); *K.C. v. Medical Licensing Bd.*, No. 1:23-cv-00595, ECF No. 67, slip op. 32–33 (S.D. Ind. June 16, 2023) (attached as Exhibit 1); *Doe v. Ladapo*, 2023 WL 3833848, at *1 (N.D. Fla. 2023); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. 2022).  Defendants Thornbury and Denker, officials responsible for enforcing the Treatment Ban, agree it would "behoove … licensees and their patients for the Court to grant the injunction and maintain the status quo pending final ruling on the merits of the suit, to avoid potentially unnecessary cost, time, and harmful exposure should Plaintiffs be successful."  ECF Nos. 41 at 1-2.  Against that backdrop, an order enjoining Defendants from enforcing the Treatment Ban for the duration of this case is warranted.  Attorney General Cameron fails to show otherwise.

## ARGUMENT

### I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.     Precedent Forecloses Cameron's Arguments Against Heightened Scrutiny.

Cameron misconstrues Supreme Court and Sixth Circuit precedent, which establishes that discrimination based on transgender status is prohibited sex discrimination.  The Sixth Circuit has held that discrimination against transgender persons is sex-based discrimination for purposes of the Equal Protection Clause.  *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004).  This is so because discrimination against transgender persons is discrimination against a person for failing "to act and/or identify with his or her gender."  *Id.* at 575.  The Treatment Ban targets transgender

youth.  Thus, under *Smith*, the Ban is presumptively invalid and cannot be upheld without an "exceedingly persuasive justification." *United States v. Virginia,* 518 U.S. 515, 531 (1996).  Here, as every court to consider similar bans on medical treatments for transgender youth has concluded, the government's asserted justifications fall far short of this demanding test.  *See Brandt*, 47 F.4th at 670–71; *Eknes-Tucker*, 603 F. Supp. 3d at 1147–48; *Ladapo*, 2023 WL 3833848, at *10–11.

Cameron attempts to avoid *Smith* by arguing that the Treatment Ban does not discriminate based on sex because it draws classifications based on "inherent physical differences" between boys and girls, not sex stereotypes.  ECF No. 45 ("Opp.") at 11.  Heightened scrutiny applies to *all* sex-based classifications.  Cameron's argument to the contrary fails for two reasons.  *First*, it conflates two distinct questions: (a) whether a sex-based classification exists, and (b) whether the sex-based classification survives scrutiny.  Whether a classification arises from "physical differences" relates only to this second question.[1]  Indeed, both of the cases Cameron cites in an attempt to escape heightened scrutiny *apply heightened scrutiny.  See Nguyen v. INS*, 533 U.S. 53, 60–61, 70 (2001); *Virginia*, 518 U.S. at 556.  No authority holds that a sex-based classification avoids strict scrutiny simply because it relates to "inherent physical differences."

The Treatment Ban explicitly references "sex" to define the treatments it prohibits.  The statute prohibits treatments that "alter the appearance" or "validate a minor's perception of[] the minor's sex, if that appearance or perception is inconsistent with minor's sex" at birth.  SB 150 § 4(2).  The prohibition "cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (cleaned up); *accord Brandt*, 47 F.4th at 669.  "If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex."

---

[1]     Further, physical differences do not independently constitute an "exceedingly persuasive" justification. *Virginia*, 518 U.S. at 533.

*Ladapo*, 2023 WL 3833848, at *8; *accord Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741–42 (2020) (holding that "sex plays an unmistakable and impermissible role" in discrimination against transgender individuals).

*Second*, the Treatment Ban expressly relies on sex stereotypes.  It only prohibits hormones and puberty blockers for the purpose of affirming a gender identity that "is inconsistent with" with a minor's natal sex, (SB 150 § 4(2)); *see also* ECF No. 17-3 ("Kingery Decl.") at ¶ 35—that is, it only prohibits these medicines for minors who fail to "act and/or identify with his or her gender," *Smith*, 378 F.3d at 575.  By only banning gender-affirming treatments, the Treatment Ban mandates that a minor have an appearance and identity that is consistent with the appearance and identity stereotypically associated with his or her natal sex.  As the Sixth Circuit has made clear: "discrimination against a plaintiff who is a trans[] . . . is no different from the discrimination directed against [a woman], who, in sex-stereotypical terms, did not act like a woman." *Id.* at 576.  Mandating gender conformity is sex discrimination.

Cameron also claims that the Treatment Ban does not discriminate based on sex because it applies equally to boys and girls. Opp. at 9.  In *Bostock*, the Supreme Court considered and rejected this same argument: "[A]n employer who intentionally fires an individual . . . transgender employee . . . violates the law *even if* the employer is willing to subject all male and female . . . transgender employees to the same rule." *Bostock*, 140 S. Ct. at 1744 (emphasis added).  So, too, here.

Cameron next argues that *Bostock*'s explanation of sex discrimination is limited to Title VII and does not apply to an equal protection claim. Opp. at 10.  Sixth Circuit precedent forecloses his argument.  Courts have made clear that a plaintiff alleging a violation of the Equal Protection Clause "must prove the same elements as are required to establish a disparate treatment claim

3

under Title VII." *Smith*, 378 F.3d at 577 (cleaned up).  Cameron's reliance on *Pelcha* is misplaced. Opp. at 10.  Unlike *Smith*, *Pelcha* does not analyze the relationship between sex discrimination claims under Title VII and the Equal Protection Clause.  *Pelcha* only considers whether an *age discrimination* claim under the Age Discrimination in Employment Act should be analyzed under the same test as a sex discrimination claim under Title VII.  *Pelcha*, 988 F.3d at 324.

Moreover, contrary to Cameron's view, it is irrelevant that some transgender youth do not receive the banned treatments.  *See* Opp. at 9, 11.  A law need not apply to *all* members of a group to draw impermissible distinctions based on sex.  For example, in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543–44 (1971), the Court held that a workplace policy that applied only to women with children discriminated based on sex, even though not all women have children. Similarly, the Court has held laws that ban interracial and same-sex couples from marriage discriminate based on race and on sexual orientation, respectively, even though not all such couples wish to marry.  *See Obergefell v. Hodges*, 576 U.S. 644, 675 (2015); *Loving v. Virginia*, 388 U.S. 1, 12 (1967).

Cameron's argument that the Treatment Ban targets procedures rather than transgender people is equally unavailing.  *See* Opp. at 12.  Because the law targets treatments only for treatment purposes transgender people require, it discriminates based on transgender status.  *See, e.g.*, *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (policy banning individuals who have undergone "gender transition" from open military service discriminates based on transgender status).  On its face, the Treatment Ban prohibits treatments only for a minor whose "perception of his or her sex … is inconsistent with the minor's sex" at birth—*i.e.*, only for and to treat transgender minors.  There is no mystery or ambiguity about the class of minors for whom the Treatment Ban's "protections" were enacted.

Cameron's reliance on *Geduldig v. Aiello*, 417 U.S. 484 (1974), and *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022), is misplaced. Those cases involved policies that did not facially discriminate based on sex: nobody received health coverage for pregnancy (*Geduldig*); nobody had the right to an abortion (*Dobbs*). In contrast, the Treatment Ban makes a facial distinction between transgender and cisgender youth. *See Ladapo*, 2023 WL 3833848, at *3 (rejecting the argument that a substantially identical treatment ban for Florida transgender adolescents survived under *Geduldig*). Neither *Geduldig*, *Dobbs*, nor any other case, holds that facial sex-based classifications can avoid heightened scrutiny simply because they relate to the regulation of medical care. *See Ladapo*, 2023 WL 3833848, at *3; *K.C.*, slip op. 18.

Cameron's argument that the Treatment Ban targets "medical-procedures-*for-a-specific-purpose*," Opp. at 12 (emphasis added), proves Plaintiffs' point. That specific purpose is to prevent gender transition by transgender persons. *See, e.g.*, *Karnoski*, 926 F.3d at 1201. Cameron's reliance on *Vacco v. Quill*, 521 U.S. 793 (1997), which involved a law prohibiting euthanasia, is profoundly misplaced for this reason. *See* Opp. 12. Prohibiting euthanasia does not single out any particular group, much less based on sex.

It is irrelevant that the Treatment Ban also draws a classification based on age. *See* Opp. at 12. Laws can create multiple distinctions based on multiple classes. An appropriate distinction does not cure a distinction that the Equal Protection Clause forbids. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 192 (1976) (analyzing a law prohibiting the sale of 3.2% beer to males under the age of 21 and to females under the age of 18 as a "gender-based" classification, even though the law also classified based on age).

In addition to its sex-based classification, the Treatment Ban also discriminates against a suspect class—transgender persons—and that discrimination independently warrants at least

intermediate scrutiny.  Cameron does not meaningfully respond to this argument.  He addresses a strawman instead, arguing that "*gender-dysphoric individuals* are not a protected class."  Opp. at 13 (emphasis added).  That is not Plaintiffs' argument.  That is not the classification drawn by the Treatment Ban.  The Treatment Ban does not use the term "gender dysphoria."  It repeatedly uses the term "sex."  SB 150 § 4.  It prohibits the use of hormones and puberty blockers for the purpose of affirming a gender identity that "is inconsistent with" a minor's natal *sex.  Id.*  As another court observed, the inconsistency described in the Treatment Ban almost perfectly defines a "transgender" person.  *Ecknes-Tucker* 603 F. Supp. 3d at 1138.

None of Cameron's arguments on this issue have merit.  Cameron portrays transgender people as unable to contribute to society, (Opp. at 14), but there "is obviously no relationship between transgender status and the ability to contribute to society."  *Dep't of Educ.*, 208 F. Supp. 3d at 874.  Cameron also insists transgender people have political power because activists and medical associations are advocating against the recent onslaught of treatment bans.  Opp. at 14.  Plainly, such advocacy would be unnecessary if Kentucky and more than a dozen other states had not imposed such bans in the first instance.  *See*, *e.g.*, *Ladapo*, 2023 WL 3833848, at *13.

## B.   Cameron Cannot Avoid Strict Scrutiny On Plaintiffs' Due Process Claim.

The Treatment Ban burdens Parent Plaintiffs' fundamental right to control the care and upbringing of their children by prohibiting them from obtaining medically accepted treatments for their transgender children.  *See* Pl. Br. at 22–23; *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) ("[P]arents' substantive due process right to make decisions concerning the care, custody, and control of their children includes the right to direct their children's medical care.").  Plaintiffs do not, as Cameron claims, assert "a fundamental right to obtain whatever drugs they want for their children."  Opp. at 5.  Rather, they seek, in consultation with their treating providers, access to medications that are endorsed by "at least twenty-two major

medical associations" as "well-established, evidence-based treatments for gender dysphoria in minors." *Eknes-Tucker*, 603 F. Supp. 3d at 1145; *cf. Pickup v. Brown*, 740 F.3d 1208, 1224 (9th Cir. 2014) (rejecting parental rights claim where "legislature relied on the well-documented, prevailing opinion of the medical and psychological community" that conversion therapy is ineffective and harmful).[2]   Parents' fundamental right to direct their children's medical care includes, at a minimum, the right to obtain these accepted treatments.   *See Eknes-Tucker*, F. Supp. 3d at 1146 (parents' "fundamental right to direct the medical care of their children . . . includes the more specific right to treat their children with transitioning medications subject to medically accepted standards").

The Commonwealth cannot infringe upon that right based on a generally stated purpose of protecting children or the observation that parental rights have limits.   The government's interest in protecting children does not grant it absolute power to impose its judgment over parents' objections.   "[T]he statist notion that governmental power should supersede parental authority in all cases . . . is repugnant to American tradition."   *Parham*, 442 U.S. at 603.[3]

If Cameron's contrary argument were correct, no state restriction on medical care— however unwarranted or extreme—could ever be held to burden parents' rights to care for and protect their children's health and well-being.   Although states have an interest in protecting health,

---

[2]       As noted, Parent Plaintiffs do not seek access to experimental medications, like the plaintiffs in *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697–98 (D.C. Cir. 2007). They seek treatments that, for many years, have been provided and deemed safe and effective both by medical specialists and the nation's leading medical and mental health organizations.   *See infra.* at § II(C)(3).   Barring parents from following such conventional medical advice for their children is a severe intrusion on their parental rights.

[3]       This fundamental right of parents is not "derivative from" or dependent on a minor's right to access medical treatment.   Opp. at 7.   A parent's fundamental right to obtain accepted medical care for a child stands on its own. Indeed, parents have a fundamental right to decide whether their children attend public or private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925), even though children have no constitutional right to education, *San Antonio Indep. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973).   In the same way, parents' right to obtain accepted care for their children exists irrespective of whether children have an underlying right to that medical care.

they must do so within constitutional limits and based on credible evidence.  *See, e.g.*, *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 68 (2020) (enjoining public health order that infringed religious rights where government had "not shown that public health would be imperiled").  Here, Plaintiffs "are likely to prevail on their parental-rights claim" because "there is no rational basis, let alone a basis that would survive heightened scrutiny, for prohibiting these treatments in appropriate circumstances." *Ladapo*, 2023 WL 3833848, at *11.

### C.    Cameron's Proffered Justifications Do Not Withstand Scrutiny.

Every major medical organization, representing every relevant scientific and medical discipline—psychology, psychiatry, endocrinology, and pediatrics—has endorsed well-established protocols for treating adolescents with gender dysphoria.  ECF No. 19; ECF No. 17-1 ("Schumer Decl.") at ¶ 53.  Cameron disparages this consensus but fails to support his sharp rhetoric with any credible evidence to justify a ban.  As other courts have found, these unsupported claims do not survive any level of review.  *Lapado*, 2023 WL 3833848, at *11; *Brandt*, 551 F. Supp. 3d at 891–93; *Eknes-Tucker*, F. Supp. 3d at 1146, 1148; *K.C.*, slip op. 25.[4]

### 1.    Gender dysphoria is a recognized medical condition.

Cameron seeks to justify the Treatment Ban by arguing that adolescents who identify as transgender should be "encouraged" to identify with their natal sex.  Opp. at 15–16.  Cameron thus insinuates that gender dysphoria is not a legitimate medical diagnosis and that children should be discouraged from being transgender.  But gender dysphoria is a recognized medical condition.  Children with gender dysphoria are not simply masculine girls or feminine boys, (*see* Expert

---

[4]    Cameron insinuates repeatedly and without evidence that providers who treat gender dysphoria in minors are improperly motivated by financial gain.  Opp. at 1, 16. But Cameron does not argue that the Treatment Ban was intended to prevent profiteering by doctors.  Cameron's references to providers' supposed financial interests are purely pretextual, not serious attempts to justify the Treatment Ban.  "The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients.  There is no reason to believe the doctors who adopted these standards were motivated by anything else." *Ladapo*, 2023 WL 3833848, at *14.

Rebuttal Declaration of Dan H. Karasic, M.D. ("Karasic R-Decl.") at ¶ 45), and encouraging children to be "confident . . . in their own skin," (Opp. at 16), is no treatment for gender dysphoria. On the contrary, therapy to change a child's gender identity is ineffective and harmful. Karasic R-Decl. at ¶ 44. For that reason, every major medical and mental health organization has rejected such therapy as dangerous and unethical. Shumer Decl. at ¶ 27; ECF No. 17-2 ("Janssen Decl.") at ¶ 20.

### 2. Adolescents with gender dysphoria overwhelmingly do not "desist."

Cameron argues that the Treatment Ban is justifiable because "most children with gender dysphoria will desist." Opp. at 16. That is false. Cameron's experts misrepresent older studies focused on *prepubertal* children. But the gender-affirming care at issue here is provided only to *adolescents* and gender dysphoria in adolescents does not simply resolve or dissipate without treatment. Rather, "once youth reach the beginning of puberty and identify as transgender, desistance is rare." Karasic R-Decl. at ¶ 48; Supplemental Expert Declaration of Suzanne Kingery, M.D. ("Kingery S-Decl.") at ¶ 10; *see also* Rebuttal Declaration of Aron Janssen, M.D. ("Janssen R-Decl.") at ¶¶ 25-38.

### 3. Treatments for gender dysphoria are safe and effective.

Cameron is also wrong that treating adolescents with puberty blockers or hormone therapy "causes irreversible harm to their physical and mental health." Opp. at 16–17. This claim is unsupported by any credible evidence and in fact contradicts the overwhelming consensus of medical experts. "Medical treatment for gender dysphoria has been studied for over half a century, and there is substantial evidence that it improves quality of life and measures of mental health." Karasic R-Decl. at ¶ 33. Puberty blockers have been safely used to treat precocious puberty for decades, and they are also safe when used to treat gender dysphoria. Shumer Decl. at ¶ 63; Shumer R-Decl. ¶¶ at 19–22; Kingery Decl. at ¶¶ 55–61. Hormone therapy is safely used to treat other

adolescent medical conditions and is also safe when used to treat gender dysphoria.  Shumer Decl. at ¶ 74-86; Shumer R-Dec. at ¶¶ 34–42; Kingery Decl. at ¶¶ 62–67.

### 4.     The international medical consensus supports the use of puberty blockers and hormone therapy for transgender adolescents.

Cameron falsely claims that an "international consensus is building that there is no reliable evidence to support any of the claims that injecting puberty blockers and cross-sex hormones into children with gender dysphoria is beneficial."  Opp. at 17.  To the contrary, as Plaintiffs experts show, there is a strong international medical consensus supporting the use of puberty blockers and hormone therapy to treat gender dysphoria in transgender adolescents.  *See, e.g.*, Karasic R-Decl. at ¶¶ 63-67.  Further, "no country in Europe—or so far as shown by this record, anywhere in the world—entirely bans these treatments."  *Ladapo*, 2023 WL 3833848, at *14.  *At mos*t, some of the reports Cameron cites advocate for additional research and appropriate guardrails.  Moreover, none of the cited reports critique the current WPATH or Pediatric Endocrine Guidelines for determining to whom and how to provide care.

### 5.     Anecdotes do not justify banning established medical care for a serious medical condition.

Cameron submits declarations from former adolescent patients and parents who regret receiving or allowing their children to receive gender-affirming treatment.  But these anecdotes do not justify a blanket denial of medical care for all transgender adolescents in Kentucky.  Opp. at 18.  At most, these anecdotes suggest that some doctors failed to follow standard treatment guidelines, and that like any other medical procedure, treatments for gender dysphoria are not without some risk.  A doctor's failure to meet an established standard of care with a patient may provide grounds for a civil lawsuit, but not a basis for a wholesale ban for all medical providers and their patients.

6.  **Robust evidence shows the safety and efficacy of medical treatments for gender dysphoria in adolescents.**

Relying on his proffered experts, Cameron claims "three systematic, comprehensive research reviews . . . have been conducted concerning the safety and efficacy of puberty blockers and cross-sex hormones as treatments for gender dysphoria in children' that 'unanimously concluded the evidence on medicalized transition in minors to be of poor quality.'"  Opp. at 19. This reflects a fundamental misunderstanding of systematic reviews.  Systematic reviews rate the quality of evidence supporting a particular treatment based on Grading of Recommendations Assessment, Development, and Evaluations ("GRADE") or a comparable tool.  Expert Rebuttal Declaration of Kenneth W. Goodman, Ph.D. ("Goodman R-Decl.") at ¶¶ 14–15.  There is no direct correlation between a GRADE score and whether a treatment is effective or safe, or the strength of a practice recommendation.  *Id.* ¶¶ at 16–17; Karasic R-Decl. at ¶¶ 88–92.

Rather, "randomized control trials are initially rated as 'high quality' and observational studies as 'low quality,'" which "does not reflect a condemnation of evidence but rather reflects that the body of peer-reviewed literature in this area is comprised of primarily observational studies."  Goodman R-Decl. at ¶ 17.  A "low quality" rating "does not imply the strength of a particular clinical recommendation," and "low quality studies regularly guide important aspects of clinical practice."  *Id.*  Indeed, for most systematic reviews of medical interventions, GRADE scores are low or very low.  Karasic R-Decl. at ¶¶ 89–90.  It is thus "incoherent to suggest that, in the absence of 'best-grade' evidence, clinicians should provide no clinical intervention or treatment at all, especially where there is solid evidence that points in the same direction with respect to showing efficacy of treatment."  Goodman R-Decl. at ¶ 17.

Cameron's reference to systematic reviews is, therefore, inapposite.  The reality is that evidence supporting medical treatments for transgender adolescents is robust and "parallel to

11

countless other practice guidelines." *Id.* at ¶ 18.

### 7.    WPATH and the Endocrine Society guidelines are based on evidence.

Cameron's unsubstantiated attacks on WPATH, the Endocrine Society, and other professional organizations, (*see, e.g.*, Levine Decl. at ¶¶ 61–63; Laidlaw Decl. at ¶ 172), are baseless and not credible.  WPATH standards of care have been widely endorsed and adoption by multiple professional organizations and were developed based on a rigorous, evidence-based process comparable to that used in the development of treatment protocols for other medical conditions. Shumer R-Decl. at ¶¶ 9–11 (describing process).  As Dr. Karasic notes, "that there are some outlier views . . . does not mean that there is no broad consensus among the larger medical and scientific community about the propriety, safety, and effectiveness of medical care for the treatment of gender dysphoria."  Karasic R-Decl. at ¶ 27.

Dr. Levine, Dr. Cantor, Dr, Laidlaw, and Dr. Nangia disagree with this broad consensus,[5] but they do not dispute that WPATH guidelines are the widely accepted standard for treating minors with gender dysphoria in the U.S. Cameron nevertheless argues that outlier opinions should be credited over the standards endorsed by reputable medical organizations. He insists, without evidence, that it is a "given" that every reputable medical association in the U.S. is a victim of

---

[5]       Dr. Cantor, Dr. Laidlaw, and Dr. Levine have testified in multiple cases involving transgender issues to offer their idiosyncratic views, and courts have consistently found their testimony to be of limited value. *See Eknes-Tucker*, 603 F. Supp. 3d at 1142–43 (giving "very little weight" to testimony of Dr. Cantor because "he had never provided care to a transgender minor under the age of sixteen," "never treated a child or adolescent for gender dysphoria," and "had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic"); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield*, 2022 WL 17092846, at *4 (W.D. Wash. 2022) (finding Dr. Laidlaw's expert qualifications were "a close question" because "[l]ess than five percent of his patients are under the age of 18 and he has treated two patients with gender dysphoria," "[h]e has done no original research on gender identity," and he "bases his opinions on his general experience as an endocrinologist and a review of literature"); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125–26 (giving "virtually no weight" to Dr. Levine's opinion because he is "an outlier in the field of gender dysphoria" who does not "reflect opinions that are generally accepted"), *vacated in part on other grounds*, 935 F.3d 757 (9th Cir. 2019); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (giving Dr. Levine's testimony "very little weight" due to its "illogical inferences, inconsistencies, … inaccuracies," misrepresentation of the Standards of Care, reliance on "generalizations about gender dysphoric [individuals]," and admitted fabrication of anecdotal evidence).

"ideological takeover." *Id.* at 20.  That conspiracy theory is not a "given." Indeed, "it is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river." *Ladapo*, 2023 WL 3833848, at *14.  Rejecting the overwhelming medical consensus is not rational.  Nor can it qualify as an exceedingly persuasive justification for a sex-based classification. *See Brandt*, 47 F.4th at 670.

### 8.      There is no evidence that psychotherapy alone is effective.

Cameron seeks to justify banning all medical treatments for gender dysphoria by claiming that "[t]here are other, better ways of treating gender dysphoria, like psychotherapy, … that can identify other mental health issues that may be the true catalyst for gender dysphoria." This assertion is baseless.  As Plaintiffs have shown, psychotherapy alone does not effectively treat gender dysphoria in adolescents, (*see, e.g.*, Kingery R- Decl. at ¶ 12), and there is no evidence that gender dysphoria is a symptom of other mental health conditions.  Janssen R-Decl. at ¶¶ 59-63.

### 9.      Minors can provide informed assent to treatment.

Cameron incorrectly claims that "a child cannot provide informed consent to puberty blocker or hormones."  Opp. at 22.  Parents, not minor patients, must consent to medical care for their children; the minor patients must assent.  Shumer R.-Decl. at ¶ 48.  Minors make these decisions with guidance and support from their medical providers and parents. The WPATH standard "outlines criteria for how providers obtain assent and consent for medical intervention," to ensure that parents and patients understand the risks and benefits.  *Id.* at ¶ 48; Kingery Decl. at ¶¶ 33–34.  These decisions are not "different than other complex medical decisions that parents and guardians make regarding the health and wellness of their children every day."  Shumer R.-Decl. at ¶ 48.

In sum, Cameron has not shown that any of his asserted justifications for the Treatment Ban is supported by evidence sufficient to survive rational-basis review, much less the heightened or strict scrutiny required here.  Cameron also cannot show that completely banning all medical treatment for transgender adolescents is narrowly tailored or substantially related to an asserted interested in protecting youth.  To the contrary, there are multiple alternatives, such as requiring providers to follow the standard of care or ensuring that providers obtain written informed consent, that would address any legitimate concerns without entirely depriving transgender adolescents of any ability to obtain essential and in some instances potentially lifesaving care.

## II.    A PRELIMINARY INJUNCTION AGAINST ALL ENFORCEMENT OF THE TREATMENT BAN IS NECESSARY TO PROTECT PLAINTIFFS.

Plaintiffs' strong likelihood of success on the merits satisfies the remaining conditions for a preliminary injunction. "When reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).  Indeed, Cameron makes no real effort to show that Plaintiffs will not be irreparably harmed without an injunction.  Cameron instead posits that Plaintiffs would be irreparably harmed *by an injunction*.  That unusual argument is founded on the false and unsupported premise that treatment with puberty blockers and hormone therapy is harmful.  Plaintiffs and their doctors have concluded otherwise, and their opinion is controlling. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (treating physician opinion given "controlling weight" "absent justifiable reason . . . for discounting those opinions").

Because Plaintiffs have shown a likelihood of success on the merits, a preliminary injunction enjoining enforcement of the Treatment Ban is warranted. *See Bassett v. Snyder*, 951 F. Supp. 2d 939, 972–73 (E.D. Mich. 2013) (noting, in an equal protection challenge, that "[t]o provide effective relief, the injunction must prohibit the defendant from enforcing" the challenged

act, as "[a]n injunction applicable only to the named plaintiffs would be impractical and difficult to enforce"). Cameron's arguments for a more limited injunction specific to Plaintiffs makes no sense. The Treatment Ban constrains *medical providers* by threatening their licenses, and those providers treat the Minor Plaintiffs *and others*. If defendants must enforce the ban against those providers for treating others, as Cameron suggests, then Plaintiffs will suffer irreparable harm. A blanket injunction against enforcement is thus necessary to afford relief *to Plaintiffs*.

Injunctions are not improper simply because they benefit non-parties. *See, e.g.*, *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) ("Because relief for the named plaintiffs in the case would also necessarily extend to all federal inmates, the district court did not err in granting wide-ranging injunctive relief."). "Facial unconstitutionality as to one means facial unconstitutionality as to all, regardless of the fact that the injunctive portion of the judgment directly adjudicated the dispute of only the parties before it." *Mulholland v. Marion Cnty. Elec. Bd.*, 746 F.3d 811, 819 (7th Cir. 2014).

## CONCLUSION

For the forgoing reasons and the reasons stated in Plaintiffs' original motion, Plaintiffs' motion should be granted.

Dated: June 16, 2023                    Respectfully Submitted,

*/s/ Stephanie Schuster*
Stephanie Schuster (pro hac vice)
Randall M. Levine (pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
(202) 739-3000
stephanie.schuster@morganlewis.com
randall.levine@morganlewis.com

Amanda J. Ford (pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
(617) 431-7700
amanda.ford@morganlewis.com

Corey Shapiro
Heather Gatnarek
Crystal Fryman
Kevin Muench
**ACLU OF KENTUCKY FOUNDATION**
325 W. Main St. Suite 2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org
crystal@aclu-ky.org
kevin@aclu-ky.org

Christopher F. Stoll (pro hac vice)
Kelly Jo Popkin (pro hac vice)
**NATIONAL CENTER FOR LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

*Counsel for Plaintiffs*

16

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing was filed with the Court using the CM/ ECF system on June 16, 2023, which will generate an electronic notice of filing to all counsel registered with that service.

*/s/ Stephanie Schuster*
Stephanie Schuster