## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JANE DOE 1, et al.,<br><br>             *Plaintiffs*,<br>         v.<br><br>WILLIAM C. THORNBURY, JR., MD,<br>et al.,<br><br>             *Defendants*. | Civil No. 3:23-cv-00230-DJH |

## REBUTTAL DECLARATION OF ARON JANSSEN, M.D.

I, Aron Janssen, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, of sound mind, and in all respects competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. The opinions expressed in this declaration are my own and do not express the views or opinions of my employer.

3.      I have actual knowledge of the matters stated in this declaration. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.      I incorporate as part of this rebuttal declaration my opinions and qualifications set forth in the expert declaration I previously filed in this matter

1

(Doc. 17-2).

5.      I submit this rebuttal declaration to respond to the expert declarations from James Cantor (Doc. 47-9), Michael Laidlaw (Doc. 47-10), Stephen Levine (Doc. 47-11), and Geeta Nangia (Doc. 47-12), which Intervenor-Defendant Daniel Cameron has submitted in this case. In preparing this rebuttal declaration, I have relied on my training and years of research and clinical experience, as set out in my *curriculum vitae* (attached as **Exhibit A** to my original declaration) and on the materials listed therein; the materials listed in the bibliography attached as **Exhibit B** to my original declaration; and the additional materials listed in the supplemental bibliography attached as **Exhibit C** to this rebuttal declaration.  The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications. I reserve the right to revise and supplement the opinions expressed in this declaration or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced by Defendants in discovery and in response to additional information from Defendants' designated experts.

2

## SUMMARY OF OPINIONS

6.      The declarations submitted by Intervenor-Defendant Cameron's designated experts largely argue about hypothetical concerns, for which there is no proof, and the limitations of particular studies. But these witnesses completely ignore that the evidence base for the safety and efficacy of medical treatment for gender dysphoria is not based on any one particular study. Rather, as is the norm in all of science and medicine, we look at the entire body of research surrounding gender-affirming care. When one does so, the conclusion that medical care for the treatment of gender dysphoria in transgender adolescents and adults is safe and effective becomes inescapable. Decades of clinical experience further support this conclusion.

7.      Intervenor-Defendant Cameron's experts further ignore the robust evidence for the harm faced by transgender individuals when barred access to medically necessary gender-affirming care.

8.      Medical care for gender dysphoria, including puberty-delaying medications or hormone therapy for transgender adolescents when medically indicated, is safe and effective, and it is not substandard or experimental.

9.      Understanding patients' experience of gender dysphoria is a vital component of being an expert in this field. Without understanding the distress transgender patients face – as well as the joy and resilience they experience when

3

they get the care they need – one is only spouting unmoored and unfounded opinions. Medicine and science demand more than just personal opinions, it demands study and experience in the field. For the most part, Intervenor-Defendant Cameron's experts lack both.

## EXPERT OPINIONS

### I.   RESPONSES TO DR. LEVINE AND GENERAL RESPONSES TO INTERVENOR-DEFENDANT'S OTHER EXPERTS

#### A.   Dr. Levine Lacks the Experience and/or Training to Opine on the Diagnosis, Assessment, and Treatment of Gender Dysphoria in Transgender Children and Adolescents

10.    Because Dr. Levine does not appear to be board certified in child and adolescent psychiatry, he lacks the related experience and training in specific developmental considerations for children and adolescents that is critical for working with transgender youth and their families.

11.    Moreover, Dr. Levine repeatedly acknowledges in his declaration that he has no firsthand knowledge of how gender-affirming mental health care is actually provided to children and adolescents. His descriptions are based on second-hand conversations and often sensationalized media reports. (*See, e.g.*, Levine Decl. ¶ 45 (offering opinions based on anecdotal reports from the internet)). He speaks in his declaration with authority on developmental and family factors that shape identity development in youth despite lacking the requisite training and experience and even ascribes reasons for why boys and girls may pursue social transition despite

4

no clinical experience in the relevant population.

    **B.**    **Dr. Levine and Intervenor-Defendant's Other Experts Display a Misunderstanding of the Nature of Gender Identity and of the Harm Caused by Attempting to Alter Gender Identity**

12.    Every person has a gender identity, and it is not a personal decision, preference, or belief. A transgender boy cannot simply turn off his gender identity like a switch, any more than a non-transgender boy or anyone else could.

13.    Living in a manner consistent with one's gender identity is critical to the health and wellbeing of any person, including transgender people.

14.    The lack of evidence demonstrating that gender identity can be altered, either for transgender or for non-transgender individuals, further underscores the innate nature and immutability of gender identity. Past attempts to "cure" transgender individuals by using talk therapy, and even aversive therapy, to change their gender identity to match their birth-assigned sex were ineffective and caused extreme psychological damage.

15.    A recent study found that experiencing those conversion efforts was associated with greater odds of attempting suicide, especially for those who had those experiences in childhood (Turban, et al., 2020b). That conclusion is further supported by the extensive evidence that rejection of a young person's gender identity from family and peers are the strongest predictors for adverse mental health outcomes. Every leading medical and mental health organization has issued clear

statements that those practices are discredited, harmful, and ineffective, including the American Medical Association (2022), the American Psychiatric Association (2018), the American Academy of Child & Adolescent Psychiatry (2018), the American Psychological Association (2021), and the American Academy of Pediatrics (Rafferty, et al., 2018), among others.

16.    Dr. Levine notes in his declaration "it is widely agreed that the therapist should not directly challenge a claimed transgender identity in a child." (Levine Decl. ¶ 46). This characterization misunderstands the standard of care for providing competent therapy to a minor with gender dysphoria, which includes challenging assumptions based on gender stereotypes and encouraging a child to build nuance around identity. However, what Dr. Levine seems to be arguing for is not to encourage a psychotherapeutic process that helps a child come to a clear and nuanced sense of self, whatever the gender identity may be, but instead recommending a psychotherapeutic intervention that seeks to prevent a child from being transgender. There is no evidence that such efforts are effective, and significant evidence that they put youth at risk of serious harms.

17.    By foreclosing the possibility of a healthy transgender identity and instead encouraging these transgender youth who will persist into transgender adults to strive towards a cisgender outcome, as Intervenor-Defendant Cameron's experts argue, one is, by definition, practicing conversion therapy.

6

18.     Dr. Levine and Intervenor-Defendant Cameron's other experts devote a great deal of space to discussing a theory that an increasing number of people who are assigned female at birth are suddenly identifying as males in mid-to- late adolescence as a result of peer pressure and social contagion. (See, e.g., Levine Decl. ¶¶ 90-91; Cantor Decl. ¶ 135; Nangia Decl. ¶¶ 33-36; Laidlaw Decl. ¶¶ 208-211). The theory that some adolescents experience "rapid- onset gender dysphoria" as a result of social influences is based almost exclusively on one highly controversial study (Littman, 2018). Although purporting to provide a basis for Dr. Levine's speculations, the study was based on an anonymous survey, allegedly of parents, about the etiology of their child's gender dysphoria. Participants were recruited from websites promoting this social contagion theory, and the children were not surveyed or assessed by a clinician. Those serious methodological flaws render the study meaningless. The only conclusion that can be drawn from that study is that a self-selected sample of anonymous people recruited through websites that predisposed participants to believe transgender identity can be influenced by social factors do, in fact, believe those social factors influence children to identify as transgender.

**C.    The Guidelines for Treatment of Gender Dysphoria Are Evidence-Based**

19.     The World Professional Association of Transgender Health (WPATH) has issued Standards of Care for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care") since 1979. The current version is SOC 8,

7

published in 2022. The WPATH Standards of Care provide guidelines for multidisciplinary care of transgender individuals, including children and adolescents, and describes criteria for medical interventions to treat gender dysphoria, including hormone treatment and surgery when medically indicated, for adolescents and adults.

20.    Contrary to Dr. Levine's claims, SOC 8 is based upon a rigorous and methodological evidence-based approach. (Coleman, et al., 2022). Its recommendations are evidence-based, informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus via a Delphi procedure. The process for development of SOC 8 incorporated recommendations on clinical practice guideline development from the National Academies of Medicine and The World Health Organization. Its recommendations were graded using a modified GRADE methodology (Guyatt, et al., 2011), considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

21.    A clinical practice guideline from the Endocrine Society (the Endocrine Society Guidelines) provides similar protocols for the medically necessary treatment of gender dysphoria. (Hembree, et al., 2017).

22.    Each of these guidelines are evidence-based and supported by scientific research and literature, as well as extensive clinical experience.

23.     Each of these guidelines also provides distinct guidance for age-appropriate care for children, adolescents, and adults with gender dysphoria. And none of these guidelines recommend medical treatment for prepubertal children, meaning no medical treatment is recommended until after the onset of puberty.

24.     The protocols and policies set forth by the WPATH Standards of Care and the Endocrine Society Guidelines are endorsed and cited as authoritative by the major professional medical and mental health associations in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American College of Obstetrics and Gynecology, the American College of Physicians, and the World Medical Association, among others.

**D.      Intervenor-Defendant's Experts' Discussion of Gender Diverse Children Who Desist Before Puberty Is Largely Irrelevant and Erroneous in Many Respects**

25.     Intervenor-Defendant Cameron's experts spend substantial portions of their declarations criticizing supportive care for prepubertal transgender children. For example, according to Dr. Levine, studies have indicated that gender dysphoria in prepubertal gender diverse children may desist by the time the children reach puberty, and thus medical professionals should adopt a "watchful waiting" approach and avoid affirming a prepubertal child's gender identity.

26.     However, with regards to prepubertal gender diverse children, the

WPATH Standards of Care state that prepubertal gender diverse children "are not eligible to access medical intervention," and therefore focuses on developmentally appropriate psychosocial practices. This case concerns a ban on certain types of medical treatment, namely, puberty delaying medications and hormones, and none of those treatments are recommended for transgender youth until after the onset of puberty (i.e., until adolescence). Even then, such treatments are available only when it is medically necessary, age appropriate, and the legal caregivers consent.

27.     As such, many of Dr. Levine's and Intervenor-Defendant Cameron's other experts' litany of criticisms is largely irrelevant to the population of people affected by Kentucky's medical care ban. For example, a significant number of Dr. Levine's and the other experts' arguments relate to prepubertal children who "desist" from expressing a transgender identity once they reach puberty. While many of the statements being made about this population are erroneous, they are also largely irrelevant.

28.     That said, to avoid any confusion, I address some of Dr. Levine's and the other experts' arguments pertaining to prepubertal transgender youth here.

29.     As with all health care, treatment of prepubertal gender diverse children is individualized based on the needs of the child and the family and other psychosocial considerations and is decided upon only after a discussion of possible benefits and risks (Hidalgo, et al., 2013). As part of those discussions, the child and

10

their family are advised that prepubertal gender diverse children do not always go on to identify as transgender when they reach adolescence, and that children are encouraged to continue developing an understanding of their gender identity without expectation of a specific outcome even after social transition takes place (American Psychological Association, 2015; Edwards-Leeper and Spack, 2012).

30.     The term "gender diverse" includes transgender children as well as children who will ultimately not identify as transgender later in life (Coleman, et al., 2022).

31.     Dr. Levine and Intervenor-Defendant Cameron's other experts present a caricatured description of prevailing standards of care that reflects a profound misunderstanding of the subject with respect to prepubertal gender diverse children. Mental health providers cannot change a prepubertal child's gender identity or prevent them from being transgender, just as mental health providers cannot change a cisgender child's gender identity. Furthermore, it is far from the standard of care for clinicians to blindly support a child's potential social transition without careful assessment and a thorough discussion of the risks, benefits and alternatives of this intervention.

32.     Prepubertal children who "desist" are children with nonconforming gender expression who realize with the onset of puberty that their gender identity is consistent with their sex assigned at birth. Their understanding of their gender

identity changes with the onset of puberty, but their gender identity does not. We cannot definitively determine which prepubertal children will go on to identify as transgender when they reach adolescence, but we know that children with gender dysphoria who persist into puberty are more likely to have expressed a consistent, persistent, and insistent understanding of their gender identity from a young age (Steensma, et al., 2013).

33.     The focus of SOC 8 is thus in supporting the overall health and wellbeing of the child. In this manner, the primary goal of supportive care is to help a child understand their own gender identity and build resilience and mental wellness in a child and family, without privileging any one outcome over another.

34.     Important considerations in deciding whether social transition is in a child's best interest include: whether there is a consistent, stable articulation of a gender different from the child's sex assigned at birth, which should be distinguished from merely dressing or acting in a gender non-conforming manner; whether the child is expressing a strong desire or need to transition; the degree of distress the child is experiencing as a result of the gender dysphoria; and whether the child will be emotionally and physically safe during and following transition (Coleman, et al., 2022; American Psychological Association, 2015).

35.     A treatment plan is informed by a psychosocial assessment, which may vary greatly depending on the patient's presentation and the complexity of the

issues the patient is navigating. Further, in conducting that assessment, the mental health provider is drawing from their professional training and experience in working with transgender young people, exercising professional judgment, and tailoring the assessment to each individual patient.

36.     There is also no requirement that prepubertal children who socially transition receive mental health therapy. Many prepubertal children who express a gender identity different from their sex assigned at birth do not experience any co-occurring conditions or other psychological distress requiring treatment (Coleman, et al., 2022; de Vries, et al., 2011a). Mental health therapy may be useful for some prepubertal children but is not necessary or appropriate for everyone. Forcing children to undergo therapy when it is not medically indicated is both harmful and unethical.

37.     Dr. Levine and Intervenor-Defendant Cameron's other experts seem to think social transition is a single decision that irrevocably alters a child's trajectory over time. This belief belies their lack of clinical experience in working with gender diverse pre-pubertal youth. Clinically, social transition is often a series of steps taken gradually with feedback from the child, the family, and the clinician elicited over time. It is false that allowing prepubertal transgender children to socially transition puts these children on a path to becoming transgender adolescents and adults. Rather, the evidence shows that the same prepubertal children who are likely to have a stable

transgender identity into adolescence are the children who are most likely to articulate a strong and consistent need to socially transition (Steensma, et al., 2013). For example, a recent study found that a group of transgender children who transitioned before puberty and a group of transgender children who waited to transition until after puberty both showed the same intensity of cross-gender identification. In other words, socially transitioning before puberty did not increase children's cross-gender identification, and deferring transition did not decrease cross-gender identification (Rae, et al., 2019).

38.     Intense cross-gender identification and a strong, persistent desire to transition is simply an indicator that a child is more likely to be transgender and not merely gender nonconforming.

### E.     In Adolescents, Evidence Shows That Treatment of Gender Dysphoria with Puberty-Delaying Medications and Hormones Positively Impacts Psychological Functioning and Quality of Life, and Withholding Treatment is Harmful

39.     The criticisms of medical care for adolescents by Dr. Levine and Intervenor-Defendant Cameron's other experts reflect a distorted interpretation of the relevant scientific literature and the nature of this care.

40.     Dr. Levine and Intervenor-Defendant Cameron's other experts criticize the methodology of studies supporting the WPATH standards of care while proposing a "therapy only" treatment without any empirical or scientific support whatsoever.

14

41.     Adolescents with gender dysphoria who have entered puberty may be prescribed puberty-delaying medications (GnRHa) to prevent the distress of developing permanent, unwanted physical characteristics that do not align with the adolescent's gender identity. Puberty-delaying medications allow the adolescent time to better understand their gender identity, while delaying distress from the progression of the development of secondary sex characteristics such as breasts or facial hair.

42.     Prior to initiation of puberty-delaying medications, providers counsel patients and their families on potential benefits and risks. The intended benefit of treatment is to reduce the risk of worsening gender dysphoria and mental health deterioration. More specifically, use of puberty-delaying medications in transmasculine adolescents allows for decreased chest development, reducing the need for breast binding and surgical intervention in adulthood. For transfeminine adolescents, puberty-delaying medications limit facial and body hair growth, voice deepening, and masculine bone structure development, which greatly reduce distress both at the time of treatment and later in life and reduce the need for later interventions such as voice therapy, hair removal, and facial feminization surgery. The goal in using puberty-delaying medications is to minimize the patient's dysphoria related to progression of puberty and allow for later initiation of puberty consistent with gender identity. The pubertal stage and individual needs of the

15

patient direct conversations regarding care options.

43.     A growing body of evidence, including peer-reviewed cross-sectional and longitudinal studies, demonstrates the positive impact of pubertal suppression in adolescents with gender dysphoria on psychological functioning and quality of life, including a decrease in behavioral and emotional problems, a decrease in depressive symptoms, and improvement in general functioning (e.g., Achille, et al., 2020; Turban, et al., 2020a; van der Miesen, et al., 2020; Costa, et al., 2015; de Vries, et al., 2011b). Furthermore, studies show improvements in body satisfaction with gender-affirming treatment, and the extant literature recognizes that the body satisfaction is a mediator for improved quality of life and mental health outcomes. (Chen, et al., 2023).

44.     In my own practice, I have had patients describe pubertal suppression as lifesaving and the vast majority have experienced a great deal of relief when the treatment is initiated. In some cases, being on puberty blockers has enabled a youth to understand their gender identity to be consistent with their assigned sex; these youth discontinue this treatment and resume puberty.  While each patient and each family is unique, a thorough assessment and a clear discussion of the risks, benefits and alternatives of this interventions is consistent among all of my patients.

45.     After ongoing work with mental health professionals and when the adolescent has lived in accordance with their gender identity for a significant period

of time, they may start treatment with hormones (testosterone for transgender boys, estrogen and testosterone suppressants for transgender girls), if and when medically indicated.

46. There is no credible basis for Dr. Levine's assertion that an adolescent's decision to begin puberty-blocking medication "act[s] as a psychosocial 'switch,' decisively shifting many children to a persistent transgender identity." (Levine Decl. ¶ 129). Studies showing that a high percentage of transgender adolescents who receive puberty blockers ultimately decide to move forward with gender- affirming hormone therapy more likely reflect the fact that participants were rigorously screened and had demonstrated sustained, persistent gender dysphoria before receiving medical treatment.

47. Eligibility and medical necessity are determined case-by-case, based on an assessment of the adolescent's unique cognitive and emotional maturation and ability to provide a knowing and informed assent in addition to the informed consent of the legal medical decision maker, most often the parent or guardian. The decision would be made only after a careful review with the youth and parents/guardians of the potential risks and benefits of hormone therapy.

48. Under SOC 8 and the Endocrine Society Clinical Guidelines, hormone therapy is an appropriate treatment for transgender adolescents with gender dysphoria when the experience of dysphoria is marked and sustained over time, the

adolescent demonstrates emotional and cognitive maturity required to provide and informed consent/assent for treatment, other mental health concerns (if any) that may interfere with diagnostic clarity and capacity to consent have been addressed, and the adolescent has discussed reproductive options with their provider. SOC 8 also highlights the importance of involving parent(s)/guardian(s) in the assessment and treatment process for minors (Coleman, et al., 2022; Hembree, et al., 2017).

49.     As with puberty-delaying medications, the risks and benefits of hormone treatment are discussed with the patient and their families, prior to initiation of hormone therapy.

50.     And, as with the use of puberty-delaying medications, treatment of gender dysphoria with testosterone or estrogen is highly beneficial for both short-term and long-term psychological functioning of adolescents with gender dysphoria and withholding treatment from those who need it is harmful (e.g., Achille, et al., 2020; Allen, et al., 2019; Chen, et al., 2023; de Lara, et al., 2020; de Vries, et al., 2014; Grannis, et al., 2021; Green, et al., 2022; Kaltiala, et al., 2020; Kuper, et al., 2020).

51.     In my own practice, I have seen youth with severe gender dysphoria who avoided all social contacts who were able to thrive with the initiation of gender affirming hormones and feel confident with the changes seen as they developed secondary sex characteristics aligned with their gender identity. I have seen my

patients start hormones and find themselves more able to build social and romantic relationships and begin to address underlying co-occurring psychiatric disorders.

52.     When viewed as a comprehensive body of research, the weight of the evidence and the experience of clinicians as well as from the experience of patients has demonstrated that puberty-delaying medication and hormones have been associated with a variety of mental health benefits across different contexts (Chen, et al., 2023; de Vries, 2023).

53.     Dr. Levine also criticizes the quality of evidence supporting treatment of gender dysphoria. (See, e.g., Levine Decl. ¶¶ 80-81, 121, 134-36; Cantor Decl. ¶¶ 72, 247). But treatments for gender dysphoria have the same or similar level of evidentiary support as many other well-established treatment protocols in psychiatry—and other disciplines of medicine. The evidentiary basis for those treatment protocols is developed, and regularly updated, using a combination of peer-reviewed research and the extensive clinical experience of providers who regularly treat patients with that condition. Those treatment protocols are considered the standard of care and are safe and effective for the conditions they are intended to treat.

54.     Dr. Levine also suggests that the lack of FDA approval of medical treatments for these specific uses indicates that the treatments are not supported by evidence of safety. (See, e.g., Levine Decl., ¶ 174). But off-label use of medication

is common in medicine, especially treatments for children and adolescents. For example, in children, Zoloft is FDA approved to treat Obsessive-Compulsive Disorder, but is also regularly used to treat depression and anxiety, such that the use of Zoloft is considered the standard of care for children who medication to treat those conditions despite the lack of FDA approval for those indications.

55.      In his declaration, Dr. Levine suggests that the WPATH Standards of Care require the unquestioned and automatic affirmation of an adolescent's desires. This is false. Medical treatments such as GAH are provided to an adolescent only after careful evaluation and working with the adolescent and their parents/guardians, who are the ones who provide the informed consent, including addressing any co-occurring psychiatric disorders.

## II.    RESPONSES TO DR. CANTOR

### A.    Dr. Cantor Lacks the Experience and/or Training to Opine on the Diagnosis, Assessment, and Treatment of Gender Dysphoria in Transgender Children and Adolescents

56.      Based on his declaration and curriculum vitae, Dr. Cantor does not appear to have sufficient training or clinical experience to offer expert opinions regarding the diagnosis and treatment of gender dysphoria in children and adolescents. He discusses his work on academic journals and as a member of the American Psychological Association ("APA"), but Dr. Cantor's CV does not indicate he has ever been on a review board or an editor of a journal that specializes

20

in transgender health. Instead, he has worked with journals that focus on sexuality, sexual behavior, and sexual abuse. His conference presentations and journal publications primarily focus on pedophilia, sex offenders, and hypersexuality. Only a handful of his presentations and publications (most of which were not research) appear to have some connection to transgender people.

57.    Dr. Cantor does not appear to have ever treated a minor with gender dysphoria. He does not indicate that he has ever diagnosed a child or adolescent with gender dysphoria, nor does he appear to have ever monitored or supervised any minor patient receiving medication to treat gender dysphoria.

**B.    Dr. Cantor's Criticisms of the Standards of Care Are Not Well Founded**

58.    Dr. Cantor claims that the standards of care for gender dysphoria lack a sufficient evidentiary basis. As stated above with respect to Dr. Levine's similar criticisms, the standards of care are evidence-based. WPATH and the Endocrine Society developed these standards for treating gender dysphoria in minors using the same evidence-based approach used to develop standards of care and practice guidelines for the treatment of many other medical conditions. (Coleman, et al., 2022; Hembree, et al., 2017).

**C.    Dr. Cantor's View That Transgender Adolescents Should be Prohibited from Receiving Supportive Medical Care is Not Well Founded**

59.    Dr. Cantor appears to believe that adolescents who are diagnosed with

gender dysphoria should not be permitted to transition either socially or with medication. Instead, Dr. Cantor seems to believe children and adolescents should be given counseling to discourage them from identifying as transgender. This view appears to be based on his opinion that gender dysphoria in children and adolescents is a manifestation of some other mental health condition, such as borderline personality disorder. (Cantor Decl. ¶ 151 (advancing the "hypothesis that mental health issues, such as Borderline Personality Disorder (BPD), cause both suicidality and unstable identity formation (including gender identity confusion).").

60.    Dr. Cantor's views on this topic have no scientific basis. Contrary to Dr. Cantor's views, some children and adolescents are in fact transgender. Gender dysphoria is a real and distinct medical condition. It is not a manifestation of "gender identity confusion" caused by other "mental health issues." (Cantor Decl. ¶ 151) There is no basis for Dr. Cantor to claim that patients who have borderline personality disorder are regularly being misdiagnosed with gender dysphoria. There are no studies that support Dr. Cantor's claims.

61.    Dr. Cantor rejects the use of the term "conversion therapy" to describe counseling that aims to discourage children and adolescents from identifying as transgender, based on his inaccurate claim that the research on conversion therapy has exclusively addressed sexual orientation and that its results cannot be extrapolated to gender identity. (Cantor Decl. ¶ 267.) As noted above, research has

found an increased likelihood of suicide attempts for those who have experienced conversion efforts, especially as minors (Turban, et al., 2020b). Every leading medical and mental health organization has issued clear statements that opposing those practices as harmful an ineffective in changing a person's gender identity.

62.     Dr. Cantor uses an outdated and inaccurate definition of sex. Dr. Cantor states that sex can only be determined either by "visual inspection" or "chromosomes." (Cantor Decl. ¶ 104.) In fact, sex involves multiple sex-related characteristics including gender identity, and which also include, among others, internal reproductive organs, external genitalia, chromosomes, hormones, and secondary sex characteristics.

63.     Dr. Cantor also incorrectly claims that gender identity is not innate and has no biological foundation. (Cantor Decl. ¶¶ 106-107, 134.) This is false. There is consensus among professional organizations that one's gender identity cannot be changed and it is a "deeply felt, inherent sense" (e.g., American Psychological Association 2021). As the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric Persons explain: "although there is much that is still unknown with respect to gender identity and its expression, compelling studies support the concept that biologic factors, in addition to environmental factors, contribute to this fundamental aspect of human development." (Hembree, et al. 2017).

64.    To support his view that minors should not be permitted to transition,
Dr. Cantor claims that "among prepubescent children who feel gender dysphoric,
the majority cease to want to be the other gender over the course of puberty." (Cantor
Decl. ¶ 115.) The studies that are cited in support of this view were not limited to
transgender children, but also included children who did not have gender dysphoria
and children who did not identify as transgender. As stated above, gender diverse
children include transgender children as well as children who will ultimately not
identify as transgender later in life. Therefore, the concept of gender dysphoria being
"outgrown" does not apply to a large portion of gender diverse children since they
did not have gender dysphoria to begin with. All of these studies used criteria for
diagnosing gender identity disorder that focused mainly on behaviors (and not
identity) and had less specific criteria for distinguishing those with the disorder from
other children. The current DSM-5-TR (American Psychiatric Association 2022)
gender dysphoria criteria require that children/adolescents identify with a gender that
is different from their assigned gender for at least six months, which was not the case
for any of the studies that are cited to indicate whether or not a youth will identify
experience gender dysphoria in the future (Temple Newhook et al., 2018).

65.    Steensma & Cohen-Kettinis (2018) agree that their data have been
cited incorrectly to support the purportedly low persistence rates and have stated that
their "studies cannot be used to support" the persistence estimation, in that they

24

never calculated or reported rates of persistence/desistence. They also note that the negative social climate for transgender children and adolescents should be taken into account when reading the data. They further state that their data did not actually reflect gender dysphoria in children and "expect that future follow up studies using the new diagnostic criteria may find higher persistence rates." (Steensma & Cohen-Kettinis, 2018). Finally, they indicate that the terms "desistence" and "persistence" have been misused; they state that when they were researching youth, there were many youth who may have been "hesitating, searching, fluctuating, or exploring" and that those youth have been misclassified as desisting." (Steensma & Cohen-Kettinis, 2018).

66.     Today, based on current scientific knowledge and clinical practice, researchers and clinicians are much better equipped to differentiate transgender from non-transgender children and adolescents. As the Endocrine Society Practice Guidelines explain: "It may be that children who only showed some gender nonconforming characteristics have been included in the follow-up studies, because the DSM-IV text revision criteria for a diagnosis were rather broad . . . With the newer, stricter criteria of the DSM-5, persistence rates may well be different in future studies" (Hembree, et al. 2017).

67.     Dr. Cantor does not dispute that minors whose transgender identification persists into adolescence are likely to continue to identify as

transgender as adults. As recent studies have shown, for "transgender adolescents who, following careful assessment, receive medical necessary gender-affirming medical treatment," "rates of reported regret…are low" (Coleman et al. 2022).

**D.   Medical Treatments for Transgender Adolescents Reduce Suicidality and Suicide**

68.     Dr. Cantor asserts that there is no evidence that medicalized transition significantly reduces rates of suicide or suicidality among transgender youth. (Cantor Decl. ¶ 146.) That is untrue. In fact, studies have repeatedly documented that puberty blocking medication and hormone therapy are associated with mental health benefits for transgender people in both the short and long term, including a dramatically reduced rate of suicidality. (Tordoff, 2022; Green, 2021; Turban, 2020; Achille, 2020; Kuper, 2020; van der Miesen, 2020; Costa, 2015).

69.     Dr. Cantor and Dr. Laidlaw cite Dhejne (2011) for the proposition that undergoing sex-reassignment surgery does not decrease suicidality among transgender adults.  (Cantor Decl. ¶ 147; Laidlaw Decl. ¶ 203) The study itself warns against drawing any conclusions regarding the effectiveness of surgery as a treatment for gender dysphoria: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." (Dhejne,

2011). Since the study was published, Dr. Dhejne has cautioned that interpretations like Dr. Cantor's and Dr. Laidlaw's are incorrect. (Dhejne, 2017).

70.     Dr. Cantor further opines that McNeil, et al. (2017) does not show that transition reduces suicidality among transgender youth. (Cantor Decl. ¶ 149.) In fact, the study concluded that "[d]iscrimination emerged as strongly related to suicidal ideation and attempts, whereas positive social interactions and timely access to interventions appeared protective." Bauer, et al. (2015), which Dr. Cantor erroneously cites for the proposition that social support is associated with increased suicide attempts, further supports that conclusion: "Our findings support a strong effect for social exclusion, discrimination and lack of medical transition (for those needing it) on suicide ideation and attempts, and potentially on the survival of trans persons." The WPATH Standards of Care cite Bauer's study as evidence that "[a]ccess to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt (Coleman et al., 2022).

71.     Dr. Cantor also cites Canetto, et al. (2021) in support of his claim that providing social support to transgender youth is associated with increased suicidal attempts. (Cantor Decl. ¶ 150.) The Canetto study did not include or address transgender youth and does not support Dr. Cantor's claim.

72.     Dr. Cantor also relies on the lack of research showing that medical treatments for transgender youth reduce suicide as opposed to reducing suicidality

to support his opposition to providing transgender youth with supportive treatment and care. But this gap in the available research does not support his position, for several reasons. First, the absence of data about how treatment impacts suicide as opposed to suicidality largely reflects the difficulty of designing or undertaking such research. The Baker study cited by Dr. Cantor did not find that treatment failed to reduce suicide, but only that it was impossible to draw conclusions because of "the difficulty of identifying appropriate comparison groups and uncontrolled confounding factors." (Baker, 2021).

73.     Second, the harms caused by suicidality are themselves very serious. In a recent systematic review of the impact of suicidal ideation, the harms directly associated with suicidal thoughts are clear: a sense of loss of the self, lack of self-worth, low self-esteem, loss of meaning in life, self-hatred, feelings of worthlessness, increased guilt, and increased shame. (Søndergaard, 2023). These experiences are incredibly painful. Even if suicidality and suicide were not related, which they are, preventing suicidality alone would be a compelling reason to provide medically needed care to transgender adolescents.

74.     And third, because suicide attempts and suicide are interrelated, a treatment that reduces the former reduces the latter, even if current research designs cannot quantify that impact precisely. (Jones, 2023). For example, a recent study found that transgender teens were 7.6 times as likely to attempt suicide as their non-

transgender peers. (Kingsbury, 2022). Providing medically necessary care dramatically reduces the suicidality of transgender youth, including reductions in suicide attempts. In one recent study of transgender youth under 18, receiving hormone therapy was associated with nearly 40% lower odds of having had a suicide attempt in the past year. (Green, 2021). Given the relationship between suicide attempts and suicide, there can be little doubt that receiving medically necessary care significantly reduces suicide among transgender youth.

## III.   RESPONSES TO DR. NANGIA

### A.   Summary

75.   Based on her declaration and curriculum vitae, Dr. Nangia does not appear to have a sufficient clinical basis for offering expert opinions regarding the diagnosis and treatment of gender dysphoria in children and adolescents, or the assessment and informed consent process involved when treating adolescents with gender dysphoria with gender affirming care. Her declaration appears to be based on a series of hypothetical assumptions about how other mental health practitioners are diagnosing minors with gender dysphoria and recommending treatment— without any direct experience doing so herself, and without any apparent knowledge of how care is actually provided by others.

76.   Dr. Nangia's implausible claim to have treated "550 children and adolescents (and hundreds of adults) who have met criteria at some point in their

lives for a 'gender dysphoria' diagnosis," Nangia Decl. ¶ 48, appears to reflect a misunderstanding of how gender dysphoria is diagnosed and an inability to distinguish between people with gender dysphoria—a medical condition requiring clinically significant distress or impairment in social, occupational, or other important areas of functioning—and people who are simply gender nonconforming.

77.     While Dr. Nangia speculates that people are being misdiagnosed with gender dysphoria because they are tomboys, or have co-occurring medical conditions, or have experienced trauma, those speculations appear to be based on her own misunderstanding of how gender dysphoria is properly diagnosed.

78.     Dr. Nangia also appears to assume that mental health providers working with transgender youth are not explaining risks and benefits and are unfamiliar with principles of informed consent and assent. Once again, that speculation appears to be based on her own misunderstanding of how care is actually provided by specialists in the field.

79.     Dr. Nangia also does not appear to have an expert basis for her speculation that an increasing number of youth are being diagnosed with gender dysphoria as a result of factors such as "social media" or "social contagion." None of Dr. Nangia's speculation is supported by actual evidence, and her personal opinions do not reflect the common views of experts in the field.

**B.     Dr. Nangia Lacks Experience or Familiarity with Properly Diagnosing Gender Dysphoria**

80.     I have significant questions about Dr. Nangia's actual experience working with transgender youth. Dr. Nangia implausibly claims to have evaluated and treated "550 children and adolescents (and hundreds of adults) who have met criteria at some point in their lives for a 'gender dysphoria' diagnosis," including 350 patients who "had a history of gender dysphoria, as discovered on evaluation or over the course of patient care," and "close to 100 additional child patients who meet criteria for gender dysphoria on clinical interview during or over the course of treatment with [her]" and "just over 100 adolescents who have presented with gender dysphoria that has been more abrupt in onset." Nangia Decl. ¶¶ 48-49, 52. While claiming that these 550 children and adolescents met criteria for gender dysphoria, Dr. Nangia does not claim to have provided any actual treatment for that condition.

81.     Dr. Nangia appears to derive her claim to have worked with "550 children and adolescents who have met criteria at some point in their lives for a 'gender dysphoria' diagnosis," based on patient case histories that she thinks could have hypothetically supported a gender dysphoria diagnosis. But a proper diagnostic evaluation requires more than reviewing a simple case history. As Dr. Nangia herself notes "in mental health, if a five-year-old patient presented with difficulty with affect regulation, as well as trouble focusing and being still in the

31

classroom, most physicians would not diagnose ADHD on initial assessment," and would instead evaluate those symptoms within the context of other psychosocial developments in the child's life, while keeping in perspective what we know about the typical emotional and neurological development of children that age. Nangia Decl. ¶ 125. Just as most physicians would not immediately diagnosis a 5-year-old child with difficulty in affect regulation as having ADHD, most physicians would not claim to have worked with 550 patients who had ADHD based on the fact that those patients reported having trouble sitting still when they were 5 years old. Nor would most physicians claim to be experts in treating ADHD based on those case histories.

82.     Dr. Nangia's assumption that 550 of her patients *could* have been diagnosed with gender dysphoria also reflects a failure to distinguish between people who have gender dysphoria and people who are simply gender nonconforming. Most critically, Dr. Nangia fails to appreciate that a diagnosis of gender dysphoria in children or adolescents requires "clinically significant distress or impairment in social, occupational, and other important areas of functioning." (DSM-5- TR).

83.     Dr. Nangia concedes she has "difficulty appreciating th[e] distinction" between gender nonconformity and gender discordance. Nangia Decl. ¶ 24. But to be qualified to make a diagnosis, one must understand what that

diagnosis is. That is why mental health providers making a gender dysphoria diagnosis should have the training and experience to provide a thorough and comprehensive evaluation that can distinguish gender non-conforming behaviors from a core incongruence of identity with associated distress. Treating patients with gender dysphoria also involves educating patients and their parents and caregivers about the difference between preferred play, dress, and playmates and core identity concerns.

84.     Here and elsewhere, Dr. Nangia inexplicably assumes that mental health providers somehow disregard everything else they know about adolescent development and identity formation when they make a gender dysphoria diagnosis. In reality, when assessing adolescents for gender-affirming medical care, providers engage in a comprehensive assessment that takes precisely these considerations into account. Understanding potential reinforcers of identity and challenging patients' assumptions with an aim of developing a nuanced sense of self is a core component of the diagnostic assessment.

85.     Dr. Nangia speculates that people with symptoms of gender dysphoria are not being assessed to see if they have suffered other trauma. Like other mental health providers, mental health providers who specialize in gender dysphoria are familiar with treating traumatized youth. We assess patients for trauma, and we assess for how trauma informs identity or complicates a gender dysphoria

33

diagnosis. If an adolescent's identity questions are secondary to trauma, that patient would not meet criteria for the diagnosis of gender dysphoria. But transgender adolescents may experience trauma and still have gender dysphoria that independently requires gender- affirming care to be treated properly.

86.     Dr. Nangia also speculates that transgender youth are being misdiagnosed when they have other co-occurring mental health conditions. I have extensive clinical and research experience working with transgender youth who have co-occurring mental health diagnoses. The WPATH Standards of Care specifically recommend that providers who assess adolescents for gender-affirming care should have experience and training to distinguish between gender dysphoria and other mental health conditions or developmental anxieties. But the existence of a co-occurring mental health diagnosis is not—by itself—a reason to withhold care for gender dysphoria. It is important that co-occurring conditions are treated. And if co-occurring conditions impair the individual's capacity to understand the interventions in question, we have to treat those conditions before any medical care for gender dysphoria would be initiated. But there is no evidence that treating co-occurring mental health conditions resolves gender dysphoria. In the same way that we would not expect that treating anxiety is going to get rid of ADHD, treating anxiety, for example, is not going to get rid of gender dysphoria.

C.     **Dr. Nangia Lacks Familiarity With Procedures for Informed Consent to Gender-Affirming Care**

87.     As with her other speculations, Dr. Nangia wrongly assumes that other mental health providers are not explaining risks and benefits of medical interventions for gender dysphoria or are unfamiliar with principles of informed consent and assent. But a fundamental part of assessment for gender-affirming care is determining whether the minor can understand and articulate to the best of their ability the risks, benefits, and alternatives of that intervention, and determining whether parents can provide consent for that intervention. The risks and benefits associated with gender-affirming care are not more difficult to understand than those associated with other mental health conditions.

88.     Dr. Nangia asserts that adolescents have developing brains that cannot think about long-term consequences. But a decision to receive pubertal suppression or hormone therapy for gender dysphoria is not a spur-of-the-moment decision. For gender dysphoria care, it is inherent to our assessment that we are evaluating an individual's cognitive capacity, capacity to understand, and ability to think through potential consequences. These are discussions and assessments that occur longitudinally over time, and these are decisions that adolescents and family are making over a long period and not in a moment.

89.     In my psychiatric practice, I have seen a tremendous benefit from these interventions. I have seen individuals who blossom when they are able to

express and live their lives according to their experienced gender after receiving medical intervention to treat gender dysphoria. And I have seen so much joy and improvement in functioning when adolescents receive the care that is clinically indicated.

### D. Dr. Nangia's Speculations About Social Causes of Gender Dysphoria Are Not Based on Any Apparent Expert Knowledge and Lack Scientific Support

90.     Access to medical care for transgender youth with gender dysphoria has dramatically improved over the past 20 years. Instead of attributing an increase in the number of gender dysphoria diagnoses to increased access to care, Dr. Nangia speculates about other phenomena that she views as causes. But none of Dr. Nangia's speculation is supported by actual evidence, and her personal opinions do not reflect the common views of others in the field.

91.     Dr. Nangia speculates that children and adolescents are being diagnosed with gender dysphoria because of an "[i]ncrease in pathologization of a normal part of childhood development." Nangia Decl. ¶ 21. Dr. Nangia acknowledges that "[g]ender-medicine experts today distinguish between tomboys or tomgirls and children with gender dysphoria," but she speculates without any evidence that "[m]any parents, who in the past simply would not have worried about their children" who are tomboys or tomgirls "are now compelled to consider a diagnosis of gender dysphoria" and that "[p]hysicians likewise, are acting quickly to

usher these children into gender- affirming care." Nangia Decl. ¶¶ 22, 25. There is no evidence that these sorts of misdiagnoses are occurring in significant numbers by practitioners experienced in providing gender-affirming care. In fact, what we see is the opposite. In clinical care, parents are less likely to be concerned by stereotypical non-conforming behaviors than in the past.

92.     Dr. Nangia also attributes gender dysphoria diagnoses to social media. But there is no evidence to suggest that social media has led to an increase in youth identifying as transgender. Nor is this a widely-held belief of most child psychiatrists in my experience.

93.     Expertise in a field means drawing from the relevant literature. While not commenting on the quality of the New York Times as a news source, it is not a reference from which psychiatrists should make assertions about their clinical practice. And yet, in quoting from the Wortham 2018 article in the New York Times (Nangia Decl. ¶ 30), Dr. Nangia seems to misunderstand the underlying scientific literature being discussed. The study by Helana Darwin discussed in the New York Times article actually contradicts Dr. Nangia's assertions that social media leads to an increase in gender dysphoria. (Darwin, 2017). In that article, individuals who already had a non-binary identity sought out online spaces of support. It was not the online space that created the identity.

94.     Although Dr. Nangia divides her speculation into different headings

of "social media," "heightened vulnerability" and "social contagion," all of these sections reflect the same speculation that more people are identifying as transgender because of social influences. The only evidence Dr. Nangia cites in support of this speculation is a highly controversial article that purported to survey parents who believe their children experienced what the parents view as "rapid onset gender dysphoria," which is not an actual diagnostic term or concept. (Littman, 2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. (Littman, 2018). Although purporting to provide a basis for Dr. Nangia's speculations, the study was based on an anonymous survey, allegedly of parents, about the etiology of their child's gender dysphoria. Participants were recruited from websites promoting this social- contagion theory, and the children were not surveyed or assessed by a clinician. Those serious methodological flaws render the study unreliable. The only conclusion that can be drawn from that study  is that a self-selected sample of anonymous people recruited through websites that predisposed participants to believe that transgender identity can be influenced by social factors believe those social factors influence children to identify as transgender.

95.     It is a normal developmental process for adolescents to seek out peers with shared experiences. This is not unique to transgender and gender-diverse young people. All types of minoritized youth tend to seek out affinity groups with those

that share their experiences. In my experience, transgender youth also seek out those social connections. It is not the social connections that leads to the identity, but it is the identity that leads to seeking out these social connections.

## IV.  RESPONSES TO DR. LAIDLAW

96.    Expertise in mental health care requires specialized training and ongoing work in the field with appropriate certification and licensure. To my knowledge, and based on a review of his CV, Dr. Laidlaw has neither had the training nor the certification and licensure to weigh in as an expert on the appropriateness of a mental health assessment or treatment plan. This lack of expertise, however, has not stopped him from making broad generalizations about mental health care that bear little resemblance to the care as typically delivered. As such, his characterization of the practice of mental health care should be seen as a lay opinion based on secondhand knowledge at best. Furthermore, expertise in the treatment of transgender individuals requires experience in the care of transgender individuals, a characteristic that Dr. Laidlaw does not possess.

97.    Dr. Laidlaw makes many of the same mistakes about consent as the other experts, namely mistaking that children consent to gender affirming medical and surgical care. But he goes further and notes that in his opinion, even parents are unable to provide consent because the full accounting of the potential risks is, according to him, unknown. If Dr. Laidlaw's rubric were to be applied to the rest of

medicine, medicine would never evolve. There are inherent unknown risks to every intervention, and it is the role of the provider to incorporate what is known and what is not known about these risks into a discussion about informed assent and informed consent. Moreover, the fact that we do not know everything about an intervention does not make that intervention experimental. In medicine and in science, every day we discover something and with the advent of new techniques or investigative tools we are able to learn new information about the effects of well-established and longstanding medical interventions. None of this renders a medical intervention to be experimental.

98.     Additionally, Dr. Laidlaw spends much of his declaration opining on the appropriateness of the psychiatric care of the patients involved in this case. However, Dr. Laidlaw is not a psychiatrist and has no basis to comment on the psychiatric care of any of these patients. It is unethical for him to do so.

## V.    PROHIBITING ACCESS TO MEDICAL CARE HARMS TRANSGENDER ADOLESCENTS

99.     Intervenor-Defendant Cameron's experts completely ignore the harms associated with prohibiting access to gender-affirming care to adolescents with gender dysphoria for whom it is necessary and appropriate. They also ignore the harmful effects of governmental action like Kentucky's medical care ban.

100.    The overarching goal of treatment for gender dysphoria is to eliminate clinically significant distress. For some, this is achieved by aligning an individual

patient's body and presentation with their internal sense of self. The denial of medically indicated care to transgender adolescents not only frustrates this goal and results in the prolonging of their gender dysphoria, but also causes additional distress and poses other health risks, such as depression, trauma, self- harm, and suicidality.

101.    Intervenor-Defendant Cameron's experts not only ignore the volumes of data showing the efficacy of gender-affirming medical care, but they also cannot deny that there are transgender adolescents that persist into transgender adults and who benefit from this care. But notwithstanding this latter undeniable fact, Cameron's experts are not interested in a nuanced discussion about prevalence, process, or technique. Instead they advocate for a complete prohibition of this safe, efficacious, and medically necessary care for all transgender adolescents.

102.    Lack of access to gender-affirming care therefore directly contributes to poorer mental health outcomes for transgender people (Owen-Smith, et al., 2018).

103.    It is also well documented that experiencing discrimination has negative impacts on people's mental health and wellbeing. For example, a 2019 study found that experiencing discrimination in health care settings posed a unique risk factor for heightened suicidality among transgender individuals, a population already at heightened risk compared with the general population (Herman, et al., 2019). And of note, the 2022 National Survey on LGBTQ Youth Mental Health found that LGBTQ youth who had experienced discrimination based on sexual

orientation or gender identity had attempted suicide in the past year at nearly three times the rate as those who had not (19% vs. 7%) (The Trevor Project, 2022).

104.    In addition, the 2022 National Survey on LGBTQ Youth Mental Health found that 93% of transgender and nonbinary youth said that they have worried about transgender people being denied access to gender-affirming medical care due to state or local laws (The Trevor Project, 2022).

105.    Research has shown that the mere introduction, debate, and adoption of discriminatory laws and policies like the medical care ban  negatively affects the mental health of transgender youth. A prospective study with sexual minority populations found that living in states with discriminatory policies was associated with a statistically significant increase in the number of psychiatric disorder diagnoses (Hatzenbuehler, et al., 2010). Other studies "shown that restrictive laws and policies are related to destructive health behaviors on the part of transgender individuals" (Cunningham, et al., 2022; Du Bois, et al., 2018).

106.    Recent studies show the negative toll that anti-LGBTQ measures, like Kentucky's medical care ban, and debates surrounding them have had on the mental health of transgender youth. For example, in a survey of youth in November 2022, 86% of transgender and nonbinary youth said that the debates about anti-transgender bills had negatively impacted their mental health (Movement Advancement Project, 2023; The Trevor Project and Morning Consult, 2023). And a study from 2022

though with limitations, showed that the passage of anti-transgender bills is linked with Internet searches related to depression and suicide (Cunningham, et al., 2022).

107.    Perhaps more poignantly, those of us with clinical experience hear from our patients about how it feels to be targeted with this kind of legislation. As two of my transgender patients have expressed to me in recent months, "why does everyone hate me just for existing?" and "it's a hard time to be transgender right now."

## CONCLUSION

108.    By denying access to necessary, safe, and effective medical care as treatment for gender dysphoria, Kentucky's medical care ban endangers the mental health and well-being of transgender children and adolescents in Kentucky.

109.    Intervenor-Defendant Cameron and his experts, who for the most part have no experience in transgender health, not only ignore the robust evidence for the potential harm faced by transgender adolescents when barred access to medically necessary gender-affirming care, but they also mischaracterize, misapprehend, and even ignore the robust body of evidence showing that gender-affirming medical care

is safe, effective, and not experimental or investigational.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of June 2023.

_____
                    Aron Janssen, M.D.

# Exhibit C
## *Supplemental Bibliography*

# SUPPLEMENTAL BIBLIOGRAPHY

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results*. International Journal of Pediatric Endocrinology, 2020, 8.

Allen, L.R., Watson, L.B., Egan, A.M., & Moser, C.N. (2019). *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*. Clinical Practice in Pediatric Psychology, 7(3), 302-311.

American Academy of Child and Adolescent Psychiatry. (2018). *Policy Statement: Conversion Therapy*. Available at: https://www.aacap.org/AACAP/Policy Statements/2018/Conversion Therapy.aspx.

American Medical Association and GLMA. (2022). *Issue Brief: Sexual orientation and gender identity change efforts (so-called "conversion therapy")*. Available at: https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf.

American Psychiatric Association. (2022). *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2018). *Position Statement on Conversion Therapy and LGBTQ Patients*. Available at: https://www.psychiatry.org/getattachment/3d23f2f4-1497-4537-b4de-fe32fe8761bf/Position-Conversion-Therapy.pdf.

American Psychological Association (2021). *APA Resolution on Gender Identity Change Efforts*. Available at: https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

American Psychological Association (2015). *Guidelines for psychological practice with transgender and gender nonconforming people*. American Psychologist, 70, 832-864.

Baker, K. E., et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, Journal of the Endocrine Society, Vol. 5, Issue 4, 11-12 https://doi.org/10.1210/jendso/bvab011 (2021).

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). *Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada*. BMC Public Health, 15, 525. https://doi.org/10.1186/s12889-015-1867-2.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). *Suicidal as normal: A lesbian, gay, and bisexual youth script?* Crisis, 42, 292–300.

Chen D, Berona J, Chan YM, Ehrensaft D, Garofalo R, Hidalgo MA, Rosenthal SM, Tishelman AC, Olson-Kennedy J. (2023). *Psychosocial Functioning in Transgender Youth after 2 Years of Hormones*. New England Journal of Medicine, 2023 Jan 19;388(3):240-250.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer- Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8.* International Journal of Transgender Health, 23(Suppl 1), S1–S259.

Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). *Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria*. The Journal of Sexual Medicine, 12(11), 2206–2214.

Cunningham, G. B., Watanabe, N. M., & Buzuvis, E. (2022). *Anti-transgender rights legislation and internet searches pertaining to depression and suicide*. PloS one, 17(12), e0279420.

Darwin, H. (2017), *Doing Gender Beyond the Binary: A Virtual Ethnography. Symbolic Interaction*, 40 Symbolic Interaction 317-334.

de Lara, D.L., Rodríguez, O.P., Flores, I.C., et al. (2020). *Psychosocial Assessment in Transgender Adolescents*. Anales de Pediatría (English Edition), 93(1), 41-48.

de Vries A. L. C. (2023). *Ensuring Care for Transgender Adolescents Who Need It: Response to 'Reconsidering Informed Consent for Trans-Identified Children, Adolescents and Young Adults'*. Journal of Sex & Marital Therapy, 49(1), 108–114.

de Vries, A. L., Doreleijers, T. A., Steensma, T. D., & Cohen-Kettenis, P. T. (2011a). *Psychiatric comorbidity in gender dysphoric adolescents*. Journal of Child Psychology and Psychiatry, and Allied Disciplines, 52(11), 1195–1202.

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011b). *Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study*. The Journal of Sexual Medicine, 8(8), 2276–2283.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*. Pediatrics, 134(4), 696-704.

Dhejne, C. et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, PLOS One, 6(2):e16885, doi:10.1371/journal.pone.0016885 (2011).

Dhejne, C. H, *Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything!*, Winnower 10:e150124.46274 (2017).

Du Bois, S. N., Yoder, W., Guy, A. A., Manser, K., & Ramos, S. (2018). *Examining Associations Between State-Level Transgender Policies and Transgender Health*. Transgender Health, 3(1), 220–224.

Edwards-Leeper, L., & Spack, N. P. (2012). *Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center*. Journal of Homosexuality, 59(3), 321–336.

Grannis, C., Leibowitz, S. F., Gahn, S., Nahata, L., Morningstar, M., Mattson, W. I., Chen, D., Strang, J. F., & Nelson, E. E. (2021). *Testosterone treatment, internalizing symptoms, and body image dissatisfaction in transgender boys*. Psychoneuroendocrinology, 132, 105358, 1-8.

Green, A. E., De Chants, J. P., Price, M. N., & Davis, C. K. (2022). *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*. The Journal of Adolescent Health: official publication of the Society for Adolescent Medicine, 70(4), 643–649.

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., Norris, S., Falck-Ytter, Y., Glasziou, P., & deBeer, H. (2011). *GRADE guidelines: 1. Introduction—GRADE evidence profiles and summary of findings tables*. Journal of Clinical Epidemiology, 64(4), 383–394.

Hatzenbuehler, M. L., McLaughlin, K. A., Keyes, K. M., & Hasin, D. S. (2010). *The impact of institutional discrimination on psychiatric disorders in lesbian, gay, and bisexual populations: a prospective study*. American Journal of Public Health, 100(3), 452–459.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline.* The Journal of Clinical Endocrinology and Metabolism, 102(11), 3869–3903.

Herman, J.L., Brown, T. N. T., & Haas, A. P. (2019). *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey*. The Williams Institute, UCLA School of Law.

Hidalgo, M. A., Ehrensaft, D., Tishelman, A. C., Clark, L. F., Garofalo, R., Rosenthal, S. M., Spack, N. P., Olson, J. (2013). *The Gender Affirmative Model: What We Know and What We Aim to Learn. Human Development*, 56(5):285-290.

Jones, S.E., et al., *Mental Health, Suicidality, and Connectedness Among High School Students During the COVID-19 Pandemic—Adolescent Behaviors and Experiences Survey, United States, January-June 2021*, 71(Suppl-3):16-21 (2022), *available at*, https://www.cdc.gov/mmwr/volumes/71/su/su7103a3.htm (last visited May 31, 2023).

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). *Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria*. Nordic Journal of Psychiatry, 74, 213–219.

Kingsbury, M., et al., *Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada*, 194 CMAJ E767-74 (June 2022).

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). *Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*. Pediatrics, 145(4), e20193006.

4

Littman L. (2018). *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*. PloS one, 13(8), e0202330.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). *Suicide in trans populations: A systematic review of prevalence and correlates.* Psychology of Sexual Orientation and Gender Diversity, *4*(3), 341–353. https://doi.org/10.1037/sgd0000235

Movement Advancement Project (2023). *Under Fire: The War on LGBTQ People in America*. Available at: https://www.mapresearch.org/file/Under%20Fire%20report_MAP%202023.pdf.

Owen-Smith, A. A., Gerth, J., Sineath, R. C., Barzilay, J., Becerra-Culqui, T. A., Getahun, D., Giammattei, S., Hunkeler, E., Lash, T. L., Millman, A., Nash, R., Quinn, V. P., Robinson, B., Roblin, D., Sanchez, T., Silverberg, M. J., Tangpricha, V., Valentine, C., Winter, S., . . . Goodman, M. (2018). *Association between gender confirmation treatments and perceived gender congruence, body image satisfaction, and mental health in a cohort of transgender individuals*. Journal of Sexual Medicine, 15(4), 591-600.

Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). *Predicting early-childhood gender transitions*. Psychological Science, 30(5), 669-681.

Rafferty, J., Committee on Psychosocial Aspects of Child and Family Health, Committee on Adolescence, & Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness (2018). *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*. Pediatrics, 142(4), e20182162.

Søndergaard, R., et al., *Living with Suicidal Thoughts: A Scoping Review*, Scandinavian Journal of Caring Sciences, 37(1), 60-78 (2023).

Steensma & Cohen-Kettinis (2018). *A critical commentary on "A critical commentary on follow-up studies and "desistence" theories about transgender and gender non-conforming children."* International Journal of Transgenderism, 19(2), 225-230.

Steensma, T. D., McGuire, J. K., Kreukels, B. P., Beekman, A. J., & Cohen-Kettinis, P. T. (2013). *Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study*. Journal of the American Academy of Child and Adolescent Psychiatry, 52(6), 582–590.

Temple Newhook, J. T., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M.-L., Jamieson, A., & Pickett, S. (2018). *A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children.* International Journal of Transgenderism, 19, 212–224.

Tordoff, D.M., et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, Jama Network Open, 5(2):e220978 at 1 (2022)

The Trevor Project. (2022). *2022 National Survey on LGBTQ Youth Mental Health*. Available at: https://www.thetrevorproject.org/survey-2022/ (last visited March 9, 2023).

The Trevor Project and Morning Consult. (2023). *Issues Impacting LGBTQ Youth: Polling Presentation*. Available at https://www.thetrevorproject.org/wp-content/uploads/2023/01/Issues-Impacting-LGBTQ-Youth-MC-Poll_Public-2.pdf (last visited March 9, 2023).

Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020b). *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*. JAMA Psychiatry, 77(1), 68–76.

Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020a). *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*. Pediatrics, 145(2), e20191725.

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., & Popma, A. (2020). *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers.* The Journal of adolescent health : official publication of the Society for Adolescent Medicine, 66(6), 699–704.