### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JANE DOE 1; *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>WILLIAM C. THORNBURY, JR., MD, in his official capacity as the President of the Kentucky Board of Medical Licensure; *et al.*,<br><br>    *Defendants*. | **SUPPLEMENTAL DECLARATION OF SUZANNE KINGERY, M.D.**<br><br>Civil No. 3:23-cv-230-DJH |

### SUPPLEMENTAL EXPERT DECLARATION OF SUZANNE KINGERY, M.D.

I, Suzanne Kingery, M.D., hereby declare as follows:

1. I previously submitted an Expert Declaration in the above-captioned litigation (Doc. 17-3).

2. I have reviewed four declarations submitted by Intervenor-Defendant Daniel Cameron in this case: declarations from James Cantor (Doc. 47-9), Michael Laidlaw (Doc. 47-10), Stephen Levine (Doc. 47-11), and Geeta Nangia (Doc. 47-12) (together "declarants"). The following responds to certain of declarants' opinions.

### I. The Multidisciplinary Treatment Team Model is Thoughtful and Deliberate.

3. Unlike the declarants, I have extensive personal experience providing care to transgender patients in Kentucky. The declarants' submissions create a false impression that minor transgender patients are rushed into medical treatment for their gender dysphoria. That impression is inconsistent with my practice and the practice of the Pediatric and Adolescent Gender Education ("PAGE") Program, where I am the director, which adheres to the approach recommended by the World Professional Association of Transgender Health (WPATH) Standards of Care and the Endocrine Society practice guidelines.

4. As I stated in my Expert Declaration, for each patient seen by the PAGE Program, we consult with a team of providers who have experience treating youth with gender dysphoria. Sometimes it can take a period of time before the team, along with the patient and their parents, determine that a minor is eligible to be treated with puberty blockers or cross sex hormone therapy. I have seen some patients for over a year before starting either course of treatment. The ultimate decision must be made on a case-by-case basis depending on the particular needs of each patient and in close communication with the patient and their parents.

5. Patients and their families are fully informed about the benefits and risks of available treatment options. I meet with each patient and their parents as many times as necessary to ensure that the patient and their parents have a full understanding of and can provide informed consent to the treatment.

6. Dr. Levine asserts that, in his view, transgender youth are put on a "conveyor belt" (Doc. 47-11, ¶ 49) path of care beginning with social transition. I do not agree with Dr. Levine's overbroad and unsupported characterization, and unlike Dr. Levine I have relevant personal experience. The PAGE Program's treatment model is not a one-size-fits-all approach, but is carefully crafted based on each patient's individualized needs and circumstances.

7. Dr. Levine observes that in many cases, social transition leads to progression on to puberty blockers which in turn leads to the use of cross sex hormone therapy. (*Id.*, and ¶ 171). Dr. Levine implies that a harmful correlation exists between social transition and medical interventions with puberty blockers and hormone therapy. In my opinion, that implication reflects only Dr. Levine's bias against the use medical interventions to treat gender dysphoria and is not founded in any scientific basis.

8. Many of the patients treated by the multidisciplinary team at the PAGE Program ultimately are prescribed either puberty blockers or cross sex hormone therapy or both. There is no evidence, anecdotal or otherwise, that suggests that social transition somehow causes the need for puberty blockers or hormone therapy. The reason that treatment with puberty blockers and cross sex hormone therapy often follows from a period of social transition is that gender dysphoria is real, consistent, persistent, and insistent, and puberty blockers and/or hormone therapy are the best, most well-supported treatment for the diagnosis of gender dysphoria for many adolescent transgender patients. It is my opinion that Dr. Levine's declaration reflects outlier opinions that are far outside the accepted mainstream of prevailing medical research and practice.

9. Dr. Nangia asserts in her declaration that every minor patient she has ever seen with gender dysphoria "grow[s] out of" it. (Doc. 47-12, ¶ 50).

10. I do not have personal knowledge of Dr. Nangia's patients, nor do I know how many patients with gender dysphoria she has seen. It would be unethical for me to speculate about the treatment or conditions of another doctor's patients. However, I am skeptical of Dr. Nangia's representation because it is inconsistent with my own clinical experience, as well as with the overwhelming medical and scientific literature and medical consensus. Pubertal children that present with gender dysphoria and that experience a persistent incongruence between their natal sex and their gender identity do not tend to just "grow out" of it.

11. Dr. Nangia also asserts in her declaration that gender dysphoria in children is better treated with psychotherapy alone until adulthood. (*Id.* at ¶ 163-70).

12. I am not at all opposed to the use of psychotherapy for the treatment of gender dysphoria in children as part of their multi-disciplinary course of care. However, it is not my experience that psychotherapy alone is an effective treatment or the best course of treatment for

gender dysphoria in every adolescent, nor is Dr. Nangia's opinion consistent with the expertise and recommendations of nearly every major medical professional association, including the American Medical Association, American Academy of Pediatrics, Society for Adolescent Health and Medicine, American Psychiatric Association, and the American Academy of Family Physicians, among others, which recognize the treatment of gender dysphoria with transition-related care. It is my opinion that Dr. Nangia's declaration reflects outlier opinions far outside the mainstream of prevailing medical research and practice.

13. Delaying medical interventions until adulthood, which is to say until when puberty is completed, however, may lead to long-term gender dysphoria. This can have harmful effects both psychologically and physically, and lead to the only option being more invasive and less effective treatments as an adult.

14. Dr. Laidlaw offers opinions about the appropriate course of treatment for each of the four children whose parents submitted a pseudonymous declaration in support of the Motion for Preliminary Injunction in this case. (Doc. 47-10, ¶¶ 234-62). Specifically, Dr. Laidlaw opines that all of the patients should stop treatments with puberty blockers or cross sex hormone therapy and should not be treated according to the accepted standards of care. (Doc. 47-10, ¶¶ 234, 246, 253(d), 262). Dr. Laidlaw has never met these patients or reviewed their medical records. It is improper and unethical for a doctor to opine about a patient's condition, diagnosis, or treatment plan without evaluating the patient. Dr. Laidlaw's opinion that none of the patients should be treated with medical interventions is of no value in any case, however, because it is also Dr. Laidlaw's opinion that the WPATH Standards of Care 8 should not be followed by any physician, mental health care provider, or other medical professionals. (Doc. 47-10, ¶ 185). As a result, Dr. Laidlaw's opinion about the proper treatment for a gender dysphoric patient is a foregone

conclusion that is not based on an evaluation of the actual circumstances of any particular patient, and Dr. Laidlaw's opinion should not be regarded as a medical opinion supported by evidence.

## II. Dr. Cantor's Allegation of a Conflict of Interest.

15. In his declaration, Dr. Cantor alleges that because I treat transgender minor patients at my clinic, I have a conflict of interest in this case. (Doc. 47-9, ¶ 300). I disagree with Dr. Cantor's opinion, which is not based on any facts or evidence and is not within any field of expertise that Dr. Cantor appears to possess.

16. To allay any doubt about the impartiality of my opinions and my relation of facts to which I have personal knowledge, I will state the following. I am providing my expert opinion here at the request of Plaintiffs' counsel, and in order to provide first-hand information from my own personal knowledge about the status of health care for youth with gender dysphoria in Kentucky, as well as to demonstrate the impact that SB 150 would have on my ability to continue providing this care to my patients.

17. I am trained as a pediatric endocrinologist, and I provide care within that specialty to patients who are not transgender in addition to my transgender patients in the PAGE Program. I am committed to my work at the PAGE Program because I recognize the need for transgender youth to be able to access compassionate, well-informed, multidisciplinary health care for their gender dysphoria. My patients will suffer greatly if Section 4 of SB 150 takes effect. However, my ability to make a living as a doctor would not be substantially impacted.

18. As I previously stated (Doc. 17-3, ¶ 22), I am not being compensated for providing my opinions in this matter.

### III.  SIGNATURE

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of June, 2023.

_____
SUZANNE KINGERY, M.D.