UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISIVLLE DIVISION

*Electronically filed*

| | |
|---|---|
| DOE 1, *et al.*<br>        Plaintiffs | |
| v. | Civil Action No. 3:23-CV-00230-DJH |
| THORNBURY, *et al.*<br>        Defendants | |
| and | |
| COMMONWEALTH OF KENTUCKY,<br>*ex rel.* ATTORNEY GENERAL DANIEL CAMERON<br>        Intervening Defendant | |

---

**REBUTTAL DECLARATION OF STEPHEN B. LEVINE, M.D.**

---

**I, Stephen B. Levine, M.D., hereby declare and state as follows:**

1. I am over 18 years of age, and of sound mind, and competent to testify.

2. I have been retained by counsel as an expert in connection with the above captioned litigation.

3. The opinions expressed in this declaration are my own and do not express the views of others.

4. I have actual knowledge of the matters stated herein.

5. If I am called to testify in this matter, I would do so truthfully and based on my expert opinion.

6. My background and qualifications, review of prior testimony, and compensation have been previously provided in my expert report. The curriculum vita attached to my initial expert report remains true, correct and up to date.

7. I previously submitted an Expert Declaration in the above-captioned litigation (Doc. 47-11). After the filing of my declaration, the plaintiffs retained two new experts who rendered opinions critical of the opinions expressed in my declaration.

8. I have reviewed the declarations of Kenneth Goodman, PhD, FACMI, FACE, and Dan H. Karasic, M.D.

9. In preparing this rebuttal report, I have relied on my training and years of research and clinical experience, as set out in my curriculum vita attached to my original report and on the materials listed therein; the materials listed in the bibliography attached to my original report; and the additional materials listed in the supplemental bibliography attached to this rebuttal report.

10. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including because of new scientific research or publications or in response to statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced by Plaintiffs in discovery and in response to additional information from Plaintiffs' designated experts.

11. I submit this rebuttal declaration to respond to expert declarations of Drs. Dan Karasic and Kenneth Goodman.

12. In paragraphs 16-18, and in paragraph 20 of his declaration, Dr. Goodman summarizes the evidence for safety and efficacy of puberty blockers and cross-sex hormones as "robust."  In contrast, every systematic comprehensive scientific review of this evidence independently concludes that the evidence of safety and effectiveness is of very low and of low quality respectively.  I detailed this reality in Paragraphs 14j, 55, 80-81, 217, and footnote 2 of my original declaration. Thus, the physicians and nurse practitioners who administer these medications do so based on evidence that scientific experts in data analysis call inadequate: uncontrolled, insufficiently followed up, employing variable means of measurement, and biased by selection and patient dropout. These reviews have asserted the uncertainty of the treatment's efficacy. And that is very far from robust.

13. Indeed, this issue is a bioethical one since social transition and puberty blockers interfere with natural desistence of cross-gender identity and prevent the acceptance of the self during adolescence as a lesbian, gay or bisexual person, thereby seemingly delaying recognition of earlier felt attractions to the same sex. When puberty is upsetting in its earliest manifestations of breast development, menstruation, penile growth, erections, and predictable emotional turmoil in each sex, adolescents who do not undergo social or medical transition tend to accept their natal sex when they begin to have

3

romantic attractions and early pleasant sexual interactions. Thus, the early blocking of puberty to ameliorate the dread of physiological events deprives the teens of the social, romantic, and physical interactions of their maturing bodies which have the potential to allow them to accept themselves. Avoiding puberty blockers can allow some trans-identified middle and high school aged individuals to accept their bodies as they experience these age-expected pleasures. Puberty blockers keep children puerile and deprive them of the positive aspects of being like their age mates who are now interested in exploring the complexities and pleasures of crushes and new social interactions. I detailed the well-documented concerns of social and medical transition on desistance in my declaration at paragraphs 174, 183, 184, and 194.

14. In my declaration at paragraphs 135, 136, 217, and 218, I described the GRADE system. Dr. Goodman's review of the GRADE system and the acceptance of the challenged treatments as evidence-based stands in contrast to the opinion of the founder of the GRADE system, Dr. Guyatt (Guyatt et al, 2008) about the same evidence. Dr. Goodman's argument rests upon other low-quality evidence in medicine, but those treatments are based on the treatment of diseased anatomy or physiology whereas applying low quality evidence to justify inducing abnormal physiological states and changes anatomy is a far more serious matter.

15. The integration with patient/parental values is, of course, clinically important. But parental values are informed by parental beliefs in the evidence that medical and social treatment are best responses to transgender identities— information obtained through discussion with professionals who hold the same belief. Thus, parental values are influenced by trust of the beliefs of their specialist doctors. The matter of informed consent requires parents to be told the state of the evidence, the uncertainties, the long-term elevated suicide rates, the meaning of infertility and sexual dysfunction for the long-term happiness of their child. These are difficult subjects to discuss with parents of 9-13 year-olds in part because they are difficult for the doctors who are primarily focused on short term distress and beliefs that there is nothing else that can help. I detailed the known risks in my declaration in paragraphs 157, 171, and 201-209.  These doctors make no mention of the fact that many parents do not have the value system that social transition and hormones are the best approach. In many instances, the parents disagree, and the doctors are working only with the parent who agrees with affirmative care, not working with the parent who disagrees.

16. In paragraph 19 of his declaration, Dr. Goodman opines that randomized controlled studies are unethical, thus attempting to explain the lack of qualitative medical evidence from such studies. The reason randomized controlled studies are thought to be unethical is simply that many physicians believe, as does Dr. Goodman, that the affirmative care model is effective and

safe.  But, if they accepted the conclusions of five independent reviews of this issue (*see* Carmichael et al 2021; Levine et al 2022; Biggs 2022; Abbruzzese et al 2023; Thompson et al 2022, cited in my declaration in paragraphs 48 and 55), they could honestly report to parents that a controlled study in which minors are enrolled in affirmative care, psychotherapy only, and no treatment with defined intervals of agreed upon measurements, tracking outcomes and dropouts, there would be no ethical issue.  This is how medicine ethically advances, including pediatric medicine. It is my understanding that Sweden is permitting affirmative care only in the context of a high quality scientific protocol.

17. In Kentucky, minors get cosmetic procedures such as breast augmentation, ear lobe correction, rhinoplasty for cosmetic reasons and yet these same procedures for currently trans-identified patients are not cosmetic. The reason that no other pediatric interventions have received such scrutiny is that they do not cause infertility, sexual dysfunction, social isolation, carry an elevated lifetime risk of suicide or have a known statistically significant shortening of patients' life span from all causes. *See* Jackson et al, 2023 and Levine declaration paragraphs 146, 162-168, 190, 193, 194, and footnote 14. Why is treatment of adolescent gender dysphoria so important?  It is a significant matter because what we do to and for young people not only affects their health *now*, but also profoundly shapes their chances of living as happy, healthy, functional adults over their lifetimes.  Therefore, to be a responsible provider of care, one must

have scientifically-justified confidence that in trying to helping the *child* or *adolescent,* one is not doing long-term harm to *the adult* whom that child or adolescent becomes.

18. Suffering from gender dysphoria is not the same thing as identifying as a transgender person. Yet "affirmative" approaches to adolescent gender dysphoria (encouraging social presentation in the gender that does not conform to their biological sex, using puberty blockers, cross-sex hormones, and various surgeries) provide patients with precious little motivation to explore the possibility that their gender dysphoria is not merely genetically dictated, may be a response to postnatal psychological and social influences, and may have a clinical significance that is not yet apparent to the patient, the parents, or the provider.

19. It is troubling that every cross-sectional study of transgender communities shows that both adolescents and adults have higher rates of autism, depression, suicidality, substance abuse, anxiety states, eating disorders, and the need for psychiatric care than control groups. They also tend to do poorly on quality-of-life measures, particularly physical health. The transgender population has lower marriage rates, lower life expectancies, and higher incarceration rates. Case series of adolescents presenting to gender clinics have higher rates of psychiatric problems and childhood adversities prior to their identification as transgender adolescents.

20. How we think about and therapeutically respond to young people with gender dysphoria has enormous significance for the adolescent's life trajectory.  The current controversy concerns whether clinicians are quick to assume that the patient's current transgender identity is immutable, that is, permanent, and can only be addressed by social transition and medical/surgical intervention, or whether clinicians take time to evaluate the patient's development and carefully assess and respond therapeutically to their other very common life challenges.  Doctors and our clinical surrogates must take the utmost care so that we are not—ourselves—influencing patients because of our erroneous belief that science has already established the best clinical approach to this complex personal and familial problem. Patient desire, physician belief, and ancillary clinic personnel support may very well create a short-term placebo effect that accounts for the initial happiness described by affirmative care professionals (Clayton, 2022).[1]

21. Those who advocate for and practice "affirmative" interventions of adolescents have a decided lack of data about the long-term outcome of their patients.  They are self-servingly assuming they are enabling their patients to have full healthy successful lives, even though decades of experience indicate that an average transgender life involves medical dependency, diminished social and

---

[1] A. Clayton, Gender-Affirming Treatment of Gender Dysphoria in Youth: A Perfect Storm Environment for the Placebo Effect—The Implications for Research and Clinical Practice, Archives of Sexual Behavior (2022), https://personandidentity.com/wp-content/uploads/2022/12/Clayton-2022-Placebo-Effect-of-Gender-affirming-treatment-for-gender-dysphoria-Perfect-storm-2022.pdf.

vocational prospects, sterility, sexual dysfunction and long periods of relative social isolation.  "Affirmative" providers, however, believe that they are helping these adolescents because many are initially glad to receive it.   These clinicians, their young hopeful patients, and some of their parents share this unsubstantiated optimism.

22. The current state of transgender medicine in the United States is a volatile mixture of at least seven elements. They are: 1. a vulnerable young person's distress about the incongruence of the mind and body; 2. parents' profound concern for their child's current and future welfare; 3. the ideologically freighted advice of gender specialists; 4. the hidden financial support for educational programs and WPATH itself by hormone manufacturers; 5. Families' tradition of trusting the medical profession; 6. the emerging declaration that adolescents themselves know best what they need for long term happiness, that is, the rebalancing of medical ethics such conviction that "respect for patient autonomy" trumps "do no harm."); and 7. The policies of support of US medical professional organization provided without systematic review of the data. Nowhere in this mixture of forces do we find the ethical and legal requirement that informed consent requires physicians to share what is known and not known about benefits, risks, and alternative treatments.[2]

---

[2] S. Levine, E. Abbruzzese, and J. Mason (2022), Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults, *Journal Sex & Marital Therapy*, in press.

23. Adolescents are newly and rapidly maturing young people whose imaginative creative possibilities are influenced by their passionate intensities, impulsive judgments, desire to change the world, discomforts with their changing bodies, new sexual attractions, teen culture, and emerging capricious sexual desires. They are just beginning the long journey of learning how to cope with their new emotions, rapidly growing bodies, acquired insights, and shifting attitudes. Adult society knows that puberty creates hormone-driven sexual desires, new socialization challenges, and sudden sexual excitements, even if the individual adolescent does not recognize what is happening to him or her and why. It is, of course, normal to be uncomfortable with the emerging self during adolescence and to wonder if others are experiencing the anxiety and concerns that are occurring within the subjective realm of the patient.

24. Powerful elements in our culture are now creating a new explanation for adolescent angst. Many newly transgender identified adolescents have learned from Internet sources, other transgender teens, and public images of carefully scrubbed presentation of transgender people in the media that they belong to a category—a community. "I am trans" means to the previously alienated and often socially isolated youth that "I belong to a group." This serves as a ready explanation for their subjective angst.—"I did not know where I belonged." The medical profession increasingly reinforces their membership in this community through its diagnosis of gender dysphoria. "Affirmative" professionals typically display no skepticism or concern for what

else might be happening within the patient.   Instead of helping the adolescent to tolerate subjective distress, to work out one's sexual orientation and understanding of gender over time, and to recognize and accept the diverse dimensions of the self, these adolescents are being naively ushered into a medicalized developmental trajectory by doctors with misguided confidence that they are offering "life-saving" treatment. It is as though the professionals' have negated what 50 years of study of adolescent developmental processes have recognized about the twists and turns of changeable teenage identity processes.

25. This exaggerated and uninvestigated belief, along with other dubious assumptions, has medicalized adolescent developmental angst.   Instead of recognizing and defining the normal tasks of adolescent development (for example, growing new capacities and skills, mastering social anxieties, and gradually comfortably separating and individuating from the family while preserving relationships with them) such treatment assumes that the psychological and functional difficulties they observe are due to gender dysphoria and will improve with their medical interventions. The well-known characteristics of adolescents, particularly those impaired by psychiatric syndromes—heightened susceptibility to peer pressure, deficiency in making cost-benefit calculations, tendency to become passionately caught up in ideas and identities that they eventually shed—are felt to be irrelevant to the presence of gender dysphoria.  Gender dysphoria, "affirmative" professionals

unjustifiably believe, is an entity unto itself that must be treated by bringing the body into congruence with the patient's present gender identity.

26. The American Academy of Pediatrics' Committee of Bioethics recognizes that "parents…are better situated than others to understand the unique needs of their children and to make appropriate, caring decisions regarding their children's health care" (Katz et al., 2016).[3] The plight of the families unable to find specialists capable of conducting thorough evaluations draws attention to the widespread acceptance of medical interventions for gender-dysphoric youth as the first line of treatment. The problem is that such care has been established through precedent rather than through scientific demonstrations of its efficacy. We contend that parents and patients have a right to know this, and that it is the professionals' responsibility and obligation to inform them of the state of knowledge in this arena of care.

27. The poor quality of mental health evaluations has been a point of significant discontent for a growing number of parents of gender dysphoric youth. Increasingly, parents have formed dozens of support groups in North America, Europe, and Australia and New Zealand, united in their objections to the idea that the best or the only treatment for their gender dysphoric children is affirmation (Genspect, 2021).[4] These distressed parents, recognizing that their

---

[3] K. Katz et al., Transgender Patients, Isotretinoin, and US Food and Drug Administrative-Mandated Risk Evaluation and Mitigation Strategies: A Prescription for Inclusion, JAMA Dermatol, 152(5): 513-514 (2016), doi:10.1001/jamadermatol.2015.5547.

[4] Helpful Groups, Genspect (2021), https://genspect.org/groups/

12

son or daughter may eventually decide to present to others as a transgender person, want a psychotherapeutic investigation to understand what contributed to the development of this identity and an exploration of noninvasive treatment options. Frequently, they cannot find anyone in their community who does not recommend immediate affirmation.

28. Dr. Karasic and I disagree about many aspects of the reasons for medical care and psychological care. I conclude that he thinks a diagnosis of gender dysphoria demands hormonal and surgical treatment if the patient wants it, and I conclude that the pathway to a current transgender identity needs to be seriously considered in a psychotherapeutic process for a long period before hormonal treatment is elected. Depriving children of the biopsychosocial aspects of puberty just because of the child's distress prevents them from discovering the pleasures of their bodies, and depriving them of an exploratory psychotherapeutic process keeps their illusion that the only option for them is medical transition. Psychotherapy also helps the parents manage their complicated situation.

29. In the final analysis of our disagreements, the issue of what happens to these adolescents who are medically transitioned over time is not known by the advocates. Dr. Karasic should be less certain and more willing to acknowledge that the indicators do not all point to happy, full, and successful lives as he promises. We need to begin our discussions with the elevated mortality rates from all causes. Throughout medicine, the outcome of the intervention are the

13

ultimate proofs of their efficacy and harms.  Why are we so passionately sure the outcomes are great without the data to claim this?  Even the deVries group recognizes the need for follow up information. In fact, they have begun to obtain such.  However, in their first report, 50% of prior patients did not want to participate or were lost to follow up.

30. I, with colleagues, and additionally Dr. Biggs, have provided the first critical reviews of the Dutch protocol on which the wide medical consensus that puberty blockers, cross-sex hormones, and various surgeries are based. (*See* Biggs, M. (2021); Biggs, M. (2022a); Biggs, M. (2022b); Levine, S, et al. (2022) Abbruzzese et al (2023)). Both the Endocrine Society and WPATH 8th Standards of Care refer only to the Dutch protocol as the scientific basis for the consensus recommendations.  Thus, Dr. Karasic, who as an expert, most likely has read these critical reviews and has ignored their importance. They have had an enormous readership as tracked by the publishers.  As of this writing, the Levine et al 2022 publication alone has had 64,038 downloads.  Thus, Dr. Karasic is hiding behind professional organizations' recommendations that have ignored our, and much other, evidence from systematic reviews.

31. In response to paragraphs 25, 26, and 29 of Dr. Karasic's declaration, Dr Karasic is correct in pointing out the recommendations for comprehensive psychiatric evaluation, but there are two issues to consider:

    a. Recommendations are easy to make, the devil is in the details in how they are conducted at any particular location.  When patients are given

prescriptions at the end of the first 45-minute encounter, there is no such thing as a comprehensive psychiatric evaluation. If comprehensive is defined, it would include separate visits with the parents, with the parents and child, and with the minor alone. Thus, a comprehensive evaluation requires considerable time and an initial uncertainty on how best to address the findings.

b. The reason for the evaluation is not to make the evaluation per se but to identify the co-existing problems and to approach each of these comorbidities therapeutically. The comprehensive psychiatric evaluation is not an end unto itself; it is a tool for prudent treatment planning. What often happens is that the treatment of the distress of the current transgender identity is prioritized for treatment in the hope that the co-morbidities will improve. Thus, the underlying purpose of the comprehensive evaluation is often obviated, and while teens are often happy with the cosmetic appearance of cross-sex hormones, their mental health is often not otherwise improved. This has not been Dr. Karasic's experience for he believes that mental health is improved, despite the lack of convincing evidence from many studies. (*See* Hisle-Gorman et al (2021)).[5] Confirmation bias exists when professionals only quote studies that support their views.

---

[5] Hisle-Gorman et al, Mental Healthcare Utilization of Transgender Youth Before and After Affirming Treatment, J Sex Med Aug 18(8), 1444-1454 (2021), doi: 10.1016/j.jsxm.2021.05.014.

15

c. The idea that comorbidities are "appropriately addressed" is aspirational, but the standards of care state "under reasonably good control" which is never defined. One has to look at the mental health outcomes of adults who have undergone medical and surgical treatment to know that the co-morbidities are not eradicated by hormones and surgery nor is gender dysphoria. I explained this in detail in paragraph 197 of my declaration.

32. The informed consent issue is a complex one as is the idea that a young, middle, or older adolescent has the cognitive maturity and life experiences to agree to bodily alterations that will produce infertility, sexual dysfunction, social isolation marginalization, and premature mortality. *See* Levine declaration paragraphs 146, 162-168, 190, 193, 194, and footnote 14. Adolescents are notoriously certain, arrogantly so, before they realize that life is more complex than their youthful views of it. Thus, we are resting upon the professional's view that the adolescent is mature enough to make these decisions even though the doctors do not know how to ascertain this. Reading a checklist and endorsing that they understand the risk of future cardiovascular disease, infertility, lipid abnormalities, high RBC counts, blood clots, weight gain, diabetes is not informed consent. Informed consent is a process over time with the parents and the teen, usually in psychotherapy setting, where each person has a chance over time to consider the profound implications of these treatments. *See* Levine declaration paragraphs 201-209; *see also* Vrouenraets

16

et al., 2015; Levine et al., 2022; Levine, 2018; Vrouenraets et al., 2022; Biggs, 2022.  Some affirmative care specialists think this view of informed consent is merely a scare tactic and glibly think that a teen who want these treatments know best what will serve them well over time.  We ask doctors to be more prudent that to endorse such assumptions uncritically.

33. I have personally treated patients, over the course of decades of experience, and have seen countless patients whose prescriptions of hormones and cheerleading support for transition by professionals fail to meet WPATH's announced standards of care and the parents' standards of care and personal value system.

34. There is a growing recognition that rapid evaluations that disregard factors contributing to the developing of gender dysphoria in youth are problematic. In November 2021, two leaders of the World Professional Organization for Transgender Health (WPATH) warned the medical community that the "The mental health establishment is failing trans kids" (Anderson & Edwards-Leeper, 2021). Frequently, evaluations provided by gender clinicians may only ascertain the diagnosis of gender dysphoria (DSM-5) or its ICD-11 counterpart gender incongruence, and screen for conspicuous mental illness prior to recommending hormones and surgeries. These limited, abbreviated evaluations overlook, and as a result fail to address, the relevant issue of the forces that may have influenced the young person's current gender identity.

35. I recently returned from an international conference, having heard discussions of Dr. Edwards-Leeper and Dr. Anderson. These doctors believe affirmative care helps some individuals, like Dr. Anderson herself who is trans-identified. But each asserts that psychotherapy should be the first treatment approach. (International conference communication, June 16, 2023). Dr. Karasic has not considered that these psychologists were early endorsers of affirmative care, and now with seeing the rapid institution of hormones and the negative outcomes, have become more cautious in their approaches. Both were attacked for their earlier statements of concern and pressured to modify their statements, and yet remain far more cautious that plaintiff's experts.

36. The "scandal"[6] of transition regret caused by a lack of attention to psychosocial aspects of gender identity and other psychiatric comorbidities has now caught the attention of the media. Dr. Edwards-Leeper, founder with Dr. Norman Spack of the first children's transgender clinic in the United States, joined Dr. Anderson, a former WPATH president, in a *Washington Post* essay entitled "The Mental Health Establishment is Failing Trans Kids." They write that "the rising number of detransitioners that clinicians report . . . indicates that this [medical] approach can backfire. This is not the most common outcome of a transition process, but it is hardly unheard of, either." They write that

---

[6] *See* Anatomy of a Scandal: Opinion on the Use of Puberty Blockers in America is Turning, *The Economist*, (October 16, 2021), https://www.economist.com/united-states/2021/10/16/opinion-on-the-use-of-puberty-blockers-in-america-is-turning ("too few teens undergo crucial mental-health assessments before starting treatment.")

18

"[l]onger-term longitudinal studies are needed to better understand the role of medical interventions on lifetime psychological health, particularly with the newer subset of adolescents presenting with no childhood dysphoria and significant mental health concerns.  Research is needed to help determine whether quick medical treatment or a more cautious approach is best in these cases."  They observe that *three quarters* of detransitioners do not tell their doctors that they have reversed their transitions, and they warn that "we may be harming some of the young people we strive to support."[7]

37. *The Economist* recently highlighted a study by Littman[8] of one hundred detransitioners, the majority of whom stated that they had not received an adequate psychiatric evaluation before treatment.   The detransitoners reported that their gender dysphoria was caused by underlying trauma, abuse, or a mental-health condition.  The article describes a woman, Carol, who began taking testosterone and transitioned to living as a man before going on antidepressants, which relieved her anxiety and panic attacks.  The article

---

[7] L. Edwards-Leeper and E. Anderson, The Mental Health Establishment is Failing Trans Kids, *The Washington Post* (November 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/; *see* L. Littman (2021) Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners, *Archives of Sexual Behavior* 50(8), doi: 10.1007/s10508-021-02163-w

[8] L. Littman (2021), Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners, *Archives of Sexual Behavior* 50(8), doi: 10.1007/s10508-021-02163-w

quotes her as saying "I needed the antidepressants; I didn't need to transition."[9]

38. Along with Dr. Marci Bowers, a vaginoplasty specialist set to become WPATH president this year, Erica Anderson has "blown the whistle" on gender clinics' treatment of adolescents.   Referring to the phenomenon of "Rapid Onset Gender Dysphoria," Anderson decries the "sloppy healthcare work" of gender clinics.  This includes "[r]ushing people through the medicalization . . . and failure—*abject* failure—to evaluate the mental health of someone historically in current time, and to prepare them for making such a life-changing decision."[10]  "In my over 40 years as a psychologist," Anderson explains, "I've seen psychotherapeutic phenomena come and go.  Eating disorders, multiple personality disorders and repressed memory syndrome have in retrospect spread through subgroups of adolescents and the professionals who have treated them.  This spread is like wildfire through vulnerable underbrush, clearly borne in an environment of contagion.  Why is this phenomenon distinctly different than previous ones?"[11]  The implicit answer, of course, is that there's no reason to believe it is any different.

---

[9] Portrait of a Detransitioner as a Young Woman, *The Economist* (November 6, 2021), https://www.economist.com/united-states/2021/11/06/portrait-of-a-detransitioner-as-a-young-woman.

[10] A. Shrier, Top Trans Doctors Blow the Whistle on "Sloppy" Care, *Common Sense with Bari Weiss* (October 4, 2021), https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle

[11] E. Anderson, When it Comes to Trans Youth, We're in Danger of Losing Our Way, *San Francisco Examiner* (January 4, 2022),

39. *The New York Times* has covered the controversy in an article titled, "Doctors Debate Whether Trans Teens Need Therapy Before Hormones."[12]  It explains that "experts in transgender health are divided" on WPATH's draft guidelines, "reflecting a fraught debate over how to weigh conflicting risks for young people, who typically can't give full legal consent until they are 18 and who may be in emotional distress or more vulnerable to peer influence than adults are."

40. Despite these warnings, WPATH more broadly has thrown caution to the wind and even *further* deemphasized the role of psychotherapy for people with gender dysphoria.  Karasic notes that he is the lead author on the draft of the Mental Health chapter of the WPATH Standards of Care, version 8.  That chapter—in a shift from version 7—actually now recommends that "health professionals should *not* make it mandatory for transgender and gender diverse people to undergo psychotherapy prior to the initiation of gender-affirming [medical procedures]."[13]  As the former Chairman of the committee that drafted version 5 of the WPATH guidelines, I find WPATH's movement away from psychotherapy utterly dismaying.

---

https://www.sfexaminer.com/opinion/are-we-seeing-a-phenomenon-of-trans-youth-social-contagion/ (omitting paragraph break).

[12] A. Ghorayshi, Doctors Debate Whether Trans Teens Need Therapy Before Hormones, New York Times (January 13, 2022), https://www.nytimes.com/2022/01/13/health/transgender-teens-hormones.html

[13] World Professional Association for Transgender Health, Standards of Care, Version 8 Draft (December 2021), chapter entitled "Mental Health," Statement 9 (emphasis mine).

41. Dr. Karasic reports in paragraph 33 of his declaration that the Pffafflin and Junge report was in 1998, but it was issued in 1991.

42. Many of these studies—Almazan, deVries, Tordoff, Achille, Turban, etc.—have been analyzed and criticized for their biases and limitations. Dr Karasic is using the authors' conclusions and not the quality of their work to dismiss my concerns.  The Almazan & Keuroghian and the Bränström & Pachanis studies (the latter not mentioned) were undertaken to prove that medical/surgical interventions improved mental health.  If this is such a clear concept that 60 years of surgery for these conditions have demonstrated their effectiveness in improving mental health, why have these authors conducted recent studies to ascertain the improvements? Bränström & Pachankis's conclusions were retracted in August 2020, which Dr. Karasic fails to mention in his rebuttal.

43. Dr. Karasic does not mention that proportion of patients who improve or fail to improve. Systematic studies have failed to show the preponderance of improvement in mental health (*see* Thompson, 2022). It is well understood that clinicians working with patients tend to have more positive views of their work than can be objectively verified.  I too think my work has positive impacts, the patients tell me this in the short span of their lives that I am a part of.  Dr. Karasic should espouse more humility in this arena.

44. I have written about regret rates and their biases in Current Sexual Health Reports in a widely read article published on April 14, 2023 (40,000 downloads as of June 24, 2023).  The regret rates commonly asserted—two % or less—are

beyond credulity and are artifacts of how regret was defined—request for legal name change or surgical reversal of the trans operation (Jorgensen, 2023).[14] They are not based on the current wave of treatments of adolescents; they are based on previous surgical treatments of adults who typically had more psychiatric scrutiny prior to surgery. We know why the treatments are undertaken and we know that reduction in gender dysphoria immediately after hormones or surgery is not the same as curing it for a lifetime. Why is there such an elevated lifetime suicide rate if the treatments are so effective?

45. For an increasing number of people with gender dysphoria, a transgender self-identification and "affirmation" by well-meaning providers has proven to be, at best, a distraction from dealing with underlying psychiatric conditions, and at worst, a disastrous mistake resulting in profound personal regret. Dr. Karasic, suggests that the regret rate is only about one percent, citing an unreliable post-surgical study based on data that is "inherently flawed by loss to follow up."[15] This is an example of selection bias that taints the results. Surgery occurs at the end of a multiple step process. Regrets reflected by dropping out of endocrine treatment or after living in the aspired-to gender are not reflected in the astonishing 1% figure, nor are suicides calculated as regrets. Estimated

---

[14] Sarah C. J. Jorgensen (2023): Iatrogenic Harm in Gender Medicine, Journal of Sex & Marital Therapy, DOI: 10.1080/0092623X.2023.2224320

[15] I. Boyd, T. Hackett, and S. Bewley (2022), Care of Transgender Patients: A General Practice Quality Improvement Approach, Healthcare 2022, 10(1), 121, https://doi.org/10.3390/healthcare10010121

rates of detransition and regret likely underreport true regret rates,[16] which vary by methods used, countries of origin, and ages and stages of patients.[17] New post-hormones or post surgical romantic, sexual, and medical problems can create regret that is not initially felt. These experiences are not even considered when the 1 or 2% regret figures are repeatedly quoted. The Court may ask those who claim such low regret rates if those making suicide attempts, those who die of suicide or drug overdoses, those who stop their hormones, and those that return to living in their original gender represent regret?

46. Az Hakeem, a distinguished British psychiatrist, has warned about such low regret claims. "The public are often told that relative regret is extremely low," he says, "[b]ut this of course is a complete fiction. There are no follow-up studies," and "this low rate results from the lack of any information being collected." Hakeem reports that 26% of his patients are post-operative regretters. "Many of them were too embarrassed to admit that they regretted

---

[16] R. D'Angelo (2018), Psychiatry's Ethical Involvement in Gender-affirming Care, *Australasian Psychiatry*, *26*(5), 460–463, https://doi.org/10.1177/1039856218775216

[17] C. Wiepjes, N. Nota, C. de Blok, M. Klaver, A. de Vries, S. Wensing-Kruger, R. de Jongh, M. Bouman, T. Steensma, P. Cohen-Kettenis, L. Gooren, B. Kreukels, & M. den Heijer (2018), The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets, *The Journal of Sexual Medicine*, *15*(4), 582–590, https://doi.org/10.1016/j.jsxm.2018.01.016

their decision having persuaded the Doctors and Psychiatrists and gender clinic to give them what they wanted and felt they needed."[18]

47. A recent study surveyed 237 detransitioners, both male and female, finding that over half the respondents had *three* mental health co-morbidities. The majority of the sample, a full 70%, detransitioned because they realized their "gender dysphoria was related to other issues," 62% did so due to health concerns, 50% did so because transitioning proved unhelpful for their dysphoria, and 45% did so because they found other ways of dealing with their dysphoria.[19]   It is reasonable to assume that not all who experience regret detransition.  There are many reports of individuals who regret transitioning but make the best of the situation they find themselves in.  Those individuals' experiences are not captured by this data.

48. The evidence increasingly suggests that for many teens and young adults, a post-pubertal onset of transgender identification can be a transient phase of identity exploration, rather than a permanent identity, as evidenced by a

---

[18] An Interview with Dr. Az Hakeem, *Transgender Trend Blog* (September 1, 2021), https://www.transgendertrend.com/interview-az-hakeem/; *see* A. Hakeem (2007), Trans-sexuality: A Case of the "Emperor's New Clothes," in D. Morgan and S. Ruszczynski, eds. (2007), *Lectures on Violence, Perversion and Delinquency*, at 179-192, https://doi-org.ezproxy.lib.utexas.edu/10.4324/9780429476648

[19] E. Vandenbussche (2021), Detransition-Related Needs and Support: A Cross-sectional Online Survey, *Journal of Homosexuality*, doi: 10.1080/00918369.2021.1919479

growing number of young detransitioners.[20]   In the last several years since "affirmative" approaches have increased in popularity, the detransition rate appears to be accelerating.  According to a recent study from a UK adult gender clinic, 6.9% of those treated with gender-affirmative interventions detransitioned within 16 months of starting treatment, and 3.4% had a pattern of care suggestive of detransition, yielding a rate of probable detransition in excess of 10%.  Another 21.7% of patients disengaged from gender clinics without completing their treatment plan.[21]  While some of these individuals later re-engaged with the gender service, the authors concluded, "detransitioning might be more frequent than previously reported."  Another recent study among slightly older endocrine treated transgender patients also showed similar high rates of desistence and stopping hormonal treatment.[22]  Indeed, given that regret may take up to 8-11 years to materialize,[23] many more detransitioners are likely to emerge in the coming years.

---

[20] K. Entwistle  (2020), Debate: Reality check – Detransitioner's Testimonies Require Us to Rethink Gender Dysphoria, *Child and Adolescent Mental Health*, https://doi.org/10.1111/camh.12380

[21] R. Hall, L. Mitchell, & J. Sachdeva  (2021), Access to Care and Frequency of Detransition among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-note Review.  *BJPsych Open*, *7*(6), e184, https://doi.org/10.1192/bjo.2021.1022

[22] Boyd, I., Hackett, T., & Bewley, S. (2022). Care of Transgender Patients: A General Practice Quality Improvement Approach. *Healthcare*, *10*(1), 121. https://doi.org/10.3390/healthcare10010121

[23] C. Dhejne, K. Öberg, S. Arver, & M. Landén (2014), An Analysis of All Applications for Sex Reassignment Surgery in Sweden, 1960–2010: Prevalence,

49. The many medical institutions' endorsements of affirmative care are not based on scientific reviews; they are based on welcoming diversities of all types. Invoking conversion therapy arguments for attempts to modify comorbidities and equating all psychotherapeutic attempts with decades ago attempts to cure homosexuality is a politically successful but specious argument. Those who are more prudent and wanting to investigate the psychosocial antecedents of a new gender identity are called conversion therapist whereas Dr. Karasic preferred treatment of the body is not conversion therapy.

50. Some of the gender-affirmative specialists are unaware of alternative approaches, such as gender-exploratory psychotherapy or watchful waiting (Bonfatto & Crasnow, 2018;[24] Churcher Clarke, A., & Spiliadis, 2019;[25] Spiliadis, 2019). Others erroneously believe that science has established the efficacy of gender-affirmative interventions (Clayton et al., 2021). Some even claim that gender-affirmative care will address the frequently observed accompanying neurocognitive deficits and psychiatric symptoms, with negligible health risks (Turban, 2018; Turban & van Schalkwyk, 2018; Turban

---

Incidence, and Regrets, *Archives of Sexual Behavior*, *43*(8), 1535–1545, https://doi.org/10.1007/s10508-014-0300-8

[24] M. Bonfatto & E. Crasnow, Gender/ed identities: an overview of our current work as child psychotherapists in the Gender Identity Development Service, Journal of Child Psychotherapy, 44:1, 29-46 (2018), https://doi.org/10.1080/0075417X.2018.1443150.

[25] A. Churcher Clarke & A. Spiliadis, 'Taking the lid off the box': The value of extended clinical assessment for adolescents presenting with gender identity difficulties, Clin Child Psychol Psychiatry, 24(2): 338-352 (2019), doi: 10.1177/1359104518825288.

et al., 2020). The assertions have proven controversial even among the supporters of "gender-affirmative" care (Strang et al., 2018;[26] van der Miesen, Cohen-Kettenis, & de Vries, 2018). Recent data have emerged suggesting that youth with underlying psychiatric issues continue to struggle post-transition (Kaltiala-Heino, Työläjärv & Suomalainen, 2020).[27]

51. Dr. Karasic repeatedly references deVries 2014 without mentioning the international published dialogue between Levine, Abbuzzese, Mason and Biggs and deVries (*see* Levine declaration paragraph 48, citing Levine et al, 2022; Biggs, 2022, Abbruzzese et al, 2023) which has demonstrated the limitations of that study and undermines the certainty with which Dr. Karasic views the positive long-term results. In fact, the issue is how these individuals are faring in their twenties and thirties whereas the study evaluated them within 18 months following surgery between ages 19-22. Over and over again, arguments are based on authors' conclusions rather than objective appraisals of the degree of certainty of their conclusions.  This is where systemic reviews of data need to be considered by people outside the field who have no economic and ethical conflicts of interest. Rather than quoting Dr. Zucker from 2010, Dr. Karasic

---

[26] J. Strang et al., Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents, J. Clin. Child Adolesc. Psychol., 47(1): 105-115 (2018), doi: 10.1080/15374416.2016.1228462.

[27] R. Kaltiala et al., Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria, Nordic Journal of Psychiatry, 74:3, 213-219, doi: 10.1080/08039488.2019.1691260.

should recognize Dr. Zucker's scientific approach to the uncertainty of outcome and the uncertainty of the best practice.[28]

52. Dr. Karasic's experience is with those who reach for medical care. Various studies are aware of the difference between adolescent transgender identity and gender dysphoria and those with symptoms of gender dysphoria who do not seek hormonal therapy. A transgender identity does not equate with demand for, or medical necessity of, hormonal intervention. It is likely that a current adolescent transgender identity is not necessarily a permanent identity as teens are known to try on various identities prior to stabilizing into adult forms. *See* Levine declaration paragraphs 45, 105-118; *see also* Cantor 2019 at 1; Adelson et al. 2012 at 963; *see also* Cohen- Kettenis 2008 at 1895; Hembree 2017 at 3879. Anyway, desistance has been observed in up to 30% of adults who were given hormones as adolescents. *See* Boyd et al, 2022; Hall et al., 2021; and Roberts et al, 2022[29].

53. The difference between 20% and 80% persistence of transgender identities at puberty for those not transitioned compared to those who were transitioned seems like reasonable evidence that social transition of children *causes* persistence, *see* Levine declaration paragraph 123; *see also* Zucker 2018 at 77;

---

[28] Zucker KJ. Debate: Different strokes for different folks. Child Adolesc Ment Health. 2020 Feb;25(1):36-37. doi: 10.1111/camh.12330. Epub 2019 May 31. PMID: 32285638.

[29] C. Roberts et al., Continuation of Gender-affirming Hormones Among Transgender Adolescents and Adults, The Journal of Clinical Endocrinology & Metabolism, Vol. 107, Issue 9, e3937-e3943 (2022), https://doi.org/10.1210/clinem/dgac251.

Steensma et al. 2013; Singh et al. 2021 at 14, despite Dr. Karasic's uncharacteristic skepticism and methodology.

54. Dr. Karasic's lengthy explanation denying the rising incidence, changing sex ratios, and the role of social contagion does not seem to accept the observations made even by treatment advocates on at least three continents.  What is so dangerous about the idea that youth are influenced by social changes and are part of the ever-evolving social construction of life?  Why should rising fashion of identifications of new gender identity forms be exempt from social contagion when all of us, including Dr Karasic, are influenced by and adopt changing fashion styles as a result of social "contagion."  Is there an ordinary adolescent (a person in formation) anywhere who is not influenced by his or her teenage culture of music, fashion, ideology, education, and media?

55. Confirming the young person's self-diagnosis of gender dysphoria is easy.  Clarifying the developmental forces that have influenced it and determining an appropriate intervention are not.  Contextualizing these forces involves an understanding of child and adolescent developmental processes, childhood adversity, co-existing physical and cognitive disadvantages, unfortunate parental or family circumstances (Levine, 2021), as well as the role of social influence (Anderson & Edwards-Leeper, 2021; Littman, 2018; Littman, 2021).

56. Dr. Karasic is in error in asserting DSM-5 demonstrated the validity of the diagnosis; it only demonstrated the inter-rater reliability, which is not a form of validity.  The head of the NIMH shortly after DSM-5 was available pointed

this out and recognized that similar symptoms of anxiety and depression and inattentiveness are found in numerous diagnoses.[30]

57. Dr. Karasic provides a superficial look at the European countries statements and policies making psychotherapy the first approach to transgender minors. Most transgender identified minors will be treated with psychotherapy first in UK, Norway, Finland, and Sweden while other countries, not sharing American optimism or belief in the merit of WPATH's Standards of Care, do not share Dr. Karasic's certainty about what is best for this population. They have seen the result in their countries of affirmative care. The science and the clinical results have led to their policy changes.

58. Rather than being based on controlled studies or long-term systematic follow-up, affirmative care is based on clinical precedent—therapeutic fashion—that has been evolving dramatically in the past seven years when it comes to children and adolescents with atypical gender identities. Three national studies in Sweden, Finland, and the UK have independently reviewed the many existing studies and have found the evidence so weak and methodologically problematic (National Institute for Health and Care Excellence, 2020a, 2020b) that Finland is urging delaying affirmative care until adulthood, Sweden suggests adolescents be only treated in the context of a controlled scientific trial, and all consider psychotherapy as a first response.

---

[30] Sharon Jayson, NIH official clarifies criticism of diagnostic manual, USA Today (May 14, 2023), https://www.usatoday.com/story/news/nation/2013/05/14/dsm-5-mental-health-diagnosis/2159345/

There are few attempts to study this topic in the US, in part because we have 50 states, no history of careful follow-up studies, and the adolescent specialists often have limited awareness of the adult transgender populations. Practitioners are often taught how to treat in their residency programs by those who may believe what they are teaching but have no grasp of its scientific foundation or lack thereof. No responsible expert, such as Karasic, is unaware of the criticism found in numerous publications raising objections to WPATH's "best practices." Wide acceptance of poorly informed professionals does not equate with scientifically established efficacy, known rates of cure or major improvements, known rates of various harms. The wide acceptance without a well-established scientific foundation may be highly unethical if parents and teens are not fully informed of the limitations of knowledge.

59. First, in 2019, Sweden commissioned a review of the scientific literature on gender dysphoria in children and adolescents. That review found a lack of evidence in the literature to support the use of hormone treatment (i.e., puberty blockers and cross-sex hormones) and surgery to reduce distress associated with gender dysphoria.[31] Consequently, the Karolinska Hospital in Sweden issued a new guideline effective May 1, 2021, that recognized that "the studies conducted to date are small, uncontrolled observational studies

---

[31] Swedish Agency for Health Tech. Assessment and Assessment of Soc'l Servs., *Gender Dysphoria in Children and Adolescents: An Inventory of the Literature*, https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/.

providing low quality evidence that the treatments have the desired effect, and . . . we have very little knowledge about their safety in the long term."[32]  It noted that "these treatments are potentially fraught with extensive and irreversible adverse consequences such as cardiovascular disease, osteoporosis, infertility, increased cancer risk, and thrombosis."  It concluded that "[i]n light of the above, and based on the precautionary principle, which should always be applied, the [Hospital] will not initiate hormonal treatment (i.e., puberty blocking and cross-sex hormones, *see* above) for patients with gender dysphoria."  Accordingly, it banned the use of cross-sex hormones in those under 16 years old and banned all such procedures for those between 16 and 18 outside of clinical-trial settings specifically approved by the Swedish Institutional Review Board.

60. Then, in June 2020, Finland published new guidelines governing medical treatments of adolescents with gender dysphoria.  Finland broke with the WPATH guidelines, stating that, "[a]s far as minors are concerned, there are no medical treatment[s] that can be considered evidence-based."  Finland recognized that for adolescents with gender dysphoria, "[t]he first-line treatment . . . is psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders."  It concluded that

---

[32] *Guideline Regarding Hormonal Treatment of Minors with Gender Dysphoria at Tema Barn - Astrid Lindgren Children's Hospital (ALB)*, https://segm.org/sites/default/files/Karolin-ska%20Guideline%20K2021-4144%20April%202021%20%28English%2C%20unoffi-cial%20translation%29.pdf

because "reduction of psychiatric symptoms cannot be achieved with hormonal and surgical interventions, it is not a valid justification for gender reassignment."[33]

61. Months later, in October 2020, the UK National Institute for Health and Care Excellence (NICE) published two systematic reviews of the evidence concerning whether puberty blockers and cross-sex hormones effectively treated adolescents with gender dysphoria. The review of studies of puberty blockers found that they "are all small, uncontrolled observational studies, which are subject to bias and confounding, and all the results are of very low certainty." It noted that "[s]tudies that found differences in outcomes could represent changes that are either of questionable clinical value, or the studies themselves are not reliable and changes could be due to confounding, bias or chance." In any case, the review found "little change . . . from baseline to follow-up" on "the critical outcomes of gender dysphoria and mental health (depression, anger and anxiety), and the important outcomes of body image and psychosocial impact (global and psychosocial functioning)."[34] The NICE review similarly found that all of the studies of cross-sex hormones "are

[33] Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)*, https://segm.org/sites/default/files/Finnish_Guidelines_ 2020_Minors_Unofficial%20Translation.pdf

[34] National Institute of Health & Care Excellence, *Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, at 13 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334888&returnUrl= search%3fq%3dtransgender%26s%3dDate.

uncontrolled observational studies, which are subject to bias and confounding and were of very low certainty."[35]

62. Then, in November 2020, Cochrane—an international network of many tens of thousands of researchers devoted to Evidence-Based Medicine—published a systematic review that "aimed to assess the efficacy and safety of hormone therapy" for male-to-female transitioners.   Considering 1057 studies, the review concluded that "[d]espite more than four decades of ongoing efforts to improve the quality of hormone therapy, . . . no [randomized controlled trials] or suitable cohort studies have yet been conducted to investigate the efficacy and safety of hormonal treatment approaches."  It noted that the Endocrine Society, the UK National Health Service, and the NHS Guideline Panel had all reached the same conclusion.  The review struck a note of perplexity:  "If hormone therapy is highly valued in the treatment of gender dysphoria, then this raises the question: why are there no [randomized controlled trials] or appropriate cohort studies for this clinical condition?"[36]

63. Most recently in April 2021, the *British Medical Journal* Open published a systematic review that specifically assessed clinical practice guidelines for

---

[35] National Institute of Health & Care Excellence, *Evidence Review: Gender-affirming Hormones for Children and Adolescents with Gender Dysphoria*, at 47 (Mar. 11, 2021), https://www.evidence.nhs.uk/document?id=2334889&returnUrl=search%3ffrom%3d 2021-03-10%26q%3dEvidence%2bReview%26to%3d2021-04-01.

[36] Claudia Haupt, et al., *Antiandrogen or Estradiol Treatment or Both during Hormone Therapy in Transitioning Transgender Women*, Cochrane Database of Systematic Reviews (Nov. 28, 2020).

treatment of people who identify as transgender.  The review analyzed guidelines for treatment of blood-borne infections (including HIV) as well as those for gender-transition-related interventions.  It found that, in contrast to the guidelines for blood-borne infections, those related to gender transition were "lower quality" and "tended to lack methodological rigour and rely on patchier, lower-quality primary research."  The review singled out the WPATH guidelines, noting that they are produced by a "special-interest association" and "cannot be considered 'gold standard.'"  It warned that these guidelines are "linked to a weak evidence base."[37]

64. Before these reviews were published, clinicians associated with WPATH may have honestly believed that the use of puberty blockers, cross-sex hormones, and surgery was a well-supported treatment for gender dysphoria.[38]  But that certainly cannot be maintained now, as these five reviews demonstrate.[39]

[37] Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: systematic review and quality assessment. *BMJ open*, *11*(4), e048943. https://doi.org/10.1136/bmjopen-2021-048943

[38] A review that was limited to puberty blockers and purported to show few adverse outcomes and many potential positive outcomes was subsequently shown to suffer from serious flaws in the same journal that published it. *See* A. Clayton, W. Malone, P. Clarke, J. Mason, R. D'Angelo (2021), The Signal and the Noise—Questioning the Benefits of Puberty Blockers for Youth with Gender Dysphoria—a Commentary on Rew et al. (2021), *Child and Adolescent Mental Health*, https://doi.org/10.1111/camh.12533

[39] It is worth noting that a sixth review in the United States, by the Centers for Medicare & Medicaid Services, rejected a nationwide coverage mandate for adult sex-reassignment surgery, T. Jensen, J. Chin, J. Rollins, E. Koller, L. Gousis, and K. Szarama, Gender Dysphoria and Gender Reassignment Surgery, *Centers for Medicare & Medicaid Services* (August 13, 2016), https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282

65. WPATH-affiliated psychiatrists and mental health professionals who advocate for "affirmative" approaches have largely been taught to entertain a set of beliefs that is not evidence-based but ideology- and opinion-based.  Plaintiffs and their witnesses make evident that they are in thrall to this set of beliefs, which includes the following:

   a. A transgender identity is immutable;

   b. Transgender identities are primarily caused by biological forces;

   c. Gender identity and orientation are distinct, stable dimensions of identity;

   d. All gender identities are normal;

   e. Psychotherapy cannot cure, ameliorate, or assist with gender identity-body incongruence;

   f. Social transition, cross-sex hormones, and surgery (if desired) improves patients' mental health and social function;

   g. "Affirmative" treatment reduces the rates of suicidal ideation and suicide;

   h. Young teens can give informed consent for puberty blockers and cross-sex hormones because they know best what will make them happy now and in the future; and

---

("Based on an extensive assessment . . . there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively.").

   i. Associated psychopathology is primarily due to "minority stress."

These nine assumptions are highly controversial and unsupported—even contradicted—by the evidence.

66. Two crucial questions must be addressed to ensure that "affirmative" procedures (i.e., social transition, puberty blockers, cross-sex hormones, and surgery) are not doing harm to young people:  First, what is the evidence that gender dysphoria is cured or ameliorated by it?  Second, what is the evidence of the long-term impact these procedures have on young patients' ability to enjoy a satisfying social and romantic life, maintain a livelihood and a career, and function on other qualify-of-life measures?

67. There is simply not good evidence that these procedures improve mental health or quality of life, as I explain in my principal report.  The plaintiffs' witnesses' selective reference to low-quality studies that deal with only a snapshot in time cannot show that any benefits outweigh the harms (only some of which are known) of these procedures.   That is especially the case when the evidence is evaluated (as it must be) from a perspective that takes into account a young person's long-term life course.  The consequences of treatment for young people must be conceived in terms of what happens in the long run.  They simply cannot be determined within 12, 18, or 24 months after treatment commences—before hormone-fueled euphoria subsides, before patients realize that modifying their body does not ameliorate their gender dysphoria, before they begin to appreciate the significance of the fact that the hormone- or

surgically-wrought changes to their body have robbed them of the ability to be sexually responsive, before they develop the desire for children (which they typically are unable to have), and before long-term side effects (both physical and psychosocial) become impossible to ignore.  It is startling that many of these "affirmative" interventions have occurred before the adolescents have fallen in love with another person who has acknowledged falling in love with them.  Have "affirmative" providers forgotten about the power of such an intimate experience to rearrange the sense of self and to hasten maturation?

68. Dr. Karasic, does not claim that the evidence *taken as a whole* shows that puberty blockers and cross-sex hormones improve the quality of life or mental health of adolescents with gender dysphoria.  Rather, he makes only the limited, more opaque claim that there is "substantial evidence" for his view. It would be possible to rigorously review the scientific literature to demonstrate that the data does not support claims that puberty blockers, cross-sex hormones, or surgery improve quality of life or mental health.  But that is not feasible in this rebuttal report.  Fortunately, it is not necessary either— because others have recently done precisely that, as explained below.

69. The plaintiffs and their witnesses rely on opaque euphemisms at crucial points—assertions that puberty blockers, cross-sex hormones, and surgery are, for example, "substantial[ly] evidence[d]," "widely accepted," "best practices," and "medically necessary."  This is rhetorical cover for the scientific dubiousness of their claims.

70. The plaintiffs and their witnesses also make much of the purported consensus of various American professional and advocacy organizations.  Two points are important to note here.  First, the associations they cite are out of step with medical authorities in the rest of the world.  The conclusions drawn by the Swedish, Finnish, and British reviews—not to mention those published by Cochrane, the *British Medical Journal*, and the U.S. Centers for Medicare and Medicaid Services—might as well not even exist.  Unlike in these countries, which have centralized health care systems, adolescents in the United States are not typically followed after they age out of pediatrics.  So long-term data for American patients is sorely lacking.

71. Second, it would certainly be comforting to believe that a consensus of experts could produce reliable treatment recommendations for helping children and adolescents with gender dysphoria to flourish.  Unfortunately, we now know that is unlikely to be the case.  Although basing treatments on expert consensus might have been considered a best practice in 1980, the rise of evidence-based medicine in the 1990s cast doubt on the reliability of consensus-seeking forms of decision making.

72. It has been noted that consensus seeking often produces *worse* decisions as a result of well-recognized phenomena that render group deliberation unreliable, such as polarization, anchoring, and groupthink.[40]  As an example, one might

---

[40] K. Kendler and M. Solomon (2016), Expert Consensus v. Evidence-based Approaches in the Revision of the DSM, *Psychological Medicine* 46, doi:10.1017/S003329171600074X

point to a subcommittee of the American Psychiatric Association, which in 2010 declared without evidence that the diverse transgender identities were not associated with any inherent limitation of capacity and represented only normal variations in gender identity development.   Other organizations followed this compassionate attempt to remove stigma from public opinion and to prevent transgender persons from a negative self-view and issued similar statements.   The problem is that these well-intentioned pronouncements ignored the previous and subsequent data showing the significantly higher rates of associated psychiatric problems—and the consequent need for mental-health treatments.

73. Fortunately, in the past 30 years, methods far more reliable than expert consensus for determining treatment recommendation have been developed. The medical community has increasingly come to depend on systematic reviews, which more reliably evaluate both the quality and quantity of the evidence.   The high-quality reviews described above—all of which conclude that there is a lack of evidence to support the use of puberty blockers, hormones, and surgery—are precisely the kind of evidence-based authorities that should be heeded.   Not the opinions of experts, which, as I explain in my principal report, is the least reliable form of "knowledge."   (Kendler and Solomon, *Expert Consensus v. Evidence-based Approaches*, at 2258 ("Evidence hierarchies typically rank expert consensus at the bottom.")).

74. Dr. Karasic does not seem to know that I started transgender care for prisoners beginning in 2006. In fact, in 2007 and since I have organized the transgender care program for prisoners in Massachusetts. Dr. Karasic knows nothing about my work in Massachusetts. Dr. Karasic is confusing scientific skepticism and clinical caution with being a critic of the poor scientific and ethical basis of transgender care for youth.

75. When Dhejne et al publishes a study, other scholars are allowed to form their opinions.  This group found that the suicide rate was 19.1 times the control groups.  It is interesting to note how Dr. Karasic has managed to minimize this finding.  But the Swedish study is 12 years old. Its value was based on a sample of every patient given SRS over 30 years. It was published before the 7th edition was published which gave the finding short shrift after ignoring them entirely at first. Now we have a 2023 study from the UK that demonstrates a decided increase in mortality in the transgender group. Let's not minimize the significance of young people committing to a medical process that four studies have recognized leads to a shortened life span, including the Dhejne study.

76. My "wholly unsupported claim" of romantic patterns is in fact referenced in my original report. *See* Levine declaration paragraph 194, citing Levine 2017, at 5, 13; Levine 2013, at 40.

77. WPATH intended to have a section on detransition when it conceptualized the 8th edition according to Coleman, but there is no such section, despite addressing the subject in some forums and conferences.

42

78. It seems logical that the stronger the cross-gender identity of a grade school aged child the more likely he or she is to persist in cross-gender identity in adolescence. However, it is uncertain how to measure strength of this identity. It is usually done by parent and clinician judgments with a questionnaire sometimes used. Follow up data indicated that even some of the most intensely identified children desisted when not socially transitioned. Thus, what is clinically judged to be intense does not guarantee persistence. This has been recognized in Holland and Canada (Steensma et al, 2013, Singh et al, 2012). In 2019, Rae et al published a study that recognized the absence of objective valid means of making such assessments. They found that the strongest identities had a 48% probably of transitioning in two years whereas those with a lower intensity had a 30% probability of transitioning. This study is extraordinarily complex in its statistical methods. The authors' conclusions emphasize the strength of identity predicts persistence but it is clear that this is not an absolute. This was a two year only study so that the 36 who transitioned may have detransitioned later and the 49 who did not transition may have later transitioned. Rae et al recognized the need to repeat the study for confirmation of its results.[41] Such complexities have not been mentioned by Dr. Karasic.

---

[41] Rae, J. R., Gulgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. Psychological Science, 30(5), 669–681, https://doi.org/10.1177/0956797619830649.

79. In paragraph 38, Karasic warns about the dire consequences of not providing treatment. The specific consequences are generally listed as exactly those that are often present prior to affirmative care. The 2018 Owen-Smith retrospective survey of trans patients in 2.5 states (just southern California) of over 2100 patients had 697 trans persons who participated. The "no treatment" group had poorer outcomes on measures of body incongruence and more anxiety and depression. The more affirmative care the better the cross-sectional one-time subject estimates were. It is interesting to note how inconsistent this sample has been with other studies that separate bodily satisfaction with functional aspects of mental health. Such surveys have no means of ascertaining the accuracy of the patient reports and no convincing explanation for why the majority of those invited declined to participate. It is a legitimate concern, and an answered question, about what happens to treated patients. To assume that untreated patients fare worse in the most relevant functional patterns of mental health is simply based on ignoring what is not actually known.

80. In my original expert opinion report, I distinguished suicide from suicidality and manipulative and seriously intended non-fatal suicide attempts. I pointed out that the promise that affirmative care prevented death by suicide was not born out by the elevated suicide rates at every stage of cross-sex hormonal and surgical transition. I emphasized that suicidality is common in these youth and adults, and that various retrospective studies did not find an absence of suicidality among those treated, only a reduction in percentage in some but not

each parameter measured. The suicide rates appear to be equal to those with serious mental illness, particularly among natal females, all the more reason to treat these co-morbidities when the young person appears for some assistance (deGraff et al, 2022). I am not downplaying the risk of persistent suicidality, episodes of depression, panic attacks, substance abuse, and loneliness all of which likely play a role in suicide. I am, however, not equating short term relief of suicidality upon getting the hormonal or surgical treatment that one fervently desires with preventing ultimate suicide as Plaintiffs' experts imply.[42]

81. I don't think I deserve attack for my role in presiding over the committee that issued the 5th edition of the Standards of Care for the Harry Benjamin International Gender Dysphoria Association (subsequently renamed as WPATH). I had 7 other members who agree with its consensus recommendations. I did not appoint the committee; that was done by the executive board to reflect both mental health, endocrine and surgical expertise. There was no great effort to review existing literature. It was assumed we knew what had been published in our respective disciplines. "Roundly criticized" actually was the response of the president, Richard Green, MD, who

---

[42] de Graaf NM, Steensma TD, Carmichael P, VanderLaan DP, Aitken M, Cohen-Kettenis PT, de Vries ALC, Kreukels BPC, Wasserman L, Wood H, Zucker KJ. Suicidality in clinic-referred transgender adolescents. Eur Child Adolesc Psychiatry. 2022 Jan;31(1):67-83. doi: 10.1007/s00787-020-01663-9. Epub 2020 Nov 9. PMID: 33165650.

long before felt that the field should move patients quickly forward to surgeries because of one published study from England. He was perturbed by our recommendations for psychiatric evaluation and even some degree of psychotherapy. He immediately appointed a new committee which produced largely the same short document in the 2002 6th edition. Considering the absence of Evidence-Based Medicine principles in the 5th and subsequent standards of care, the 5th edition only reflected 8 well-intentioned professionals trying to update and clarify the dimensions of care giving, none of whom understood the issues as we do today. Even the current 8th edition has been recognized as having profound scientific limitations and bias that depart from Evidence-Based Medicine standards. The 7th and 8th editions have grown in their length considerably, however, reflecting the growing awareness of the complexities of the issues of this care. Dr. Karasic's opinions do not reflect the known complexities that other apologists have recognized. It is not scientifically acceptable to reduce this arena of care as scientifically decided upon.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed this 26 the day of June, 2023.

Stephen B. Levine, M.D.

46