UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISIVLLE DIVISION

*Electronically filed*

| | |
|---|---|
| DOE 1, *et al.*<br>    Plaintiffs<br><br>v.<br><br>THORNBURY, *et al.*<br>    Defendants<br><br>and<br><br>COMMONWEALTH OF KENTUCKY,<br>*ex rel.* ATTORNEY GENERAL DANIEL CAMERON<br>    Intervening Defendant | Civil Action No. 3:23-CV-00230-DJH |

## REBUTTAL DECLARATION OF GEETA NANGIA, M.D.

**I, Geeta Nangia, M.D., hereby declare and state as follows:**

1. I am over 18 years of age, and of sound mind, and competent to testify.

2. I have been retained by counsel as an expert in connection with the above captioned litigation.

3. The opinions expressed in this declaration are my own and do not express the views of opinions of others.

4. I have actual knowledge of the matters stated herein.

5. If I am called to testify in this matter, I would do so truthfully and based on my expert opinion.

1

6. My background and qualifications, review of prior testimony, and compensation have been previously provided in my expert report. The curriculum vitae attached to my initial expert report remains true, correct and up to date.

7. I previously submitted an Expert Declaration in the above-captioned litigation (Doc. 47-12). After the filing of my declaration, the plaintiffs retained two new experts who rendered opinions critical of the opinions expressed in my declaration.

8. I have reviewed the declarations of Kenneth Goodman, PhD, FACMI, FACE, and Dan H. Karasic, M.D.

9. In preparing this rebuttal report, I have relied on my training and clinical experience, as set out in my curriculum vitae attached to my original report; the materials listed in the bibliography attached to my original report; and the additional materials listed in the supplemental bibliography attached to this rebuttal report.

10. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including because of new scientific research or publications or in response to statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced by Plaintiffs in discovery and in response to additional information from Plaintiffs' designated experts.

11. I submit this rebuttal declaration to respond to the expert declarations of Drs. Dan Karasic and Kenneth Goodman.

## The Core Issue in Gender Bans is Neurological, Psychosocial, and Cognitive Development as it Pertains to Minor Decision Making and Informed Consent

12. As a child psychiatrist, I believe that the most fundamental problem with medical and surgical transition in minors is that informed consent cannot be attained by the minor. Parental consent with child assent is not sufficient for medical or surgical gender transition, as these treatments violate bodily integrity and are non-emergent and medically unnecessary in the growing minor who stands to experience very serious and potentially irreversible medical and psychological side effects. Furthermore, parental consent in lieu of minor informed consent presents a challenge to the future autonomy of the growing adolescent who cannot psychologically grasp the potential ramifications of these treatments ten or twenty years down the road.

13. Plaintiffs' expert states that there are "rigorous informed consent protocols" for transition related care. (Karasic ¶ 28 ¶ 36)

14. I am very familiar with procedures for informed consent to gender affirming care. I simply assert that minors are unable to provide informed consent for medical and surgical transition regardless of any procedure that is utilized.

15. It concerns me that any physician would assert that any minor, at any time, would be able to have the capacity to understand and appreciate a consequence like infertility.

16. Infertility is one of the most severe and highly likely consequences for the minor who is administered cross sex hormones. It is beyond reason to state that minors can understand the psychological impact of this. I have treated many individuals who have suffered from infertility over the course of my career. The psychological burden of infertility cannot be underestimated. It affects all areas of an individual's life. Having worked with children

and adolescents for over twenty years, and having worked with a significant group of adolescents who have gender dysphoria, I cannot conceptualize a situation in which a minor can understand or appreciate that burden. A resource document from The American Psychiatric Association states that the "psychological impact of being unable to conceive is a profound loss and significant life crisis." (Kohan 2015; Becker 2019) In addition to profound sadness and grief, it can create relationship struggles, anger with self for a failure to be able to procreate, an associated decrease in sexual desire, loss of sexual satisfaction, social exclusion, negative stigma, anxiety, depression, impaired quality of life, and a significantly higher risk of suicidal ideation. (Marci 2012; Ergin 2018; Shani 2016; Kjaer 2011)

17. Examples of other such potential consequences of cross sex hormones that minors, in my opinion, cannot conceptualize are: myocardial infarction, ischemic stroke, venous thromboembolism, inability to breastfeed, inflammation of the liver, prolactinomas, gallbladder disease, and heightened risk of breast cancer. (Dahl 2015)

18. My declaration highlights the fundamental problems with informed consent in minor gender transition:

    a. Gender dysphoria is a condition involving distress and most youth who struggle with it describe feeling affected by their peer experiences. The best neurodevelopmental research and brain imaging available to physicians today shows that the prefrontal cortex (planning center) lags in development when compared to the amygdala and ventral striatum (reward centers) in adolescence. (Steinberg 2013) This translates to minors being impulsive and reward driven in their decision making, particularly in emotionally laden situations and in the

    presence of peer influence. (Casey 2008a; Casey 2008b; Casey 2010; Casey 2013; Chein 2011) Psychosocial and cognitive development models also support this. Hence, decision making capacity in minors with gender dysphoria is problematic when considering medical and surgical gender transition.

b. Minors lack the ability to provide informed consent to medical or surgical gender transition treatments given their complex side effect profiles and long-term risk potential, including (but not at all limited to) loss of fertility, which they cannot begin to understand, reason through, or appreciate until they are older and neurodevelopmentally able to do so.

c. Minors lack the ability to provide informed consent to medical or surgical gender transition treatments given their inability to comprehend and appreciate the current debate. Plaintiffs' experts assert that their recommended treatment approach is accepted widely in the medical community by numerous organizations. However, their assertion does not effectively negate the existence of the ongoing debate over medical and surgical transition in minors and the fact that this debate has recently changed the course of recommendations in other countries. The ongoing debates are over the quality of studies, the safety and efficacy of the treatments themselves, their outcomes, their possible long-term side effects (i.e. on bone growth, brain maturation, endocrine and metabolic function, reproductive capacity, and psychological outcomes), and the matter of minor informed consent. Minors can't comprehend and appreciate the content of this debate that is highly relevant to the outcomes they may face with medical and surgical transition.

19. Therein, when the neurodevelopmental tasks required for decision making capacity cannot be met, informed consent cannot be obtained from the minor. Further, when treatments are non-emergent and medically unnecessary, and have serious and potentially irreversible consequences such as (but not at all limited to) infertility, they place the minor at extraordinary and unfair risk for long term psychological ramifications that the minor is unable to even understand. Parental consent with child assent therefore is not sufficient.

### Plaintiffs' Expert Appears to Question Defense Experts' Understanding of Gender Dysphoria Diagnosis, Prevalence, and Treatment

20. Plaintiffs' Expert appears to question defense experts' understanding and appreciation of gender dysphoria and its prevalence. Plaintiffs' Expert also suggests that defense experts do not offer effective treatment alternatives for gender dysphoria. Plaintiffs' Expert also refers to Defense Experts as "outliers". (Karasic ¶ 27, 42, 52-57)

21. I have outlined my experience with gender dysphoria in my main report. I am educated and well informed of the diagnosis of gender dysphoria, how to make it, its treatment, present guidelines, the recent changes to recommendations for puberty blockers and cross sex hormones in countries abroad, the issues of informed consent, and the present debate here in the United States. There is no misunderstanding or lack of familiarity with diagnosis or understanding of gender dysphoria, as Plaintiffs' expert implies. In fact, the criteria, while broad, are far from esoteric in the DSM 5- TR, and the WPATH Guidelines are indeed quite clear. (Coleman 2022)

22. As a community based Child and Adolescent Psychiatrist, I have the benefit of seeing children with a broad range of psychiatric disorders. In many ways, this has allowed me the opportunity to observe gender dysphoria presenting or evolving in patients of all

backgrounds who are simultaneously dealing with various psychiatric conditions and/or stressors. I have come to understand and appreciate gender dysphoria more thoroughly because of this context. The number of minors with gender dysphoria has dramatically risen in recent years in my clinical practice. I base my assertions regarding what seems to be contributing to this rise on my clinical experience and on what my patients directly report to me in the process of evaluation and psychotherapy.

23. I assert that psychotherapy is a compassionate and safer treatment alternative to medical and surgical transition. I have effectively treated gender dysphoria in adolescents with psychodynamic therapy (both individual and family) that addresses their life systems and circumstances (i.e., family, school, home, peer groups, stressors, past trauma, mental health histories). In having done so, most patients have experienced a resolution of gender dysphoria. Those who have persisted in experiencing gender dysphoria have felt supported through the therapeutic process and have benefitted from it.

24. Much of the rhetoric from the Plaintiffs' experts is exactly why other physicians and mental health providers who have had experiences like mine are reluctant to share their opinions. The dialogue that should be taking place within the medical community over the issue of gender transition in minors is derailed and stifled by such language, that only serves to attack those of us who have highly relevant experiences to share in order to help our patients who are suffering from gender dysphoria. Despite attempts to state that defense experts' claims are "implausible", "do not reflect common views of others in the field", or reflect those of "outliers", I've stepped forward to share my clinical experiences. Plaintiffs' experts' attempts to devalue or debase my clinical experiences may serve their purpose of advancing the gender affirming care model, but it does not serve the field of medicine well,

nor our patients, to provide a one-sided perspective without consideration of what other providers in community settings are seeing in their patient populations. Proper scientific dialogue does not simply entail aligning our views with others. We owe it to our patients and to ourselves to share our different opinions and experiences for the sake of improving our patients' well-being and contributing to the field of medicine.

**Plaintiffs' Expert Mischaracterizes Defense Experts' Opinion Regarding Gender Affirming Care and Mental Health Evaluations**

25. Plaintiffs' expert states that defense experts are ignoring the mental health care that gender affirming teams provide. (Karasic ¶ 42-59) Plaintiffs' experts also suggest that I have asserted that certain transgender youth are being misdiagnosed with gender dysphoria because of comorbidities.

26. First, I understand that mental health experts are a part of gender affirming teams.

27. However, the issue is that the WPATH itself states that only one comprehensive psychological evaluation is necessary for medical transition. (Coleman 2022). I assert that this is far from what a mental health expert needs to determine that a minor's gender dysphoria is not impacted by mental health or other issues in the minor's life. In my experience, it often isn't until a minor has been in therapy for an extensive period, that the issues that impact the child's gender dysphoria become clear. Hence, merely having a mental health professional on the gender affirming care team to do a comprehensive assessment, or to provide support, does not equate to an understanding that a patient needs far more than one evaluation to understand the factor(s) that may be influencing and contributing to gender dysphoria, such that addressing the factor(s) may lead to its' resolution or betterment.

28. Regarding trauma, I assert that trauma screening or initial evaluation is simply not enough. Trauma is not generally disclosed during a first psychological evaluation. It can take months, and even years, for patients to disclose a history of trauma. As cited in my declaration, a recent study showed that 56 percent of patients with gender dysphoria have experienced four or more forms of trauma, compared to 3 percent in the control group. (Gionvanardi 2018) Another study reported similar findings. (Schnarrs 2019)

29. Hence, no screening process or initial evaluation is sufficient to truly assess whether a patient has dealt with trauma that has influenced, contributed to, or caused gender dysphoria. Minor patients benefit from an ongoing process of assessment and psychotherapy, a relationship with supportive mental health staff, and support from their family as they develop.

30. Secondly, I have not asserted that youth are misdiagnosed with gender dysphoria.

31. Rather, I asserted that in my experience, gender dysphoria is most often influenced by issues and stressors in the patient's life systems (i.e., school, family, community, peer group), gender role perceptions, online exposures, other mental health conditions (i.e., trauma, autism, depression, anxiety), vulnerability, and search for belonging. I have observed that when these matters have been dealt with in psychotherapy, gender dysphoria has resolved in most cases.

**Plaintiffs' Expert's Assertions Undermine the Influence of Social Media on Youth**

32. Plaintiffs' expert ignores the importance of the effect of social media on the rapid rise in rates of gender dysphoria. (Karasic ¶ 57)

33. Social media provides a forum for support for youth, but also is a tremendous and powerful vehicle of influence.

34. Plaintiffs' expert's assertion that social media is not a primary contributor to youth experiencing gender dysphoria lacks any support.

35. It would be illogical to state that social media does not influence the ideology, self-concept, and identity of youth today.

### Plaintiffs' Expert Mischaracterizes Psychotherapy as "Conversion Therapy"

36. The Plaintiffs' expert falsely assumes that the goal of psychotherapy is conversion to a cis-gender identity. (Karasic ¶ 39)

37. Nowhere in my declaration have I stated that I engage in conversion therapy. In fact, I have stated that I do not engage in this practice and find it detrimental. Furthermore, I stated that I had a patient who underwent conversion therapy and found it to be a highly negative experience.

38. Psychotherapy should not be conducted with the therapist having a preconceived end goal that is subjective in any capacity. It is the client who determines their own goals within the therapeutic process, and the therapist facilitates the journey through therapy objectively and without bias. This is therapeutic neutrality. (Simon 1992)

39. The Plaintiffs' Expert falsely makes this assumption, presumably because I stated that in my experience:

    a. Gender dysphoria has resolved with time and maturation in the children I've evaluated and treated.

    b. Gender dysphoria in my own adolescent patients has most often resolved with individual and family psychodynamic psychotherapy, added support, and maturation. I have found adolescents in my care to have at least one of the following co-occurring issues upon evaluation: 1) a history of trauma 2) a history

10

      of an autism spectrum disorder 3) a history of anxiety (often social anxiety) or depression 4) a history of disrupted attachment 5) complex family dynamics that have shaped perception of gender roles 6) exposure to peer groups and/or social media that influenced their self-concept and feeling of gender incongruence, and 7) a feeling of vulnerability amongst peers and of "not belonging" followed by a search to belong with others who feel similarly.  In the majority of adolescent cases, when patients were able to process and explore these issues in the context of their life "systems" (i.e. family, school, peers, community, stressors) through exploratory (psychodynamic) therapy, gender dysphoria resolved and the adolescents became comfortable with their natal sex.

  c. In cases wherein gender discordance persisted, individuals were better suited to make decisions about medical and surgical transition once they were able to provide informed consent as adults and had undergone therapy to process relevant issues in their lives, thus lowering their risk of future regret post transition.

40. Psychotherapy is effective and helpful for minors with gender dysphoria to help them to navigate their mental health and stressors.  The risk is low, and the benefit can be tremendous.  The goal is not conversion to cis-gender identity as Plaintiffs' expert states.  Rather, most patients I have worked with who have gender dysphoria decide that their goals are to be more mindful, find out more about themselves, process their stressors (usually related to family, peers, prior trauma, school, mental health), and secure better support and have better relationships with people they love.  Most realign with their natal sex in the process of therapy, despite no pre-existing agenda to do so.  It happens when other aspects of their lives fall into place through resolution of various unconscious conflicts, treatment

of past trauma, processing of past experiences, exploration of relationships, improvement of family dynamics, and simple age maturation.

41. Psychotherapy is a compassionate and low risk approach that helps minors to bridge the course of their own development by harnessing proper support, helping them gain a better understanding of themselves, working through their own stressors and unique life circumstances, and gaining clarity so that their medical decisions can be more certain and well informed when they reach adulthood.

**Plaintiffs' Expert Fails to Mention the Lack of Quality Data on Suicide Risk in De-Transitioners and the Lack of Services that are Afforded to Them**

42. Plaintiffs' expert cites the risk of suicide in patients with gender dysphoria, and the concern that bans on medical and surgical transition will lead to an increase in the risk of suicide. (Karasic ¶ 34, 38, 39, 73-75, 84-85, 99)

43. Several problems exist with the studies assessing suicide risk in patients with gender dysphoria. I agree with Dr. Cantor's assessment of these studies.

44. It is concerning that Plaintiffs' expert does not address the lack of data on de-transitioners and the suicidal thoughts that they may deal with, the intense regret they face, and the psychological impact of realizing that transitioning may have been the wrong choice.

45. Further, Plaintiffs' expert does not discuss that de-transitioners have difficulty finding support and services for medical and mental health care.

**Plaintiffs' Expert Minimizes and Does Not Acknowledge Critical Issues Pertaining to Gender Dysphoria Treatment, Creating Concern for the Informed Consent Process**

46. Plaintiffs' expert reports that defense experts have created a "straw man" and then attacked it. (Karasic ¶ 28, ¶ 29)

47. There is very clear concern about the fact that Plaintiffs' experts do not acknowledge, or they minimize the following: 1) the lack of proper research on psychotherapy outcomes in patients with gender dysphoria (D'Angelo 2021), including research which takes into account therapeutic modality, direction, and content, and stratifies minors according to historical risk factors (stressors, exposures, co-occurring conditions), 2) the lack of data on de-transitioners and their rates of suicide, 3) the ongoing debates over the quality of studies that are used to support medical and surgical transition, 4) the ongoing debate over the safety, efficacy, and outcomes of gender transition treatments and matters of informed consent, and 5) the discussion of the changes in regulations and recommendations in other countries that have come as a result of these debates.

48. Hence, the defense experts have not created a "straw man". It is very reasonable to assume that Plaintiffs' experts discuss a risk of suicide with patients and their parents, given that this is a continual concern that they voice in their declarations. It is also reasonable to assume that the lack of acknowledgement or minimization of the above five issues in their declarations may translate into a lack of full disclosure with parents and patients. The discussion of the risk of suicide with parents is a conversation that places a tremendous emotional burden on them. Telling parents that their child may have a risk of suicide if they are not affirmed in their gender or permitted to transition is very concerning from an ethical standpoint if all the other issues above are not also given their due acknowledgment and merit in the same discussion. A lack of full disclosure would present additional concerns about the informed consent process.

## Conclusion

49. Informed Consent is not attainable for medical or surgical transition in minors based upon their lack of ability to complete the neurodevelopmental tasks required for decision making capacity. Parental informed consent with minor assent is not sufficient given that treatments on the medical transition trajectory are non-emergent, medically unnecessary, carry highly significant potential consequences (such as infertility), and therein challenge the future autonomy of the growing minor who cannot appreciate such outcomes nor the debate surrounding them.

50. A better and more compassionate approach to gender dysphoria in minors is the provision of therapy until adulthood, when informed consent can be provided.

51. Quality research is necessary to assess alternative forms of treatment.

52. The experience of de-transitioners is due acknowledgment, merit, and study.

53. SB 150 appropriately protects minors.

_____
Dr. Geeta Nangia

June 26, 2023

**Works Cited**

American Psychiatric Association (2022). *Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR*. American Psychiatric Association Publishing.

Casey, B. J., Thomas, K. M., Davidson, M. C., Kunz, K., Franzen, P. L. (2002). Dissociating Striatal and Hippocampal Function Developmentally with a Stimulus–Response Compatibility Task. *Journal of Neuroscience*, 22(19), 8647–8652. https://doi.org/10.1523/JNEUROSCI.22-19-08647.2002

Casey, B. J., Getz, S., Galvan, A. (2008a). The adolescent brain. *Developmental Review*, 28(1), 62–77. https://doi.org/10.1016/j.dr.2007.08.003

Casey, B. J., Jones, R. M., Hare, T. A. (2008b). The adolescent brain. *Annals of the New York Academy of Sciences,* 1124, 111–126. https://doi.org/10.1196/annals.1440.010

Casey, B. J., Jones, R. M. (2010). Neurobiology of the Adolescent Brain and Behavior: Implications for Substance Use Disorders. *Journal of the American Academy of Child &Adolescent Psychiatry,* 49(12), 1189–1201. https://doi.org/10.1016/j.jaac.2010.08.017

Casey, B. J. (2013, April 27). *BJ Casey presents The Teen Brain: Implications for Legal Responsibility [Conference Presentation].* The Future of Law and Neuroscience.  Chicago, IL, United States. https://www.lawneuro.org/aba/ChicagoABA_BriefingBook_PostConference.pdf. https://www.youtube.com/watch?v=kaJM1jeNEmM

Chein, J., Albert, D., O'Brien, L., Uckert, K., Steinberg, L. (2011). Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Developmental Science*, 14(2), F1–F10. https://doi.org/10.1111/j.1467-7687.2010.01035.x

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., De Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L.,

Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health*, 23(sup1), S1–S259. https://doi.org/10.1080/26895269.2022.2100644

Dahl, M., Feldman, J.L., Goldberg, J.M., & Jaberi, A. (2015). Endocrine Therapy for Transgender Adults in British Columbia: Suggested Guidelines Physical Aspects of Transgender Endocrine Therapy.

D'Angelo, R., Syrulnik, E., Ayad, S. *et al.* (2021) One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria. *Arch Sex Behav* 50, 7–16 https://doi.org/10.1007/s10508-020-01844-2

Ergin RN, Polat A, Kars B, Öztekin D, Sofuoğlu K, Çalışkan E. (2018)Social stigma and familial attitudes related to infertility. *Turk J Obstet Gynecol.*15(1):46-49. doi: 10.4274/tjod.04307. Epub 2018 Mar 29. PMID: 29662716; PMCID: PMC5894536.

Erikson, E. H., Erikson, J. M. (1998). *The Life Cycle Completed (Extended Version)*. W. W. Norton & Company.

Giovanardi, G., Vitelli, R., Maggiora Vergano, C., Fortunato, A., Chianura, L., Lingiardi, V., Speranza, A. M. (2018). Attachment Patterns and Complex Trauma in a Sample of Adults Diagnosed with Gender Dysphoria. *Frontiers in Psychology*, 9 https://www.frontiersin.org/articles/10.3389/fpsyg.2018.00060

Kjaer TK, Jensen A, Dalton SO, Johansen C, Schmiedel S, Kjaer SK. (2011). Suicide in Danish women evaluated for fertility problems. Hum Reprod. Sep 26(9):2401-7. doi: 10.1093/humrep/der188. Epub 2011 Jun 13. PMID: 21672927.

Kohan, S., Ghasemi, Z., Beigi, M., 2015. Exploring infertile women's experiences about sexual life: A qualitative study. *Iranian Journal of Nursing and Midwifery research* (20)1, pp. 34-39

Marci, R., Graziano, A., Piva, I. *et al.* (2012) Procreative sex in infertile couples: the decay of pleasure?. *Health Qual Life Outcomes* 10, 140. https://doi.org/10.1186/1477-7525-10-140

Schnarrs, P. W., Stone, A. L., Salcido, R., Baldwin, A., Georgiou, C., Nemeroff, C. B. (2019). Differences in adverse childhood experiences (ACEs) and

quality of physical and mental health between transgender and cisgender sexual minorities. *Journal of Psychiatric Research,* 119, 1–6. https://doi.org/10.1016/j.jpsychires.2019.09.001

Shani C, Yelena S, Reut BK, Adrian S, Sami H. Suicidal risk among infertile women undergoing in-vitro fertilization: Incidence and risk factors. *Psychiatry Res.* 2016 Jun 30;240:53-59. doi: 10.1016/j.psychres.2016.04.003. Epub 2016 Apr 8. PMID: 27084991.

Simon, R., (1992). Treatment Boundary Violations: Clinical, Ethical, and Legal Considerations, *Bull Am Acad Psychiatry Law*, Vol. 20, No. 3. P. 273

Steinberg, L. (2013). Does Recent Research on Adolescent Brain Development Inform the Mature Minor Doctrine? *The Journal of Medicine and Philosophy: A Forum for Bioethics and Philosophy of Medicine,* 38(3), 256–267. https://doi.org/10.1093/jmp/jht017