# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

|  |  |
|---|---|
| Jane Doe 1, et al., | |
| *Plaintiffs*, | No. 23-cv-00230-DJH |
| v. | |
| William C. Thornbury, Jr., et al., | |
| *Defendants*, | |
| & | |
| Commonwealth of Kentucky ex rel. Attorney General Daniel Cameron, | |
| *Intervenor-Defendant*. | |

## BRIEF OF FAMILY RESEARCH COUNCIL AS *AMICUS CURIAE* IN SUPPORT OF INTERVENOR-DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Christopher Mills*
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
Tel: (843) 606-0640
cmills@spero.law

*pro hac vice motion pending

Christopher Wiest (KBA 90725)
CHRIS WIEST, ATTORNEY AT LAW, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Family Research Council is a nonprofit corporation that does not have a parent corporation and is not publicly held.

**TABLE OF CONTENTS**

**Page**

Corporate Disclosure Statement ........................................................................... i

Table of Authorities ........................................................................................ iii

Interest of *Amicus Curiae* ............................................................................... 1

Introduction ................................................................................................. 1

Argument ....................................................................................................... 3

    I.   The Plaintiffs' favored medical groups are driven by non-scientific motivations ............... 4

        A.  WPATH ...................................................................................... 6

        B.  AAP ............................................................................................ 15

        C.  Endocrine Society ....................................................................... 19

    II.  No high-quality evidence supports sterilizing interventions in children. .......................... 20

Conclusion ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Boe v. Marshall*, No. 2:22-cv-184-LCB, 2023 WL 2646437 (M.D. Ala. Mar. 27, 2023)............ 12

*Boe v. Marshall*, No. 2:22-cv-184-LCB, 2023 WL 3454575 (M.D. Ala. May 15, 2023)............ 13

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019)........................................................ 5

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).................................... 5

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)............................................................. 6

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .................................................................... 4

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) ............................................................ 6

*Wilk v. AMA*, 895 F.2d 352 (7th Cir. 1990) ................................................................... 5

**OTHER AUTHORITIES**

A. L. Nos et al., *Association of Gonadotropin-Releasing Hormone Analogue Use With Subsequent Use of Gender-Affirming Hormones Among Transgender Adolescents*, 5 JAMA Netw. Open e2239758 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798002 ............................... 15

Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://www.thefp.com/p/the-hijacking-of-pediatric-medicine .......................................... 16, 17

Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, The Free Press (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle .................................. 6, 7

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2016)............................................................................................................... 5

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014), https://doi.org/10.1542/peds.2013-2958 .................................................................... 25

Annelou L.C. de Vries, *Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents*, 146 Pediatrics 1 (2020), https://doi.org/10.1542/peds.2020-010611 .................. 25

Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. Times (Sept. 26, 2022), https://www.nytimes.com/2022/09/26/health/top-surgery-transgender-teenagers.html..... 10, 11

*Boe v. Marshall*, No. 2:22-cv-184-LCB (M.D. Ala. Dec. 27, 2022), ECF No. 208.................... 13

Brief for Am. Acad. of Pediatrics et al. as *Amici Curiae* Supporting Plaintiffs, *Brandt v. Griffin*, No. 4:21-cv-00450 (E.D. Ark. June 24, 2021), ECF No. 30 ......................................... 1, 11, 21

Brief for Family Research Council as *Amicus Curiae* Supporting Appellants, *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (No. 21-2875) .............................................................. 1

Christal Achille et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results*, 8 Int'l J. Pediatric Endocrinology (Apr. 30, 2020), https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2 ............................................................................................................... 22

Christina Buttons, *TikTok Doc's Trans Patients Post More Gruesome Stories of Post-Op Complications*, DailyWire (Jan, 4, 2023), https://tinyurl.com/3zmf4hjs .................................. 12

Christine Milrod & Dan H. Karasic, *Age is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, 14 J. Sexual Med. 624 (2017), https://doi.org/10.1016/j.jsxm.2017.02.007 .............................................................................. 13

*Correction*, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/48e6rcfb ........... 10

Cory Turner & Anya Kamenetz, *What Your Teen Wishes You Knew About Sex Education*, NPR (Feb. 11, 2020), https://www.npr.org/transcripts/804508548?ft=nprml&f=804508548 .......... 17

David Oliver, *Can My Doctor Out Me to My Parents?*, U.S. News & World Reports (Mar. 22, 2017), https://health.usnews.com/wellness/articles/2017-03-22/can-my-doctor-out-me-as-gay-to-my-parents .................................................................................................................... 18

Diane Chen et al., *Psychosocial Functioning in Transgender Youth After 2 Years of Hormones*, 388 New Eng. J. Med. 240 (2023) ............................................................................... 24

*Dr. Bowers Makes History in Trans Medical Field*, Marci L. Bowers, M.D., https://marcibowers.com/blog/dr-bowers-makes-history-in-trans-medical-field/ ..................... 7

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 .................................................. 2, 9, 10, 14

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html ............................. 7, 8, 9

Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health ............ 22

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 Pub. Rel. Inquiry 295 (2021) ........................................................................................... 8, 9

The Federalist No. 10 .......................................................................................................... 4

Frank C. Woodside & Michael J. Gray, *Researchers' Privilege: Full Disclosure*, 32 W. Mich. U.T.M. Cooley L. Rev. 1, 33 (2015) ..................................................................................... 13

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://tinyurl.com/bddr6hhf ........................................... 9

Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1 (Feb. 2020), https://doi.org/10.1542/peds.2019-1725 .................................. 23

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307 (2019), https://doi.org/10.1080/0092623X.2019.1698481 ................................................................ 16

Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1 (2018), https://doi.org/10.1542/peds.2018-2162 ................................................................................................. 15, 16, 18

Jennifer Block, *Gender dysphoria in young people is rising — and so is professional disagreement*, 380 BMJ 382 (2023), https://www.bmj.com/content/380/bmj.p382.long ..................................................... 16, 19, 20

Jenny Jarvie, *This Abortion Doctor is Not Ready to Leave Alabama*, L.A. Times (April 28, 2023), https://tinyurl.com/2tf2hrnn............................................................................. 14

Jesse Singal, *The New, Highly Touted Study on Hormones for Transgender Teens Doesn't Really Tell Us Much of Anything*, Singal-Minded (Feb. 7, 2023), https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones ...................... 24

Joint Letter from USPATH and WPATH (Oct. 12, 2021), https://www.wpath.org/media/cms/Documents/Public%20Policies/2021/Joint%20WPATH%20USPATH%20Letter%20Dated%20Oct%2012%202021.pdf ................................................... 7

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall Street Journal (Aug. 17, 2022), https://on.wsj.com/3BzOuTZ ........................................ 16

Kaylee White, *Follow the money*, Washington Examiner (Sept. 20, 2022), https://tinyurl.com/3jkmvn9r ............................................................................................. 11

Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7894249 ................................................... 24

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://tinyurl.com/3xfwxurk ............................................. 7

Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://nypost.com/2022/09/29/kid-gender-guidelines-not-driven-by-science/........................ 10

Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7 Clinical Prac. Pediatric Psychol. 302 (2019) ...................................... 24

Michael Biggs, *Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria*, 49 Archives of Sexual Behav. 2227 (2020), https://link.springer.com/article/10.1007/s10508-020-01743-6 ............................................. 23

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals*, 49 J. Sex & Marital Therapy 348 (2023), https://bit.ly/3DIUNY3 ............................................................................................. 25

Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* (2021), https://tinyurl.com/4fsz2krm......... 2

*Questioning America's Approach to Transgender Health Care*, The Economist (July 28, 2022), https://tinyurl.com/26t96wj3.................................................................................................. 17

Robin Resput & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022)............................................................................................................... 11

Sarah Maslin Nir & Kristi Berner, *A 10-Year-Old Got a Tattoo. His Mother Was Arrested.*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/nyregion/tattoos-children.html ................................... 17

Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. (2021), https://bit.ly/3qTCwRm .................................................................................................... 21

Statement of Removal, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/2wv6mxhf ................................................................................................. 12

Stephen Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. Sex & Marital Therapy 706 (2022), https://tinyurl.com/2s4x67ks ..................................................................................................................................... 3

Usha Lee McFarling, *Transgender Clinics See Surge in Demand From Youth Seeking Early Treatment*, KQED (Apr. 11, 2017), https://www.kqed.org/futureofyou/370142/transgender-clinics-see-surge-in-demand-from-youth-seeking-early-treatment .......................................... 17

*USPATH Demand Meeting Feb. 2017,* YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=rfgG5TaCzsk .................................................................... 8

*USPATH Gala Part 2*, YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=wxbsOX4hX0M#t=2m45s ................................................ 9

Videorecording of Dr. Tishelman's WPATH presentation, Twitter (Sep. 19, 2022, 7:06 PM). https://twitter.com/SwipeWright/status/1571999221401948161 ............................................ 10

Vinay Prasad & Adam Cifu, *Medical Reversal*, 84 Yale J. Biology & Med. 471 (2011) .............. 5

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017) ......................................................................................... 19, 20

## INTEREST OF *AMICUS CURIAE*

Family Research Council (FRC) is a nonprofit research and educational organization that seeks to advance faith, family, and freedom in public policy from a biblical worldview. FRC recognizes and respects the dignity of every human life, which entails protection of the vulnerable.

## INTRODUCTION

The World Professional Association for Transgender Health, the American Academy of Pediatrics, the Endocrine Society, the American Medical Association, and other medical interest groups (collectively, "WPATH") file an *amicus* brief in just about every case challenging the public's efforts to protect children from sterilizing medical interventions. But the original version of that brief looks much different from the one WPATH now files here and in other cases around the country. The original brief asserted that "[a] robust body of scientific evidence supports the efficacy of" gender transition medical interventions for "young people."[1] WPATH repeatedly made this claim, touting a "robust consensus" and a "robust body of empirical evidence."[2]

But WPATH's claim of robust evidence has always been false. How do we know? Because after the Family Research Council filed a brief in that early case exhaustively showing that nearly everyone—other than ideologically-captured American medical interest groups—recognizes the paucity of reliable long-term evidence about sterilizing interventions in minors,[3] WPATH quietly deleted *every claim* about a "robust body of empirical evidence" from its brief on that appeal— and all its future briefs. Then WPATH refused repeated invitations to explain its about-face, instead retreating to meaningless and still-incorrect claims that "evidence indicates the effectiveness

---

[1] Brief for Am. Acad. of Pediatrics et al. as *Amici Curiae* Supporting Plaintiffs, *Brandt v. Griffin*, No. 4:21-cv-00450 (E.D. Ark. June 24, 2021), ECF No. 30, at 12 (hereinafter "*Brandt* Brief").
[2] *Id.* at 3, 13; *see id.* at 4, 8, 9, 20.
[3] Brief for Family Research Council as *Amicus Curiae* Supporting Appellants, *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (No. 21-2875).

of treating gender dysphoria according to the guidelines." WPATH et al. Br. (ECF No. 19-2) 16 (cleaned up) ("Br."). WPATH's "indicatory" evidence is a handful of slipshod studies that failed to control for relevant variables or to reach statistically or clinically significant results.

The medical groups' reliance on such studies to claim a "robust" scientific "consensus" exposes WPATH, the AAP, and others for what they are: policy advocates rather than honest brokers of medical evidence, at least when it comes to this issue. The one common ground in all the literature—even the medical groups' own policy statements—is that, as an England National Health Service review recently concluded, there is "limited evidence for the effectiveness and safety of gender-affirming hormones in children and adolescents with gender dysphoria" and the "long-term safety profile of these treatments" is "largely unknown."[4] WPATH's own new Standards of Care, which nonetheless approve chest and genital *surgeries* to transition children regardless of age, say that because "the number of studies" about adolescent treatment "is still low," "a systematic review regarding outcomes of treatment in adolescents is not possible" and "the long-term effects of gender-affirming treatments initiated in adolescence are not fully known."[5]

But once again, WPATH withholds that information from the Court, suggesting no evidentiary doubt whatsoever about giving cross-sex hormones to an 11-year-old. As these repeated episodes show, there is no reason to trust WPATH and the other medical interest groups when it comes to this politicized issue. If the medical groups tell these lies about "robust" "evidence-based" treatments in federal court, they will push physicians to tell the same lies to children who could face a lifetime of personal devastation so that WPATH and the AAP can satisfy their self-

---

[4] Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* 50 (2021), https://tinyurl.com/4fsz2krm.
[5] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S46, S65 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 (hereinafter "SOC 8").

serving agendas. Indeed, as one recent article explained, "the implications of administering a treatment with irreversible, life-changing consequences based on evidence that has an official designation of 'very low certainty'" are "rarely discussed with the patients," much less the "risks to fertility, bone, and cardiovascular health."[6]

The reason to wait for medical interventions—and the reason that this law passes any level of scrutiny—is that the consequences of "gender-affirming care" for a minor are drastic. Gender dysphoria in the vast majority of children does not persist into adulthood.[7] But children who take puberty blockers then cross-sex hormones—the near-universal transitioning pathway—are expected to become sterile and potentially suffer many other negative repercussions.[8]

All this is why Kentucky had to act: to protect girls and boys from a medical establishment more interested in profit and ideology than the needs of children. The Plaintiffs rely on certain interest groups to define the standard they want to govern the people. But constitutional law should not be outsourced to medical interest groups. On this issue, these groups' positions derive from ideology, not science. The Court should deny a preliminary injunction.

## ARGUMENT

Starting in the second paragraph in their complaint, the Plaintiffs put the views of "major medical association[s] in the United States" front and center, claiming that they provide "widely accepted protocols" for the use of "puberty-delaying treatment" and "hormone therapy." Compl. (ECF No. 2) ¶ 2. They claim that these treatments for minors are "medically necessary" because their favored "medical and mental health associations in the United States" say so. *Id.* ¶¶ 4, 23.

---

[6] Stephen Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. Sex & Marital Therapy 706, 709 (2022), https://tinyurl.com/2s4x67ks.

[7] *Id.* at 711.

[8] *Id.* at 713 ("puberty blockade followed by cross-sex hormones leads to infertility and sterility").

3

They assert that "[t]he standards of care for treatment of transgender people" are the standards "developed by the World Professional Association for Transgender Health ('WPATH')," proclaiming that these standards are "based upon a rigorous and methodological evidence-based approach." *Id.* ¶¶ 24–25. They rely on the Endocrine Society's "similar standard of care" and "other professional medical organizations" that have fallen in line with "the WPATH and Endocrine Society standards of care." *Id.* ¶ 28. They note that these guidelines "were graded" based on the "available evidence" (*id.* ¶ 26)—albeit without noting what grades the guidelines received.

The Plaintiffs' legal claims hinge on the validity of these groups' standards. Their substantive due process claim is premised on a parental right to "obtain[] established, medically necessary care for their minor children." *Id.* ¶ 81. Their equal protection claim is likewise premised on their alleged inability to "obtain[] medically necessary treatment." *Id.* ¶ 87. And why do the Plaintiffs say their desired treatments are "medically necessary"? Because "the WPATH Standards of Care" and the guidelines of other medical interest groups say so. *E.g.*, *id.* ¶ 34.

But "[t]he law need not give [physicians] unfettered choice in the course of their medical practice." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). To be sure, no business likes to be regulated, and medical advocacy groups like WPATH and the AAP have both financial incentives and ideological commitments in play. But no honest broker of scientific evidence could have claimed that a "robust" "consensus" exists about the experimental treatments Kentucky regulates. These interest groups have put ideology above the scientific evidence—and above patients. This Court should discount their views accordingly. Constitutional law should not be outsourced to medical interest groups.

## I.    The Plaintiffs' favored medical groups are driven by non-scientific motivations.

In most areas of the law, courts properly recognize that interest groups with ideological or financial stakes may push a self-interested legal view. *Cf.* The Federalist No. 10 (James Madison).

Such groups can advocate for their positions, but courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). Yet some courts treat (certain) medical groups differently, letting them drive constitutional interpretation despite ideological and self-interested motivations.

The Supreme Court recently revoked the permission slip for select medical interest groups to preempt the People when it comes to self-government. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) ("[T]he position of the American Medical Association" does not "shed light on the meaning of the Constitution." (cleaned up)). Yet the Plaintiffs' case would substitute the standards of certain ideological, financially-interested medical interest groups for the default rule that the People may govern themselves when it comes to protecting health and welfare. The Court should not elevate the view of self-interested medical interest groups to law.

As a historical matter, medical interest groups are hardly paragons of truth or virtue. Not so long ago, for instance, "[t]he most important elite advocating eugenic sterilization was the medical establishment"; "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice."[9] Other examples abound: racist medical experimentation, lobotomies, opioids, thalidomide, and smoking. The American Medical Association's "systematic, long-term wrongdoing" has led courts to "doubt[] the AMA's genuineness regarding its concern for scientific method." *Wilk v. AMA*, 895 F.2d 352, 363, 366 (7th Cir. 1990). Even apart from nefarious motives, the nature of science is that it changes; certainty on any issue—especially an emerging one—risks future contradiction.[10]

---

[9] Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016).
[10] Vinay Prasad & Adam Cifu, *Medical Reversal*, 84 Yale J. Biology & Med. 471, 472–73 (2011) (collecting examples).

Skepticism is even more appropriate here. The interest groups claim that their "treatment protocols" are "evidence-based." Br. 9. But a careful examination of the main medical *amici*—WPATH, the AAP, and the Endocrine Society—reveal that these groups are more committed to achieving policy ends than accurately presenting scientific evidence about gender transitioning.

### A.    WPATH

WPATH's vaunted Standards of Care—which just substantially changed—"reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 78–79 (1st Cir. 2014). For proof, look no further than WPATH's own leaders. Dr. Stephen Levine, who helped author an early version of WPATH's guidelines, "expressed concerns that later versions of WPATH were driven by political considerations rather than medical judgment." *Gibson*, 920 F.3d at 222. Dr. Levine said that the guidelines are not "politically neutral" because WPATH is "an advocacy group for the transgendered"—which means that its positions "sometimes conflict" with its aspirations to be a "scientific organization." *Id.* According to Dr. Levine, "[s]kepticism and strong alternative views are not well tolerated" and "have been known to be greeted with antipathy from the large numbers of nonprofessional adults who attend each of the organization's biennial meetings." *Kosilek,* 774 F.3d at 78 (alteration omitted). Dr. Levine added that the field generally is characterized by a "lack of rigorous research" about "the long-term effects of sex reassignment surgery and other gender dysphoria treatments." *Gibson*, 920 F.3d at 222 (brackets omitted).

WPATH's own president, Dr. Marci Bowers, agrees that there are those in WPATH "trying to keep out anyone who doesn't absolutely buy the party line," leaving "no room for dissent."[11]

---

[11] Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, The Free Press (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.

Bowers—who has conducted more than 2,000 gender transition surgeries—and another former WPATH board member, psychologist Erica Anderson, are two of the "most prominent" and "most respected" "providers in the field of transgender medicine."[12] About WPATH's guidelines, Bowers said, "I think maybe we zigged a little too far to the left," because "there was naivete on the part of pediatric endocrinologists who were proponents of early [puberty] blockade thinking that just this magic can happen" without harm.[13] Bowers is "not a fan" of putting children on puberty blockers, doubting whether the effects are truly reversible.[14] And Bowers lamented that many clinics, like Planned Parenthood, start giving adolescents cross-sex hormones after just "one visit."[15] (Of course, WPATH's standards require nothing more, as its brief here implicitly concedes. *See* Br. 10 ("a thorough evaluation").) Anderson expressed similar concerns: "It is my considered opinion that due to some of the . . . I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process."[16]

WPATH's response to these criticisms? Censuring Anderson and banning board members from speaking to the press.[17] Seriously.[18] And this response is par for the course. Take WPATH's annual conferences. For actual medical groups, such conferences are a time to present research and

---

[12] *Id.*; *Dr. Bowers Makes History in Trans Medical Field*, Marci L. Bowers, M.D., https://marci-bowers.com/blog/dr-bowers-makes-history-in-trans-medical-field/.

[13] Shrier, *supra* note 11.

[14] *Id.*

[15] *Id.*

[16] *Id.*; *see also* Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://tinyurl.com/3xfwxurk ("[W]e find evidence every single day . . . that the field has moved from a more nuanced, individualized and developmentally appropriate assessment process to one where every problem looks like a medical one that can be solved quickly with medication or, ultimately, surgery.").

[17] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html.

[18] Joint Letter from USPATH and WPATH (Oct. 12, 2021), https://www.wpath.org/media/cms/Documents/Public%20Policies/2021/Joint%20WPATH%20USPATH%20Letter%20Dated%20Oct%2012%202021.pdf.

debate medical issues. For WPATH, conferences are group struggle sessions intended to terrorize into submission those not fully on board with WPATH's agenda.

For instance, at WPATH's U.S. affiliate's (USPATH) inaugural conference in 2017, one respected researcher presented findings not to the liking of the activists in attendance. When his panel discussion began, "protesters interrupted and picketed."[19] "That evening, at a meeting with the conference leaders, a group of advocates led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 'remains grounded in cis-normativity and trans exclusion.'"[20] According to one professor who attended the meeting (and later wrote admiringly about it), the session with USPATH leadership "was not a forum for dialog; it was a space" for the activists "to vocalize their demands to the USPATH executive board."[21]

WPATH caved to every one of the activists' demands. The speaker's panels were cancelled, and "[c]onference organizers and board members publicly" apologized for the speaker's "presence at the conference and their part in perpetuating the mistreatment of and violence against transgender women of color in particular" by allowing the speaker to attend.[22] They also "promised to incorporate transgender women of color into each level of WPATH's organization"—including, presumably, "the scientific committees that decide which academic papers are accepted for conferences."[23] The former president of WPATH told the activists—not the speaker—"We are very,

---

[19] Bazelon, *supra* note 17; Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 Pub. Rel. Inquiry 295, 302 (2021).

[20] Bazelon, *supra* note 17.

[21] Ciszek, *supra* note 19, at 302; *see also USPATH Demand Meeting Feb. 2017,* YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=rfgG5TaCzsk.

[22] Ciszek, *supra* note 19, at 304.

[23] *Id.* at 302, 304.

very sorry."[24] The public apology ended with the protesters on stage chanting "Trans Power!":



*Figure 1: Aftermath of USPATH Speaker Protest*[25]

In December 2021, WPATH released a draft of the updated 8th edition of its Standards of Care. Included in the draft was a chapter that had not appeared in previous iterations, detailing the care of eunuchs—"those assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[26] The final standards explain that "the greatest wealth of information about contemporary eunuch-identified people is found within the large online peer-support community that congregates on sites such as the Eunuch Archive (www.eunuch.org)."[27] One of the "most prominent participants" at Eunuch Archives was apparently in charge of the new chapter on eunuch care.[28] And in the draft of SOC 8, "the Eunuch Archive's 'Fiction Archive' [was] directly acknowledged and named."[29] What the draft standards did *not*

---

[24] Bazelon, *supra* note 17.

[25] *USPATH Gala Part 2*, YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=wxb-sOX4hX0M#t=2m45s; Ciszek, *supra* note 19, at 304.

[26] *See* Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://tinyurl.com/bddr6hhf; SOC 8, *supra* note 5, at S88.

[27] SOC 8, *supra* note 5, at S88.

[28] Gluck, *supra* note 26.

[29] *Id.*

mention was the Eunuch Archives' association with child abuse fetishism—particularly "the large amount of stories within that archive that directly involve the sadistic sexual abuse of children."[30] According to a reporter who accessed the archive, "[t]he stories primarily focus on the eroticization of child castration": "[s]ome narratives contain violent sexualized depictions of children with stunted puberty being raped by doctors," while others "include[] themes such as Nazi doctors castrating children, baby boys being fed milk with estrogen in order to be violently sex trafficked as adolescents, and pedophilic fantasies of children who have been castrated to halt their puberty.[31]

Along with adding a "Eunuch" chapter (yet continuing to omit an "Ethics" chapter), SOC 8 also initially retained (some) age requirements for transitioning minors—fourteen for cross-sex hormones (down from sixteen in SOC 7), fifteen for mastectomies, "and vaginoplasty and hysterectomy at 17."[32] These minimum ages displeased the activists at WPATH. So a mere nine days after WPATH published the latest iteration of its standards—years in the making—it issued a "correction" eliminating minimum ages for transition surgeries, including genital surgeries.[33] One author admitted that a "challenge[]" for the adolescent guidelines "is limited research," but justified the "correction" because WPATH does not want to "make it more likely that practitioners would be sued" for malpractice by devastated children.[34] Plus, according to WPATH's president, to "propose" surgeries at defined "younger age[s]" would require "a better political climate."[35] *Contra* Br. 9, 15 (WPATH's Standards are "evidence-based" and "the product of careful and

---

[30] *Id.*

[31] *Id.*

[32] Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://nypost.com/2022/09/29/kid-gender-guidelines-not-driven-by-science/.

[33] *Correction*, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/48e6rcfb.

[34] Videorecording of Dr. Tishelman's WPATH presentation, Twitter (Sep. 19, 2022, 7:06 PM). https://twitter.com/SwipeWright/status/1571999221401948161.

[35] Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery*,*'* N.Y. Times (Sept. 26, 2022), https://www.nytimes.com/2022/09/26/health/top-surgery-transgender-teenagers.html.

robust deliberation"). Just two years ago, WPATH's standard *amicus* brief assured that "genital surgeries on youth under 18 are not recommended and are not performed in [the state]."[36] Even this claim was highly questionable,[37] and now WPATH runs from the surgery issue. *See* Br. 3 n.3.

Of course, ideology and lawsuits are not the only explanations for WPATH's child genital surgery backtracking. As a doctor in Vanderbilt's transition clinic bragged, the hospital started the clinic after being convinced that it would be a "big money maker": hormone interventions "bring[] in several thousand dollars," while "top" surgeries "bring in" $40,000, and "female to male bottom surgeries are *huge* money makers" ($100,000) because they are so "labor-intensive" and "require a lot of follow-up."[38] Why bother with the difficult work of addressing underlying mental health issues through psychosocial support—an approach that many countries mandate but WPATH here ignores—when profitable genital surgeries on vulnerable children without threat of lawsuits await?

Indeed, one surgeon profiled by the *New York Times* "has built a thriving top surgery specialty" by advertising her services to children on social media.[39] Dr. Sidhbh Gallagher in Miami "frequently posts photos, FAQs and memes on Facebook, Instagram and TikTok" to "connect[] with hundreds of thousands of followers."[40] "Her feeds often fill with photos tagged #NipReveal-Friday, highlighting patients . . . whose bandages were just removed."[41] Dr. Gallagher regularly provides surgeries to minors—who are "usually at least 15," but occasionally as young as thirteen

---

[36] *Brandt* Brief, *supra* note 3, at 12 n.44.

[37] *See* Robin Resput & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-data/ (in a partial review of insurance claims from 2019 through 2021, finding dozens of teen genital transition surgeries and hundreds of mastectomies).

[38] Kaylee White, *Follow the money*, Washington Examiner (Sept. 20, 2022), https://tinyurl.com/3jkmvn9r (video).

[39] Ghorayshi, *supra* note 35.

[40] *Id.*

[41] *Id.*

and fourteen.[42] Echoing Plaintiffs' experts here, Dr. Gallagher claimed that "I don't know of a single case of regret" and assumed that reports of her patients detransitioning were "a hoax."[43] That was false, and Dr. Gallagher "amended her stance" after the *New York Times* asked her about a patient who detransitioned sixteen months after surgery, saying: "I slowly came to terms with the fact that it had been a mistake born out of a mental health crisis."[44] According to the devastated girl, "I realized I lost something about myself that I could have loved, I could have enjoyed, I could have used to feed children."[45] Recently, there have been several documented accounts of gruesome and "life threatening complications" with top surgeries performed by Dr. Gallagher.[46]

Despite all this, WPATH claims that its standards "were developed through a robust and transparent process." Br. 15 (capitalization omitted). This is a bold claim for an organization that has yanked from the internet even the evidence of the surgery age correction noted above.[47] If the process for formulating the new standards was—all evidence to the contrary—"robust and transparent," then surely WPATH would be willing to provide details about that process. Yet when another state defending its similar law subpoenaed WPATH seeking information "related to the process WPATH 'used to create, review, and adopt [its] . . . standards of care regarding transitioning treatments'"—standards that WPATH also told the court there were "developed through a robust and transparent process"[48]—WPATH switched gears. Suddenly, instead of a neutral,

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] Christina Buttons, *TikTok Doc's Trans Patients Post More Gruesome Stories of Post-Op Complications*, DailyWire (Jan, 4, 2023), https://tinyurl.com/3zmf4hjs.

[47] *See* Statement of Removal, 23 Int'l J. of Transgender Health S259 (2022), https://tinyurl.com/2wv6mxhf.

[48] *Boe v. Marshall*, No. 2:22-cv-184-LCB, 2023 WL 2646437, at *1–3 (M.D. Ala. Mar. 27, 2023) (cleaned up).

transparent scientific organization, WPATH proclaimed itself to be an "advocacy organization[]" shielded from public disclosure by the First Amendment.[49] The district court rejected that argument both because WPATH failed to make a *prima facie* case of First Amendment harm and because "WPATH's guidelines are part and parcel of Plaintiffs' proposed constitutional standard in this case."[50] WPATH tried (and failed) to convince the court to certify the decision for immediate appeal[51] and is now seeking mandamus, all to avoid giving any information about the allegedly "robust and transparent" process it used to formulate its guidelines. "[P]revent[ing] research data from ever seeing the light of day does not foster quality research, scientific progress, or public health."[52] But it is unsurprising coming from a self-described "advocacy organization."

Finally, WPATH's guidelines are not true standards of care. As much as the medical groups try to hide behind these guidelines, no physician must adhere to them. One survey found that 55% of WPATH surgeons did *not* follow its (since-abandoned) age recommendations for gender surgeries.[53] As for cross-sex hormones, WPATH assures this Court that "[h]ormone therapy is only prescribed when a qualified mental health professional has confirmed the persistence of the patient's gender dysphoria, the patient's mental capacity to assent to the treatment, and that any co-existing problems have been addressed," and "[a] pediatric endocrinologist or other clinician experienced in pubertal induction must also agree with the indication." Br. 14. An unsuspecting reader might think that describes the real world. It does not.

---

[49] *Boe v. Marshall*, No. 2:22-cv-184-LCB (M.D. Ala. Dec. 27, 2022), ECF No. 208, at 3.

[50] *Boe*, 2023 WL 2646437, at *3, *4.

[51] *Boe v. Marshall*, No. 2:22-cv-184-LCB, 2023 WL 3454575 (M.D. Ala. May 15, 2023).

[52] Frank C. Woodside & Michael J. Gray, *Researchers' Privilege: Full Disclosure*, 32 W. Mich. U.T.M. Cooley L. Rev. 1, 33 (2015).

[53] *See* Christine Milrod & Dan H. Karasic, *Age is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, 14 J. Sexual Med. 624 (2017), https://doi.org/10.1016/j.jsxm.2017.02.007.

A recent *Los Angeles Times* article tells the story of an OB-GYN physician at the West Alabama Women's Center, whose abortion business all but disappeared after the Supreme Court's decision in *Dobbs*. Needing new sources of revenue, the center made "[a] key prong of its new work" "bringing in LGBTQ+ patients," including minors for gender transition hormone therapy.[54] The OB-GYN—who "has been practicing such care for only a year" and admitted that "this area of medicine is pretty new to me"—said that she "does not believe adolescents seeking hormones require mental health evaluations": "'No, I don't need a psychologist or psychiatrist to evaluate someone who's telling me, "This is how I felt for years."'" "'I know that how they felt for years is not pathological.'"[55] Even though the OB-GYN recognized "that this is a relatively experimental area of medicine without a lot of data," the article described the OB-GYN's first visit with a minor girl: she informed the patient "early in their first conversation" via telehealth that she "would pre-scribe a low dose of testosterone."[56] The OB-GYN made this prescription despite knowing that "the teen's pediatrician and staff at a psychiatric hospital" where the patient had been seen had *not* prescribed testosterone.[57] So much for only providing "gender-affirming medical interventions" "to carefully evaluated patients who meet diagnostic criteria." Br. 4.

In short, WPATH's guidelines are based on ideology, not evidence. As SOC 8 forthrightly admits, its standards consider not just "the published literature" "but also" "consensus-based ex-pert opinion"[58]—a consensus obtained by hounding out dissenters with chants of "Trans Power!" Neither WPATH's scientific claims nor its *amicus* brief should be taken at face value.

---

[54] Jenny Jarvie, *This Abortion Doctor is Not Ready to Leave Alabama*, L.A. Times (April 28, 2023), https://tinyurl.com/2tf2hrnn.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] SOC 8, *supra* note 5, at S8.

**B.**      **AAP**

The American Academy of Pediatrics also places ideology above scientific evidence. AAP's argument here is especially deceptive because it fails to accurately reflect its own policy statement. For instance, AAP's brief asserts that puberty blockers are "reversible," have "well-known efficacy and side-effect profiles," and have been commonly used "for more than 40 years." Br. 13. AAP also asserts that "any potential risks" can be "mitigate[d]." *Id.* at 14. But AAP's own policy statement contradicts these claims:

> Pubertal suppression is not without risks. Delaying puberty beyond one's peers can also be stressful and can lead to lower self-esteem and increased risk taking. Some experts believe that genital underdevelopment may limit some potential reconstructive options. Research on long-term risks, particularly in terms of bone metabolism and fertility, is currently limited and provides varied results.[59]

Making arguments that contradict its own policy statement disqualifies AAP. If AAP does not know what the risks are, it cannot know that the risks can be mitigated. And if AAP does not believe its own arguments, no one else should either. Worse, neither AAP's brief nor its policy statement accounts for the fact that over 95% of children who start on puberty blockers will go on to cross-sex hormones.[60] This means that all the risks of those hormones—including permanent sterility for many children—are *also* risks of starting puberty blockers. Again, AAP tells neither the Court nor families that information.

Of course, AAP's policy statement is itself an ideological document. As one researcher meticulously explained, the few "references that AAP cited as the basis of their policy instead

---

[59] Jason Rafferty et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics 1, 5 (2018), https://doi.org/10.1542/peds.2018-2162.
[60] *E.g.*, A. L. Nos et al., *Association of Gonadotropin-Releasing Hormone Analogue Use With Subsequent Use of Gender-Affirming Hormones Among Transgender Adolescents*, 5 JAMA Netw. Open e2239758 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798002.

outright contradicted that policy," and AAP "left out" "the actual outcomes [of] research on [gender dysphoric] children"—disregarding 10 of the 11 studies on this cohort.[61] "[A]ny assertion that their policy is based on evidence is demonstrably false"; instead, "AAP's statement is a systematic exclusion and misrepresentation" of the literature.[62] That is unsurprising: according to the statement itself, the AAP's policy statement appears to have been written from beginning to end not by a committee or drafting team but by a single doctor, who agreed "to be accountable for all aspects" of the statement.[63] That doctor admitted that the AAP's process "doesn't quite fit the definition of systematic review" so its "policy statement is not meant to be" "a protocol or guidelines."[64]

AAP has never responded to these published critiques. "By 2019," the policy statement "was eliciting quiet concern among rank-and-file doctors affiliated with the AAP."[65] Rather than address these concerns, AAP's tactic has been to silence dissenting voices. To that end, AAP recently refused to allow the Society for Evidence-Based Gender Medicine to present contrary evidence at its annual conference and suppressed a resolution calling for more discussion of alternatives to the use of hormone therapies.[66] Then AAP made up a new policy to shut down comments on a similar resolution this year.[67] Meanwhile, AAP continues to publish facially flawed studies in its flagship journal.[68] "The stifling of dissent has created an illusory medical consensus that

---

[61] James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 307–313 (2019), https://doi.org/10.1080/0092623X.2019.1698481.

[62] *Id.*

[63] Rafferty*, supra* note 59, at 1.

[64] Jennifer Block, *Gender dysphoria in young people is rising — and so is professional disagreement*, 380 BMJ 382, at *2, 3 (2023), https://www.bmj.com/content/380/bmj.p382.long.

[65] Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://www.thefp.com/p/the-hijacking-of-pediatric-medicine.

[66] *Id.*; Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall Street Journal (Aug. 17, 2022), https://on.wsj.com/3BzOuTZ.

[67] Mason & Sapir, *supra* note 66.

[68] *Id.*

nonetheless exerts extraordinary influence over public policy and debate."[69]

*The Economist* recently reported on AAP's suppression of dissenting views, highlighting "a growing number of doctors who are starting to push back against the apparent medical consensus on transgender issues" who "accuse the academy of trying to suppress debate on the subject" of pediatric transitioning treatments.[70] The article pointed out that pediatricians seeking an honest assessment of the evidence and a robust debate before the AAP updates its position are bound to be disappointed. The new policy statement, though not formulated, already has a title that indicates the position of AAP leadership: "Providing affirmative clinical care."[71]

The past chair of AAP's Committee on Adolescence, Dr. Cora Breuner, recently gave a revealing interview supporting state laws prohibiting children from obtaining tattoos. Breuner said: "It is a permanent mark," "and I don't think kids under 18 have that kind of agency to make a decision."[72] Breuner has explained that during adolescence, "kids' decision-making ability [is] going a little haywire": "the part of their brain that's supposed to say, stop doing that, isn't really working."[73] Yet Breuner—one of the signatories of AAP's policy statement—says that she wants to make sterilizing gender transition interventions for adolescents "absolutely mainstream."[74] Neither she nor the AAP has explained why an 11-year-old boy can provide informed consent to taking drugs (and surgeries) that will sterilize him but not to receiving a tattoo.

---

[69] Sibarium, *supra* note 65.

[70] *Questioning America's Approach to Transgender Health Care*, The Economist (July 28, 2022), https://tinyurl.com/26t96wj3.

[71] *Id.*

[72] Sarah Maslin Nir & Kristi Berner, *A 10-Year-Old Got a Tattoo. His Mother Was Arrested.*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/nyregion/tattoos-children.html.

[73] Cory Turner & Anya Kamenetz, *What Your Teen Wishes You Knew About Sex Education*, NPR (Feb. 11, 2020), https://www.npr.org/transcripts/804508548?ft=nprml&f=804508548.

[74] Usha Lee McFarling, *Transgender Clinics See Surge in Demand From Youth Seeking Early Treatment*, KQED (Apr. 11, 2017), https://www.kqed.org/futureofyou/370142/transgender-clinics-see-surge-in-demand-from-youth-seeking-early-treatment.

AAP's claim here that gender transition drugs are "only prescribed" after the child's "parents or guardians" "give their informed consent" (Br. 14) is particularly egregious given Breuner's suggestion that doctors can (and should) withhold information about a child's care from their parents.[75] Breuner's own transgender clinic emphasizes that "some treatments are available to patients without formal parental consent," including "medications used to suppress menstrual cycles" and "some testosterone blockers."[76] That policy accords with the AAP's policy statement, which calls for families that "take issue with providers" who "offer gender-affirming care" and that "deny access to [that] care" to have "legal" authorities called on them for endangering the child's "welfare and safety."[77] The AAP says that the physician (not the family) must "maintain their primary responsibility for the welfare of the child."[78] As for that physician, the AAP will have attempted to indoctrinate her with its ideological views, as the AAP calls for those views to be adopted in "certifying examinations" and "maintenance of certification activities."[79] Physicians who do not toe the AAP line may see challenges to their board certification for supposed "disinformation."[80]

In sum, the AAP has a policy view, and that view subordinates both children and families to AAP's ideological values. The AAP is entitled to those values, as harmful to children as they are. But no one should pretend that the AAP's view here is based on the scientific evidence.

---

[75] *See* David Oliver, *Can My Doctor Out Me to My Parents?*, U.S. News & World Reports (Mar. 22, 2017), https://health.usnews.com/wellness/articles/2017-03-22/can-my-doctor-out-me-as-gay-to-my-parents.
[76] *Caring for Transgender Youth: A Q&A With Dr. Juanita Hodax*, Seattle Children's Hospital (Apr. 3, 2019), https://providernews.seattlechildrens.org/caring-for-transgender-youth/.
[77] Rafferty, *supra* note 59, at 8.
[78] *Id.*
[79] *Id.* at 10.
[80] Alyson Sulaski Wyckoff, *Board-Certified Physicians Who Spread COVID Vaccine Misinformation Risk Certification*, Am. Acad. of Pediatrics (Sept. 10, 2021), https://publications.aap.org/aapnews/news/15622.

## C.      Endocrine Society

Many of the concerns raised about WPATH's standards apply also to the Endocrine Society's transitioning recommendations and practice guidelines—which expressly disclaim "establish[ing] a standard of care."[81] WPATH is a co-sponsor of the Endocrine Society's practice guidelines,[82] and as is true with many authors of the WPATH and AAP standards, many of these guidelines' authors make their livings performing the treatments blessed by the standards they write, raising concerns about financial conflicts of interest.

The Endocrine Society's *amicus* brief trumpets that its guidelines are graded "based on the internationally recognized Grading of Recommendations Assessment, Development and Evaluation (GRADE) system." Br. 15; *see also* Compl. ¶ 26. This system measures the quality of evidence after "an unbiased, thorough, critical systematic review of all the relevant evidence."[83] So the natural follow-up questions would be (1) what evidence the Endocrine Society considered and (2) what grades the evidence received. Neither Plaintiffs nor the interest groups dare answer those questions. That is because the Endocrine Society commissioned only "two systematic reviews for its clinical practice guideline": "one on the effects of sex steroids on lipids and cardiovascular outcomes" and "the other on their effects on bone health."[84] That's it. As Dr. Gordon Guyatt—who helped develop GRADE and is cited multiple times by the interest groups' brief—noted, "the systematic reviews didn't look at the effect of the interventions on gender dysphoria itself"—seemingly "the most important outcome."[85] Nor did the Endocrine Society's systematic reviews

---

[81] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3895 (Nov. 2017).
[82] *Id.* at 3869.
[83] Block, *supra* note 64, at *2.
[84] *Id.* at *3.
[85] *Id.*

19

consider *any* other risks or potential benefits of these treatments. Guyatt described this as a "serious problem[]": making a recommendation without a systematic review "violat[es] standards of trustworthy guidelines."[86]

Turning to the second question about what grades the Endocrine Society's guidelines received, all recommendations about "affirming" treatment of adolescents are supported only by low or very low-quality evidence.[87] To justify offering strong recommendations based on weak evidence, the guidelines rely on the Society's own "values and preferences."[88] But as Mark Helfand, professor of medical informatics and clinical epidemiology at Oregon Health and Science University, explained, "[w]eak evidence 'doesn't just mean something esoteric about study design, it means there's uncertainty about whether the long term benefits outweigh the harms.'"[89] In a recent interview, Guyatt said:

> "Everybody now has to claim to be evidence based" in order to be taken seriously . . . . But people "don't particularly adhere to the standard of what is evidence based medicine . . . ." When there's been a rigorous systematic review of the evidence and the bottom line is that "we don't know,'" he says, then "anybody who then claims they do know is not being evidence based."[90]

In sum, public information about WPATH, AAP, and the Endocrine Society raises serious concerns about their motivations here. Ideology, not evidence, appears to be their north star.

## II. No high-quality evidence supports sterilizing interventions in children.

The Plaintiffs' case hinges on claims by WPATH and other medical interest groups. Likewise, in their *amicus* brief here, the medical interest groups tout their "important expertise" and claim to "provide the Court with an accurate" summary of the "widely accepted" "scientific

---

[86] *Id.*
[87] *Id.*; *see* Hembree, *supra* note 81, at 3869–3903.
[88] Block, *supra* note 64, at *3; *see* Hembree, *supra* note 81, at 3879–89.
[89] Block*, supra* note 64, at *3.
[90] *Id.* at *5.

evidence supporting [gender transition medical] interventions" in minors. Br. 2–4. But as noted, their brief has abandoned their prior claims about a robust consensus of empirical evidence supporting the medical transition of minors. So if WPATH and AAP provided *in*accurate information to other courts via their *amicus* briefs, why should their promise of accuracy be trusted here? A look at the latest brief's claims suggests that it should not. Most of the "evidence" cited by the medical interest groups consists of references to their own policy statements. As discussed, there is little reason to credit those self-serving, ideological statements. The few studies the groups discuss underscore the point.

   In place of their prior claim that a "robust body of scientific evidence" "shows that young people suffering from gender dysphoria who receive the gender-affirming standard of care experience improvements in their overall well-being,"[91] WPATH and AAP now say that "[e]mpirical evidence *indicates* that . . . gender-affirming medical interventions provided to *carefully evaluated* patients *who meet diagnostic criteria*[] *can* alleviate clinically significant distress." Br. 4 (emphases added). This new claim borders on meaningless, thanks to all the italicized weasel words. And the only source cited for this claim is the same one they cited for the previous claim, which looks like a scientific article published in the *New England Journal of Medicine. Id.* at 5 n.7 (citing Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, 385 New Eng. J. Med. (2021), https://bit.ly/3qTCwRm). But it is an opinion piece written by a recent college graduate. It is not scientific evidence. Yet the medical interest groups cite the op-ed over and over—*passim* in their Table of Authorities—presenting its ideological claims as scientific fact each time.

   The medical interest groups next claim that "gender-affirming medical interventions"

---

[91] *Brandt* Brief, *supra* note 1, at 12.

"greatly reduce[] the negative physical and mental health consequences that result when gender dysphoria is untreated." Br. 8. Their only citation? A dated "position statement" of the Endocrine Society, filed in the "Advocacy" section of its website. This claim is founded on a false dichotomy: the choice is not whether to leave gender dysphoria "untreated," but whether to use proven, low-risk interventions like psychotherapy instead of permanently sterilizing cross-sex hormones—at least until the minor becomes an adult and can fully comprehend the decisions she is asked to make. None of the studies cited by the interest groups appears to separate psychotherapy from medical interventions. In many studies, both treatments are provided, but then the interest groups proclaim that any improvement in outcome is due to the medical intervention. That unscientific approach is implicitly contrary even to the Endocrine Society's "position statement," which says that "the degree of improvement as a result of the intervention" is "not yet known."[92] The position statement also says that "further studies are needed to determine strategies for fertility preservation and *to investigate long-term outcomes of early medical intervention*."[93] That is because, contrary to what one would assume reading the interest groups' brief here, we do not know those outcomes.

Meanwhile, the studies the groups cite are deeply flawed. Take the lead study in their string-cites of studies about puberty blockers *and* studies about cross-sex hormones. The study is a joke. Of 116 participants who entered the study, less than 50% completed it. 47 participants were given drugs, and 3 participants were not. Many participants were older than age 18—as old as

---

[92] Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (Dec. 16, 2020), https://www.endocrine.org/advocacy/position-statements/transgender-health.
[93] *Id.* (emphasis added).

25.[94] A non-randomized control group of three participants is deficient, and the study makes no attempt to compare outcomes between the groups. And because the study makes little effort to control for other relevant variables, the study could not show any causal relationship between gender transition interventions and outcomes. The length of the study—only twelve months—also discounts its findings. Finally, according to the study itself, "most predictors did not reach statistical significance."[95] Unsurprising, given that the total evidence collected from each participant amounted to a three-questionnaire survey, administered three times at six-month intervals.[96] No entity concerned with evidence-based medicine would *lead* with this study.

Next, the interest groups wave around a study that "analyzed survey data from 89 transgender adults." Br. 18–19. The study's "data" were responses from an online survey drawn from trans-affirming websites. It "excluded those who underwent medical intervention and then subsequently stopped identifying as transgender," and "[o]bviously, those who actually committed suicide."[97] "73% of respondents who reported having taken puberty blockers" "said they started on them *after* the age of 18 years"—which is not even when puberty blockers are prescribed.[98] And the study itself concedes that it "does not allow for determination of causation."[99]

The groups' reliance on other studies is just as embarrassing. The study they cite as finding

---

[94] *See* Christal Achille et al., *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results*, 8 Int'l J. Pediatric Endocrinology, at 1, tbl. 1 (Apr. 30, 2020), https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2; *id.* tbl. 2 (showing that apparently 24 participants were only given cross-sex hormones).

[95] *Id.* at 3.

[96] *Id.* at 2–3.

[97] Michael Biggs, *Puberty Blockers and Suicidality in Adolescents Suffering from Gender Dysphoria*, 49 Archives of Sexual Behav. 2227, 2227 (2020), https://link.springer.com/article/10.1007/s10508-020-01743-6.

[98] *Id.*

[99] Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 Pediatrics 1, 1, 7 (Feb. 2020), https://doi.org/10.1542/peds.2019-1725.

"that suicidality was decreased" (Br. 19) involved only 47 participants who were overwhelmingly white, considered a treatment period of as little as three months, admitted that it "lacked a control group" so "cannot infer that [medical interventions] are causally responsible for the beneficial outcomes," and did not control for confounding variables like "whether a patient is actively receiving psychotherapy."[100] Again, this last failure is shared by practically all of the studies relied on by the groups—meaning that none of those studies can tease out any difference between treatment with sterilizing cross-sex hormones and treatment with psychotherapy. WPATH's own reviewers said "[i]t was impossible to draw conclusions about the effects of hormone therapy on death by suicide" based on the available evidence.[101]

The 2023 study the medical groups cite as finding that interventions were "associated with decreased symptoms of depression and anxiety" (Br. 19) also did not include a control group, did not separate psychiatric interventions, saw 2 (of 307) patients commit suicide (a 0.6% mortality rate within two years), and suspiciously omitted data about *most* of the outcomes that the study set out to examine.[102]

Last, the study the medical groups cite as finding "a statistically significant decrease in depression and anxiety" (Br. 19–20) looked at a mere 55 people, drawn with self-selection problems from an initial group of nearly 200 that was concededly "different from the transgender youth

[100] Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones*, 7 Clinical Prac. Pediatric Psychol. 302, 303–04, 308–09 (2019).
[101] Kellan E. Baker et al., *Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review*, 5 J. Endocrine Soc'y 1, 1, 12 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7894249.
[102] Diane Chen et al., *Psychosocial Functioning in Transgender Youth After 2 Years of Hormones*, 388 New Eng. J. Med. 240, 243, 245–48 (2023); *see generally* Jesse Singal, *The New, Highly Touted Study on Hormones for Transgender Teens Doesn't Really Tell Us Much of Anything*, Singal-Minded (Feb. 7, 2023), https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones.

in community samples" and omitted one patient who died after genital surgery.[103] The study found that gender dysphoria was *worse* after puberty blockers.[104] And the study's lead author said its protocol may not be relevant to the more recent wave of girls who present as adolescents with gender dysphoria, a "new developmental pathway."[105]

If the open ideological bias of the medical interest groups were not enough to warrant skepticism, their repeated reliance on studies that are facially deficient confirms that interests other than evidence-based medicine are driving their views on this issue. The Court should not defer to those self-interested, ideological views.

**CONCLUSION**

Given the mounting evidence that these sterilizing interventions harm children and the absence of any long-term studies demonstrating their safety and effectiveness, Kentucky's law is necessary to protect children. If Plaintiffs' injunction is granted, some number of Kentucky children will be permanently prevented from engaging in intimate relationships, having children of their own, and being able to care for their children. The Court should deny an injunction.

---

[103] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 697, 702 (2014), https://doi.org/10.1542/peds.2013-2958; *see* Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals*, 49 J. Sex & Marital Therapy 348, 354–55 (2023), https://bit.ly/3DIUNY3.
[104] de Vries, *supra* note 103, at 699, tbl. 2.
[105] Annelou L.C. de Vries, *Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents*, 146 Pediatrics 1, 1 (2020), https://doi.org/10.1542/peds.2020-010611.

Respectfully submitted,

s/ Christopher Wiest
Christopher Wiest (KBA 90725)
CHRIS WIEST, ATTORNEY AT LAW, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

Christopher Mills*
SPERO LAW LLC
557 East Bay St. #22251
Charleston, SC 29413
Tel: (843) 606-0640
cmills@spero.law

*pro hac vice motion pending

Counsel for *Amicus Curiae*

JUNE 9, 2023