## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

JANE DOE 1, *et al.,*              )
                                   )
    Plaintiffs,                    )
                                   )
    v.                             )          No. 3:23-cv-00230-DJH
                                   )
WILLIAM C. THORNBURY, JR., MD, in his )
Official capacity as the president of the Kentucky )
Board of Medical Licensure, *et al.*, )
                                   )
    Defendants,                    )
                                   )
&                                  )
                                   )
COMMONWEALTH OF KENTUCKY ex rel. )
Attorney General Daniel Cameron,   )
                                   )
    Intervenor-Defendant.          )

**Brief of *Amici Curiae* Arkansas, Alabama, Alaska, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Carolina, South Dakota, Utah, and West Virginia in Support of Intervenor-Defendant's Opposition to Motion for Preliminary Injunction**

Steve Marshall
    *Attorney General*
Edmund G. LaCour Jr.
    *Solicitor General*
A. Barrett Bowdre
    *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Tim Griffin
    *Attorney General*
Nicholas J. Bronni
    *Solicitor General*
Dylan L. Jacobs
    *Deputy Solicitor General*
Michael A. Cantrell
    *Assistant Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

Clinton J Elliott
Matthew D. Doane
Doane & Elliott, P.S.C.
P.O. Box 372
120 E. Adams Street, Suite 2
La Grange, Kentucky 40031
(502) 602-0008
clint@cornerstonelawky.com
matt@cornerstonelawky.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICI .................................................................................................... 1

ARGUMENT .................................................................................................................... 1

    I.    Gender-Transition Procedures Are Not Evidence-Based ............................... 1

        A.    Healthcare authorities have determined that gender-transition procedures are "experimental." ......................................................................... 2

        B.    The medical interest groups endorsing gender-transition procedures are biased advocates, not neutral experts ....................................................... 5

    II.    SB 150 Does Not Violate Equal Protection .................................................. 11

        A.    SB 150 does not discriminate based on sex ......................................... 11

        B.    Even if SB 150 classifies based on transgender identity, transgender individuals are not a suspect class triggering intermediate scrutiny .................... 16

        C.    SB 150 passes intermediate scrutiny .................................................... 18

    III.    Parents Do Not Have a Substantive Right to Subject Children to these Procedures ..... 21

# TABLE OF AUTHORITIES

**Cases**

*Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*,
57 F.4th 791 (11th Cir. 2022) (en banc) .............................................................. 15, 16, 18, 19

*Application of Pres. & Directors of Georgetown College, Inc.*,
331 F.2d 1000 (D.C. Cir. 1964) ............................................................................. 21

*B.P.J. v. W.V. State Bd. of Educ.*,
2023 WL 111875 (S.D.W.V. Jan. 5, 2023) ............................................................ 18, 20

*Ballard v. United States*,
329 U.S. 187 (1946) ............................................................................................... 18

*Boe v. Marshall*,
No. 2:22-cv-184-LCB (N.D. Ala.) ......................................................................... 4

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) ........................................................................................... 14, 15, 17

*Brandt by and through Brandt*,
2022 WL 16957734 (8th Cir. Nov. 16, 2022) ....................................................... 15

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ............................................................................................... 16, 18

*Craig v. Boren*,
429 U.S. 190 (1976) ............................................................................................... 19

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ........................................................................................... passim

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
920 F.3d 421 (6th Cir. 2019) ................................................................................. 10

*Frontiero v. Richardson*,
411 U.S. 677 (1973) ............................................................................................... 17, 20

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ............................................................................................... 16

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ................................................................................. 9

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)..................................................................................... 10

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)..................................................................................... 11

*Kirchberg v. Feenstra*,
   450 U.S. 455 (1981)..................................................................................... 19

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014)................................................................... 6, 7, 9

*Lyng v. Castillo*,
   477 U.S. 635 (1986)..................................................................................... 17

*Mass. Bd. of Retirement v. Murgia*,
   427 U.S. 307 (1976)................................................................................ 16, 17

*McMain v. Peters*,
   2018 WL 3732660 (D. Or. Aug. 2, 2018)................................................... 12

*Michael M. v. Superior Court*,
   450 U.S. 464 (1981)..................................................................................... 19

*Nguyen v. INS*,
   533 U.S. 53 (2001)................................................................................. 18, 19

*Parham v. J.R.*,
   442 U.S. 584 (1979)................................................................................ 21, 22

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ...................................................................... 15

*Prince v. Massachusetts*,
   321 U.S. 158 (1944)..................................................................................... 21

*Reed v. Reed*,
   404 U.S. 71 (1971)....................................................................................... 19

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973)......................................................................................... 16

*Stanley v. Illinois*,
   405 U.S. 645 (1972)..................................................................................... 21

*Stanton v. Stanton*,
    421 U.S. 7 (1975) ........................................................................................ 19

*Titus v. Aranas*,
    2020 WL 4248678 (D. Nev. June 29, 2020) ......................................... 12

*Troxel v. Granville*,
    530 U.S. 57  (2000) .................................................................................. 21

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................................ 19

*Vacco v. Quill*,
    521 U.S. 793 (1997) ......................................................................... 11, 16

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................................ 15

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................................ 21

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................................ 21

**Regulations**

Nondiscrimination in Health and Health Education Programs or Activities, Delegation of
    Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020) ............................................ 9

**Other Authorities**

Aaron Devor, WPATH, *History of the Association*, https://perma.cc/E2R6-XCQE
    (last accessed May 24, 2023) .................................................................................. 9

Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022),
    https://perma.cc/34VG-CVWK ........................................................................... 5, 6

Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, The Free Press
    (Oct. 4, 2021), https://perma.cc/LJD6-TH7P ......................................................... 8

Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender
    'Care,' Threats Against Dissenting Doctors*, The Dailywire (Sept. 20, 2022),
    https://perma.cc/7ZGW-NDY4 ........................................................................... 5

Anna Smith Haghighi, *What To Know About Estrogen in Men*, Medical News Today
(Nov. 9, 2020), https://perma.cc/B358-S7UW ........................................................ 13

Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*,
N.Y. Times (June 9, 2023), https://perma.cc/Z74M-ED6R ...................................... 3

Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'*
N.Y. Times (Sept. 26, 2022), https://perma.cc/9786-V27T ...................................... 5

Claire Sissions, *Typical Testosterone Levels in Males and Females*,
Medical News Today (Jan. 6, 2023),
https://perma.cc/M98N-4WG .................................................................................... 13

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022),
https://perma.cc/ZMT2-W6DX ............................................................................. 7, 8

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*,
10 Public Relations Inquiry 295 (2021) .................................................................... 8

*Gender-affirming hormones for children and adolescents with gender dysphoria*,
Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021),
https://perma.cc/M8J5-MXVG .................................................................................. 2

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/NRX5-U85C ......................... 6

*Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021),
https://perma.cc/93NB-BGAN.................................................................................... 2

Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022),
https://perma.cc/KS4N-V2GX.................................................................................... 3

Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022),
https://perma.cc/RJU2-VLHT.................................................................................... 3

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307 (2019),
https://perma.cc/D7X3-TMC4 ................................................................................... 5

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics (2018), https://perma.cc/MYL7-DFDS .... 5

Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today
(Jan. 12, 2023), https://perma.cc/BT38-L79X ......................................................... 13

Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/59HW-4J4G ................................ 9

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9 ........................................ 4

Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS ............ 8

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022), https://perma.cc/KBZ4-TBN9 ......................... 5, 6

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolescent Gynecology 460 (2019), https://perma.cc/WU36-5889 ................................................................................... 14

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://perma.cc/A5YL-RYYY ......................................... 8

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behavior 3353 (2021).................................................................. 15, 17

Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://perma.cc/8NQA-SQ3Q..................................................................................... 6

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males: Current Practice and Unmet Needs*, 5 J. Endocrine Society 1 (2021), https://perma.cc/E3ZQ-4PZV................................ 13

Mayo Clinic, *Enlarged Breasts in Men (Gynecomastia)*, https://perma.cc/PX5W-JVVF ........... 14

Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV ......................................... 12, 13

Nationwide Children's, *Macromastia*, https://perma.cc/PAD7-9QY2........................................ 14

NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H ...................................................................................... 3

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 ..................................................................................... 12

Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT.................................................................... 3, 4

Patrick Lappert, *Florida Medicaid Project: Surgical Procedures and Gender Dysphoria* 4 (May 17, 2022), https://perma.cc/7JAD-3HBQ....................................................... 14

*Statement of Removal*, 23 Int'l J. of Transgender Health S259 (2022),
https://perma.cc/UZ94-C9VE ................................................................................. 7

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022),
https://perma.cc/FDS5-BDF3 ................................................................................ 3

Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023),
https://perma.cc/H83F-4ZR7 ............................................................................... 11

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ......... 7

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017),
https://perma.cc/3PNE-SQ3T ........................................................................... 9, 10

## INTEREST OF AMICI

Amici curiae are the States of Arkansas, Alabama, Alaska, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Carolina, South Dakota, Utah, and West Virginia. Like Kentucky, Amici are concerned by the recent surge of children suffering from gender dysphoria and other forms of gender-related psychological distress. And like Kentucky, Amici are concerned because these vulnerable children are suffering greatly and need help.

The question is how to help them. Throughout their brief, Plaintiffs assert that gender-transition procedures—puberty blockers, cross-sex hormones, and surgical interventions—are "the only safe and effective treatments for their gender dysphoria." Doc. 17 at 27. The problem is that the evidence does not support this approach—regardless of whatever label Plaintiffs wish to attach. That's why experts in several European countries and the State of Florida have moved away from those treatments. And that's why a growing number of States, including some of the Amici, have banned gender-transition procedures on minors. Amici thus write in support of Kentucky's similar law.

## ARGUMENT

### I.   Gender-Transition Procedures Are Not Evidence-Based.

Read Plaintiffs' brief and one might think that gender-transition procedures stand on a robust mountain of evidence-based research. Plaintiffs suggest that giving puberty blockers and cross-sex hormones to minors for gender dysphoria is grounded in "established science." Doc. 17 at 14. And they place great weight on the endorsement of gender-transition procedures by medical interest groups. *Id.* at 11. But on the first count, they're wrong; gender-transition procedures are experimental, as systematic reviews of the evidence by medical authorities in the United Kingdom, Sweden, Finland, and Norway explain. And on the second, their reliance is misplaced; as the

Supreme Court recently explained, while "the position of the American Medical Association" and other medical interest groups may be relevant to a "legislative committee," it does not "shed light on the meaning of the Constitution." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (cleaned up). That is particularly true here given that the interest groups Plaintiffs rely on suppress dissent and rebuff calls for open, systematic evidence reviews.

### A. Healthcare authorities have determined that gender-transition procedures are "experimental."

Plaintiffs proclaim that gender-transition procedures are well-supported and efficacious. That is far from the case. In recent years, medical authorities in the UK, Finland, Sweden, and Norway have all looked at the evidence and determined that transitioning treatments for minors are experimental.

*1. United Kingdom.* In 2020, Britain's National Institute for Health and Care Excellence (NICE) commissioned an independent review of the use of puberty blockers and cross-sex hormones to treat gender dysphoria chaired by Dr. Hilary Cass. As part of the review, NHS reviewed the scientific evidence concerning puberty blockers and cross-sex hormones for children and adolescents. *See Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021), https://perma.cc/M8J5-MXVG (hereinafter "NICE Cross-Sex Hormone Evidence Review"); *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, Nat'l Inst. for Health & Care Excellence (Mar. 11, 2021), https://perma.cc/93NB-BGAN (hereinafter "NICE Puberty Blocker Evidence Review"). That review exposed the lack of scientific support for the procedures. It concluded that there are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers]," NICE Puberty Blocker Evidence Review at 12, and that the safety of cross-sex hormones was similarly unknown, NICE Cross-Sex Hormone Evidence

2

Review 14. Thus, Dr. Cass determined that "the available evidence was not strong enough to form the basis of a policy position," Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT, and called for experiments to *start* being conducted, Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.

On June 9, 2023, NHS published an interim service specification officially adopting many of Dr. Cass's recommendations. NHS now prioritizes psychological—not hormonal or surgical—care for the treatment of gender dysphoria in youth and will consider prescribing puberty blockers *only* as part of a formal research protocol. Recruitment for that research study is expected to begin in 2024—meaning that until then, puberty blockers will ordinarily not be prescribed by NHS physicians. *See* Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. Times (June 9, 2023), https://perma.cc/Z74M-ED6R; NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H.

*2. Sweden.* In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare concluded that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3. Concerned that there was no "reliable scientific evidence concerning the efficacy and the safety of both treatments," that "detransition occurs among young adults," and that there has been an "unexplained increase" in minors identifying as transgender, the National Board restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases." *Id.* at 3-4.

*3. Finland.* In June 2020, Finland's Council for Choices in Healthcare in Finland also suggested changes to its treatment protocols. *See* Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT. Though allowing for some hormonal interventions under certain conditions, the Council lamented the lack of evidence and urged caution in light of severe risks associated with medical intervention. "As far as minors are concerned," the Council found, "there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based," and "it is critical to obtain information on the benefits and risks of these treatments in rigorous research settings." *Id.* Accordingly, the Council concluded, "no decisions should be made that can permanently alter a still-maturing minor's mental and physical development."

*4. Norway.* In March 2023, the Norwegian Healthcare Investigation Board (Ukom) released a report finding that its national guidelines for treating gender dysphoria were inadequate. Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9. The existing 2020 guidelines had not been based on a literature review, and the new report found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services." *Id.* Accordingly, Ukom "recommended that updated guidelines should be based on a new commissioned review or existing international up-to-date systematic reviews, such as those conducted in 2021 by the UK's National Institute for Health and Care Excellence." *Id.* At present, "Ukom defines such treatments as utprøvende behandling, or 'treatments under trial,'"—that is, experimental. *Id.*

**B. The medical interest groups endorsing gender-transition procedures are biased advocates, not neutral experts.**

Ignoring these European evaluations, Plaintiffs point to statements by American organizations that gender-transition procedures are safe and effective. Doc. 17 at 24-25. But the interest groups that endorse gender-transition procedures, *see id.*, are just that—interest groups. These groups come with their own point of view, their own financial interests, and their own causes— which is why WPATH recently described itself in court as "an advocacy organization[]," *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. And these groups have a strong interest in promoting gender-transition procedures, which are a "big money maker." Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors*, The Dailywire (Sept. 20, 2022), https://perma.cc/7ZGW-NDY4; *see also* Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery*,*'* N.Y. Times (Sept. 26, 2022), https://perma.cc/9786-V27T (reporting that double mastectomies can "cost[] anywhere from $9,000 to $17,000"). Unsurprisingly, while these organizations claim to reflect the views of the medical community, there is growing evidence that this is far from true.

*1. American Academy of Pediatrics (AAP)*. Start with AAP. It would be one thing if its position statement truly reflected either the state of the science or its membership's views. Instead, the 2018 AAP statement was "written by a single doctor," who "'conceptualized,' 'drafted,' 're-viewed,' 'revised,' and 'approved' the manuscript himself." Aaron Sibarium, *The Hijacking of Pediatric Medicine*, The Free Press (Dec. 7, 2022), https://perma.cc/34VG-CVWK (hereinafter "Sibarium, *Hijacking*"); *see* Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics (2018), https://perma.cc/MYL7-DFDS. That statement outright disregarded or misrepresented several studies on gender-dysphoric children. James M. Cantor, *Transgender and Gender Diverse*

*Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 307-13 (2019), https://perma.cc/D7X3-TMC4. And it elicited much concern from AAP's membership.

Yet a recent resolution "submitted to the AAP's annual leadership forum to inform the academy's 67,000 members about the growing international skepticism of pediatric gender transition" was quashed by "the AAP's leadership," "[e]ven though the resolution was in the top five of interest based on votes by members cast." Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022), https://perma.cc/KBZ4-TBN9 ((hereinafter "Mason & Sapir, *Dubious Science*"). AAP "decried the resolution as transphobic and noted that only 57 members out of 67,000 had endorsed it," but allowed a motion supporting "affirming" interventions to go through the next week with only 53 members supporting it. *Id.* AAP even asked "the Department of Justice to investigate critics of 'gender affirming care,' arguing that they were spreading 'disinformation.'" Sibarium, *Hijacking*. As AAP member Dr. Julia Mason concluded, "AAP has stifled debate … and put its thumb on the scale … in favor of a shoddy but politically correct research agenda." Mason & Sapir, *AAP's Dubious Transgender Science.*

*2. World Professional Association for Transgender Health (WPATH).* Things are even worse at WPATH. As Dr. Stephen Levine, a psychiatrist who "helped to author the fifth version of the [WPATH] Standards of Care" has testified, "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014). Those conflicting aspirations have often impacted WPATH's recommendations. In September 2022, for instance, WPATH released the updated 8th edition of its Standards of Care (SOC 8). This edition added a controversial "Eunuch" chapter and made other changes. *See* Genevieve Gluck, *Top Trans Medical Association*

*Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/NRX5-U85C. And though SOC 8 initially retained (some) age requirements for transitioning minors—14 years old for cross-sex hormones (down from 16 in SOC 7), 15 for mastectomies, "and vaginoplasty and hysterectomy at 17," Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://nypost.com/2022/09/29/kid-gender-guidelines-not-driven-by-science—WPATH issued a "correction" shortly after publication *removing* most minimum age requirements. (Remarkably, this correction has itself since been removed. *See Statement of Removal*, 23 Int'l J. of Transgender Health S259 (2022), https://perma.cc/UZ94-C9VE .) Why? According to Dr. Tishelman, lead author of the chapter on children, it was to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held legally liable for malpractice if they deviated from the standards. Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

WPATH's conflicting aspirations have also led it to stifle dissent. As Dr. Levine has explained, "[s]kepticism and strong alternative views are not well tolerated" at WPATH and "have been known to be greeted with antipathy." *Kosilek*, 774 F.3d at 78 (alteration omitted). Dr. Ken Zucker was one such professional "greeted with antipathy" by activists at WPATH and its U.S. affiliate, USPATH. Zucker is "a psychologist and prominent researcher who directed a gender clinic in Toronto" and headed the committee that developed the American Psychiatric Association's criteria for "gender dysphoria" in the DSM-5. Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. Times Magazine (June 15, 2022), https://perma.cc/ZMT2-W6DX (hereinafter "Bazelon, *Battle*"). The 2012 WPATH Standards of Care—SOC 7—"cited his work 15 times." *Id.* In his nearly forty years of research, Zucker discovered "that most young children who came to his clinic stopped identifying as another gender as they got older." *Id.* Instead, "[m]any of them would go

on to come out as gay or lesbian or bisexual, suggesting previous discomfort with their sexuality, or lack of acceptance." *Id.* Zucker became concerned that socially transitioning children could entrench gender dysphoria that would otherwise resolve.

Zucker's position was not popular with activists at WPATH. In 2017, when USPATH hosted its inaugural conference, Zucker submitted research, "his research passed the peer review process," and he was invited to present. Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 Public Relations Inquiry 295, 302 (2021). But "[a]ctivists demanded Zucker's symposium be cancelled and for the WPATH Executive Board to provide an explanation and apology for his presence." *Id.* They won. Zucker's panels were cancelled and "[c]onference organizers and board members publicly apologized for Zucker's presence at the conference." *Id.* at 304.

A few years later, in the fall of 2021, a number of articles by and about three WPATH leaders exposed further fissures in the organization. Dr. Marci Bowers, a world-renowned vaginoplasty specialist who currently serves as president of WPATH; Dr. Erica Anderson, a clinical psychologist and a former president of USPATH; and Dr. Laura Edwards-Leeper, the founding psychologist at the first hospital-based children's gender clinic in the United States, voiced their concern that medical providers in America were transitioning minors without proper gender exploratory psychotherapy and other safeguards. *See, e.g.*, Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, The Free Press (Oct. 4, 2021), https://perma.cc/LJD6-TH7P ; Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, Wash. Post (Nov. 24, 2021), https://perma.cc/A5YL-RYYY. When Anderson, Bowers, and Edwards-Leeper went public with their concerns, USPATH and WPATH released a joint statement condemning "the use of the lay press … as a forum for the scientific debate" over "the use of

pubertal delay and hormone therapy for transgender and gender diverse youth." *See* Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS. "In early November, the board of USPATH privately censured Anderson, who served as a board member. In December, the board imposed a 30-day moratorium on speaking to the press for all board members. That month, Anderson resigned." Bazelon, *The Battle.*

Because WPATH is an advocacy organization, not a neutral scientific body, the First and Fifth Circuits—and, until recently, the U.S. Department of Health and Human Services—have found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see also Kosilek*, 774 F.3d at 90; Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020) (warning of "rel[ying] excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific factfinding").

*3. Endocrine Society.* While there has been less public reporting about the Endocrine Society, one cause for concern is that the authorship of its guidelines for treating gender dysphoria is composed almost entirely of WPATH leaders. WPATH is an official co-author of the Endocrine Society Guidelines, and of the nine listed authors, it appears that only *one* (M. Hassan Murad) has not served as a leader in WPATH or an author of its standards of care. *See generally* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017), https://perma.cc/3PNE-SQ3T (hereinafter "Endocrine Society Guidelines"); Aaron Devor, WPATH, *History of the Association*, https://perma.cc/E2R6-XCQE (last accessed May 24, 2023). Moreover, Gordon Guyatt, "who co-developed" the Grading of Recommendations Assessment, Development and Evaluation

9

(GRADE) system for assessing evidentiary value "found 'serious problems' with the Endocrine Society guidelines, noting that the systematic reviews didn't look at the effect of the interventions on gender dysphoria itself, arguably 'the most important outcome.'" Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/59HW-4J4G. "He also noted that the Endocrine Society had at times paired strong recommendations—phrased as 'we recommend'—with weak evidence," even though "'GRADE discourages strong recommendation with low or very low quality except under very specific circumstances'" that "should be made explicit." *Id.* The Endocrine Society's guidelines do not discuss any of these exceptions. *See generally* Endocrine Society Guidelines.

* * * * *

Plaintiffs rely on district court opinions that wrongly allow the opinions of interest groups like AAP, WPATH, and the Endocrine Society to override the responsibility of the state to make its own policy judgments about appropriate medical care. But there are good reasons the Supreme Court has upheld laws that "conflicted with official positions of [medical interest groups]." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 438 (6th Cir. 2019); *see, e.g.*, *Dobbs*, 142 S. Ct. at 2267; *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). One is that groups like AAP, WPATH, and the Endocrine Society are not neutral arbiters of science or medical opinion, but *interest groups*, composed of practitioners whose livelihoods depend on being paid for the treatments at issue. Their endorsement should thus carry little weight. Conversely, countries that have conducted a systematic review of the evidence have concluded that gender-transition procedures are experimental and risky, certainly not supported by "established science," as Plaintiffs suggest. Doc. 17 at 14.

## II.    SB 150 Does Not Violate Equal Protection.

At any rate, the views of Plaintiffs' medical interest groups don't matter. For the Constitution does not require States to show that their public-health regulations are met with the approval of those organizations. Rather, such regulations are "entitled to a strong presumption of validity," and must be upheld if they have some rational basis. *Dobbs*, 142 S. Ct. at 2245, 2284 (internal quotation marks omitted). And although Plaintiffs go so far as to suggest that SB 150 would violate rational basis, Doc. 17 at 27-28, Kentucky easily wins under that standard. It has a legitimate interest in ensuring the safety of its citizens, and—if the systematic reviews conducted by European nations are any indication—there are reasons to be concerned about performing gender-transition procedures on minors. *Dobbs*, 142 S. Ct. at 2284.

Plaintiffs' other equal-protection arguments—that it classifies based on transgender status or sex, triggering intermediate scrutiny—fare no better. For one, SB 150 classifies based on age and procedure, not transgender identity or sex. And neither procedure nor age triggers heightened review. *Vacco v. Quill*, 521 U.S. 793, 800 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991). But even if the Plaintiffs could show that the Act distinguishes based on transgender identity or sex, they would still lose. Individuals who identify as transgender do not form a suspect class, so distinguishing based on transgender identity does not trigger heightened review. And any classification centers around biological differences between the sexes, not stereotypes, so SB 150 passes intermediate scrutiny.

### A.  SB 150 does not discriminate based on sex.

*1. SB 150 classifies based on procedure, not sex.* Start with the Plaintiffs' sex-classification argument. That argument goes something like this: under SB 150, males can receive testosterone and phalloplasties, but females can't. Conversely, females can take estrogen, but males can't. Thus, they assert, whether a medical treatment is prohibited depends on the sex of the minor.

11

That argument breaks down entirely when one considers each of the procedures barred. Some of SB 150's applications *can't* be sex-based. For instance, puberty blockers work the same way in males and females alike, and sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for gender dysphoria. *See, e.g.*, Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited May 12, 2023). Thus, banning their use in gender-transition procedures doesn't draw any lines between the sexes; girls and boys are treated identically. The same is true of chest surgeries. SB 150 obviously doesn't prevent girls from undergoing a mastectomy to treat cancer, so the Act's ban on mastectomies for gender transition can't be sex-based.

Plaintiffs' sex-classification argument has a second flaw: it (incorrectly) presumes that gender-transition procedures are identical to traditional uses of puberty blockers or hormones and similar surgeries. But that is not the case because these different uses have (1) different diagnoses and diagnostic criteria, (2) different goals, and (3) different risks. Thus, just as administering morphine to treat a patient's pain is not the same medical procedure as using morphine to assist a patient's suicide, the same distinction holds true here. *See, e.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Or. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with Klinefelter Syndrome); *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat low levels not similarly situated to biological female prisoner taking testosterone to transition).

Consider puberty blockers again. Other than treating gender dysphoria, puberty blockers are ordinarily prescribed to stop precocious puberty, in which a child begins puberty at an unusually early age. Mayo Clinic, *Precocious Puberty*. But precocious puberty is a physical abnormality

that can be diagnosed through medical scans and tests, *see* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited May 12, 2023), not a subjective "internal sense" that cannot be measured. Doc. 27 at 4. Indeed, the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty," Mayo Clinic, *Precocious Puberty*—the exact opposite goal of using them to halt normal development in children with gender dysphoria. And using puberty blockers to treat precocious puberty poses fewer risks than using them to treat gender dysphoria. Because the goal of treating precocious puberty is to let children develop at the normal time, doctors stop the blockers when the child hits "the normal pubertal age." Mayo Clinic, *Precocious Puberty*. Conversely, doctors prescribe blockers to dysphoric children well beyond the normal age, which may risk their bone growth and social development. NICE Puberty Blocker Evidence Review at 26-32 (very low-quality evidence on the risks of puberty blockers when used to treat gender dysphoria).

The same distinctions exist between uses of hormones barred by SB 150 and those that are not. Males and females normally have very different amounts of naturally occurring testosterone or estrogen. *See, e.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, Medical News Today (Jan. 6, 2023), https://perma.cc/M98N-4WG4. And these hormones serve very different purposes in the different sexes. In females, excess testosterone can cause infertility. Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today (Jan. 12, 2023), https://perma.cc/BT38-L79X. Conversely, testosterone is prescribed to males to help alleviate problem with their fertility or sexual development. Maria Vogiatzi et al., *Testosterone Use in Adolescent Males: Current Practice and Unmet Needs*, 5 J. Endocrine Society 1, 2 (2021), https://perma.cc/E3ZQ-4PZV. The inverse is true of estrogen. When prescribed at an excess level to males, estrogen can cause infertility and sexual dysfunction. Anna Smith Haghighi, *What To*

13

*Know About Estrogen in Men*, Medical News Today (Nov. 9, 2020), https://perma.cc/B358-S7UW. But for females, estrogen is usually prescribed to treat problems with sexual development. Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolescent Gynecology 460 (2019), https://perma.cc/WU36-5889. Providing cross-sex hormones to a child "in amounts greater than would normally be produced endogenously" is obviously not the same procedure as providing naturally occurring hormones. SB 150, sec. 4.

Or consider gender-transition mastectomies. As with all other procedures, a mastectomy performed for gender transition has a different diagnosis, different goal, and different risks from the permissible surgeries they superficially resemble. Females may undergo a mastectomy to treat cancer or breast-reduction procedures to relieve pain caused by "abnormally large breasts." Nationwide Children's, *Macromastia*, https://perma.cc/PAD7-9QY2 (last visited May 12, 2023). And males may undergo a similar procedure to remove excess breast tissue that "sometimes [causes] pain." Mayo Clinic, *Enlarged Breasts in Men (Gynecomastia)*, https://perma.cc/PX5W-JVVF (last visited May 31, 2023). But transgender chest surgeries are "not based in any medical diagnosis and do not seek to restore any form or function that may have been lost due to trauma, disease, or developmental accident." Patrick Lappert, *Florida Medicaid Project: Surgical Procedures and Gender Dysphoria* 4 (May 17, 2022), https://perma.cc/7JAD-3HBQ. Thus, they are "not ethically equivalent" to these other procedures. *Id.*

Because SB 150 distinguishes between different procedures, not between different sexes, and because that distinction is perfectly rational—the different treatments have different risks and ethical concerns, especially when provided to children— SB 150 is perfectly constitutional. *See Dobbs*, 142 S. Ct. at 2284.

*2.* Bostock *does not control.* Because SB 150 distinguishes based on procedure, not sex, it's unsurprising that Plaintiffs also try to argue that it is barred by *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which held that Title VII's prohibition on sex discrimination also prohibited discrimination based on gender identity. Doc. 17 at 21. But "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself," *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *accord Bostock*, 140 S. Ct. at 1753. And there's ample reason to doubt that *Bostock* has any relevance for the Equal Protection Clause. The Equal Protection Clause "predates Title VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt by and through Brandt*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., joined by Gruender, Erickson, Grasz, & Kobes, J.J., dissenting from the denial of rehearing en banc); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976) (declining to hold that Title VII's race discrimination standards are "identical" to the Fourteenth Amendment's). Indeed, the "text" of Title VII "is not similar in any way" to the protections in the Clause. *Brandt*, 2022 WL 16957734, at *1 n.1 (Stras, J., dissenting).

But even if *Bostock* controls, SB 150 passes muster. Its restrictions do not operate based on sex, so to use the *Bostock* formulation, it is not true that but for a child's sex he or she could be given sterilizing transitioning treatments under the Act. And even if the Act did classify based on sex, that classification is tied to real biological differences, not stereotypes. *See infra* Section II.C; *Bostock*, 140 S. Ct. at 1749 (focusing on stereotypes, not biology). Such a classification is entirely permissible, and it does not implicate discrimination based on transgender status either. *Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). Indeed, "a policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status." *Id.*

**B. Even if SB 150 classifies based on transgender identity, transgender individuals are not a suspect class triggering intermediate scrutiny.**

Plaintiffs argue that targeting gender-transition procedures performed on minors effectively targets transgender people because only transgender people seek gender-transition procedures. Doc. 17 at 22. But the growing ranks of detransitioners refute this notion. *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Archives of Sexual Behavior 3353 (2021). And even if it were true, heightened scrutiny doesn't apply simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class. *Vacco*, 521 U.S. at 800. For instance, classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, though those people are uniformly women. *Dobbs*, 142 S. Ct. at 2245-46 ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974))).

In any event, individuals who identify as transgender do not constitute a suspect class that receives heightened scrutiny. Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985). Indeed, the Court has rejected suspect classification for disability, age, and poverty. *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does. *Adams*, 57 F.4th at 803 n.5.

Precedent explains why. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441 (noting that classifications attain suspect status when they have historically "provided no sensible ground for differential treatment"). Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* at 441. Same for racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to be "suspect," a classification must single out a so-called "immutable characteristic" that has historically been the basis for deep discrimination. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender identity does not check these boxes. For one, it is not "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). To the contrary, according to Plaintiffs, individuals identify as transgender when their internal perception of who they are departs from the "immutable characteristic" that is their biological sex. Doc. 27 at 4-5. That necessarily takes place sometime *after* birth. And many individuals who identify as transgender alternate between gender identifications, whether it's non-binary, gender fluid, third gender, or their natal gender. Littman, *Individuals Treated for Gender Dysphoria*. That fluidity means transgender identity cannot form a protected class.

Transgender identity falls short on the other suspect-classification factors too. Individuals identifying as transgender as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or gender. *Murgia*, 427 U.S. at 313-14 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications"). States enshrined purposeful race and sex discrimination into their laws for

decades; conversely, as the Supreme Court has explained, transgender individuals have been protected by a "major piece" of federal civil rights legislation" for nearly a half-century. *Bostock*, 140 S. Ct. at 1753. And the laws (wrongly) described as discriminating against transgender individuals are recent enactments grappling with the policy questions and potential harms to children arising from the recent spike in transgender identification. For example, the dangers inherent in taking cross-sex hormones arise when they are, by definition, administered to a person of the opposite sex—something that occurred very rarely in medicine until the advent of the "affirmative" model of treating gender dysphoria. To the extent that regulating to prevent those harms requires zeroing in on those individuals most likely to risk them, such a classification is a "sensible ground for differential treatment," not the sort of irrelevant grouping that warrants heightened review. *Cleburne*, 473 U.S. at 441.

### C.  SB 150 passes intermediate scrutiny.

Even if this Court believes that SB 150 classifies by sex or that individuals who identify as transgender constitute a suspect class, the Act still does not have an equal-protection problem. The Equal Protection Clause commands that "all persons *similarly situated* . . . be treated alike." *Cleburne*, 473 U.S. at 439 (emphasis added). But males and females are not similarly situated with respect to receiving sex hormones or obtaining certain surgeries. *See supra* Section II.A. So a law targeting the unique problems inherent in providing cross-sex hormones or operating on one sex can't ignore those biological realities. *Dobbs*, 142 S. Ct. at 2245-46. Nor does the Constitution require it to. To the contrary, "fail[ing] to acknowledge ... basic biological differences ... risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *Ballard v. United States*, 329 U.S. 187, 193 (1946). And a transgender identity doesn't obviate sex-based harms. *Accord Adams*, 57 F.4th at 809-10 (upholding single-sex

bathroom policy); *B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D.W.V. Jan. 5, 2023) (upholding single-sex sports policy), *enjoined pending appeal*, 2023 WL 2803113 (4th Cir. 2023).

Biological differences are "the driving force behind the Supreme Court's sex-discrimination jurisprudence." *Adams*, 57 F.4th at 803 n.6. Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place." *Id.* at 809. Intermediate scrutiny prevents States from legislating based on "overbroad generalizations about the different talents, capacities, or preferences or males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996). For instance, States cannot presume that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster. *See, e.g.*, *id.* at 541; *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981); *Reed v. Reed*, 404 U.S. 71, 74 (1971); *Craig v. Boren*, 429 U.S. 190, 192 (1976); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975).

But applying intermediate scrutiny, rather than strict, ensures that distinctions based on "enduring" and "[i]nherent differences" between the sexes survive. *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). Indeed, such distinctions are, by their nature, substantially related to the relevant governmental interest and have thus been upheld time and time again. Consider *Michael M. v. Superior Court*, which upheld a statutory-rape statute that prohibited sex with a minor female only. 450 U.S. 464, 466 (1981). The Court explained that that classification was permissible because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant." *Id.* at 471; *accord Nguyen*, 533 U.S. at 58.

In short, biology matters, and legislatures aren't required to ignore differences rooted in biology. Rather, when preventing harms unique to one sex, legislatures can and should take sexual differences into account.

Indeed, two recent decisions demonstrate that classifications grounded in biological reality survive intermediate scrutiny, even in claims brought by transgender people. *Adams*, 57 F.4th at 803 n.3 (analysis about sex-based intermediate scrutiny would be the same if transgender individuals were a suspect class). In *Adams*, the Eleventh Circuit, sitting en banc, upheld a school's policy separating bathrooms by biological sex. *Id.* at 796. That court acknowledged that schools have a legitimate interest in "protecting the privacy interests of students" in "shielding one's body from the opposite sex." *Id.* at 803 n.6 & 805. Because that interest was grounded in real, physical differences between the sexes, the court concluded that the sex classification satisfied intermediate scrutiny. *Id.* at 807. And the school's interest didn't change even though one student identified as a member of the opposite sex because that student's self-identification could not change the "immutable characteristic[s] of biological sex" that underpinned the school's privacy interests. *Id.* at 803 n.6, 809 (citing *Frontiero*, 411 U.S. at 686).

Similarly, in *B.P.J. v. West Virginia Board of Education*, a district court upheld West Virginia's law prohibiting biological males from playing girls' sports, even if they identify as transgender. 2023 WL 111875, at *7. That's because "[w]hether a person has male or female sex chromosomes," not what gender he or she identifies as, "determines many of the physical characteristics relevant to athletic performance." *Id.* And "males [generally] outperform females because of inherent physical differences between the sexes." *Id.* To further its "interest in providing equal athletic opportunities for females," the State could "legislate sports rules" based on biological sex. *Id.* at *7-8. So too, Kentucky can legislate based on sex to prevent sex-based harms.

20

### III.    Parents Do Not Have a Substantive Right to Subject Children to these Procedures.

The parents' substantive-due-process claim likewise fails. Gender-transition procedures are a recent invention not deeply rooted in our nation's history and traditions, so the Constitution does not establish a right to obtain them. And Plaintiffs wisely do not argue that it does. Still, they try to smuggle in a right-to-gender-transition-procedures claim through a backdoor: a nominally different substantive-due-process argument that parents have the right to sign up children for gender-transition procedures.

Restrictions on other procedures confirm that parents do not possess such a right. Parents cannot veto State policy choices that apply to all citizens. Thus, if the State can permissibly ban abortion, parents don't have a separate substantive-due-process right to get their teenage daughter an abortion. *Cf. Dobbs*, 142 S. Ct. at 2257 (no right to abortion). And if the State can ban euthanasia, parents can't ask a doctor to aid in their terminally ill son's suicide. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) (no right to assisted suicide). Likewise, if States can prohibit dangerous gender-transition procedures on minors, parents have no independent right to put their preteen on puberty blockers or cross-sex hormones. In sum, parents may have a (qualified) right to decide which lawful medical procedures their children receive; they do not have the right to expand the menu of options.

No precedent suggests otherwise. True, the Supreme Court has said parents have a general substantive-due-process interest in raising their children. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (visitation); *Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (custody); *Wisconsin v. Yoder*, 406 U.S. 205, 231-32 (1972) (religious education). Even so, "a [S]tate is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham*, 442 U.S. at 603-04; *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (noting that "the [S]tate as parens patriae may restrict the parent's control ... in

many ... ways"). Parents cannot exempt children from compulsory vaccination; they do not have a constitutional right to expose their child "to ill health or death." *Id.* at 166-67. And they cannot deny their children medical treatment for serious illness or injury. *Application of Pres. & Directors of Georgetown College, Inc.*, 331 F.2d 1000, 1007 (D.C. Cir. 1964) (in chambers opinion). At most, the parents may have a substantive-due-process right to stand in the shoes of their child and make medical choices children lack legal capacity to make. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). If parents truly had a right to make health and medical decisions for their children despite state law, none of this could be true.

The parents' claim really boils down to a policy disagreement with the State. *See* Doc. 17 at 28 (SB 150 "bar[s] Parent Plaintiffs from obtaining the only medically accepted, safe, and effective treatment for their transgender children."). But Kentucky—like several European countries and many other States—weighs the (known) risks and (unproven) benefits very differently. And under our Constitution, that's Kentucky's call to make. *Dobbs*, 142 S. Ct. at 2284.

* * * * *

Whatever Plaintiffs claim, there is no evidence that gender-transition procedures are safe or efficacious. And the Constitution does not require States like Kentucky to permit those procedures anyway. To the contrary, the Constitution leaves this controversial public health issue in the hands of States—even if plaintiffs disagree. *Dobbs*, 142 S. Ct. at 2245, 2284. Because the responsibility to choose among divergent medical views rests with the State, not this Court, this Court should deny Plaintiffs' request for a preliminary injunction and allow SB 150 to go into effect.

Respectfully submitted on this 12th day of June, 2023,

/s/ Clinton J Elliott

Clinton J Elliott

Steve Marshall
    *Attorney General*
Edmund G. LaCour Jr.*
    *Solicitor General*
A. Barrett Bowdre*
    *Principal Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Clinton J Elliott
Matthew D. Doane
Doane & Elliott, P.S.C.
P.O. Box 372
120 E. Adams Street, Suite 2
La Grange, Kentucky 40031
(502) 602-0008
clint@cornerstonelawky.com
matt@cornerstonelawky.com

Tim Griffin
    *Attorney General*
Nicholas J. Bronni*
    *Solicitor General*
Dylan L. Jacobs*
    *Deputy Solicitor General*
Michael A. Cantrell*
    *Assistant Solicitor General*

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Amici Curiae*

* *pro hac vice* motion forthcoming

(Additional Amici Counsel listed below)

## ADDITIONAL COUNSEL

| | |
|---|---|
| TREG TAYLOR<br>Attorney General<br>State of Alaska | ANDREW BAILEY<br>Attorney General<br>State of Missouri |
| ASHLEY MOODY<br>Attorney General<br>State of Florida | AUSTIN KNUDSEN<br>Attorney General<br>State of Montana |
| CHRIS CARR<br>Attorney General<br>State of Georgia | MICHAEL T. HILGERS<br>Attorney General<br>State of Nebraska |
| RAÚL R. LABRADOR<br>Attorney General<br>State of Idaho | DREW H. WRIGLEY<br>Attorney General<br>State of North Dakota |
| THEODORE E. ROKITA<br>Attorney General<br>State of Indiana | ALAN WILSON<br>Attorney General<br>State of South Carolina |
| BRENNA BIRD<br>Attorney General<br>State of Iowa | MARTY JACKLEY<br>Attorney General<br>State of South Dakota |
| KRIS W. KOBACH<br>Attorney General<br>State of Kansas | SEAN REYES<br>Attorney General<br>State of Utah |
| LYNN FITCH<br>Attorney General<br>State of Mississippi | PATRICK MORRISEY<br>Attorney General<br>State of West Virginia |

**CERTIFICATE OF SERVICE**

I, Clinton J Elliott, an attorney, hereby certify that on this day a copy of the foregoing was served on all parties via this Court's CM/ECF system.

Dated: June 12, 2023

*/s/ Clinton J Elliott*
Clinton J Elliott