UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISIVLLE DIVISION

*Electronically filed*

| | |
|---|---|
| DOE 1, *et al.*<br>        Plaintiffs | |
| v. | Civil Action No. 3:23-CV-00230-DJH |
| THORNBURY, *et al.*<br>        Defendants | |
| and | |
| COMMONWEALTH OF KENTUCKY,<br>*ex rel.* ATTORNEY GENERAL DANIEL<br>CAMERON<br>        Intervening Defendant | |

---

**THE COMMONWEALTH OF KENTUCKY
*ex rel.* ATTORNEY GENERAL DANIEL CAMERON'S
EMERGENCY MOTION FOR A STAY PENDING APPEAL**

---

Pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A) and Federal Rule of Civil Procedure 62(d), the Commonwealth of Kentucky, *ex rel.* Attorney General Daniel Cameron, moves for a stay of the Court's preliminary injunction granted on June 28, 2023. Op. & Order 14–15, DN 61. So that the Commonwealth may seek appellate review expeditiously, the Commonwealth requests the following expedited briefing schedule: the Plaintiffs' response should be due on July 3, and the Commonwealth's reply should be due on July 5. The Commonwealth intends to seek relief in the Sixth Circuit by July 7.

1

Four considerations govern whether the Court should stay the district court's preliminary injunction: (i) whether the Commonwealth has made a "strong showing" it will prevail on the merits; (ii) whether the Commonwealth has established irreparable harm absent a stay; (iii) whether a stay will "substantially injure" other parties; and (iv) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). All four factors favor the Commonwealth.

## I.     The Commonwealth will prevail on the merits.

The Court found that Sections 4(2)(a)–(b) of SB 150 likely impermissibly discriminate according to sex in violation of the Equal Protection Clause and infringe on a parent's purported right to obtain a particular medical treatment for his or her child. Op. & Order 5–13, DN 61. Those conclusions are erroneous. Because the Commonwealth will prevail on the merits, this Court should stay its grant of a preliminary injunction.

### A.     The Plaintiffs' equal protection claim fails.

**1.**     In finding that Sections 4(2)(a)–(b) of SB 150 are likely unconstitutional under the Equal Protection Clause, the Court adopted wholesale the Plaintiffs' erroneous sex-based-discrimination-claims analysis. The problem with that analysis is that it upends almost 30 years of established law concerning what constitutes a sex-based classification for purposes of the Equal Protection Clause. Only when a law "closes a door or denies opportunity" to one sex versus the other is intermediate scrutiny review of that law afforded. *United States v. Virginia*, 518 U.S. 515, 532 (1996). If a law does not do that, then only rational basis review applies.

The purpose of the Equal Protection Clause is "to secure every person within the state's jurisdiction against intentional and arbitrary discrimination." *Sadie v. City of Cleveland*, 718 F.3d 596, 601 (6th Cir. 2013) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)). Intentional and arbitrary discrimination requires a "[d]iscriminatory purpose" which "implies more than intent as volition or intent as awareness of consequences." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (citation omitted). "It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 271–72 (cleaned up). This is because the Equal Protection Clause was never intended to automatically supplant a State's authority to pursue a laudable "goal" through "health and welfare laws." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246, 2284 (2022).

Forcing a State to satisfy intermediate scrutiny on every one of its laws that involves sex upsets the balance between a State's authority to protect its citizens and the protection afforded by the Equal Protection Clause. That is why the Supreme Court has always held that a law that applies to both sexes but that may affect a particular sex in a different way, like the challenged provisions here, is still reviewed for a rational basis unless the law is a "mere pretext designed to effect an invidious discrimination against members of one sex or the other." *Id.* at 2246 (cleaned up) (citation omitted). The Plaintiffs have never made such a claim, so rational basis review applies.

3

**2.** *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) continues to be inapposite to this case. Op. & Order 6–7, DN 61. The plaintiff in *Smith* was fired for "his failure to conform to sex stereotypes"—in other words, for "not being masculine enough." *Id.* at 572. Masculinity is a sex "stereotype, defined as a frame of mind resulting from irrational or uncritical analysis," *Nguyen v. INS*, 533 U.S. 53, 68 (2001), because it is shaped by one's view of how someone *should* look or act and not a person's inherent biology. The prohibitions in Sections 4(2)(a)–(b) of SB 150 are not dependent on how masculine or feminine a child is. Rather, they involve the consideration of "inherent . . . [p]hysical differences between men and women [that] are enduring." *Virginia*, 518 U.S. at 533. *Smith* did not deal with biology but turned on an employer's view of what a man *should* be. What a man should be is a stereotype. Biology is not.

Similarly, attempting to distinguish "abortion and pregnancy cases" ignores reality. Op. & Order 7, DN 57. The reason that laws about abortion and pregnancy trigger rational basis review only has nothing to do with the fact that they do "not bar access to treatment for some patients but not others depending on the patient's sex." *Id.* Of course they do. Take the Kentucky statute that "give[s] pregnant women priority in accessing" substance abuse treatment. Ky. Rev. Stat. § 218A.274. Only women can become pregnant, so preferring women over men for substance abuse treatment does, in part, depend on sex. And if the Court meant to assert that the challenged provisions are *solely* dependent on the patient's sex, that's wrong too. For example, if a female is producing *no* testosterone, she would be allowed to take it to

place her in the normal female testosterone level of 2–45 ng/dL. Laidlaw Decl., ¶ 127, DN 47-10. So the prohibitions in the challenged provisions are not solely dependent on sex.

In any event, as discussed, the real reason that abortion and pregnancy laws do not trigger heightened scrutiny is because the Supreme Court has consistently recognized that some laws that are not intended to treat one sex differently from the other may nevertheless have that effect. *Bray*, 506 U.S. at 271–73. But because the Equal Protection Clause is meant to protect against "intentional and arbitrary discrimination" only, *Sadie*, 718 F.3d at 601 (citation omitted), a challenger to such a law is required to show not merely incidental discrimination but something much stronger—"invidious" discrimination. Again, the Plaintiffs have not even attempted to make that showing here, so rational basis review applies.

At the end of the day, what has always been the case is that the challenged provisions create age-based and medical-procedure-for-a-specific-purpose-based classifications, neither of which is subject to heightened scrutiny. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) (age); *Vacco v. Quill*, 521 U.S. 793, 800–01 (1997) (medical procedure). Only minors, not adults, are prohibited from being prescribed drugs and only for the off-label purpose of attempting to alter the minor's sex-inherent characteristics. Moreover, the Plaintiffs admit that puberty blockers and cross-sex hormones were developed for reasons other than attempting to alter a minor's sex-inherent appearance. Pls.' Mot. Prel. Inj. 15, DN 17. That is a classification based on the use of the drug, not based on who is using it. And it is an

5

important distinction because puberty blockers and cross-sex hormones have far different applications and results depending on what they are used for and the duration of use. Laidlaw Decl. ¶¶ 64–152, DN 47-10.

**3.** Regardless, the Commonwealth previously explained why any level of scrutiny is satisfied. The Court did not question the compelling government interests the Commonwealth has here. Commw. Resp. Pls.' Mot. Prel. Inj. 15, DN 47. Rather, the Court essentially found that Sections 4(2)(a)–(b) of SB 150 do not actually further those interests. Op. & Order 8–10, DN 61.

To summarize some of the previous reasons given, those provisions are justified because of: (1) the serious lack of evidence supporting the use of cross-sex hormones and puberty blockers to treat children with gender dysphoria, as particularly evidenced by recent international developments calling such treatment "experimental" at best; (2) the long-term and irreversible physical and mental health consequences of using such drugs for the purposes Sections 4(2)(a)–(b) of SB 150 prohibit, including having the exact opposite effect that proponents of those purposes claim; (3) the lackadaisical way the "treatment" is employed, as evidenced in part by the stories of the Commonwealth's fact witnesses; (4) the alternative methods for treating gender dysphoria that do not involve subjecting children to long-term, irreversible damage; and (5) the inability of a child to be able to provide legitimate

6

informed consent to such treatment.[1] Commw Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24, DN 47.

It's true that hormones and puberty blockers "have a long history of safe use in minors for various conditions." Op. & Order 4, DN 61. But there is no such "long history of safe use" of such drugs on children with gender dysphoria, a reality that a plethora of sources cited by the Commonwealth have observed. *See* Commw Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24, DN 47. This is also why the Court's point "that the statute allows the same treatments for [non-gender dysphoric] minors" is inapposite and wrong. Op. & Order at 8, DN 61. There is no dispute that cross-sex hormones and puberty blockers can be beneficial for approved uses, such as precocious puberty. What is heavily disputed is the benefit of the use of these drugs to treat gender dysphoria. Commw Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24, DN 47. The latter is not the "same treatment[]" as the former.

There is also quite a lot of "evidence of . . . 'abuse, neglect, [and] mistakes' protected against by SB 150," Op. & Order 8, DN 61, as evidenced in part by the fact-witness declarations submitted by the Commonwealth showing how some in the medical community have treated children with gender dysphoria. To say the least, those witnesses—detransitioners, parents, and a whistleblower—reveal the tragic and irreversible consequences that befall individuals and their family members who

---

[1] Although the Court found that the issues before it were primarily those of law upon the parties agreement, it then proceeded to make several findings of fact without giving any real credence to the Commonwealth's evidence. Op. & Order 2, 4, 8–10, DN 61.

are subjected to the use of cross-sex hormones and puberty blockers to treat gender dysphoria. *See generally* Becker Decl., DN 47-13; Hein Decl., DN 47-14; Jane Decl., DN 47-15; Kershner Decl., DN 47-16; E.G. Decl., DN 47-17; E.T. Decl., DN 47-18; K.W. Decl., DN 47-19; Miller Decl., DN 47-20; Sheinfeld Decl., DN 47-21; Spielbauer Decl., DN 47-22; Reed Decl., DN 47-23.

Despite the Court's view to the contrary, Op. & Order 8–9, DN 61, evidence of the unscrupulous motives on the part of some in the medical profession pushing for these treatments abounds. It is undisputed that children with gender dysphoria who are given puberty blockers and cross-sex hormones will most often persist, whereas those who do not receive medical intervention have a high desistance rate. Cantor Decl., ¶¶ 113–21, 125–34; Levine Decl., ¶¶ 14(f)–(g), 96, 103–29, 138, 219–24; Laidlaw Decl., ¶¶ 55, 212–16, 264. It is also undisputed that for children who persist, the next step after using these drugs is usually surgery. Laidlaw Decl., ¶¶ 153–68; Commw. Resp. Pls.' Mot. Prel. Inj. Ex. 6 at S128–36, DN 47-6. So, respectfully, revelations akin to what happened at Vanderbilt University, Op. & Order at 8–9, DN 61, absolutely shed light on the true motivations of some of the medical professionals who push for the use of puberty blockers and cross-sex hormones on children with gender dysphoria. The pervasive conflict of interest becomes crystal clear when coupled with the evidence of the ideological takeover of the medical associations pushing for that "treatment," their practice of systematically silencing any dissent, and their self-interest in promoting that "treatment." Levine Decl., ¶¶ 60–83, 210–16, DN 47-11; Cantor Decl., ¶¶ 171–75, DN 47-9; Laidlaw Decl., ¶¶ 171–201, DN 47-10; *see also*

*Josephson v. Bendapudi*, 3:19-cv-230 (W.D. Ky.) (employment action brought by Kentucky doctor Allen Josephson, M.D., against the University of Louisville for retaliating against him for dissenting on this issue); Commw. Resp. Pls.' Mot. Prel. Inj. 21 n.5, DN 47; Family Research Council Amicus Br., DN 49-2.

Finally, the Court gave extremely short shrift to the international developments on this issue and what it called the "anecdotes from a handful of 'detransitioners.'" Op. & Order 9, DN 61. When the international consensus is that the use of cross-sex hormones and puberty blockers on children with gender dysphoria is "experimental," Commw Resp. Mot. Prel. Inj. 17–18, DN 47, that is not something to brush aside. Nor is it permissible to ignore the real-life stories of individuals whose lives have been forever changed for the worse by those pushing for that treatment. It is more than justified for the Commonwealth to ban that "treatment" and prevent its children from being subjected to such experimentation, especially when there is no true "standard of care," Op. & Order 9, DN 61, for doctors to follow in performing this experimental treatment. Levine Decl., ¶¶ 14(b)–(c), 51–83, DN 47-11.

Even if intermediate scrutiny applies here (it shouldn't), Sections 4(2)(a)–(b) of SB 150 are more than justified. While "the position of the American Medical Association" and other medical interest groups may be relevant to a "legislative committee," it does not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267; *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019) (refusing to find "that a State must surrender its authority to regulate" in a way that may not be "in accord with [alleged] 'medical practice' or

'medical purpose'"). The Kentucky General Assembly has more than enough bases to justify Sections 4(2)(a) and (b) of SB 150.

## B.   The Plaintiffs' parental-right claim fails.

The Court itself recognized that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment . . . if the government *has reasonably prohibited* that type of treatment." Op. & Order 11, DN 61 (emphasis in original) (citation omitted). So the question becomes whether Sections 4(2)(a)–(b) of SB 150 are reasonable. For the reasons previously stated, they are. Commw. Resp. Mot. Prel. Inj. 1–4, 15–24, DN 47.

The Court is mistaken that "the Commonwealth effectively concede[d] that the parent plaintiffs have a fundamental right under the Due Process Clause to choose those treatments for their children." Op. & Order 11, DN 61. The Commonwealth did not concede anything, but merely pointed out that a parent's right to direct the medical care of his or her child extends only as far as the State has not reasonably prohibited that medical care. Commw. Resp. Pls.' Mot. Prel. Inj. 5–8, DN 47. In other words, the right of the parent is simply to be the ultimate decisionmaker on the legally available care the child will receive. That right does not allow a parent to reach beyond what is legal and authorize illegal care for a child.

Even if the right is framed, as the Court frames it, as "the right to obtain established medical treatments to protect their children's health and well-being," Op. & Order 11, that does not help the Plaintiffs. To start, cross-sex hormones and puberty blockers to treat gender dysphoria may have been "available" for use before

SB 150, but their efficacy is far from "established." Commw. Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24, DN 47. Many medical professionals, most prominently those in European countries, have literally termed that treatment as "experimental." *Id.* at 17–18; *see* Op. & Order 12, DN 61 (acknowledging that precedent supports banning "experimental drugs that . . . have not been proven safe and effective" (citation omitted) (alteration of original quote omitted)). More importantly though, there are no cases (besides some nonbinding erroneous decisions on this issue) recognizing the right that the Court and the Plaintiffs proffer.

Finally, the Commonwealth did "show that SB 150 'employs the "least restrictive means" necessary to achieve its purposes.'" Op. & Order 12–13, DN 61. It explained that the evidence it presented satisfies "[w]hatever level of scrutiny is applied." Commw. Resp. Pls.' Mot. Prel. Inj. 15, DN 47. Those in the medical community employing SB 150's prohibited "treatment" have no way of knowing whether they just created an eventual detransitioner. Levine Decl., ¶ 107, DN 47-11. Put differently, they have no way of knowing whether they have imposed on a child years of delayed puberty, damaging hormones, and likely surgical mutilation that the child will come to regret but only as an adolescent or adult when it is far too late to repair the damage. And there are other ways to treat gender dysphoria that SB 150 allows for. Commw. Resp. Pls.' Mot. Prel. Inj. 21–23. The least restrictive means to ensure the prevention of long-term and irreparable harm to children is a categorical ban. There is no better way than SB 150 to protect children from treatment that causes long-term irreversible damage. *Id.* at 1–4, 15–24.

11

## II.     The other relevant factors support a stay.

**1.**     To start, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And the Kentucky Attorney General is uniquely situated to speak for "the people" as their "chief law officer." *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 363 (Ky. 2016) (citation omitted). So the interests that the Attorney General represents here are not simply those of Kentucky but also those of Kentuckians. And, as previously outlined, the children of Kentucky who are subjected to what Sections 4(2)(a)–(b) of SB 150 prohibit will be irreparably harmed absent a stay of the preliminary injunction. Commw. Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24, DN 47. So the irreparable harm factor is satisfied.

**2.**     The tragic irony in the Plaintiffs' request for a preliminary injunction is that, as previously explained, they will be irreparably harmed *without* enforcement of Sections 4(2)(a)–(b) of SB 150. *Id.* And there is simply no reason to believe that a stay of the preliminary injunction currently precluding such enforcement will substantially injure the Plaintiffs. The argument that the Plaintiffs are irreparably injured because of the purported violation of their constitutional rights assumes the success of their merits arguments, which, as explained above, have no merit. There is nothing physically wrong with the Plaintiffs. More directly, as previously explained, there is no reason to believe that Kentucky's medical professionals cannot manage the Plaintiffs' mental health in other ways, including through existing or innovative psychotherapy. Commw. Resp. Pls.' Mot. Prel. Inj. 21–24, DN 47. And not

only have the Plaintiffs failed to provide enough information for a true health assessment to be conducted, the information they have provided does not support their claims. *Id.* In fact, based on the available information, it appears the Plaintiffs' physical and mental health is getting worse but will improve once the experimentation on them ends. *Id.* Staying the preliminary injunction will ensure that improvement.

  **3.**  "It's in the public interest that we give effect to the will of the people 'by enforcing the laws they and their representatives enact.'" *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (citation omitted). But again, what is more important here is that Sections 4(2)(a)–(b) of SB 150 prevent Kentucky's children from being irreparably harmed. Commw. Resp. Pls.' Mot. Prel. Inj. 1–4, 15–24. If that doesn't sway the public interest factor in favor of the Commonwealth, what would?

## III. The scope of the district court's injunction is far too broad.

  This case involves seven Plaintiffs, but the only Plaintiffs that submitted declarations are individuals who are currently taking cross-sex hormones, puberty blockers, or a combination of both. *See generally* Doe 1 Decl., DN 17-4; Doe 2 Decl., DN 17-5; Doe 3 Decl., DN 17-6; Doe 5 Decl., DN 17-7. Despite that fact, this Court issued a statewide, categorial preliminary injunction prohibiting the enforcement of Sections 4(2)(a)–(b) under any circumstance. Op. & Order 14–15, DN 61. This includes making available cross-sex hormones and puberty blockers to children who have never taken them. The Court's injunction must be limited to the Plaintiffs who are currently taking the drugs proscribed by Sections 4(2)(a)–(b)—and no further.

The Court ignored Sixth Circuit precedent on this issue. A preliminary injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). In fact, a district court "abuse[s] its discretion" if it "extend[s] the preliminary injunction's protection to non-part[ies]" when "an injunction limited to the parties" would do. *Id.*; *see also Warshak v. United States*, 532 F.3d 521, 531 (6th Cir. 2008) ("Nor . . . was it appropriate . . . to grant a preliminary injunction in favor of persons other than [the plaintiff]. . . . [The plaintiff] did not seek class-action relief, and he has made no showing . . . why the injunction needed to run in favor of other individuals in order to protect him." (citation omitted)); *Mitchell v. City of Cincinnati*, No. 21-4061, 2022 WL 4546852, at *3–4 (6th Cir. Sept. 29, 2022) (requiring a show of "imminence" to obtain a preliminary injunction).

The Commonwealth has demonstrated that no injunction is appropriate here. But any preliminary injunctive relief should extend no further than to the Plaintiffs in this case who have begun puberty blocker or cross-sex hormone treatment. In no event should it extend further than to children who have already been subjected to cross-sex hormones and puberty blockers by some in the medical community. Despite what the Court may think, Op. & Order at 14, DN 52, the Commonwealth did offer this limitation on the scope of any preliminary injunction the Court felt inclined to award, Commw. Resp. Pls.' Mot. Prel. Inj. 24–25, DN 47. At the very least, the Court should correct that scope because it is not "impossible" to do so." Op. & Order at 14,

14

DN 61. By limiting the scope of the injunction to simply afford the Plaintiffs' current medical providers the ability to continue providing cross-sex hormones and puberty blockers to the Plaintiffs, the Plaintiffs will receive exactly what they want. Sure, their medical providers cannot treat others, but that in no way impacts the Plaintiffs' ability to receive treatment. The Plaintiffs' contention appears to be that if their medical providers cannot provide treatment to *everyone*, they will not do so for *anyone*. Pls.' Reply Mot. Prel. Inj. 14–15, DN 52. There is no evidence in the record supporting that presumptuous contention. This is just the Plaintiffs' way of attempting to bypass the burden they bear to justify the broad injunction the Court gave them.

## CONCLUSION

The Court should stay its grant of a preliminary injunction pending an appeal, or at the very least correct the scope of its injunction.

Respectfully submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

/s/ Alexander Y. Magera
Victor B. Maddox (KBA No. 43095)
Heather L. Becker (KBA No. 94360)
Jeremy J. Sylvester (KBA No. 92771)
Alexander Y. Magera (KBA No. 97708)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Heather.Becker@ky.gov
Jeremy.Sylvester@ky.gov
Alexander.Magera@ky.gov

*Counsel for the Commonwealth of Kentucky*
*ex rel. Attorney General Daniel Cameron*

## CERTIFICATE OF SERVICE

I certify that on June 29, 2023 the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

/s/ Alexander Y. Magera
*Counsel for the Commonwealth of Kentucky*
*ex rel. Attorney General Daniel Cameron*

16